# EXHIBIT A

Gregory A. Nylen (SBN 151129
GREENBERG TRAURIG, LLP
18565 Jamboree Road, Suite 500
Irvine, CA 92612
Telephone: 949.732.6500
Facsimile: 949.732.6501
nyleng@gtlaw.com

Lindsay Hutner (SBN CA 238998)
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Facsimile: 415.707.2010
Lindsay.Hutner@gtlaw.com

Adrian Nuñez (Pro Hac Vice forthcoming)
Sandra Ramirez Loe (Pro Hac Vice forthcoming)
GREENBERG TRAURIG, P.A.
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
Facsimile: 305.579.0717
nuneza@gtlaw.com
Sandra.Loe@gtlaw.com

Attorneys for Plaintiffs, Rebecca Bamberger Works, LLC d/b/a BAM Communications, a Delaware limited liability company, Llorente & Cuenca USA, Inc., a Delaware corporation; and Llorente & Cuenca Madrid S.L., a foreign corporation,

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Rebecca Bamberger Works, LLC d/b/a BAM Communications, a Delaware limited liability company; Llorente & Cuenca USA, Inc., a Delaware corporation; and Llorente & Cuenca Madrid S.L., a foreign corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>Rebecca Bamberger, an individual, RBW Holdco, Inc., a California corporation; BAM by BIG LLC, a California limited liability company; and Does 1 through 20,<br><br>        Defendants. | CASE NO. 3:24-00706-JLS-DDL<br><br>**DECLARATION OF LUISA GARCIA IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR THE ISSUANCE OF TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION, PRESERVATION ORDER, AND ORDER FOR EXPEDITED DISCOVERY** |

1

I, Luisa Garcia, hereby declare as follows:

1. I am employed by Llorente & Cuenca Madrid S.L. ("LLYC Madrid") and my current position is Global Chief Operating Officer of Llorente & Cuenca S.A. ("LLYC Group"). I am also a board member of Rebecca Bamberger Works, LLC d/b/a BAM Communications ("BAM" or "Company"). I have been a board member of BAM since January 10, 2024. I have been personally involved in BAM's operations since the acquisition by Llorente & Cuenca USA, Inc. ("LLYC"), a subsidiary of LLYC Madrid, of a majority interest in BAM in March 2023. I have personal knowledge of the following facts and can testify to them as a witness if called. I am over the age of eighteen and have not been paid for this declaration.

2. Since June 4, 2021, I have also been a board member of LLYC Group. As Global Chief Operating Officer of LLYC Group, I oversee the work of the company's human resources, information technology, financial, legal, and communications departments. My responsibilities also include supporting the company's management team in the acquisition of companies that facilitate the group's inorganic growth and with the development and implementation of the integration plans for these acquired organizations.

3. I make this declaration in support of BAM, LLYC and LLYC Madrid's Ex Parte Application for Temporary Restraining Order, Seizure Order, Order To Show Cause For Preliminary Injunction, Preservation Order, and Order for Expedited Discovery (the "Application") against BAM by BIG LLC ("BIG") and Rebecca Bamberger ("Bamberger").

**A. LLYC**

4. LLYC Madrid is part of LLYC Group, a global corporate affairs and marketing group of companies that is headquartered in Madrid, Spain.

5. LLYC Madrid is the owner of the LLYC® trademark ("LLYC Mark").



GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

6.     LLYC Madrid has and maintains all rights, title, and interest to the LLYC Mark for which it owns trademark Registration No. 6,066,337 with the United States Patent and Trademark Office ("USPTO") in connection with advertising and marketing services in Class 35, educational and informational services in Class 41, and design, research, website-hosting and other services in Class 42 ("LLYC Registration"). The LLYC Registration was issued on June 2, 2020. *A true and correct copy of the LLYC Registration is attached hereto as Exhibit 1.*

7.     Since at least 2018, LLYC Madrid additionally has and maintains all rights, title, and interest to the LLYC Mark for which it owns national and international trademark registrations in the European Union as well as in at least seven (7) countries, including Mexico, Colombia, Cuba, Brazil, Canada, United Kingdom, and Spain. LLYC *A true and correct copy of the LLYC National and International Registrations are attached hereto as Composite Exhibit 2.*

8.     LLYC Madrid is a subsidiary of Llorente & Cuenca S.A. a publicly traded (BME:LLYC) and globally recognized corporate affairs and marketing firm headquartered in Madrid, Spain. LLYC Group advises companies in their corporate communications, public affairs, crisis and issues, advertising and branding, paid media and performance and other related challenges.

9.     LLYC Madrid has spent substantial time, resources, and money to develop, grow, promote, and protect the LLYC® Mark, the result of which is that consumers have come to associate the LLYC Mark with LLYC Madrid's, and its affiliates, high-quality services.

10.     The "LLYC" name is well-known worldwide and the LLYC Mark derives significant recognition and value from its use in association with the LLYC brand and family of companies.

11.     Continued and broad use of the LLYC Mark by LLYC Madrid and its affiliates, predecessors-in-interest, and licensees have made the LLYC brand famous in the global communications, digital marketing, and PR world. The LLYC Mark is a highly-

GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

visible symbol of LLYC's history and reputation.

12.     LLYC Madrid and its affiliates have spent millions of dollars in growing, advertising, and promoting LLYC's services over the years. In 2023 alone, LLYC Madrid spent more than $███████ marketing, advertising, promoting and growing the LLYC brand.

13.     Since its formation in 1995, LLYC Group has gained recognition as one of the most reputable firms in its sector, both internationally and in each of the countries it operates.  It is, according to PR Week, the most relevant publication in its industry, amongst the largest forty (40) communications companies in the world.[1]

14.     LLYC Group has also been the recipient of many relevant awards.  Just in 2023, the company and its initiatives or campaigns have earned seventy-one (71) awards, including Provoke's recognition as Consultancy of the year in Latin America and being the "Most awarded Comms Agency of the year" at the International Business Awards, which LLYC Group has been for five consecutive years).  The recognition of LLYC Group as a brand is also evident throughout its social media, with more than 206,000 followers in Linkedin and more than 33,000 followers in X (former Twitter).

15.     Also in 2023, LLYC Group was mentioned in 17,000 news pieces in Europe, Latin America and the USA, mostly for its activity in thought leadership, its financial results, and the recognitions mentioned above.  In 2024, to name some very recent examples, LLYC Group has been named the Best Digital Marketing Agency in Mexico by Merca2.0 and has ranked amongst the Top 10 global firms for financial communications by MergerMarket.  LLYC Group's brand recognition is fundamental for its business, since as a consultancy firm all its services are offered under this one-brand umbrella.  Even acquired companies, such as the case of BAM, are endorsed with LLYC Group's brand (as in BAM by LLYC) to increase and enrich this brand asset.

---

[1]     https://www.prweek.com/article/1821395/agency-business-report-2023-rankings-table.

4

**B. BAM and Rebecca Bamberger**

16. In March 2023, LLYC acquired a majority interest in BAM, which was previously wholly owned by Bamberger. The remaining interest in BAM is held by Bamberger's corporation, RBW Holdco, Inc. ("RBW").

17. BAM is a United States based public relations ("PR") and digital marketing agency. BAM, among many other things, designs and drives stories for technology and venture capital brands by implementing transmedia creative campaigns.

18. Since approximately 2006, BAM developed, has owned, and used the mark BAM ("BAM Mark") in connection with and to promote BAM's PR and marketing services ("BAM Services").



**BAM Logo**

19. Since BAM's creation through the present, Bamberger has acted as BAM's chief executive officer ("CEO") and controlled BAM's operations and finances.

20. BAM owns and advertises its services through the domain <bamtheagency.com> ("BAM Domain").

**C. BAM is Acquired by LLYC**

21. On March 30, 2023, as part of LLYC's acquisition of BAM, LLYC, Bamberger, and RBW executed a certain Membership Interest Purchase Agreement ("Purchase Agreement"), wherein RBW and Bamberger sold 80% of BAM's equity to LLYC for an initial valuation of $10,548,000 (subject to adjustments). LLYC purchased a majority of BAM and, indirectly, the goodwill of the Company and its intellectual property, including BAM's confidential information, trade secrets and trademarks. *A true and correct copy of the Purchase Agreement is attached hereto as Exhibit 3.*

22. Bamberger and RBW sold 80% of their equity of BAM to LLYC, which included the BAM Mark, BAM Domain, and BAM's intellectual property, at great cost to

5

LLYC.

23.     On the same day, LLYC entered into a Restrictive Covenants Agreement with RBW and Bamberger setting forth certain restrictive covenants.  The Restrictive Covenants Agreement was executed to allow LLYC the benefit of the bargain set forth in the Purchase Agreement, namely for LLYC to obtain and protect BAM's "substantial relationships with its customers, suppliers, employees and other business relations," which Bamberger would "have and . . . continue to have access to such persons and derive substantial value from the Confidential Information of [BAM]," and also for LLYC to protect its legitimate business interests of the "substantial relationships with numerous existing and prospective customers and the goodwill of [BAM]."  Restrictive Covenants Agreement §§ F; G.  *A true and correct copy of the Restrictive Covenants Agreement is attached hereto as Exhibit 4.*

24.     Also on March 30, 2023, BAM and Bamberger executed a certain Employment Agreement, outlining the conditions of Bamberger's continued employment as CEO of BAM ("Employment Agreement").  *A true and correct copy of the Employment Agreement is attached hereto as Exhibit 5.*

25.     Bamberger continued to operate BAM as BAM's CEO, at the direction and guidance of BAM's Board of Managers (the "Board"), under the BAM Mark.  After the acquisition, LLYC incorporated the LLYC Mark into the BAM branding creating the new mark and logo "BAM by LLYC."

**BAM Logo**                              **(New) BAM Logo using LLYC Mark**

26.     The BAM Mark is hereby referred to as the "Old BAM Mark" and the new mark incorporating the LLYC Mark is hereby referred to as the "BAM BY LLYC Mark."

27.     The BAM BY LLYC Mark highlighted the inclusion of BAM into the LLYC

6

family, and associated BAM with the global success and notoriety of the LLYC Mark.

28.     BAM began utilizing the BAM BY LLYC Mark in all aspects of BAM's Services including but not limited to its internal and published documents, customer communications, and to advertise its services, including the BAM Domain.

29.     Finally, on March 30, 2023, BAM, LLYC, RBW and Bamberger executed the Amended and Restated Operating Agreement for BAM ("Operating Agreement"), reorganizing BAM's operations under the new ownership structure. *A true and correct copy of the Operating Agreement is attached hereto as Exhibit 6.*

30.     Pursuant to the Operating Agreement, BAM was managed by the Board, which consisted of two members appointed by LLYC (originally, Alejandro Romero Paniagua and Jose Luis Di Girolamo) and one member appointed by RBW (Bamberger). *See* Operating Agreement, § 6.1(a)-(b).

31.     On January 10, 2024, LLYC appointed me to the Board to replace Jose Luis Di Girolamo.

**D. BAM's Confidential Information, Trade Secrets and Intellectual Property**

32.     Over the course of approximately 18 years as part of its business operations, BAM originated and developed several forms of confidential information, trade secrets, and intellectual property that were and are confidential and proprietary to BAM.

33.     BAM's confidential information, trade secrets and intellectual property include, amongst other things:

a.      Financial information, including pro forma financial statements;

b.      Business development strategies, plans, proposals, and policies and procedures, including its business models;

c.      New business development information, including business credentials, proposals presented and feedback received, budgeting policies and examples for new businesses, portfolio of services (provided by BAM or other LLYC companies), sales policies and procedure, case studies, and customer relationship management ("CRM") information: leads, past proposals, contact information;

7

d.      Contact database, which is a discrete dataset that includes the names, contact information and other important business information with respect to BAM's partners, customers, targets, and employees, amongst other individuals;

e.      Client list and database containing research and experience regarding client relationships;

f.      Client information, including proposals approved by clients, contracts or terms of agreement with clients, confidential information of clients' activity before it is made public, templates and formats for communications plans, status reports and results presentations, methodologies and materials to implement communications activities (checklists, documents and presentations for media trainings, events, press releases, and news pitches), client strategies and action plans, and databases of people in current and past clients and their contact information;

g.      Third-party outreach, including a media and journalist database, key opinion leaders and influencers database, third-party biographies and profiles, and contracts and agreements with strategic partners;

h.      Financial information, business plans, business intelligence reports, pricing, contracts, client budgeting and payment and conditions of suppliers;

i.      Human resources, recruitment documents, competence dictionary, compensation policies, and training materials;

j.  The Old BAM Mark; and

k.  The BAM BY LLYC Mark.

**E. BAM Protects the Confidentiality of its Documents, Trade Secrets and Business Information**

34.    From its creation, BAM implemented certain steps to protect its trade secrets and confidential information, which include, but are not limited to:

a.      Limiting access of its trade secrets and confidential information to only those individuals or entities that have a legitimate business need to have access to the information;

8

b. Requiring employees to read and sign a comprehensive employee handbook, which includes an expansive and detailed definition of what constitutes confidential information, which includes BAM's trade secrets and trademarks, and provides how and when such information may be used and/or distributed;

c. Requiring employees to sign a confidentiality agreement as part of their employment offer and onboarding, prior to being granted access to BAM's confidential information;

d. Storing all BAM information in a secure database requiring a unique login and password (with complexity requirements) for access; and

e. Requiring a two-factor authentication to access BAM's accounts.

*A true and correct copy of BAM's Employee Handbook and an example of the employee Confidentiality Agreement are attached hereto as Exhibit 7.*

35. Similarly, Bamberger agreed to protect at all time BAM's confidential business information and trade secrets. Article IV of her Employment Agreement with BAM prohibits Bamberger's dissemination of BAM's Confidential Information, which it defines as:

> [A]ll trade secrets and information disclosed to [Bamberger] or known by [Bamberger] as a consequence of or through the unique position of her employment or relationship with [BAM] . . . prior to or after the Effective Date, and that is not generally or publicly known (other than as a result of unauthorized disclosure by [Bamberger]), about [BAM] or any of its Affiliates or the Business. Confidential Information includes, but is not limited to, inventions, ideas, designs, computer programs, circuits, schematics, formulas, algorithms, trade secrets, works of authorship, mask works, developmental or experimental work, processes, techniques, improvements, methods of manufacturing, know-how, data, financial information and forecasts, product plans, marketing plans and strategies, price lists, customer lists, client information, client lists of any existing or prospective customer, data, distributor lists, documentation, and buyer lists of any of [BAM] or any of its Affiliates, and other information, in whatever form disclosed, relating to any of [BAM] or any of its Affiliates or the Business, including, but not limited to, financial statements, financial projections, business plans, listings and contractual obligations and terms thereof, components of intellectual

9

property, unique designs, methods of manufacturing or other technology of any of Employer or any of its Affiliates.

Employment Agreement, § 1.1(k).

36.    The Employment Agreement proscribes Bamberger from directly competing with BAM or soliciting BAM's employees or customers during her Term of Employment as defined in the agreement.  The Employment Agreement defines competitive business as:

[A]ny Person, business or enterprise, other than [BAM] and/or its Affiliates, that engages, directly or indirectly, in any portion of the Business; provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

Employment Agreement, § 1.1(j).  And further provides, in relevant part, that:

**[D]uring the Term of Employment, [Bamberger] will not, either on her own account, jointly with another, or for or on behalf of any Person (other than [BAM] or any of its Affiliates), directly or indirectly:**

(a) **own, manage or control, or become engaged or serve as a shareholder, bondholder, creditor, officer, director, partner, member, employee, agent, consultant, advisor, or representative of, any Competitive Business**; provided, however, that Executive and her Affiliates may passively hold up to 1% of the outstanding publicly-traded securities of a Person engaged in a Competitive Business for investment purposes only;

(b) **solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any Competitive Business**, or promote or assist, financially or otherwise, any Person engaged in any Competitive Business;

(d) **recruit, induce, solicit, or employ, or in any manner attempt to recruit, induce, solicit, or employ, any Person that is at such time, or during the previous 12 month period was, an employee, independent contractor, or consultant of any of Employer or any of its Affiliates, for the purpose of participating in a Competitive Business**;

(e) **solicit any Person that is at such time, or during the previous two year period was, (i) a customer, supplier or business associate of any of**

10

**Employer or any of its Affiliates**, . . .

(f) **cause or seek to cause to be terminated or adversely affected, or otherwise interfere with, any agreement or arrangement of any kind to which any of Employer or any of its Affiliates is a party or from which they benefit**; or

(g) **seek to interfere with or adversely affect the ongoing relationships between any of Employer or any of its Affiliates, on the one hand, and their suppliers, customers and professional and business contacts, on the other hand**.

Employment Agreement, § 4.1 (emphasis added).

37.     The Operating Agreement contains "Restrictive Covenants" under Section 4.7 ("OA Restrictive Covenants") that provide protections for (1) the use and dissemination of BAM's Confidential Information, as defined under the Purchase Agreement; and (2) BAM against competition and solicitation from any of the Operating Agreement's signatories.

38.     The Purchase Agreement also provides similar protections for BAM's confidential information under Section 6.04, and states in pertinent part:

> [E]ach Seller Party shall, and shall cause his or its respective Affiliates to, hold, and shall use his or its reasonable best efforts to cause his or its respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business or the Company . . . .

Purchase Agreement, § 6.04.

39.     After the acquisition, LLYC added security protections to BAM's digitally stored information, including heightened password protections and two-factor authentication, an email security platform, cloud security, and endpoint security. LLYC added these security measures to further enhance the protections afforded to BAM's Confidential Information.

**F.  BAM's Bank Accounts**

40.     At the time of the acquisition, BAM's bank account was held at Chase Bank ("Chase"). The Chase account held approximately $800,000.

41.     One of LLYC's policies required BAM to add a dual signatory requirement to

11

any Company bank account.

42. Bamberger represented to the Board that Chase did not allow her to add the dual signatory requirement to BAM's Chase account.

43. Based on Bamberger's representations regarding the Chase bank account, BAM opened a new bank account with HSBC bank ("HSBC"). HSBC allowed BAM to add a dual signatory requirement for payments and transfers made from the account.

44. BAM added the dual signatory required to its HSBC account.

45. After BAM opened the HSBC account, the Board directed and resolved that Bamberger would (1) transfer all monies from the Chase account to the HSBC account; (2) close the Chase bank account; (3) inform LLYC's financial department of any payments that were linked to the Chase bank account to ensure that all expenses would be timely and properly paid through the HSBC bank account; and (4) provide BAM's clients with the new HSBC bank account for payments of invoices going forward.

## G. Bamberger Improper Use of BAM's Chase Bank Account

46. In late 2023, the Board reiterated its decision to close the Chase bank account and directed Bamberger to transfer the $800,000 Chase funds into BAM's HSBC account.

47. On October 21, 2023, without justification or Board approval, Bamberger withdrew $100,000 from the Chase account.

48. Throughout 2023, Bamberger additionally utilized BAM's corporate account to charge $18,000 in net unjustified expenses.

49. In 2023, Bamberger without justification or Board approval charged, withdrew or transferred a total of at least $118,000 from BAM's Chase bank account.

50. On January 12, 2024, Bamberger caused $20,000 to be transferred from BAM's Chase account to her personal account.

51. On February 9, 2024, Bamberger caused an additional $50,000 to be transferred from BAM's Chase account to her personal account. Between 2023 and February 2024, Bamberger diverted at least $238,000 from BAM's Chase account ("First Diversion").

12

**H. Bamberger Creates Companies to Steal from BAM**

52.     October 19, 2023, Bamberger registered two new companies with the California Secretary of State, VC Comms Con LLC ("VC Comms") and Big Magical Events LLC ("Big Magical"), listing herself as the sole member of each company.

53.     From August 2023 through December 2023, BAM performed services for VC Comms and Big Magical for which BAM issued invoices numbered 7402, 7447, 7504, 7545, 7581, 7401, 7409, 7459, 7464, 7506, 7511, and 7553. *A true and correct copy of the VC Comms and BIG Magical Invoices is attached hereto as Composite Exhibit 8.*

54.     Bamberger directed BAM employee Britney Metheny to email her any invoices directed at VC Comms or Big Magical.

55.     BAM issued the invoices to VC Comms and Big Magical and emailed them to Bamberger, at her BAM email address <rebecca@bamtheagency.com>.

56.     Neither VC Comms nor Big Magical have paid any of the invoices to BAM.

57.     On February 16, 2024, Bamberger caused both VC Comms and Big Magical to dissolve.

58.     To date, VC Comms still owes BAM at least $100,000.00.

59.     To date, BIG Magical still owes BAM at least $152,929.43.

**I.   Bamberger Misrepresented Her Actions to the Board**

60.     On February 14 and 15, Bamberger attended several in-person meetings in Madrid, Spain with me, the Chairman of LLYC's board and LLYC Group's Chief Financial Officer to discuss BAM, the management of the Company, and other operational concerns.

61.     During these meetings, LLYC's representatives offered support for improving BAM's business results, such as including LLYC's services in BAM's portfolio of services. These services include marketing solutions like paid media or deep learning capabilities based on artificial intelligence ("AI").

62.     During the first of the meetings, LLYC Group's CFO reminded Bamberger of the need to transfer the Company's funds that were in BAM's Chase Bank Account to BAM's HSBC Bank Account.  Bamberger stated that she needed to be back in the US to

13

approve and order that transfer since online banking had a lesser limit for transfers. Bamberger agreed that she would transfer the funds as soon as she returned to San Diego. She travelled back on February 15; however, to date the transfer has not been made.

63.     On March 12, 2024, Bamberger attended a BAM Board meeting where the First Diversion was discussed.

64.     The Board discussed, among other things, BAM's financial situation and the concerning nature of Bamberger's expenditures, the improper use of BAM's funds and Bamberger's failure to transfer the monies from the BAM's Chase account to BAM's HSBC account.

65.     During the meeting, as recorded in the approved Board meeting minutes, Bamberger agreed to either justify or pay back the First Diversion.  *A true and correct copy of the March 12, 2024 Board Meeting Minutes is attached hereto as Exhibit 9.*

**J.     Bamberger Diverts Additional BAM Funds Without Authorization or Approval**

66.     Just two after the March 12 Board meeting, on March 14, 2024, Bamberger transferred an additional $150,000 from BAM's Chase account to her personal account.

67.     As of March 14, 2024, Bamberger had diverted at least $338,000 from BAM's Chase, without explanation, authorization or Board approval.

68.     On April 1, 2024, Bamberger attended another BAM Board meeting.

69.     During the April 1, 2024 meeting, the Board discussed, among other things, the financial situation of BAM, VC Comms and Big Magical's failure to pay BAM, as well as a third company called Outlines, and the concerning nature of Bamberger's expenditures, improper use of BAM's funds, and her failure to transfer BAM monies from the Chase to the HSBC Bank account.

70.     The Board directed and resolved Bamberger to collect the outstanding invoices of VC Comms, Big Magical, and Outlines or to pursue legal action against the companies.

71.     As of April 1, 2024, Bamberger had only transferred $125,000 to BAM's HSBC account.

14

72.   As recorded in the Board meeting minutes, the Board directed Bamberger to transfer the remaining balance of from BAM's Chase account to BAM's HSBC account. To this date, Bamberger has failed to act.  *A true and correct copy of the April 1, 2024 Board Meeting Minutes is attached hereto as Exhibit 10.*

73.   The Board also discussed the distribution of dividends but determined that no cash distribution could be done after reviewing BAM's bank accounts and considering the expected revenues of the Company.

74.   The Board's decision not to distribute dividends was directly affected by Bamberger's unwillingness and failure to return monies to BAM or collect on outstanding services to Bamberger's related businesses, and other open accounts.

**K**.   **BAM Uncovers Bamberger's Scheme to Steal BAM's Business and Value**

75.   On April 4, 2024, LLYC was contacted by a concerned and confused customer, EverestLabs, regarding a duplicate invoice it received for services performed by BAM because the duplicate invoice was issued by a different entity and directed payment to new bank account.

76.   The customer's email stated, "[w]e are receiving separate mails from BAM By BIG for PR services for the same amount but with different bank details.  Can you please confirm if the invoice from LLYC and BAM By Big are the same or different?"  The email contained the two invoices that the client received:

a.   A March 6, 2024, BAM issued invoice No. 000053200082 directed at BAM's client EverestLabs in the amount of $15,750, for PR services performed by BAM in March 2024 directing payment to BAM's bank account.

b.   An April 2024 invoice issued by an entity named BAM by BIG LLC ("BIG") back-dated March 6, 2024 bearing No. 0053200082 (the same as BAM's invoice number) to BAM's client EverestLabs in the amount of $15,570, also for PR services performed by BAM in March 2024 directing payment to BIG's bank account.

c.   The unauthorized duplicate invoice directing payment to be made to

15

BIG (instead of BAM) and included the following contact information, "2855 5th Avenue, #802, San Diego, CA 92103," which is the same home address Bamberger used for receiving notices under the Purchase Agreement.  The invoice from "BAM by BIG" included the BAM mark without authorization.  Images of the two invoices are below.



*A true and correct copy of the BAM Invoice and BIG Duplicate Invoice are attached hereto as Composite Exhibit 11.*

77.    Upon being notified by EverestLabs, LLYC and BAM were prompted to conduct a thorough internal investigation and review of BAM's operations and systems.

**L.    <u>BAM and LLYC Unravel Bamberger's BIG Scheme</u>**

78.    Through its investigation, BAM learned that on February 16, 2024, the day after Bamberger returned from the Board meeting in Madrid, Bamberger formed BIG, a copycat company using BAM's name and mark without BAM's consent.

79.    Bamberger listed herself as the sole member of BIG in the public records filed with the State of California.  *A true and correct copy of BIG's Registration is attached hereto as Exhibit 12.*

80.    On that same day, Bamberger registered the domain name <bambybig.agency>, which incorporates the BAM Mark in its entirety ("BIG's Infringing Domain").  BIG's Infringing Domain includes an exact duplicate of all the web pages used by the BAM Domain:

16



GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

81. BIG's Infringing Domain includes links to BAM's email and displays BAM's personnel and services:



82. To cause further confusion, BIG's Infringing Domain links consumers to contact BAM at <hello@bamtheagency.com>:

mailto:hello@bamtheagency.com

83. Through the investigation, LLYC and BAM discovered documents that show how Bamberger and BIG have stolen BAM's confidential information, including its trade secrets, trademarks, and goodwill, and continue to create customer confusion by using the BAM and LLYC Marks and reputation in order to lure customers to BIG, whether for current or prospective customers.

     i.   *Bamberger's Detailed Timeline to Steal BAM's Confidential Information, Marks and Value*

84. I was surprised to learn that the investigation uncovered an internal document created by Bamberger that details her scheme and timeline to create BIG and execute her plans to steal BAM's operations. This document describes the dates, actions and methods through which Bamberger planned to steal all of BAM's operations, valuable confidential

18

information, trade secrets from under BAM and LLYC, without any compensation, by transferring all of BAM's confidential information, assets, clients, accounts receivables, and reputation to BIG, all the while using BAM's personnel to carry out her deceitful scheme.

85.   Bamberger's written timeline outlines each specific task Bamberger planned, which she then assigned to BAM's employees and herself, to effectuate the transfer of BAM's entire business, information, and assets to BIG.  Bamberger titled the document the "April 1 transition timeline" ("Heist Transition Document").  *A true and correct copy of the Heist Transition Document is attached hereto as Exhibit 13.*

86.   The Heist Transition Document includes daily documented tasks, which BAM's investigation discovered that have been diligently performed, including draft communications to be sent out to clients and LLYC.  Many of these tasks were marked as completed in the version of the Heist Transition Document uncovered during the investigation.  The documented tasks include, but are not limited to:

a.   March 13, 2024: Holding a meeting with bookkeeping team to prepare invoice strategy.

b.   March 14, 2024: Setting up email accounts for users under the BAMbyBIG.agency domain, initiating the business transfer with new clients closed as of March 15, establishing a new bank account, obtaining invoicing software, developing a master service agreement template for BIG, and meeting with third-party vendor to transfer BAM's website to BIG.

c.   March 15, 2024: delegating access of BAM's website to a third-party to facilitate the redirection of BAM's website to BIG's new website ("BIG's Infringing Website")—rendering BAM unable to access its own website.

d.   March 18, 2024: emailing clients to inform them of the domain "transition" from BAM's Domain to BIG's Infringing Domain, ***change in accounting***, ***start transferring all client files to BIG's document storage system***, ***start transferring BAM's drive to BIG's Drive***, working with vendor to ***redirect BAM's website to BIG's new website***.

19

e.      March 21, 2024: reviewing and revising BIG's new website, recreating calendar invites for clients from BIG's new email domain.

f.      March 25, 2024: sending new invoices to clients containing BIG's bank information and calling clients to ensure new invoices were received and that clients would pay the invoices to BIG's bank account, "particularly if they [were] behind."

g.      April 1, 2024: setting automatic forwarding from BAM's email to BIG's new email accounts, and confirming entire BAM drive was transferred to new BIG drive.

87.     As previously mentioned, the Heist Transition Document includes a script for an email to clients noting that BAM was "updating" its email, invoicing system, and website domain.  The correspondence script states:

**NOTE TO CLIENTS:**

Update to BAM website, email, and billing

Hi Kody and Helen-Reaching out with a few updates for you though I know we are wrapping up shortly!

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. **I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for.** In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April Fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

- A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.
- A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly if it applies.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at 619-917-5109. I'll be in touch with further messaging about our transition as needed.

GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

88. The Heist Transition Document also includes a directive to communicate with clients the "transition" from BAM to BIG, directing BAM's employees to emphasize to the clients that "**Nothing is changing with your team, how we operate, or what we stand for.**" (Emphasis in original).

89. Bamberger shared the Heist Transition Document as a Google Drive shared document with certain BAM's employees and assigned them (as well as herself) tasks for completing the transition to BIG. Bamberger and BAM's employees then added comments to the Heist Transition Document.

## M.   Bamberger Executes the Heist Transition Document

90. On or about March 13, 2024, Bamberger, together with BAM employees Mike Melvin ("Melvin") , Ramel Wallace ("Wallace"), Brenda Manea ("Manea"), Jane Giuffrida ("Giuffrida"), Sarah Pekala ("Pekala"), Jill Velahn, ("Velahn"), and Camila Contreras Merlo Flores ("Flores") (collectively, the "BAM Transition Employees"), began executing the tasks in the Heist Transition Document.

91. Bamberger, or someone on her behalf, opened a bank account for BIG with Chase bank, ending in 7686—Chase was the bank holding BAM's old operating account previously under Bamberger's control that she was required to transfer to HSBC.

   i. *Bamberger Steals BAM's Confidential Information, Trade Secrets and Trademarks*

92. On or about March 18, 2024, following the Heist Transition Document, Bamberger emailed BAM's clients, including EverestLabs, under the guise that she was sending an "Update to BAM website, email and billing."

93. In her email, Bamberger followed the script laid out in the Heist Transition Document and told BAM's clients BAM was transitioning its website, email, and billing and that BAM was transitioning to a new brand: BIG. The email included the BAM by LLYC logo. *A true and correct copy of certain of Bamberger's March 18, 2024 Emails are attached hereto as Exhibit 14.*

94. Bamberger's correspondence and actions have followed the planned steps laid

21

out in her Heist Transition Document.  *A true and correct copy of Examples of Bamberger's March 18, 2024 Update to BAM website, email and billing Communications Following the Heist Transition Document are attached hereto as Exhibit 15.*

95.    Bamberger also executed her plan to transition BAM's clients to BIG's email address.

96.    Bamberger, either directly or through a BAM employee, obtained a new logo for BIG, which used the Old BAM Mark.



| BAM logo | (New) BIG logo using BAM Mark |
|----------|-------------------------------|

97.    The BIG infringing mark copies BAM's Old Mark without any authorization.

98.    Bamberger then changed her email signature in their BAM email, to direct clients to BIG's Infringing Domain and listing BIG's Infringing Website furthering adding to the confusion BAM's clients experienced.



99.    Incredibly, despite the efforts of BAM to protect all of its Confidential Information and trade secrets, it appears Bamberger, either directly or through BAM's employees, created a *publicly-accessible* Google Drive for BIG ("BIG's Drive").

100.    Bamberger caused all of BAM's documents, including its confidential information and client information to be transferred into BIG's Drive.

101.    Having BAM's confidential information in a publicly accessible drive is

GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

extremely concerning to BAM and LLYC and can be devasting to BAM's business if that information is released to third-parties or further used by BIG.

102. BIG's Drive appears to have little to no protections to keep the confidentiality of BAM's confidential information and trade secrets.

103. BIG's Drive is accessible to the public with the use of the URL █████████████████████████████████████████████████████

104. While BIG's Drive contains a folder titled "BAM Drive," the drive and its folders and content was not authorized nor does it belong to BAM, the Board or LLYC.

### ii. *Unauthorized Use of BAM's Confidential Information, Trade Secrets and Trademarks*

105. On or about March 20, 2024, Bamberger started to communicate with BAM's clients to inform them that their new alias would be under the domain <@bambybig.agency>.

106. Bamberger caused all of BAM's website traffic intended for <bamtheagency.com> to be redirected to BIG's Infringing Website at <bambybig.agency>, BIG's Infringing Domain. Any person attempting to visit BAM's website is automatically and ***without notification*** redirected to BIG's Infringing Website.

| General | |
|---|---|
| Request URL: | https://www.bamtheagency.com/ |
| Request Method: | GET |
| Status Code: | 🟠 301 Moved Permanently |
| Remote Address: | [2606:2c40::c73c:67e4]:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

| Response Headers | |
|---|---|
| Alt-Svc: | h3=":443"; ma=86400 |
| Cache-Control: | max-age=120 |
| Cf-Ray: | 8724a4173f7d4c1b-MIA |
| Content-Length: | 0 |
| Content-Security-Policy: | upgrade-insecure-requests |
| Date: | Wed, 10 Apr 2024 18:01:14 GMT |
| Location: | https://www.bambybig.agency/home |
| Nel: | {"success_fraction":0.01,"report_to":"cf-nel","max_age":604800} |
| Report-To: | {"endpoints":[{"url":"https:\/\/a.nel.cloudflare.com\/report\/v4?s=S64SW%2BApqLrpCy2SBdNRaKILIW%2FvmVsQSReg4xStJsccO0MfxcoW9rHdJ6iP7Tj9m0NBhnqkkXlBDahs%2B%2BAOY6NgQfM%2FSNQ%2FcbgrZuujpDEW9lChP0CyNH1Xa08W%2Be987wAMGExtJBQUXc7Hj8fl3Xxm"}],"group":"cf-nel","max_age":604800} |
| Server: | cloudflare |
| Strict-Transport-Security: | max-age=31536000 |
| Vary: | Accept-Encoding |
| X-Hs-Mapping-Id: | 34977360275 |
| X-Hs-Mapping-Only-After-Not-Found: | no |
| X-Hs-Prerendered: | Tue, 09 Apr 2024 06:21:02 GMT |
| X-Hs-Route-Prefix: | http://www.bamtheagency.com |

107. By hijacking BAM's <bamtheagency.com> domain name and the BAM BY LLYC Mark, BIG, without any authorization from BAM's Board, is promoting and selling its own, directly competing services (in violation of the noncompete provisions of the parties' agreements), using the counterfeit mark BAM BY LLYC.

108. BIG's Infringing Website contains the BAM BY LLYC Mark *without authorization* from either BAM or LLYC Madrid:

| **BAM website** bamtheagency.com/about | **BIG website Using BAM BY LLYC's Mark** bambybig.agency/about |
|---|---|
|  |  |

*A true and correct copy of Screenshots of BIG's Infringing Website are attached hereto as Exhibit 16.*

109. BIG's Infringing Website unlawfully displays the BAM BY LLYC Mark on every page.

110. BIG's Infringing Website is a near-identical copy of BAM's own website.

111. In fact, the "About Us" section of BIG's Infringing Website, among others, is plagiarized directly from BAM's <bamtheagency.com> website:

24

GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

We started in 2008 back when the economy wasn't great and tech wasn't everything. Our founder was a journalist, knew media mattered, and bet technology would change the world as well as our everyday lives. Today, we're a team of 30+ BAMfs who love storytelling. In 2023, BAM was acquired by LLYC, a global communications, digital marketing, and consulting firm.

112.    By redirecting BAM's <bamtheagency.com> domain to BIG's Infringing Website, copying BAM's website, featuring the BAM BY LLYC Mark on every page of BIG's Infringing Website, and referencing LLYC's 2023 acquisition of BAM on the same, Bamberger is deceiving and confusing BAM's current and prospective customers into believing that BIG's Infringing Website and services emanate from BAM and LLYC, or are associated with, sponsored, or approved by BAM and LLYC when they are not.

113.    According to publicly available records, BIG is operating its competing business and BIG's Infringing Website (using the counterfeit mark BAM BY LLYC) from 2855 5th Avenue #802, San Diego, CA 92103 ("Designated Address")—Bamberger's residence.

### iii.    *Bamberger Scheme to Steal of BAM's Clients*

114.    Beyond the taking of BAM's website and holding BIG out as the new BAM, Bamberger also planned to take BAM's clients.  On or around March 2024, BAM's employees prepared a list of BAM's current clients with their contact information for Bamberger to reach out to BAM's clients to transition them to BIG.  The document titled "Client Transition Email Contacts 3.14.24" included notes regarding certain clients.  One

25

of the notes related to BAM's client The Venture City stated "RECOMMEND SKIPPING SINCE LLYC IS TAPPED In." In response Bamberger noted: "SKIPPED." *A true and correct copy of the Client Transition Email Contracts Document is attached hereto as Exhibit 17.*

115. On or around March 2024, Bamberger, directly or through BAM's employees, started to send invoices to BAM's clients directing them to send payment to BIG's Chase bank account for the services performed by BAM.

116. Additionally, Bamberger, directly or through BAM's employees, is sending emails with duplicate, fake invoices attempting to take the place of any BAM outstanding invoice ("Fake Invoices"). The Fake Invoices direct BAM's clients to send payment due to BAM for the services performed by BAM to BIG's new Chase account.

117. Additionally, Bamberger continues to use BAM's human capital, confidential information, trade secrets and trademarks to perform work under her counterfeit company: BIG.

### iv.  *Bamberger and BIG Are Confusing BAM's Clients*

118. Bamberger's and BIG's duplication of BAM's operations and services is of great concern as it is frustrating BAM's business and causing significant confusion amongst the employees and clients. Their actions have and continue to affect BAM by diverting human and financial resources away from BAM and confusing BAM's clients.

119. Bamberger's and BIG's use of the identical BAM Mark and BAM BY LLYC Mark also is causing confusion among current customers who have been contacted by BIG for payment or services that rightfully belong to BAM.

120. Since starting our investigation, BAM and LLYC have uncovered numerous examples of customer confusion. The amount of confused clients continues to grow as more and more of BAM's clients receive BIG's Fake Invoices and communications from BIG's Infringing Domain.

*Geonomics plc*

121. For example, on March 25, 2024, BAM's client Genomics plc inquired about

26

the bank account details where it should direct its outstanding payment for March noting that Bamberger had communicated BAM's bank account details would be changing. In response, Melvin represented that he was "the head of finance at **BAM**" but proceeded to give Genomics BIG's bank account information of payment of the invoices. *A true and correct copy of the Genomics plc correspondence is attached hereto as Exhibit 18.*

*Bikky*

122. Bamberger's and BIG's actions have not only confused consumers but Bamberger and BIG are also financially benefiting from their use of the BAM BY LLYC and BAM Marks. On March 3, 2024, Bamberger prepared a proposal for a new "BAM" client. The proposal however, included the BAM BY LLYC Mark but directed that payment should be made to BIG's bank account. *A true and correct copy of the March 3, 2024 Proposal is attached hereto as Exhibit 19.*

*AdoreMe*

123. In another example of confusion, after receiving a Fake Invoice for services performed by BAM, directing payment to BIG, BAM's client AdoreMe emailed BAM stating: "We received this invoice from BAM Agency. I remember that you mentioned they were acquired last year by Rebecca Bamberger Works, LLC LLYC. Do we process this invoice or just wait for them to send us the April PR Services invoice under their new name?"

124. In response to AdoreMe's confusion, one of BAM's employees misrepresented that the changes in invoices were due to BAM changing certain procedures, stating: "[a]ll financial operations and communications are now managed by our internal team via finance@bambybig.agency."

125. However, BAM has not updated its financial operations and the email to AdoreMe misrepresented that payment was still being made to BAM, when in reality the payment is now being directed to BIG.

126. BAM's clients are thus being contacted in order to divert their business and the monies rightfully owed to BAM away from BAM and instead to BIG. This is causing

27

significant harm to BAM's operations including a substantial financial impact and a reduction of anticipated revenues.

*EverestLabs*

127.   On April 4, 2024, EverestLabs, another one of BAM's clients, was confused after receiving one of BIG's Fake Invoices and emailed LLYC stating: "We are receiving separate mails from BAM by BIG for PR services for the same amount but with different bank details [meaning different wire instructions]. Can you please confirm if the invoice from LLYC and BAM by Big are the same or different?"  *A true and correct copy of the April 4, 2024 EverestLabs Email is attached hereto as Exhibit 20.*

*Touring Capital*

128.   On April 16, 2024, after BAM sent another one of its clients the invoice for BAM's April services, the client noted its confusion and responded: "Thank you for sending the invoice! I also received an invoice (No. 124) from BAM by BIG for PR Service in April plus media retainer. Please let me know which invoice we should pay. Going forward could you please invoice us from one source (either BAM by BIG via Intuit QuickBooks, or you email me LLYC invoice)? Please let me know which one you'll use going forward."  *A true and correct copy of the April 16, 2024 Correspondence is attached hereto as Exhibit 21.*

*BAM Continues to be Damaged by Bamberger's and BIG's Actions*

129.   Other BAM clients have reached out by phone to inquire about BAM's invoices, noting confusion based on communications received on behalf of BIG.

130.   Bamberger's and BIG's continued unauthorized use of the counterfeit and infringing BAM Mark and BAM BY LLYC Mark threatens BAM and LLYC's respective reputations and substantial goodwill.

131.   BAM and LLYC Madrid also face a loss of ability to control the services offered using BIG's BAM BY LLYC infringing and counterfeit mark.  This must be immediately stopped in order to prevent damages to the BAM and LLYC brands.

132.   BAM and LLYC will continue to suffer irreparable harm to their respective reputations and goodwill if Bamberger and BIG are allowed to continue counterfeiting the

28

BAM and BAM BY LLYC Marks and using BAM's confidential information and trade secrets.

133. As I discussed in my feature Dealing with the Adoption of Generative AI in an Evolving Context, published on LLYC Madrid's website, "**Protecting intangible assets** can represent enormous value for a company, and it **becomes even more necessary and complex in an increasingly digital and globalized world**." (Emphasis in original). *A true and correct copy of my Dealing with the Adoption of Generative AI in an Evolving Context feature is attached hereto as Exhibit 22.*

134. Bamberger and BIG are copying and misusing BAM and LLYC's Marks, which as I mentioned in my feature "**One of the risks most frequently facing businesses is another entity copying or misusing a distinctive element of its brand.**" (Emphasis in original).

135. As a result of Bamberger's and BIG's secretive and fraudulent actions, including counterfeiting the LLYC Mark and BAM Mark, without a court order against Bamberger and BIG, it will be impossible for LLYC Madrid or BAM to stop or prevent further irreparable harm to their brands.

I declare under the penalties of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 23rd, 2024 in Madrid, Spain.

By: <u>Luisa García</u>

GARCIA DECLARATION IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER

# EXHIBIT 1

# United States of America

## United States Patent and Trademark Office

# LLYC

**Reg. No. 6,066,337**

**Registered Jun. 02, 2020**

**Int. Cl.: 35, 41, 42**

**Service Mark**

**Principal Register**

LLORENTE Y CUENCA MADRID, S.L.  (SPAIN Sociedad Limitada )
Lagasca, 88 - 3
E-28001 Madrid
SPAIN

CLASS 35: Advertising services; services of advertising establishments responsible primarily for communication to the public, declarations or announcements by all means of diffusion and concerning all kinds of merchandise or services, namely, dissemination of advertisements; brand creation services, namely, brand development services for corporate and individual clients; brand strategy services, namely, brand imagery consulting services; positioning services and brand testing, namely, brand positioning and evaluation services; advertising services for creating corporate and brand identity; commercial business management; commercial administration; commercial administration of the licensing of goods and services for others; providing office functions; marketing, advertising and promotion services; market research and providing market research information services; promotion of third party goods and services via computer and communication networks by means of electronic couponing; online professional networking services for business; work exchange services, namely, bartering of goods of others; dissemination of advertising for others via online electronic communications network; company management consultancy, also via the Internet; data search in computer files for others in the nature of data processing; data search in computer files for third parties in the nature of data processing

CLASS 41: Education, training and entertainment services, namely, providing motivational and educational speakers; organization of sporting and cultural activities; publication of online non-downloadable electronic publications in the nature of electronic magazines; publishing online non-downloadable journals, namely, blogs featuring content defined by users in the field of social networking; providing information relating to online entertainment from a computer database on the internet; online electronic library services for supplying electronic information including archive information in the form of text, audio and/or video information relating to advertising, training, sport, education, culture and news via an on-line computer network; entertainment services provided via wireless global communication networks, namely, providing on-line computer games; providing online non-downloadable images featuring animal stories; publication services for magazines; post-production editing of music; providing online, non-downloadable digital music from the Internet; rental of apparatus for recording sound and video; editorial reporting services; publication of the editorial content of sites that can accessed via a global computer network; information services regarding computer games for entertainment provided on-line from computer databases or global communication networks; electronic game services provided from a computer database or via the Internet

CLASS 42: Design of trademarks in the nature of graphic design services; scientific and technological services, namely, computer programming, as well as associated scientific research and design services; industrial analysis and research services, namely, analysis of industrial fluids; computer and software design and development services; computer services, namely, creating virtual communities for registered users to organize groups and events, to



Director of the United States
Patent and Trademark Office



participate in discussions, get feedback from their peers, and engage in social, business and community networks; hosting a website that enables users to upload photographs and manage their social networking accounts, online software for modifying the appearance and enable the transmission of photographs; services, namely file sharing in the nature of providing a website featuring technology enabling users to upload and download electronic files, hosting a website that enables users to upload and download electronic media; hosting online web facilities for managing and sharing online content; Providing search index technical computer programming information and computer programming information databases; search engine services for obtaining data by means of communication networks, namely, provision of search engines for the Internet; computer services, namely, creating virtual companies in the nature of an on-line virtual environment, so that registered users can discuss the participation of social, business and community being online social networks; computer services, namely, hosting electronic facilities in the nature of internet web sites, mobile applications and other similar communication platforms enabling others to organize and hold meetings, events and interactive discussions via communications networks; services provided by application service provider (ASP), namely, hosting computer software applications for others

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

PRIORITY DATE OF 10-19-2018 IS CLAIMED

OWNER OF INTERNATIONAL REGISTRATION 1478368 DATED 10-31-2018, EXPIRES 10-31-2028

SER. NO. 79-263,552, FILED 10-31-2018

> **REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**
>
> **WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and  an  Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

# EXHIBIT 2

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - INPI (Brazil)

| 210 | Serial number | 220 | Application date |
|---|---|---|---|
| 916201422 | | November 5, 2018 | |
| 111 | Registration number | 450 | Publication date |
| 916201422 | | December 11, 2018 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | August 27, 2019 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | August 27, 2029 | |
| 511 | Nice classification - NCL | | |
| 35 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

-        Name
LLORENTE Y CUENCA MADRID, S.L.
-        Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

-        Name
Montaury Pimenta, Machado & Vieira de Mello Advogados
-        Country
Brazil

## CLASSIFICATION

### 511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

-        35
publicidade • serviços de empresas de publicidade que sejam essencialmente responsáveis pelas comunicações com o público, por declarações ou anúncios por todos os meios de divulgação e em relação a todos os tipos de bens ou serviços • serviços de criação de marcas [publicidade] • serviços de estratégias de marca [publicidade] • serviços de posicionamento e teste de marcas [publicidade] • serviços publicitários para a criação de identidade corporativa de marcas • gestão de negócios • administração de empresas • serviços de escritório • serviços de marketing, publicidade e promoção • serviços de investigação e informação de mercado • publicação de textos publicitários • promoção de produtos e serviços de terceiros através de redes informáticas e de comunicações • serviços de rede de negócios [networking] on-line • serviços de agências de emprego • divulgação de publicidade para terceiros através de uma rede eletrônica de comunicações online • consultoria de gestão de negócios, também pela internet • busca de dados em arquivos de computador para terceiros • pesquisa de dados em arquivos de computador [para terceiros]

## IP OFFICE - INPI (Brazil)



-       Official status
Registered
-       Status date
August 27, 2019
-       Designated countries
Brazil

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

270     Application language
pt

# LLYC

## REGISTERED TRADEMARK - INPI (Brazil)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| 916201481 | | November 5, 2018 | |
| 111 | Registration number | 450 | Publication date |
| 916201481 | | December 11, 2018 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | August 27, 2019 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | August 27, 2029 | |
| 511 | Nice classification - NCL | | |
| 41 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Montaury Pimenta, Machado & Vieira de Mello Advogados
- Country
Brazil

## CLASSIFICATION

### 511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 41

serviços de educação, treinamento e entretenimento • organização de atividades desportivas e culturais • provimento de publicações eletrônicas on-line (não baixáveis) • publicação de jornais on-line, em particular, blogs com conteúdo definido por usuários em conexão com redes sociais (não baixáveis) • fornecimento online de informações relacionadas com entretenimento a partir de uma base de dados informática da internet • serviços de biblioteca eletrônica para o fornecimento de informação eletrônica (incluindo informação de arquivo) sob a forma de textos, informações em áudio e / ou vídeo relacionadas com publicidade, entretenimento, esporte, educação, cultura e notícias • serviços de entretenimento prestados através de redes de comunicação globais • fornecimento online de imagens não baixáveis • serviços para a publicação de revistas • edição de música • provimento de música digital da internet • aluguel de aparelhos de gravação de som e vídeo • serviços editoriais • publicação do conteúdo editorial de sites que podem ser acessados através de uma rede global de computadores • serviços de informações relativas a jogos on-line [computadores] de entretenimento a partir de bases de dados informáticas ou de redes de comunicação globais • fornecimento de informações relacionadas com entretenimento on-line (online) a partir de uma base de dados informática da internet • serviços de jogos eletrônicos fornecidos a partir de uma base de dados ou através da internet

## IP OFFICE - INPI (Brazil)



-     Official status
Registered
-     Status date
August 27, 2019
-     Designated countries
Brazil

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

270    Application language
pt



# LLYC

## REGISTERED TRADEMARK - INPI (Brazil)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| 916201520 | | November 5, 2018 | |
| 111 | Registration number | 450 | Publication date |
| 916201520 | | December 11, 2018 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | August 27, 2019 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | August 27, 2029 | |
| 511 | Nice classification - NCL | | |
| 42 | | | |

| 541 | Reproduction of the mark where the mark is represented in standard characters |
|---|---|
| LLYC | |

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Montaury Pimenta, Machado & Vieira de Mello Advogados
- Country
Brazil

## CLASSIFICATION

### 511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 42

serviços de desenho de marcas comerciais • serviços científicos e tecnológicos, bem como serviços relacionados de pesquisa e design relacionados • serviços de análise e de pesquisa industrial • consultoria em concepção e desenvolvimento de hardware de computador • serviços de informática, em especial, design de websites para que usuários cadastrados organizem grupos e eventos, participem de debates, obtenham comentários de seus pares e participem da conexão em redes sociais, empresariais e comunitárias • hospedagem de um site que permite aos usuários fazer upload de fotos e gerenciar suas contas de conexão em redes sociais • software como um serviço online para modificar a aparência das fotografias e permitir a sua transmissão • serviços de troca de arquivos, em particular, hospedagem de um site que permite aos usuários fazer upload e download de arquivos eletrônicos • hospedagem de instalações da web on-line para gerenciar e compartilhar conteúdo on-line • fornecimento de informação técnica sobre índices de pesquisa e bases de dados de informação • serviços de busca para obter dados através de redes de comunicação • serviços de informática, em especial, a criação de sociedades virtuais para que usuários cadastrados possam discutir a participação de redes sociais, comerciais e coletivas • serviços informáticos, em especial hospedagem de instalações eletrônicas dos tipos de site de internet, aplicações móveis e outras plataformas de comunicação similares para que terceiros organizem e realizem reuniões, eventos e debates interativos através de redes de comunicação • serviços fornecidos por provedores de serviços de aplicativos (asp), especificamente, hospedagem de aplicativos de software de terceiros

## IP OFFICE - INPI (Brazil)



IP OFFICE — INPI (BRAZIL)

- Official status
Registered
- Status date
August 27, 2019
- Designated countries
Brazil

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

## FURTHER INFORMATION

270    Application language
pt

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - CIPO (Canada)

| 210 | Serial number | 220 | Application date |
|---|---|---|---|
| 1938661 | | January 2, 2019 | |
| 111 | Registration number | 450 | Publication date |
| TMA1202212 | | March 15, 2023 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | October 10, 2023 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | October 10, 2033 | |
| 511 | Nice classification - NCL(11) | | |
| 35, 41, 42 | | | |

541     Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Identifier
Legal entity
- Address
Lagasca, 88 - 3, 28001 Madrid
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
MARKS & CLERK
- Address
180 Kent Street, Suite 1900, Ottawa
- Country
Canada

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO- NCL(11)

- 35

advertising the goods and services of others • services of advertising establishments responsible primarily for communication to the public, declarations and announcements by all means of diffusion and concerning all kinds of merchandise or services, namely, dissemination of advertisements • brand creation services • brand strategy services • positioning services and brand testing, namely, brand positioning and evaluation services • advertising services to create corporate and brand identity • business management • business administration • office functions, namely, reception services for visitors, office administration, providing temporary office support staff • advice in the field of marketing, marketing services in the fields of arranging for the distribution of the products of others, promoting the goods and services of other through online advertisements • market research and information services • publication of publicity texts • promotion of third party goods and services via computer and communication networks by means of electronic couponing • online business networking services • employment agencies • dissemination of advertising for others via an on-line electronic communications network • business management consultancy, also via the internet • data search in computer files for others in the nature of data processing.

- 41

education, training and entertainment services, namely, providing motivational and educational speakers • entertainment services in the nature of organizing and conducting team and individual sports competitions and cultural events, namely theatrical, film, music and dance performances and festivals, art and museum exhibitions • publication of online electronic publications (not downloadable) • publication of online journals, namely, non-downloadable blogs featuring user-defined content in the field of social networking • providing entertainment news and information via a website in the field of sports, television shows, movies and cultural events, namely theatrical, film, music and dance performances and festivals, art and museum exhibitions • electronic library services for the providing of electronic information (including archive information) in the form of texts, audio and video information in relation to advertising, entertainment, sports, education, culture and news • entertainment services provided via wireless global communication networks, namely, providing on-line computer games • providing on-line non-downloadable images featuring television shows, movies, virtual art works, photographs, animation videos transmitted via wireless computer networks • publication of magazines • music publishing services • providing online, non-downloadable digital music from the internet • rental of equipment for recording sound and video • music publishing services, on-line book publishing services, magazine publishing • publication of the editorial content of sites accessible via a global computer network • information relating to computer gaming entertainment provided online from a computer database or a global communication network • electronic games services provided from a computer database or by means of the internet.

- 42

design of trademarks in the nature of graphic design services • scientific and technological services, namely, computer programming, as well as associated scientific research and design services • industrial analysis and research services, namely, analysis of industrial fluids • design and development of computers and software • computer services, namely, creating virtual communities for registered users to organize groups and events, participate in discussions, get feedback from their peers, and engage in social, business and community networking • hosting a website that enables users to upload photographs and manage their social network accounts • online software for modifying the appearance and enabling transmission of photographs • file sharing services, namely, hosting a website enabling users to upload and download electronic files • hosting on-line web facilities for others for managing and sharing on-line content • providing search index technical computer programming information and computer programming information databases • search engine services for obtaining data by means of communication networks, namely, provision of search engines for the internet • computer services, namely, creating virtual companies in the nature of an on-line virtual environment, so that registered users can discuss the participation of social, business and community being online social networks • computer services, namely, hosting electronic facilities in the nature of internet websites and mobile applications for others for organizing and conducting meetings, events and interactive discussions via communication network • services provided by application service provider (asp), namely, hosting computer software applications for others.

# RELATED MARKS

## 300 DATA RELATING TO PRIORITY UNDER THE PARIS CONVENTION AND OTHER DATA RELATING TO REGISTRATION OF THE MARK IN THE COUNTRY OF ORIGIN

310    Serial number assigned to the first application
17970633
320    Date of filing of the first application
October 19, 2018
330    WIPO Standard ST.3 code, identifying the national or regional Office where the first application was made or the organization where the first application was made
EM

## IP OFFICE - CIPO (Canada)



-    Official status
Registration published
-    Status date
October 10, 2023
-    Designated countries
Canada

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

## FURTHER INFORMATION

FURTHER INFORMATION

| 250 | Place of filing |
|-----|-----------------|
| Canada | |
| 270 | Application language |
| en | |



WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - OCPI (Cuba)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| CM/A/1/1478368 | | October 31, 2018 | |
| 111 | Registration number | 450 | Publication date |
| 11478368 | | August 27, 2019 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | October 30, 2020 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | October 31, 2028 | |
| 511 | Nice classification - NCL | | |
| 41, 42, 35 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Address
Lagasca, 88 - 3 E-28001 MADRID, España
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
UNGRIA PATENTES Y MARCAS, S.A.
- Address
España
- Country
Spain

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 41

servicios de educación, formación y entretenimiento • organización de actividades deportivas y culturales • publicación de publicaciones electrónicas en línea (no descargables) • publicación de diarios en línea, en concreto, blogs con contenido definido por usuarios en el ámbito de la conexión en redes sociales (no descargables) • facilitación de información relacionada con el entretenimiento en línea (online) desde una base de datos informática en internet • servicios electrónicos de biblioteca para el suministro de información electrónica (incluyendo información de archivo) en forma de textos, información de audio y/o vídeo en relación con la publicidad, el entrenamiento, el deporte, la educación, la cultura y las noticias • servicios de entretenimiento prestados mediante redes mundiales de comunicación • suministro en línea de imágenes no descargables • servicios para la publicación de revistas • edición de música • facilitación de música digital desde internet • alquiler de aparatos de grabación de sonido y de vídeo • servicios editoriales • publicación del contenido editorial de sitios a los que puede accederse a través de una red informática mundial • servicios de información sobre juegos informáticos de entretenimiento prestados en línea desde bases de datos informáticas o redes mundiales de comunicación • servicios de juegos electrónicos facilitados desde una base de datos o por medio de internet

- 42

servicios de diseño de marcas comerciales • servicios científicos y tecnológicos, así como servicios de investigación y diseño conexos • servicios de análisis e investigación industrial • servicios de diseño y desarrollo de ordenadores y software • servicios informáticos, en concreto, creación de comunidades virtuales para que usuarios registrados organicen grupos y eventos, participen en debates, obtengan comentarios de sus iguales y participen en la conexión en redes sociales, de negocios y comunitarias • alojamiento de un sitio web que permite a los usuarios cargar fotografías y gestionar sus cuentas de conexión en redes sociales, software en línea para modificar el aspecto de fotografías y permitir su transmisión • servicios de intercambio de archivos, en concreto, alojamiento de un sitio web que permite los usuarios cargar y descargar archivos electrónicos • alojamiento de instalaciones de la web en línea para gestionar y compartir contenidos en línea • suministro de información técnica de índices de búsqueda y bases de datos de información • servicios de motores de búsqueda para obtener datos a través de redes de comunicación • servicios informáticos, en concreto, la creación de sociedades virtuales para que usuarios registrados puedan debatir sobre la participación de redes sociales, comerciales y colectivas • servicios informáticos, en concreto, alojamiento de instalaciones electrónicas del tipo de sitios web de internet, aplicaciones de móviles y otras plataformas de comunicación similares para que terceros organicen y celebren reuniones, eventos y debates interactivos a través de redes de comunicación • servicios prestados por proveedores de servicios de aplicaciones (asp), en concreto, alojamiento de aplicaciones de software de terceros

- 35

publicidad • servicios de empresas de publicidad que se encargan esencialmente de comunicaciones al público, de declaraciones o de anuncios por todos los medios de difusión y en relación con toda clase de mercancías o de servicios • servicios de creación de marcas • servicios de estrategia de marcas • servicios de posicionamiento y prueba de marcas • servicios publicitarios para creación de identidad corporativa y marcas • gestión de negocios comerciales • administración comercial • trabajos de oficina • servicios de mercadotecnia, publicidad y promoción • servicios de investigación e información de mercado • publicación de textos publicitarios • promoción de productos y servicios de terceros a través de redes informáticas y de comunicaciones • servicios de conexión en red de negocios en línea • servicios de intercambio de trabajo • divulgación de publicidad para terceros a través de una red electrónica de comunicaciones en línea • consultoría de gestión empresarial, también por internet • búsqueda de datos en archivos informáticos para terceros • búsqueda de información para terceros en ficheros informáticos

# RELATED MARKS

## 300 DATA RELATING TO PRIORITY UNDER THE PARIS CONVENTION AND OTHER DATA RELATING TO REGISTRATION OF THE MARK IN THE COUNTRY OF ORIGIN

310      Serial number assigned to the first application
3740055
320      Date of filing of the first application
October 19, 2018
330      WIPO Standard ST.3 code, identifying the national or regional Office where the first application was made or the organization where the first application was made
ES

# IP OFFICE - OCPI (Cuba)



-        Official status
Registered
-        Status date
October 30, 2020
-        Designated countries
Cuba

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

FURTHER INFORMATION

# FURTHER INFORMATION

| 270 | Application language |
|-----|----------------------|
| es  |                      |

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - EUIPO (European Union)

| 210 | Serial number | 220 | Application date |
|---|---|---|---|
| 017970633 | | October 19, 2018 | |
| 111 | Registration number | 151 | Registration date |
| 017970633 | | March 30, 2019 | |
| 551 | Kind of mark | 180 | Expiry date |
| Individual | | October 19, 2028 | |
| 550 | Type of mark | | |
| Word | | | |
| 511 | Nice classification - NCL | | |
| 35, 41, 42 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Kind
Legal Entity
- Identifier
958903
- Address
Lagasca, 88 - 3, 28001 Madrid
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Javier Ungría López
- Kind
Natural Person (Professional Representative)
- Identifier
1014
- Address
Avda. Ramón y Cajal, 78, 28043 Madrid
- Country
Spain

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 35

Advertising • Services rendered by advertising companies being mainly responsible for public communications or communicating statements or announcements on distribution media of all kinds and concerning goods or services of all kinds • Brand creation services • Brand strategy services • Positioning services and brand testing • advertising services to create corporate and brand identity • Business management • Business administration • Office functions • Advertising, marketing and promotional services • Market research and information services • Publication of publicity texts • Promoting the goods and services of others via computer and communication networks • Online business networking services • Employment agencies • Dissemination of advertising for others via an on-line electronic communications network • Business management consultancy, also via the Internet • Data search in computer files for others • Data search in computer files for others

- 41

Education, providing of training, and entertainment • Arranging of sporting and cultural activities • Publication of online electronic publications (not downloadable) • publication of online journals, Namely, Non-downloadable blogs featuring user-defined content in the field of social networking • Provision of information relating to entertainment online from a computer database of the Internet • Electronic library services for the providing of electronic information (including archive information) in the form of texts, audio and/or video information in relation to advertising, entertainment, sports, education, culture and news • Entertainment provided via a global communication network • Providing on-line non-downloadable images • Publication of magazines • Music publishing services • Providing digital music from the internet • Rental of sound and video recording apparatus • Publishing services • Publication of the editorial content of sites accessible via a global computer network • Information relating to computer gaming entertainment provided online from a computer database or a global communication network • Electronic games services provided from a computer database or by means of the internet

- 42

Brand design services • Scientific and technological services, as well as related research and design services • Industrial analysis and research services • Design and development of computers and software • Computer services, namely, creating virtual communities for registered users to organize groups and events, participate in discussions, get feedback from their peers, and engage in social, business and community networking • Hosting a website that enables users to upload photographs and manage their social network accounts • online software for modifying the appearance and enabling transmission of photographs • File sharing services, namely, hosting a website enabling users to upload and download electronic files • hosting on-line web facilities for others for managing and sharing on-line content • providing technical information from searchable indexes and databases of information • Providing search engines for obtaining data via communications networks • Computing services, namely, the creation of virtual societies so that registered users may have discussions about the participation of social, commercial and collective networks • computer services, namely, hosting electronic facilities in the nature of internet websites, mobile applications and other similar communication platforms for others for organizing and conducting meetings, events and interactive discussions via communication networks • Application service provider (ASP) services, namely, hosting computer software applications of others

# IP OFFICE - EUIPO (European Union)



- Official status

Registered

- Status date

April 2, 2019

- Designated countries

European Union

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

270    Application language

es

# LLYC

## REGISTERED TRADEMARK - OEPM (Spain)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| M3740055 | | October 19, 2018 | |
| 111 | Registration number | 151 | Registration date |
| M3740055 | | April 25, 2019 | |
| 551 | Kind of mark | | |
| Individual | | | |
| 550 | Type of mark | | |
| Word | | | |
| 511 | Nice classification - NCL | | |
| 42, 41, 35 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Kind
Legal entity
- Identifier
M3740055-001
- Address
Lagasca, 88 - 3 MADRID 28001
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Javier Ungría
- Kind
Natural person
- Identifier
392
- Address
Av. Ramon y Cajal, 78 Madrid 28043
- Country
Spain

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 42

cacion similares para que terceros organicen y celebren reuniones, eventos y debates interactivos a traves de redes de comunicacion • servicios prestados por proveedores de servicios de aplicaciones (asp), en concreto, alojamiento de aplicaciones de software de terceros

- 41

servicios de educacion, formacion y entretenimiento • organizacion de actividades deportivas y culturales • publicacion de publicaciones electronicas en linea (no descargables) • publicacion de diarios en linea, en concreto, blogs con contenido definido por usuarios en el ambito de la conexion en redes sociales (no descargables) • facilitacion de informacion relacionada con el entretenimiento en linea (online) desde una base de datos informatica en internet • servicios electronicos de biblioteca para el suministro de informacion electronica (incluyendo informacion de archivo) en forma de textos, informacion de audio y/o video en relacion con la publicidad, el entretenimiento, el deporte, la educacion, la cultura y las noticias • servicios de entretenimiento prestados mediante redes mundiales de comunicacion • suministro en linea de imagenes no descargables • servicios para la publicacion de revistas • edicion de musica • facilitacion de musica digital desde internet • alquiler de aparatos de grabacion de sonido y de video • servicios editoriales • publicacion del contenido editorial de sitios a los que puede accederse a traves de una red informatica mundial • servicios de informacion sobre juegos informaticos de entretenimiento prestados en linea desde bases de datos informaticas o redes mundiales de comunicacion • servicios de juegos electronicos facilitados desde una base de datos o por medio de internet

- 35

publicidad • servicios de empresas de publicidad que se encargan esencialmente de comunicaciones al publico, de declaraciones o de anuncios por todos los medios de difusion y en relacion con toda clase de mercancias o de servicios • servicios de creacion de marcas • servicios de estrategia de marcas • servicios de posicionamiento y prueba de marcas • servicios publicitarios para creacion de identidad corporativa y marcas • gestion de negocios comerciales • administracion comercial • trabajos de oficina • servicios de mercadotecnia, publicidad y promocion • servicios de investigacion e informacion de mercado • publicacion de textos publicitarios • promocion de productos y servicios de terceros a traves de redes informaticas y de comunicaciones • servicios de conexion en red de negocios en linea • servicios de intercambio de trabajo • divulgacion de publicidad para terceros a traves de una red electronica de comunicaciones en linea • consultoria de gestion empresarial, tambien por internet • busqueda de datos en archivos informaticos para terceros • busqueda de informacion para terceros en ficheros informaticos

# IP OFFICE - OEPM (Spain)



-     Official status

Registered

-     Status date

May 3, 2019

-     Designated countries

Spain

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

| 270 | Application language |
|-----|----------------------|
| es  |                      |



WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - UKIPO (UK)

| 210 | Serial number | | 220 | Application date |
|---|---|---|---|---|
| UK00917970633 | | | October 19, 2018 | |
| 111 | Registration number | | 151 | Registration date |
| UK00917970633 | | | March 30, 2019 | |
| 551 | Kind of mark | | 180 | Expiry date |
| Individual | | | October 19, 2028 | |
| 550 | Type of mark | | | |
| Word | | | | |
| 511 | Nice classification - NCL(10) | | | |
| 35, 41, 42 | | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Identifier
1125753
- Address
Lagasca, 88 - 3 Madrid 28001
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Page, White & Farrer Limited
- Identifier
16822
- Address
Bedford House John Street London WC1N 2BF
- Country
UK

## CLASSIFICATION

### 511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO- NCL(10)

- 35

advertising • services rendered by advertising companies being mainly responsible for public communications or communicating statements or announcements on distribution media of all kinds and concerning goods or services of all kinds • brand creation services • brand strategy services • positioning services and brand testing • advertising services to create corporate and brand identity • business management • business administration • office functions • advertising, marketing and promotional services • market research and information services • publication of publicity texts • promoting the goods and services of others via computer and communication networks • online business networking services • employment agencies • dissemination of advertising for others via an on-line electronic communications network • business management consultancy, also via the internet • data search in computer files for others • data search in computer files for others

- 41

education, providing of training, and entertainment • arranging of sporting and cultural activities • publication of online electronic publications (not downloadable) • publication of online journals, namely, non-downloadable blogs featuring user-defined content in the field of social networking • provision of information relating to entertainment online from a computer database of the internet • electronic library services for the providing of electronic information (including archive information) in the form of texts, audio and/or video information in relation to advertising, entertainment, sports, education, culture and news • entertainment provided via a global communication network • providing on-line non-downloadable images • publication of magazines • music publishing services • providing digital music from the internet • rental of sound and video recording apparatus • publishing services • publication of the editorial content of sites accessible via a global computer network • information relating to computer gaming entertainment provided online from a computer database or a global communication network • electronic games services provided from a computer database or by means of the internet

- 42

brand design services • scientific and technological services, as well as related research and design services • industrial analysis and research services • design and development of computers and software • computer services, namely, creating virtual communities for registered users to organize groups and events, participate in discussions, get feedback from their peers, and engage in social, business and community networking • hosting a website that enables users to upload photographs and manage their social network accounts • online software for modifying the appearance and enabling transmission of photographs • file sharing services, namely, hosting a website enabling users to upload and download electronic files • hosting on-line web facilities for others for managing and sharing on-line content • providing technical information from searchable indexes and databases of information • providing search engines for obtaining data via communications networks • computing services, namely, the creation of virtual societies so that registered users may have discussions about the participation of social, commercial and collective networks • computer services, namely, hosting electronic facilities in the nature of internet websites, mobile applications and other similar communication platforms for others for organizing and conducting meetings, events and interactive discussions via communication networks • application service provider (asp) services, namely, hosting computer software applications of others

# IP OFFICE - UKIPO (UK)



- Official status
Registered
- Status date
March 30, 2019
- Designated countries
UK

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

270    Application language
en

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

# LLYC

## REGISTERED TRADEMARK - USPTO (USA)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| 79263552 | | October 31, 2018 | |
| 111 | Registration number | 151 | Registration date |
| 6066337 | | June 2, 2020 | |
| 551 | Kind of mark | | |
| Individual | | | |
| 550 | Type of mark | | |
| Word | | | |
| 511 | Nice classification - NCL | | |
| 35, 41, 42 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

## NAMES AND ADDRESSES

### 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

- Name
LLORENTE Y CUENCA MADRID, S.L.
- Kind
Legal Entity
- Address
Lagasca, 88 - 3; E-28001 MADRID
- Country
Spain

### 740 NAME AND ADDRESS OF THE REPRESENTATIVE

- Name
Michael J. Brown
- Kind
Attorney

### 750 ADDRESS FOR CORRESPONDENCE

- Name
Michael J. Brown
- Address
Michael J Brown Law Office LLC;
354 Eisenhower Parkway; Plaza 1
2nd Floor, Suite 2025; Livingston,
NJ 07039

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO

- 35

advertising services • services of advertising establishments responsible primarily for communication to the public, declarations or announcements by all means of diffusion and concerning all kinds of merchandise or services, namely, dissemination of advertisements • brand creation services, namely, brand development services for corporate and individual clients • brand strategy services, namely, brand imagery consulting services • positioning services and brand testing, namely, brand positioning and evaluation services • advertising services for creating corporate and brand identity • commercial business management • commercial administration • commercial administration of the licensing of goods and services for others • providing office functions • marketing, advertising and promotion services • market research and providing market research information services • promotion of third party goods and services via computer and communication networks by means of electronic couponing • online professional networking services for business • work exchange services, namely, bartering of goods of others • dissemination of advertising for others via online electronic communications network • company management consultancy, also via the internet • data search in computer files for others in the nature of data processing • data search in computer files for third parties in the nature of data processing

- 41

education, training and entertainment services, namely, providing motivational and educational speakers • organization of sporting and cultural activities • publication of online non-downloadable electronic publications in the nature of electronic magazines • publishing online non-downloadable journals, namely, blogs featuring content defined by users in the field of social networking • providing information relating to online entertainment from a computer database on the internet • online electronic library services for supplying electronic information including archive information in the form of text, audio and/or video information relating to advertising, training, sport, education, culture and news via an on-line computer network • entertainment services provided via wireless global communication networks, namely, providing on-line computer games • providing online non-downloadable images featuring animal stories • publication services for magazines • post-production editing of music • providing online, non-downloadable digital music from the internet • rental of apparatus for recording sound and video • editorial reporting services • publication of the editorial content of sites that can accessed via a global computer network • information services regarding computer games for entertainment provided on-line from computer databases or global communication networks • electronic game services provided from a computer database or via the internet

- 42

design of trademarks in the nature of graphic design services • scientific and technological services, namely, computer programming, as well as associated scientific research and design services • industrial analysis and research services, namely, analysis of industrial fluids • computer and software design and development services • computer services, namely, creating virtual communities for registered users to organize groups and events, to participate in discussions, get feedback from their peers, and engage in social, business and community networks • hosting a website that enables users to upload photographs and manage their social networking accounts, online software for modifying the appearance and enable the transmission of photographs • services, namely file sharing in the nature of providing a website featuring technology enabling users to upload and download electronic files, hosting a website that enables users to upload and download electronic media • hosting online web facilities for managing and sharing online content • providing search index technical computer programming information and computer programming information databases • search engine services for obtaining data by means of communication networks, namely, provision of search engines for the internet • computer services, namely, creating virtual companies in the nature of an on-line virtual environment, so that registered users can discuss the participation of social, business and community being online social networks • computer services, namely, hosting electronic facilities in the nature of internet web sites, mobile applications and other similar communication platforms enabling others to organize and hold meetings, events and interactive discussions via communications networks • services provided by application service provider (asp), namely, hosting computer software applications for others

# RELATED MARKS

## 832 DESIGNATION(S) UNDER THE MADRID PROTOCOL

- IP office of authority

WO

- Number

1478368

- Date

October 31, 2018

# IP OFFICE - USPTO (USA)



- Official status

Live/Registered

- Status date

June 2, 2020

- Designated countries

USA

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

270    Application language

en

# LLYC

# INTERNATIONAL REGISTRATION IN FORCE TRADEMARK - Madrid (WIPO)

| | | | |
|---|---|---|---|
| 111 | Registration number | 220 | Application date |
| 1478368 | | October 31, 2018 | |
| 551 | Kind of mark | 151 | Registration date |
| Individual | | October 31, 2018 | |
| 550 | Type of mark | 180 | Expiry date |
| Word | | October 31, 2028 | |
| 511 | Nice classification - NCL(11-2018) | | |
| 35, 41, 42 | | | |

541    Reproduction of the mark where the mark is represented in standard characters
LLYC

# NAMES AND ADDRESSES

## 730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER

-     Name
LLORENTE Y CUENCA MADRID, S.L.
-     Kind
Legal entity
-     Identifier
1186123
-     Address
Lagasca, 88 - 3, E-28001 MADRID
-     Country
Spain

## 740 NAME AND ADDRESS OF THE REPRESENTATIVE

-     Name
UNGRIA PATENTES Y MARCAS, S.A.
-     Identifier
321251
-     Address
Avda. Ramón y Cajal, 78, E-28043 MADRID
-     Country
Spain

## MADRID SPECIFIC

811    Contracting State of which the holder is a national
ES
842    Legal nature of the holder (legal entity) and State, and, where applicable, territory within that State where the legal entity is organized
Sociedad Limitada, España

# CLASSIFICATION

## 511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE CLASSIFICATION) AND/OR LIST OF GOODS AND/OR SERVICES CLASSIFIED ACCORDING THERETO- NCL(11-2018)

- 35

advertising • services of advertising establishments responsible primarily for communication to the public, declarations or announcements by all means of diffusion and concerning all kinds of merchandise or services • brand creation services • brand strategy services • positioning services and brand testing • advertising services for creating corporate and brand identity • commercial business management • commercial administration • office functions • marketing, advertising and promotion services • market research and information services • publication of advertising texts • promotion of third party goods and services via computer and communication networks • on-line networking services for businesses • work exchange services • dissemination of advertising for others via an online electronic communications network • company management consultancy, also via the internet • data search in computer files for others • data search in computer files for third parties

- 41

education, training and entertainment services • organization of sporting and cultural activities • publication of online electronic publications (not downloadable) • publishing online journals, namely, blogs featuring content defined by users in the field of social networking (not downloadable) • providing information relating to online entertainment from a computer database on the internet • electronic library services for supplying electronic information (including archive information) in the form of text, audio and/or video information relating to advertising, training, sport, education, culture and news • entertainment services provided via wireless global communication networks • providing online non-downloadable images • publication services for magazines • music editing • providing digital music from the internet • rental of apparatus for recording sound and video • editorial services • publication of the editorial content of sites that can accessed via a global computer network • information services regarding computer games for entertainment provided on-line from computer databases or global communication networks • electronic game services provided from a computer database or via the internet

- 42

design of trade marks • scientific and technological services, as well as associated research and design services • industrial analysis and research services • computer and software design and development services • computer services, namely, creating virtual communities for registered users to organize groups and events, to participate in discussions, get feedback from their peers, and engage in social, business and community networks • hosting a website that enables users to upload photographs and manage their social networking accounts, online software for modifying the appearance and enable the transmission of photographs • services, namely file sharing, hosting a website that enables users to upload and download electronic media • hosting online web facilities for managing and sharing online content • providing search index technical information and information databases • search engine services for obtaining data by means of communication networks • computer services, namely, creating virtual companies, so that registered users can discuss the participation of social, business and community networks • computer services, namely, hosting electronic facilities in the nature of internet web sites, mobile applications and other similar communication platforms enabling others to organize and hold meetings, events and interactive discussions via communication networks • services provided by application service provider (asp), namely, hosting computer software applications of others

# RELATED MARKS

## 300 DATA RELATING TO PRIORITY UNDER THE PARIS CONVENTION AND OTHER DATA RELATING TO REGISTRATION OF THE MARK IN THE COUNTRY OF ORIGIN

310    Serial number assigned to the first application
3740055
320    Date of filing of the first application
October 19, 2018
330    WIPO Standard ST.3 code, identifying the national or regional Office where the first application was made or the organization where the first application was made
ES

## 821 BASIC APPLICATION

-    IP office of authority
ES
-    Number
3740055
-    Date
October 19, 2018

# IP OFFICE - Madrid (WIPO)



-        Official status
Registered
-        Designated countries
Colombia, Mexico, USA, Cuba

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

# FURTHER INFORMATION

| | |
|---|---|
| 270    Application language | 821    Basic application |
| es | ES, 2018-10-19, 3740055 |
| | 300    Data relating to priority under the Paris Convention and other data relating to registration of the mark in the country of origin |
| | ES, 2018-10-19, 3740055 |
| | 832    Designation(s) under the Madrid Protocol |
| | CO, MX, US |
| | 834    Designation(s) under the Madrid Protocol by virtue of Article 9sexies |
| | CU |
| | 527    Indications regarding use requirements |
| | US |

# EXHIBIT 3

*Execution Version*

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**by and among**

**Llorente & Cuenca USA, Inc., a Delaware corporation,**

**Rebecca Bamberger Works, LLC, a Delaware limited liability company,**

**RBW Holdco, Inc., a California corporation**

**and**

**Rebecca Bamberger**

**dated as of**

**March 30, 2023**

*ACTIVE 686403262v1*

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ................................................................................................2

**ARTICLE II PURCHASE AND SALE**.............................................................................18
    Section 2.01.   Purchase and Sale .....................................................................18
    Section 2.02.   Purchase Price...........................................................................18
    Section 2.03.   Purchase Price Adjustment.......................................................22
    Section 2.04.   Determination of Deferred Payments.......................................24
    Section 2.05.   Closing......................................................................................25
    Section 2.06.   Withholding Tax........................................................................27

**ARTICLE III REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLER PARTIES**............................................................................................28
    Section 3.01.   Organization and Authority of the Seller Parties......................28
    Section 3.02.   Title to Purchased Interests......................................................28
    Section 3.03.   No Conflicts; Consents.............................................................29
    Section 3.04.   Brokers or Finders ...................................................................29
    Section 3.05.   Investment; Accredited Investor...............................................29

**ARTICLE IV REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COMPANY** ...............................................................................................30
    Section 4.01.   Organization, Authority and Qualification of the Company ............................30
    Section 4.02.   Capitalization............................................................................30
    Section 4.03.   Equity Commitments.................................................................31
    Section 4.04.   Qualifications............................................................................31
    Section 4.05.   No Conflicts; Consents.............................................................31
    Section 4.06.   Financial Statements.................................................................32
    Section 4.07.   Undisclosed Liabilities .............................................................32
    Section 4.08.   Absence of Certain Changes, Events and Conditions ....................33
    Section 4.09.   Material Contracts.....................................................................35
    Section 4.10.   Title to, Condition and Sufficiency of Assets...........................36
    Section 4.11.   Real Property ............................................................................37
    Section 4.12.   Intellectual Property. ................................................................37
    Section 4.13.   Accounts ...................................................................................38
    Section 4.14.   Customers and Suppliers. .........................................................39
    Section 4.15.   Insurance...................................................................................40
    Section 4.16.   Legal Proceedings; Governmental Orders................................40
    Section 4.17.   Compliance with Laws; Permits...............................................40
    Section 4.18.   Environmental Matters. ............................................................41
    Section 4.19.   Employee Benefit Matters. .......................................................41
    Section 4.20.   Employees, Consultants and Contractors. ................................43
    Section 4.21.   Taxes.........................................................................................44
    Section 4.22.   Books and Records ...................................................................46
    Section 4.23.   Brokers or Finders ...................................................................46
    Section 4.24.   Affiliate Transactions ..............................................................46

Section 4.25.  Patriot Act / Economic Sanctions ...............................................................47
Section 4.26.  No Illegal Payments...................................................................................47
Section 4.27.  Anti-Money Laundering ............................................................................48
Section 4.28.  EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES...............48

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER**....................49
Section 5.01.  Organization and Authority of the Buyer ....................................................49
Section 5.02.  No Conflicts; Consents .............................................................................49
Section 5.03.  Investment Purpose ..................................................................................50
Section 5.04.  Brokers or Finders ...................................................................................50
Section 5.05.  Legal Proceedings....................................................................................50
Section 5.06.  No Additional Representations; Disclaimer ................................................50

**ARTICLE VI COVENANTS**...........................................................................................51
Section 6.01.  Conduct of the Business Prior to Closing...................................................51
Section 6.02.  Access to Books and Records...................................................................53
Section 6.03.  Notice Regarding Changes .......................................................................53
Section 6.04.  Confidentiality .........................................................................................53
Section 6.05.  Conditions; Consents and Approvals .........................................................54
Section 6.06.  Termination of Affiliate Contracts .............................................................54
Section 6.07.  The Seller Parties' Release and Waiver.......................................................54
Section 6.08.  Continued Use of the Company Name and References to Beneficial
              Owner in Connection with the Company ...................................................55
Section 6.09.  Further Assurances ...................................................................................55

**ARTICLE VII TAX MATTERS**......................................................................................55
Section 7.01.  Tax Covenants. ........................................................................................55
Section 7.02.  Tax Indemnification .................................................................................57
Section 7.03.  Straddle Period ........................................................................................57
Section 7.04.  Contests ..................................................................................................58
Section 7.05.  Cooperation and Exchange of Information .................................................58
Section 7.06.  Tax Treatment of Indemnification Payments ...............................................59
Section 7.07.  Survival...................................................................................................59
Section 7.08.  Overlap ...................................................................................................59
Section 7.09.  Tax Refunds.............................................................................................59
Section 7.10.  Amendments and Voluntary Disclosures ....................................................59

**ARTICLE VIII CONDITIONS TO CLOSING**.................................................................61
Section 8.01.  Conditions to Obligations of All Parties......................................................61
Section 8.02.  Conditions to Obligations of the Buyer.......................................................61
Section 8.03.  Conditions to Obligations of the Seller Parties ...........................................61

**ARTICLE IX INDEMNIFICATION** ...............................................................................62
Section 9.01.  Survival...................................................................................................62
Section 9.02.  Indemnification by the Seller Parties..........................................................62
Section 9.03.  Indemnification by Buyer ..........................................................................63
Section 9.04.  Certain Limitations ..................................................................................63
Section 9.05.  Indemnification Procedures.......................................................................64

ii

Section 9.06.  Tax Treatment of Indemnification Payments ....................................................66
Section 9.07.  Effect of Investigation ...................................................................................66
Section 9.08.  Right to Set-Off ...........................................................................................66
Section 9.09.  Exclusive Remedy ........................................................................................67

**ARTICLE X TERMINATION**..................................................................................................67
Section 10.01. Grounds for Termination ...............................................................................67
Section 10.02. Effect of Termination ...................................................................................67

**ARTICLE XI MISCELLANEOUS**...........................................................................................68
Section 11.01. Expenses .....................................................................................................68
Section 11.02. Notices ........................................................................................................68
Section 11.03. Interpretation ...............................................................................................68
Section 11.04. Headings ......................................................................................................69
Section 11.05. Severability ..................................................................................................69
Section 11.06. Entire Agreement .........................................................................................69
Section 11.07. Successors and Assigns ................................................................................69
Section 11.08. No Third-Party Beneficiaries.........................................................................69
Section 11.09. Amendment and Modification; Waiver ...........................................................70
Section 11.10. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial...................70
Section 11.11. Specific Performance.....................................................................................71
Section 11.12. Counterparts.................................................................................................71

Schedule A – Calculation of Net Working Capital
Schedule B – Restructuring
Schedule C – Affiliate Contracts Exempt from Termination
Schedule D – Adjustments to EBITDA

Exhibit A – Form of Employment Agreements
Exhibit B – Form of Limited Liability Company Agreement
Exhibit C – Form of Option Agreement
Exhibit D – Form of Assignment
Exhibit E – Allocation Methodology
Exhibit F – Form of Restrictive Covenant Agreement
Exhibit G – Form of Holdco Limited Liability Company Agreement
Exhibit H – Sample Calculation of the Deferred Tax Adjustment Amount

ACTIVE 686403262v1

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "Agreement"), dated as of March 30, 2023, is entered into by and among Llorente & Cuenca USA, Inc., a Delaware corporation ("Buyer"), Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "Company"), RBW Holdco, Inc., a California corporation ("Seller") and Rebecca Bamberger, a California resident (the "Beneficial Owner", and collectively with the Seller, the "Seller Parties").

## RECITALS

**WHEREAS**, the Company was formed and operated as a California corporation;

**WHEREAS**, the Beneficial Owner has caused the restructuring as described on Schedule B (the "Restructuring") to occur prior to the date hereof;

**WHEREAS**, as part of the Restructuring, the Company converted into a Delaware limited liability company;

**WHEREAS**, the Seller owns 100% of the issued and outstanding membership interests of the Company (the "Membership Interests") and Beneficial Owner owns 100% of the issued and outstanding capital stock of Seller;

**WHEREAS**, the Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, eighty percent (80%) (the "Purchased Percentage") of the issued and outstanding Membership Interests of the Company (the "Purchased Interests") and consummate the other transactions contemplated hereby, all upon the terms and subject to the conditions set forth in this Agreement;

**WHEREAS**, as a result of Beneficial Owner's ownership of 100% of the issued and outstanding capital stock of Seller, the Beneficial Owner will benefit from the consummation of the transactions contemplated hereby, and in consideration therefor, the Beneficial Owner is entering into this Agreement and shall carry out its and her respective obligations hereunder;

**WHEREAS**, the Company is engaged in the business of providing marketing and public relations services (the "Business"); and

**WHEREAS**, as a result of the transactions contemplated hereby, the Buyer will acquire the Purchased Interests, and Seller will receive the consideration described in Article II of this Agreement (the "Transaction").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

1

*ACTIVE 686403262v1*

"2021 Enterprise Value" means an amount equal to $13,185,000 which represents the product of (a) the Applicable Multiple and (b) the 2021 Recurrent Normalized EBITDA.

"2021 Recurrent Normalized EBITDA" means Recurrent Normalized EBITDA for the calendar year ended December 31, 2021, which the parties agree is equal to $1,758,000.

"2021 Value Amount" means an amount equal to $10,548,000 which represents the product of (a) the Purchased Percentage and (b) the 2021 Enterprise Value.

"2021/2022 Enterprise Value" means the product of (a) the Applicable Multiple and (b) the 2021/2022 Recurrent Normalized EBITDA.

"2021/2022 Measurement Period" means the consecutive twenty-four (24) month period commencing on January 1, 2021, and ending December 31, 2022.

"2021/2022 Recurrent Normalized EBITDA" means an amount equal to the quotient of (a) the sum of (x) 2021 Recurrent Normalized EBITDA and (y) the Recurrent Normalized EBITDA of the Company for the calendar year 2022, divided by (b) two (2).

"2021/2022 Value Amount" means an amount equal to the product of (a) the Purchased Percentage and (b) the 2021/2022 Enterprise Value.

"2022/2023 Enterprise Value" means the product of (a) the Applicable Multiple and (b) the 2022/2023 Recurrent Normalized EBITDA.

"2022/2023 Measurement Period" means the consecutive twenty-four (24) month period commencing on January 1, 2022, and ending December 31, 2023.

"2022/2023 Recurrent Normalized EBITDA" means an amount equal to the quotient of (a) the sum of the Recurrent Normalized EBITDA of the Company for the calendar years 2022 and 2023, divided by (b) two (2).

"2022/2023 Value Amount" means an amount equal to the product of (a) the Purchased Percentage and (b) the 2022/2023 Enterprise Value.

"2023/2024 Enterprise Value" means the product of (a) the Applicable Multiple and (b) the 2023/2024 Recurrent Normalized EBITDA.

"2023/2024 Measurement Period" means the consecutive twenty-four (24) month period commencing on January 1, 2023, and ending December 31, 2024.

"2023/2024 Recurrent Normalized EBITDA" means an amount equal to the quotient of (a) the sum of the Recurrent Normalized EBITDA of the Company for the calendar years 2023 and 2024, divided by (b) two (2).

"2023/2024 Value Amount" means an amount equal to the product of (a) the Purchased Percentage and (b) the 2023/2024 Enterprise Value.

ACTIVE 686403262v1

"2024/2025 Enterprise Value" means the product of (a) the Applicable Multiple and (b) the 2024/2025 Recurrent Normalized EBITDA.

"2024/2025 Measurement Period" means the consecutive twenty-four (24) month period commencing on January 1, 2024, and ending December 31, 2025.

"2024/2025 Recurrent Normalized EBITDA" means an amount equal to the quotient of (a) the sum of the Recurrent Normalized EBITDA of the Company for the calendar years 2024 and 2025, divided by (b) two (2).

"2024/2025 Value Amount" means an amount equal to the product of (a) the Purchased Percentage and (b) the 2024/2025 Enterprise Value.

"Accounting Principles" means the definitions, accounting methods, principles, policies, practices, and procedures, including classification and estimation methodology, consistent with IFRS except as modified by Schedule A.

"Accounting Referee" means a nationally recognized independent accounting firm that has not provided services to Buyer, Seller or any of their Affiliates during the past three years and mutually agreed to by Buyer and Seller; provided that if they cannot agree on the Accounting Referee within a reasonable period of time, then any party shall have the right to cause the International Center for Dispute Resolution to appoint the Accounting Referee.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at Law or in equity.

"Adjusted Initial Payment" has the meaning set forth in Section 2.02(a)(i).

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Affiliate Contracts" has the meaning set forth in Section 4.24.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 7.01(b).

"Applicable Multiple" means the multiple to be applied as set forth in the table below based on the Average Recurrent Normalized EBITDA for a particular Measurement Period:

| Average Recurrent Normalized EBITDA | Applicable Multiple |
|---|---|

3

| | |
|---|---|
| Equal to or greater than 30% of the Average Revenue of the corresponding Measurement Period. | 8.0 |
| Equal to or greater than 25% but less than 30% of the Average Revenue of the corresponding Measurement Period. | 7.5 |
| Equal to greater than 20% but less than 25% of the Average Revenue of the corresponding Measurement Period. | 7.0 |
| Equal to greater than 15% but less than 20% of the Average Revenue of the corresponding Measurement Period. | 6.5 |
| Less than 15% of the Average Revenue of the corresponding Measurement Period. | 6.0 |

"Applicable Implicit Multiple" means an amount equal to the quotient of (a) the sum of (i) the average market capitalization of LLYC Parent in the last quarter of the applicable Measurement Period, plus (ii) the net financial position of LLYC Parent as of the last day of the applicable Measurement Period, divided by (b) the LLYC Parent Pro-Forma EBITDA for the applicable Measurement Period (each of which is available here: https://www.bmegrowth.es/ing/Ficha/LLYC__LLORENTE_Y_CUENCA__ES0105591004.aspx#ss_historico).

"Assignment" has the meaning set forth in Section 2.05(d)(i).

"Audited Financial Statements" has the meaning set forth in Section 4.06.

"Average Recurrent Normalized EBITDA" means any of the 2021/2022 Recurrent Normalized EBITDA, 2022/2023 Recurrent Normalized EBITDA, the 2023/2024 Recurrent Normalized EBITDA, and the 2024/2025 Recurrent Normalized EBITDA, as the case may be.

"Average Revenue" means the total revenue of the Company for any Measurement Period calculated in accordance with the Accounting Principles divided by two (2).

"Balance Sheet" has the meaning set forth in Section 4.06.

"Benefit Plan" has the meaning set forth in Section 4.19(a).

"Business" has the meaning set forth in the recitals.

4

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California or Madrid, Spain are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Buyer Exclusions" has the meaning set forth in Section 9.04(a).

"Buyer Indemnitees" has the meaning set forth in Section 9.02.

"Buyer's Fundamental Representations" means the representations and warranties of the Buyer set forth in Section 5.01 and Section 5.04.

"Cap Amount" has the meaning set forth in Section 9.04(a).

"Cash" means, with respect to the Company, the amount of (i) all cash on hand, plus (ii) the amount of all marketable securities and short term investments (to the extent convertible to cash within thirty (30) days), less (iii) the amount of any outbound wires sent (but not yet cleared) or checks written (but not yet cashed), as applicable, less (iv) Restricted Cash, less (v) Minimum Operating Cash Required.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"Closing" has the meaning set forth in Section 2.05(a).

"Closing Date" has the meaning set forth in Section 2.05(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble.

"Company Intellectual Property" has the meaning set forth in Section 4.12(a).

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"COVID-19 Measures" means the Coronavirus Aid, Relief, and Economic Security Act of 2020 (H.R. 748), as amended, any other Law, governmental order, action, directive, guidelines or recommendations by any Governmental Authority in connection with or in response to the COVID-19 pandemic, in each case as amended and including any administrative or other guidance published with respect thereto by any Governmental Authority, and any similar or conforming legislation in any U.S. jurisdiction.

"Debt" means, with respect to the Company, all Liabilities (including all Liabilities in respect of principal, accrued interest, penalties, fees and premiums) of the Company, whether

5

direct or indirect, (a) for borrowed money (including, but not limited to, overdraft facilities), (b) secured by any Encumbrance existing on any property or asset of the Company, (c) evidenced by notes, bonds, debentures or similar documents, (d) for the deferred purchase price of property, goods or services, whether connected or not with the acquisition of any business ("earn-out" or other similar type of payments) or noncompetition agreement, (e) under operating, finance or capital leases (in accordance with IFRS) or any lease-back arrangements, (f) in respect of letters of credit and bankers' acceptances, to the extent of the amount drawn thereon, (g) for Contracts relating to interest rate protection, swap agreements, factoring, hedging and collar agreements or similar type of Contracts, (h) obligations of the Company to pay any dividends or make any other distributions with respect to any of the Membership Interests or other Equity or ownership interests of the Company, (i) accounts payable that are more than fifteen (15) days past due or any accounts payable not arising in the ordinary course of business of the Company, (j) all unpaid wages, salaries, bonuses, unused paid time off, together with the employer portion of all applicable Taxes imposed thereon, (k) owed to suppliers of fixed assets or investments in fixed assets, (l) owed to any Affiliate of the Company, (m) in the nature of premiums (prepayment or otherwise) or penalties in connection with the obligations described in clauses (a) through (l) above, (n) in the nature of Guarantees of the obligations described in clauses (a) through (l) above of any other Person, and (o) all unpaid Taxes of the Company for any Pre-Closing Tax Period or attributable to the portion of any Straddle Period ending on the Closing Date, as determined in accordance with Section 7.03; provided; however, that "Debt" shall not include any amounts included in Net Working Capital or Transaction Expenses.

"Deferred Payments" means, collectively, the First Deferred Payment, the Second Deferred Payment, the Third Deferred Payment and the Fourth Deferred Payment; and "Deferred Payment" means any of the Deferred Payments.

"Deferred Tax Adjustment Amount" means, with respect to each Deferred Payment, subject to the provisions and adjustments below, the amount equal to the sum of (a) the Deferred Payment multiplied by the highest marginal state or local income or gross receipts Tax applicable to Seller at the time of such Deferred Payment, and assuming that the Seller remains an "S corporation" under Code Section 1361 for federal and state income tax purposes (such rate, the "Entity Tax Rate" and amount, the "Entity Level Tax") and (b) an amount that will cause the sum of the preceding clause (a) and this clause (b) to equal the sum of the Entity Level Tax calculated in the preceding clause (a), plus applicable federal, state and local Taxes assumed to be incurred by the Beneficial Owner and Seller on account of the Seller's receipt of the Deferred Tax Adjustment Amount, and taking into account in the calculation of tax liabilities, to the extent applicable, deductions of Taxes and credits for Taxes (including the California pass-through entity elective tax credit), if any, arising from the Seller's payment of Taxes with respect to the Deferred Payment and the Deferred Tax Adjustment Amount. For this purpose, (A) only the items of income, gain, deduction, loss, expense and credit or recapture arising out of the transactions contemplated by this Agreement shall be considered (including without limitation any recognition of income, gain, deduction or loss or change in character thereof as a result of the transactions contemplated by this Agreement) and (B) it shall be assumed that the Seller shall be subject to the Entity Tax Rate, and that Beneficial Owner shall be subject to the highest marginal federal, state and local income tax rates then applicable to long-term capital gain with respect to payments of the Deferred Payment and Deferred Tax Adjustment Amount incurred by individuals resident in

6

San Diego, California (or to the extent applicable, a different state or locality to the extent Beneficial Owner is a tax resident of such other state or locality or any portion of the Deferred Payment or Deferred Tax Adjustment Amount is properly apportioned to such other state or locality)) at the time of such Deferred Payment and, if applicable, the highest tax rate imposed under Section 1411 of the Code (or any successor provision thereto) as of such time. The Deferred Tax Adjustment Amount is intended to compensate for net additional Taxes incurred with respect to Deferred Payments as a result of structuring the sale of the Purchased Interests as a sale of assets by Seller instead of a sale of equity of Seller by Beneficial Owner for federal, state and local Tax purposes and provide Beneficial Owner with the same after-Tax proceeds from Deferred Payments as if the sale hereunder were a sale of equity of the Seller subject to the assumptions herein, and adjustments to the Deferred Tax Adjustment Amount shall be made to reflect such intention, and this paragraph shall be interpreted consistently with such intention. Two illustrations of the calculation of the Deferred Tax Adjustment Amount are set forth in Exhibit H hereto; provided, however, that such illustrations are based on certain assumptions, including apportionment of 100% of income to California, the application of existing tax rates, and that taxing authorities will apply deductions arising from the California pass through tax election first against ordinary income (as opposed to on a pro rata basis against ordinary income and capital gain). Notwithstanding the assumptions reflected in such illustrations, the parties acknowledge and agree that future calculations of any Deferred Tax Adjustment Amount will take into account different assumptions as set forth above; and provided further that the Deferred Tax Adjustment shall in no event be a negative number (that is, in no event shall Seller Parties be required to make a Deferred Tax Adjustment payment to Buyer). Beneficial Owner and Seller agree to advise Buyer of any California pass through entity tax election made be Seller with respect to each Tax year of Seller for which Deferred Tax Adjustment Amount is required to be computed pursuant to this Agreement. Beneficial Owner and Seller agree to reasonably cooperate with Buyer and make such elections as Buyer may reasonably request to reduce net incremental Taxes arising from structuring the sale of the Purchased Interests as a sale of assets for federal, state and local Tax purposes; provided, however, that Beneficial Owner and Seller shall not be required to take actions that will cause Beneficial Owner to directly or indirectly bear additional net unreimbursed Taxes or other costs.

"Direct Claim" has the meaning set forth in Section 9.05(c).

"Disclosure Schedules" means the Disclosure Schedules delivered by the Seller Parties concurrently with the execution and delivery of this Agreement.

"Disputed Allocation Amounts" has the meaning set forth in Section 7.01(b).

"Dollars" or "$" means the lawful currency of the United States.

"DP Negotiation Period" has the meaning set forth in Section 2.04(b).

"DP Objected Items" has the meaning set forth in Section 2.04(b).

"DP Review Period" has the meaning set forth in Section 2.04(b).

"DP Statement" has the meaning set forth in Section 2.04(a).

*ACTIVE 686403262v1*

"EBITDA" means, for any period, with respect to the Company, (i) the net income of the Company for such period, *plus* (ii) without duplication and to the extent deducted in determining such consolidated net income for such period, the sum of (A) the interest expense (net of consolidated interest income) of the Company for such period, (B) the income tax expense of the Company, and (C) all amounts attributable to depreciation and amortization expense of the Company for such period, calculated in good faith in accordance with the Accounting Principles.

"Employment Agreements" means the employment agreements to be entered into, in substantially the form set forth in Exhibit A, at the Closing by and between the Company and the Beneficial Owner.

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, lease, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership; excluding, however, for purposes of this Agreement, any option or right existing in favor of Buyer or Seller, or any Affiliate of Buyer or Seller, under the Option Agreement.

"Environmental Claim" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging Liability of whatever kind or nature (including Liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, and any Governmental Order, Contract, or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.  The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"Environmental Notice" means any notice of violation or infraction, or notice respecting any Environmental Claim, including if relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

8

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equity" means capital interests of any kind (including shares of stock, membership interests or other interests representing the equity in a limited liability company, corporation, partnership or other legal entity) and Equity Commitments.

"Equity Commitments" means (a) options, warrants, convertible securities, exchangeable securities, subscription rights, conversion rights, exchange rights, or other agreements, commitments or rights that could require a Person to issue any of its Equity or to sell any Equity it owns in another Person; (b) any other securities convertible into, exchangeable or exercisable for, or representing the right to subscribe for any Equity of a Person or owned by a Person; (c) statutory preemptive rights or preemptive rights granted under a Person's Organizational Documents; (d) stock appreciation rights, phantom stock, profit participation, or other similar rights with respect to a Person; and (e) any rights to participate in the appreciation of the net assets, enterprise value or fair market value of a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Person, any other Person or trade or business that, together with such first Person, would be treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Estimated Closing Debt" means the estimated Debt as of the Reference Time.

"Estimated Net Financial Debt" means the product of (a) $1,857,000, representing the estimated Net Financial Debt as of the Reference Time and (b) the Purchased Percentage.

"Estimated Transaction Expenses" means the estimated Transaction Expenses as of the Reference Time.

"Estimated Working Capital Adjustment" means the product of (a) $351,000, representing the estimated Working Capital Adjustment as of the Reference Time and (b) the Purchased Percentage.

"Example Calculation" means the example calculation of Net Working Capital set forth on Schedule A.

"Exchange Rate" means the rate of exchange between the Dollar and the Euro as reported by Bloomberg, L.P. as of the close of business in New York on the date immediately preceding the date on which the equity of LLYC Holding is issued in respect of the payment of the applicable Deferred Payment.

"Excess Amount" has the meaning set forth in Section 2.03(c)(i).

9

"Fair Market Value" means, for the equity interests of LLYC Holding as of any particular date, an amount equal to the product of (a) LLYC Holding's ownership of LLYC Parent (expressed as a percentage) and (b) the Euro volume-weighted average price for the shares of LLYC Parent traded on the Madrid Stock Exchange (*La Bolsa de Madrid*) during the consecutive twenty (20) Trading Days preceding such date.

"Final Adjusted Initial Payment" has the meaning set forth in Section 2.03(b)(ii).

"Final Closing Statement" has the meaning set forth in Section 2.03(b)(ii).

"Final Net Financial Debt" has the meaning set forth in Section 2.03(b)(ii).

"Final Net Working Capital" has the meaning set forth in Section 2.03(b)(ii).

"Final Target Net Working Capital" has the meaning set forth in Section 2.03(b)(ii).

"Final Working Capital Adjustment" has the meaning set forth in Section 2.03(b)(ii).

"Financial Statements" has the meaning set forth in Section 4.06.

"First Deferred Payment" means the amount calculated pursuant to Section 2.02(b)(i).

"Floor Amount" has the meaning set forth in Section 9.04(a).

"Fourth Deferred Payment" means the amount calculated pursuant to Section 2.02(b)(iv).

"General Enforceability Exceptions" has the meaning set forth in Section 3.01(c).

"Governmental Authority" means any federal, national, supranational, state, provincial, local, foreign or other government, political subdivision, governmental, regulatory or administrative authority, agency, department, ministry, board, commission, task force or any court, tribunal, judicial, self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator or arbitral body, court or tribunal of competent jurisdiction, customs and any other regulatory or administrative equivalent governmental entity in any country or territory with jurisdiction over the processes for the production, development, testing, manufacture, packaging, labeling, distribution, marketing or use of the products related to the business (including the Business) of the Company, and the Federal Trade Commission, Antitrust Division of the U.S. Department of Justice and any other regulatory or administrative equivalent governmental entity in any country or territory with jurisdiction over antitrust or other competition matters.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person; (b) any other arrangement whereby credit is extended to any obligor (other than such

10

*ACTIVE 686403262v1*

Person) on the basis of any promise, obligation, commitment or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations, Debts or Liabilities or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor; and (c) any Liability as a general partner of a partnership or as a venturer in a joint venture in respect of Debt, Liabilities or other obligations of such partnership or venture.

"Hazardous Materials" means: (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable Environmental Laws as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity or "EP toxicity;" (b) oil, petroleum or petroleum derived substances, natural gas, natural gas liquids or synthetic gas and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; (d) asbestos in any form or electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty parts per million; and (e) any substance, liquid, gas or vapor (in isolation or combined) deemed to be a pollutant by the enforcing Governmental Authority.

"Holdco" means BAM Management Holdco, LLC, a Delaware limited liability company.

"Holdco Limited Liability Company Agreement" means the limited liability company agreement of Holdco, to be entered into, in substantially the form set forth in Exhibit G, at the Closing by Holdco, Buyer and the profits interest holder members.

"IFRS" means International Financial Reporting Standards as issued by the International Accounting Standards Board.

"Indemnified Party" has the meaning set forth in Section 9.05.

"Indemnified Taxes" means (i) all Taxes of the Company (or any predecessor thereof) for any Pre-Closing Tax Period including, for the avoidance of doubt, any Tax allocable to the portion of any Straddle Period ending on (and including) the Closing Date as determined in accordance with the methodologies set forth in Section 7.03 and any Tax arising out of or resulting from the Transaction without regard to whether such Taxes are disclosed on the Disclosure Schedules; (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company (or any predecessor thereof) is or was a member on or prior to the Closing Date, including pursuant to Section 1.1502-6 of the Treasury Regulations or any analogous or similar state, local or foreign law or regulation; (iii) all Taxes of any other Person imposed on the Company (or any predecessor thereof) as the result of any Tax sharing agreement, Tax allocation agreement, tax indemnification agreement, tax gross-up agreement or other contract entered into prior to the Closing Date, (other than a contract entered into in the ordinary course of business the primary purpose of which is not related to Taxes), (iv) all Taxes of any other Person for which the Company (or any predecessor thereof) may be liable arising under the principles of transferee or successor Liability, by applicable Law, or otherwise, to the extent relating to an event or transaction

11

occurring before the Closing Date, (v) any Taxes of any Seller Party (including Taxes arising as a result of the Transaction) or for which any Seller Party may be liable (arising under the principles of transferee or successor Liability or by Contract, applicable Law or otherwise), including Taxes of the Company for which any Seller Party may be liable and Taxes described in Section 7.10(b)(iii), (vi) any Taxes incurred in connection with or arising out of the Restructuring, (vii) any breach of or inaccuracy in any representation or warranty made in Section 4.21, subject to Section 4.21(r) (determined, in each case, without regard to any materiality, Material Adverse Effect, knowledge, Knowledge of Seller Parties or any matters disclosed on the Disclosure Schedules), (viii) any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in Article VII, (ix) transfer taxes for which the Seller is responsible pursuant to Section 7.01, (x) the employer portion of any payroll Taxes arising out of any phantom equity, management bonus plan, change in control or similar plans, programs, agreements or arrangements entered into by the Company before the Closing Date and (xi) for each of (i) through (x), determined without regard to the fact that any item included therein may be disclosed or referred to in any way on the Disclosure Schedules; provided, however, that any item described in this definition shall not be considered an "Indemnified Tax" to the extent the Buyer is responsible for such amount pursuant to Section 7.01 or such amount was taken into account in the calculation of the amount of Final Working Capital, Final Net Financial Debt, or Final Transaction Expense or any Phantom Equity Payment.

"Indemnifying Party" has the meaning set forth in Section 9.05.

"Initial Payment" has the meaning set forth in Section 2.02(a).

"Initial Tax Adjustment Amount" means  an amount equal to $0.

"Insurance Policies" has the meaning set forth in Section 4.15.

"Intellectual Property" has the meaning set forth in Section 4.12(a).

"Intellectual Property Registrations" means the Company Intellectual Property that is either (a) subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing; or (b) used in the current or planned Business or operations of the Company.

"Interim Financial Statements" has the meaning set forth in Section 4.06.

"Interim Financial Statements Date" has the meaning set forth in Section 4.06.

"Knowledge" or any other similar knowledge qualification, means the actual knowledge of such Person, or, if such Person is a corporate entity, the actual knowledge of any director, managing member, manager or officer of such Person.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

12

"Liabilities" means any liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"Licensed Intellectual Property" has the meaning set forth in Section 4.12(a).

"Limited Liability Company Agreement" means the limited liability company agreement of the Company, to be entered into, in substantially the form set forth in Exhibit B, at the Closing by the Company, the Buyer, the Seller and any other party thereto.

"LLYC Holding" means LLYC Partners, S.L.

"LLYC Holding Interests" has the meaning set forth in Section 2.02(c).

"LLYC Parent" means Llorente & Cuenca, S.A.

"LLYC Parent Pro-Forma EBITDA" means, with respect to any Measurement Period, the pro-forma EBITDA of LLYC Parent on a consolidated basis for such Measurement Period and set forth on the report entitled "LLYC FY [_____] Results Announcement" for such Measurement Period, or if no pro-forma EBITDA is available in such report, then the Recurrent EBITDA for such Measurement Period contained in such report (available here: https://www.bmegrowth.es/ing/Ficha/LLYC__LLORENTE_Y_CUENCA__ES0105591004.aspx#ss_otraInfRelev).

"Losses" means losses, damages, Liabilities, Taxes, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, taken as a whole, or (b) the ability of the Seller Parties to consummate the Restructuring or the Transaction on a timely basis; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, or change, directly or indirectly, arising out of or attributable to: (i) any changes, conditions or effects in the United States or foreign economies or securities or financial markets in general; (ii) changes, conditions or effects that generally affect the industries in which the Company operate; (iii) any change, effect or circumstance resulting from an action required by this Agreement or any Transaction Document; or (iv) conditions caused by acts of terrorism or war (whether or not declared); provided further, however, that any event, occurrence, fact, condition, or change referred to in clauses (i), (ii) or (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on the Company compared to other participants in the industries in which the Company conduct its businesses.

13

"Material Contracts" has the meaning set forth in Section 4.09(a).

"Material Customers" has the meaning set forth in Section 4.14(a).

"Material Suppliers" has the meaning set forth in Section 4.14(b).

"Measurement Period" means any of the 2021/2022 Measurement Period, the 2022/2023 Measurement Period, the 2023/2024 Measurement Period, and the 2024/2025 Measurement Period.

"Membership Interests" has the meaning set forth in the recitals.

"Minimum Operating Cash Required" means $1,416,000.

"Money Laundering Laws" has the meaning set forth in Section 4.27.

"Negotiation Period" has the meaning set forth in Section 2.03(b)(i).

"Net Financial Debt" means, as of the Reference Time, an amount equal to (a) Debt less (b) Cash.

"Net Working Capital" means, as of the Reference Time, an amount equal to (a) the amount of current assets of the Company (excluding Cash and Tax Assets), less (b) the amount of current liabilities of the Company (excluding Restricted Cash, Debt and Tax Liabilities), in each case determined in accordance with the Accounting Principles and in a manner consistent with the Example Calculation.

"Objected Items" has the meaning set forth in Section 2.03(b)(i).

"Objections Statement" has the meaning set forth in Section 2.04(b).

"Option Agreement" means the option agreement to be entered into, in substantially the form set forth in Exhibit C, by the Buyer, the Seller, the Company and any other party thereto.

"Organizational Documents" means (a) in the case of a Person that is a corporation, its articles or certificate of incorporation and its by-laws, regulations or similar governing instruments required by the Laws of its jurisdiction of formation or organization; (b) in the case of a Person that is a partnership, its articles or certificate of partnership, formation or association, and its partnership agreement (in each case, limited, limited liability, general or otherwise); (c) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; and (d) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural Person, its governing instruments as required or contemplated by the Laws of its jurisdiction of organization.

"Payoff Letter" means customary payoff letters with respect to the Payoff Debt, each in form and substance reasonably satisfactory to Buyer pursuant to which the creditor(s) party thereto agree that upon payment of the amount of the Debt described therein, all obligations with respect

14

to such Debt will be indefeasibly paid in full and all Encumbrances and credit support related thereto will be discharged and automatically released.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from any Governmental Authorities in order to conduct the Business.

"Permitted Encumbrances" means, collectively, (a) Encumbrances for inchoate mechanics' and materialmen's liens for construction in progress and workmen's, repairmen's, warehousemen's and carriers' liens arising in the ordinary course of business and not for amounts then due but unpaid; (b) any option or right existing in favor of Buyer or Seller, or any Affiliate of Buyer or Seller, under the Option Agreement; and (c) Encumbrances for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, provided adequate reserves have been established for such contested Encumbrances for Taxes in accordance with IFRS.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Phantom Equity" means each plan, program, agreement or arrangement under which any phantom equity of the Company has been issued or under which any Person has a right to participate in a share of the proceeds under this Agreement (including each phantom equity award agreement and the Company's Management Bonus Plan, if any, and all award agreements thereunder).

"Phantom Equity Payments" means (a) all payments in respect of the Phantom Equity and (b) the employer portion of Taxes payable in respect of, or triggered by, the payments described in the immediately preceding clause (a).

"Post-Closing Statement" has the meaning set forth in Section 2.03(a).

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"Preliminary Net Financial Debt" has the meaning set forth in Section 2.03(a).

"Preliminary Net Working Capital" has the meaning set forth in Section 2.03(a).

"Preliminary Target Net Working Capital" has the meaning set forth in Section 2.03(a).

"Preliminary Transaction Expenses" has the meaning set forth in Section 2.03(a).

"Purchased Interests" has the meaning given to such term in the recitals.

"Purchase Price" has the meaning set forth in Section 2.02.

15

"Real Property" means the real property owned, leased or subleased by the Company, together with all buildings, structures and facilities located thereon.

"Recurrent Normalized EBITDA" means, for the applicable period, the EBITDA of the Company determined on a consistent basis in accordance with the adjustments, practices and methodologies set forth on Schedule D which includes the agreed calculation of 2021 Recurrent Normalized EBITDA.

"Reference Time" means 12:01 a.m. Pacific Time on the Closing Date.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, managing members, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Restricted Cash" means any cash or cash equivalents (i) designated as restricted cash on the Financial Statements of the Company, (ii) that is not freely usable by the Company as of the Closing because it is subject to restrictions or limitations on use or distribution by Law, Contract or otherwise, (iii) paid to satisfy or discharge any Debt or Transaction Expenses, or (iv) held in escrow accounts or as security deposits.

"Restrictive Covenant Agreement" means the restrictive covenant agreement to be entered into, in substantially the form set forth in Exhibit F, at the Closing by and between the Company and the Beneficial Owner.

"Restructuring" has the meaning set forth in the recitals of this Agreement.

"Review Period" has the meaning set forth in Section 2.03(b)(i).

"Second Deferred Payment" means the amount calculated pursuant to Section 2.02(b)(ii).

"Section 1542" has the meaning set forth in Section 6.07.

"Seller" has the meaning set forth in the preamble of this Agreement.

"Seller Parties" has the meaning set forth in the preamble of this Agreement.

"Seller Parties' Fundamental Representations" means the representations and warranties of the Seller Parties set forth in Section 3.01, Section 3.02, Section 3.04, Section 4.01, Section 4.02, Section 4.03, and Section 4.23.

"Seller Releasing Parties" has the meaning set forth in Section 6.07.

ACTIVE 686403262v1

"Shortfall Amount" has the meaning set forth in Section 2.03(c)(ii).

"Shortfall Subscription Amount" has the meaning set forth in Section 2.02(c).

"Statement of Objections" has the meaning set forth in Section 2.03(b)(i).

"Straddle Period" means any taxable period beginning on or before and ending after the Closing Date.

"Surviving Provisions" means Article I (Definitions), Section 6.04 (Confidentiality), Section 10.02 (Effect of Termination) and Article XI (Miscellaneous).

"Target Net Working Capital" means an amount equal to the average of the Net Working Capital of the Company on the last day of each of the twenty-four (24) months ending on March 31, 2023.

"Tax Authority" means the Internal Revenue Service of the United States of America and any other domestic or foreign governmental entity responsible for the administration of Taxes, including any state or local governmental entity.

"Tax Adjustment Amount" means collectively the Initial Tax Adjustment Amount and each Deferred Tax Adjustment Amount.

"Tax Claim" has the meaning set forth in Section 7.04.

"Taxes" means (a) all federal, state, local, foreign and other income, gross receipts, sales, use, value added, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, social security (or similar), disability, unemployment, estimated, alternative or add-on minimum, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind imposed by any Tax Authority, together with any interest, additions or penalties with respect thereto and (b) any Liability for amounts described in clause (a) of this definition of any other Person as a result of being a member of an affiliated, consolidated, combined, unitary or similar group (including as a result of being a member of an affiliated group within the meaning of Section 1504(a) of the Code or any similar provision of state, local, or foreign Tax Law), as a result of being a withholding or collection agent, as a result of being a transferee or successor or by Contract, pursuant to applicable Law or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating or required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Deferred Payment" means the amount calculated pursuant to Section 2.02(b)(iii).

"Third Party Claim" has the meaning set forth in Section 9.05(a).

17

ACTIVE 686403262v1

"Trading Day" means a day on which the Madrid Stock Exchange (*La Bolsa de Madrid*) is open for trading securities.

"Transaction" has the meaning set forth in the recitals.

"Transaction Documents" means this Agreement, the Option Agreement, the Limited Liability Company Agreement, the Restrictive Covenant Agreement, and the Employment Agreements.

"Transaction Expenses" means in each case, (a) any transaction bonus, retention, severance and change of control payments or obligations or any other compensatory payments made to any current or former employee or other service provider of the Company, in each case, that become payable or are triggered in connection with the sale of the Purchased Interests, the Restructuring, the Transaction Documents or the Transaction, including the Phantom Equity Payments, (b) the employer portion of Taxes payable in respect of, or triggered by, the payments described in the immediately preceding clause (a) and (c) solely to the extent not paid prior to the Closing, any legal, accounting, financial advisory and other third party advisory or consulting fees and other expenses incurred by the Company in connection with this Agreement, the sale of the Purchased Interests, the Restructuring, the Transaction Documents or the Transaction.

"Unaudited Financial Statements" has the meaning set forth in Section 4.06.

"Union" has the meaning set forth in Section 4.20(b).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101 et seq., as amended, related to plant closings, relocations, mass layoffs and employment losses.

"Working Capital Adjustment" means (a) the amount by which Net Working Capital as of the Reference Time exceeds the Target Net Working Capital or (b) the amount by which Net Working Capital as of the Reference Time is less than the Target Net Working Capital; provided that any amount that is calculated pursuant to clause (b) shall be deemed and expressed as a negative number.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01.  Purchase and Sale. Subject to the terms and conditions set forth herein, at the Closing, the Seller shall sell to the Buyer, and the Buyer shall purchase from the Seller, all of the Seller's right, title and interest in and to the Purchased Interests, free and clear of all Encumbrances.

Section 2.02.  Purchase Price. The aggregate purchase price for the Purchased Interests purchased pursuant to Section 2.01 shall be an aggregate amount equal to the Adjusted Initial Payment plus the Deferred Payments, if any (the "Purchase Price"), payable as follows:

18

(a)    Payments at Closing.

(i)    Initial Payment. Subject to the adjustments set forth in Section 2.03, at Closing, Buyer will pay to the Seller an amount equal to:

(A)    $7,067,160, representing the product of (1) the 2021 Value Amount and (2) sixty-seven percent (67%);

(B)    less the product of (1) Estimated Net Financial Debt and (2) sixty-seven percent (67%);

(C)    plus the product of (1) Estimated Working Capital Adjustment and (2) sixty-seven percent (67%); and

(D)    less the Estimated Transaction Expenses (the net amount of the forgoing clauses (A) through (D), the "Adjusted Initial Payment").

(ii)    Reserved.

(iii)    Payoff Debt. To the holders of obligations constituting Debt required to be paid off at or prior to Closing as set forth on Schedule 2.02(a)(iii) ("Payoff Debt"), Buyer shall pay on behalf of the Seller at the Closing, the portion of the Payoff Debt deducted from the Adjusted Initial Payment paid to Seller at Closing pursuant to Section 2.02(a)(i)(B), and the Company shall pay the remaining portion of the Payoff Debt not deducted from the Adjusted Initial Payment, in each case, as indicated on Schedule 2.02(a)(iii), pursuant to Payoff Letters to be provided by each such holder of obligations constituting Payoff Debt; provided that such payment by the Company shall be considered to have been paid immediately following the Closing with the Cash of the Company and shall not impact the calculation of Net Financial Debt for purposes of calculating the Final Adjusted Initial Payment and the Deferred Payments.

(iv)    Estimated Transaction Expenses.

(A)    At Closing, Buyer shall pay on behalf of Seller the Estimated Transaction Expenses (other than amounts attributable any transaction bonus, retention, severance and change of control payments or any other compensatory payments to made to any current or former employee of the Company, including the Phantom Equity Payments) in the amounts and to the Persons pursuant to invoices provided by such Persons.

(B)    At Closing, Buyer shall pay on behalf of Seller by wire transfer in immediately available funds to the Company's payroll account, the amount of the Estimated Transaction Expenses related to any transaction bonus, retention, severance and change of control payments or any other compensatory payments to be made to any current or former employee of the Company, including the Phantom Equity Payments, for further payment by the Company to each recipient thereof, less applicable withholdings, through a special payroll run on or before the Closing Date.

(v)    Payment of the Applicable Tax Adjustment Amount. Buyer shall pay to Seller (A) at Closing, together with, in addition to, and in the same manner as, the Adjusted

19

Initial Payment, an amount equal to the Initial Tax Adjustment Amount and (B) upon payment of any Deferred Payment in accordance with Section 2.02(c), together with, in addition to, and in the same manner as, such Deferred Payment, an amount equal to the Deferred Tax Adjustment Amount with respect to  such Deferred Payment.

(b)    Deferred Payments. The Deferred Payments shall be calculated as follows:

(i)    First Deferred Payment. An amount equal to (A) the product of (1) sixty-seven percent (67%) and (2) the 2021/2022 Value Amount; (B) less the product of (1) sixty-seven percent (67%) and (2) Final Net Financial Debt; (C) plus the product of (1) sixty-seven percent (67%) and (2) Final Working Capital Adjustment; (D) less the Final Transaction Expenses; and (E) less the Final Adjusted Initial Payment. The First Deferred Payment shall be reduced by the Phantom Equity Payments in respect of the First Deferred Payment, which amount shall be paid by Buyer to the Company via wire transfer of immediately available funds to the Company's payroll account for further payment by the Company to each recipient thereof, less applicable withholdings, on or before the Company next regular payroll date that is at least ten (10) Business Days after the date the First Deferred Payment is made to Seller.

(ii)    Second Deferred Payment. An amount equal to (A) the product of (1) seventy-eight percent (78%) and (2) the 2022/2023 Value Amount; (B) less the product of (1) seventy-eight percent (78%) and (2) Final Net Financial Debt; (C) plus the product of (1) seventy-eight percent (78%) and (2) Final Working Capital Adjustment; (D) less the Final Transaction Expenses; (E) less the Final Adjusted Initial Payment; and (F) less the First Deferred Payment. The Second Deferred Payment shall be reduced by the Phantom Equity Payments in respect of the Second Deferred Payment, which amount shall be paid by Buyer to the Company via wire transfer of immediately available funds to the Company's payroll account for further payment by the Company to each recipient thereof, less applicable withholdings, on or before the Company next regular payroll date that is at least ten (10) Business Days after the date the Second Deferred Payment is made to Seller.

(iii)    Third Deferred Payment. An amount equal to (A) the product of (1) eighty-nine percent (89%) and (2) the 2023/2024 Value Amount; (B) less the product of (1) eighty-nine percent (89%) and (2) Final Net Financial Debt; (C) plus the product of (1) eighty-nine percent (89%) and (2) Final Working Capital Adjustment; (D) less the Final Transaction Expenses; (E) less the Final Adjusted Initial Payment; (F) less the First Deferred Payment; and (G) less the Second Deferred Payment. The Third Deferred Payment shall be reduced by the Phantom Equity Payments in respect of the Third Deferred Payment, which amount shall be paid by Buyer to the Company via wire transfer of immediately available funds to the Company's payroll account for further payment by the Company to each recipient thereof, less applicable withholdings, on or before the Company next regular payroll date that is at least ten (10) Business Days after the date the Third Deferred Payment is made to Seller.

(iv)    Fourth Deferred Payment.  An amount equal to (A) the product of (1) one hundred percent (100%) and (2) the 2024/2025 Value Amount; (B) less the product of (1) one hundred percent (100%) and (2) Final Net Financial Debt; (C) plus the product of (1) one hundred percent (100%) and (2) Final Working Capital Adjustment; (D) less the Final Transaction Expenses; (E) less the Final Adjusted Initial Payment; (F) less the First Deferred Payment; (G)

20

less the Second Deferred Payment; and (H) less the Third Deferred Payment. The Fourth Deferred Payment shall be reduced by the Phantom Equity Payments in respect of the Fourth Deferred Payment, which amount shall be paid by Buyer to the Company via wire transfer of immediately available funds to the Company's payroll account for further payment by the Company to each recipient thereof, less applicable withholdings, on or before the Company next regular payroll date that is at least ten (10) Business Days after the date the Fourth Deferred Payment is made to Seller.

Notwithstanding anything contained herein to the contrary, in the event that (x) the Applicable Multiple used to determine any Deferred Payment would be 8 but for this sentence and (y) ninety percent (90%) of the Applicable Implicit Multiple would be less than 8, then the Applicable Multiple for such Deferred Payment shall instead be 7.5.

(c)    Payment of Deferred Payments.  Within five (5) Business Days after each Deferred Payment becomes final and binding in accordance with Section 2.04, Buyer shall or shall cause one or more of its Affiliates to pay such Deferred Payment and the corresponding Deferred Tax Adjustment Amount to the Seller by wire transfer of immediately available funds to an account designated in writing by the Seller.  Notwithstanding anything to the contrary contained in this Agreement, with respect to Buyer's obligation to pay any of the Second Deferred Payment, Third Deferred Payment and Fourth Deferred Payment as required by this Section 2.02(c), Buyer shall satisfy such obligation to pay any such Deferred Payments by (i) wire transfer of immediately available funds in an amount equal to the amount of the applicable Deferred Payment less the amount of the Deferred Payment paid in equity of LLYC Holding pursuant to clause (i) of this Section 2.02(c), to an account designated in writing by the Seller and (ii) directing LLYC Holding to issue to the Beneficial Owner an amount of equity of LLYC Holding having an aggregate Fair Market Value equal to ten percent (10%) of such Deferred Payment (calculated in Euros at the Exchange Rate) (the "LLYC Holding Interests"); provided, however, that in the event that ten percent (10%) of all the Deferred Payments is less than $700,000 in the aggregate, the Seller Parties shall pay the amount of such shortfall (the "Shortfall Subscription Amount") in immediately available cash to LLYC Holding within thirty (30) days following the date that the Fourth Deferred Payment is paid or would have been paid had an amount been due to Seller in accordance with this Agreement in exchange for the issuance by LLYC Holding of that number of LLYC Holding Interests having an aggregate Fair Market Value equal to the Shortfall Subscription Amount.  In the event that any portion of a Deferred Payment is paid in equity of LLYC Parent, the Seller Parties will take such further action (including the execution and delivery of such further instruments and documents) as Buyer or LLYC Holding reasonably may request to effectuate such issuance of equity of LLYC Holding contemplated hereby.

(d)    Measurement Period Covenants. Subject to the terms of this Agreement and the other Transaction Documents, Buyer shall have sole discretion with regard to all matters relating to the operation of the Company; provided, that following the Closing and until the last day of the 2024/2025 Measurement Period, the Buyer shall, and shall cause its Affiliates to:

(i)    Cause the Company to remain as a separate corporate entity, and for the business of the Company and all of its material operating assets to remain controlled by Buyer;

(ii)    Maintain complete and accurate books and records of the Company, necessary in all material respects to permit an audit of the Company as a stand-alone business;

21

(iii)    Not effectuate any transaction between the Company, on the one hand, and Buyer or its Affiliates, on the other hand, on a basis less favorable in any material respect to the Company than would be the case if such transaction had been at arm's-length with an unrelated Person who is not a party to this Agreement or an Affiliate of a party to this Agreement, other than any transactions related to, and the payment of, the Company Platform Costs (as defined in the Limited Liability Company Agreement);

(iv)    Not terminate the employment of the Beneficial Owner (except for "Cause" as defined in, and in accordance with, the Beneficial Owner's Employment Agreement);

(v)    Prepare the financial statements in accordance with the Accounting Principles; and

(vi)    Not directly or indirectly, take any actions in bad faith that would avoid or reduce any of the Deferred Payments;

provided, further, that nothing in this Section 2.02(d) shall restrict Buyer from integrating the Company into Buyer's corporate organization and enterprise level programs of Buyer and its Affiliates (including with respect to human resources administration, legal, compliance, risk and other similar corporate overhead services and functions) as may be advisable in achieving cost synergies or replacing Company services with corresponding services or functions provided by Buyer and its Affiliates.  Notwithstanding the foregoing, Buyer has no obligation to operate the Company in order to achieve the Deferred Payments or maximize the amount of the Deferred Payments.

Section 2.03.    Purchase Price Adjustment.

(a)    Post-Closing Adjustment. No later than 90 days following the Closing Date, the Buyer shall prepare and deliver a statement (the "Post-Closing Statement") to the Seller setting forth the Company's auditor's calculation of (i) the Target  Net Working Capital (the "Preliminary Target Net Working Capital"), the Net Working Capital as of the Reference Time and the resulting Working Capital Adjustment (the "Preliminary Net Working Capital"); (ii) the components of the Net Financial Debt as of the Reference Time and the resulting calculation of the Net Financial Debt as of the Reference Time (collectively, the "Preliminary Net Financial Debt"), (iii) the components of the Transaction Expenses as of the Reference Time and the resulting calculation of the Transaction Expenses as of the Reference Time (the "Preliminary Transaction Expenses"), and (iv) the resulting calculation of the Adjusted Initial Payment, in each case, including reasonable support for the calculations reflected thereon, based on the books and records of the Company, and prepared in accordance with the Accounting Principles.  The Company's auditor shall be selected by the Buyer.

(b)    Examination and Review.

(i)    Upon receipt of the Post-Closing Statement, the Seller shall have 30 days (the "Review Period") to review such Post-Closing Statement and the calculation of the Preliminary Target Net Working Capital, Preliminary Net Working Capital, the Preliminary Net Financial Debt and the Preliminary Transaction Expenses. Buyer shall provide the Seller with

22

reasonable access to the relevant books and records for the purpose of facilitating the Seller's review of the Post-Closing Statement. Buyer shall continue providing such access throughout the Review Period. Buyer shall respond promptly and in good faith and as fully and accurately as is reasonably practicable to reasonable inquiries from the Seller related to its review of the Post-Closing Statement. If the Seller has accepted such Post-Closing Statement in writing or has not given written notice to the Buyer setting forth any objection of the Seller to such Post-Closing Statement (a "Statement of Objections") on or before the last day of the Review Period, then such Post-Closing Statement shall be final and binding upon the parties and shall be deemed the Final Closing Statement.  In the event that the Seller delivers a Statement of Objections on or prior to the expiration of the Review Period, the Buyer and the Seller shall negotiate in good faith to resolve any objection within 30 days following the receipt by the Buyer of the Statement of Objections (the "Negotiation Period").  The Statement of Objections shall reasonably explain any objection to the Post-Closing Statement and the amounts or line items thereof as to which the Seller disagrees (collectively, the "Objected Items") and shall include the Seller's proposed calculation of each such amount.  The Seller shall provide to Buyer reasonable supporting documentation for each Objected Item concurrently with the delivery of the Statement of Objections.  Except for Objected Items, the Seller shall be deemed to have accepted all other amounts contained in the Post-Closing Statement, and all such amounts shall be considered final and binding for all purposes hereunder. If, during the Negotiation Period, the Seller and the Buyer agree in writing upon any of the Objected Items, the amounts so determined shall no longer be considered to be Objected Items and will be final and binding on the parties for all purposes hereunder.  If the Buyer and the Seller are unable to reach an agreement in writing on any Objected Item on or before the last day of the Negotiation Period, then the Buyer or the Seller shall submit such matter to the Accounting Referee, and if so submitted, the Buyer and the Seller shall execute such engagement letter or other agreements as reasonably requested by the Accounting Referee.

(ii)     The Accounting Referee shall only consider the Objected Items on which the Seller and the Buyer have not reached an agreement in writing.  The Accounting Referee's determination shall take into account the principles and definitions set forth in this Agreement and Schedule A, including the definitions of Target Net Working Capital, Net Working Capital, Net Financial Debt, Transaction Expenses, and the definitions of the components of each of the foregoing contained herein.  The Accounting Referee shall resolve all outstanding Objected Items within 20 days after receipt of the Statement of Objections, or as soon as practicable thereafter.  The Accounting Referee's determination shall be based solely on the presentations to be made by the Buyer and the Seller that are in accordance with the terms and procedures set forth in this Agreement (i.e., not on the basis of an independent review).  The Accounting Referee may not assign a value to any item greater than the greatest value for such item claimed by either the Buyer or the Seller or less than the smallest value for such item claimed by either the Buyer or the Seller.  The resolution of the dispute by the Accounting Referee shall be final, binding and non-appealable on the parties hereto, absent manifest error.  For the avoidance of doubt, the Accounting Referee shall act as an expert and not an arbitrator.

(iii)     The Post-Closing Statement as agreed to by the Seller and the Buyer (including if no Statement of Objections is given to the Buyer within the Review Period) or as determined by the Accounting Referee is referred to herein as the "Final Closing Statement" and (A) the Target Net Working Capital ( the "Final Target Net Working Capital"), the Net Working

23

Capital and the resulting Working Capital Adjustment set forth on the Final Closing Statement shall be deemed the final Net Working Capital as of Closing (the "Final Net Working Capital") and the final Working Capital Adjustment as of Closing (the "Final Working Capital Adjustment"), (B) the components of Net Financial Debt and the resulting Net Financial Debt set forth on the Final Closing Statement shall be deemed the final Net Financial Debt as of the Reference Time (the "Final Net Financial Debt"), and (C) the components of Transaction Expenses and the resulting Transaction Expenses set forth on the Final Closing Statement shall be deemed the final Transaction Expenses as of the Reference Time (the "Final Transaction Expenses"), and (D) the resulting calculation of the Adjusted Initial Payment shall be deemed the final Adjusted Initial Payment (the "Final Adjusted Initial Payment").

(iv)     The costs and expenses of the Accounting Referee shall be borne by the Seller, on the one hand, and the Buyer, on the other hand, in proportion to the difference between the Accounting Referee's determination of the Objected Items and the amount of Objected Items claimed by the Buyer and the Seller.  For example, if it is the Buyer's position that Objected Item is $300, the Seller's position is that the Objected Item is $100, and the Accounting Referee's finding is that the Objected Item is $150, then the Buyer shall pay 75% (300-150 / 300-100) of such fees and expenses and the Seller shall pay 25% (150-100 / 300-100) of such fees and expenses.

(c)     Adjustment to Adjusted Initial Payment.

(i)     If the Final Adjusted Initial Payment is less than the Adjusted Initial Payment (the amount of such difference, (the "Excess Amount"), then the Seller Parties shall pay to Buyer the amount of such Excess Amount; or

(ii)     If the Adjusted Initial Payment is less than the Final Adjusted Initial Payment (the amount of such difference, (the "Shortfall Amount"), then Buyer shall pay to Seller the amount of such Shortfall Amount.

(iii)     All payments pursuant to this Section 2.03(c) shall be made by wire transfer of immediately available funds to an account designated in writing in advance by Buyer or Seller, as applicable, and shall be made on or prior to the third (3rd) Business Day following the date on which the Final Adjusted Initial Payment is finally determined pursuant to Section 2.03.

(d)     Adjustments for Tax Purposes. Any adjustments made pursuant to this Section 2.03 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

Section 2.04.   Determination of Deferred Payments.

(a)     No later than sixty (60) days after the Company's audited financial statements for the applicable Measurement Period have been completed and delivered to the Company and Buyer, Buyer shall, or shall instruct the Company's auditor to, prepare and deliver to Seller (i) a written statement (each, a "DP Statement"), setting forth in reasonable detail the Company's auditor's calculation of applicable Deferred Payment and the components thereof and the resulting Deferred Payment for such Measurement Period,  (ii) the Company's audited

24

financial statements for such Measurement Period and (iii) the Company's auditor's calculation of applicable Deferred Tax Adjustment Amount and the assumed Entity Tax Rate and other assumed tax rates and the amount of any deductions of Taxes and any California pass-through entity elective tax credit taken into account in the determination of the Deferred Tax Adjustment Amount. The Company's auditor shall be selected by the Buyer.

(b)     Upon receipt of each DP Statement, the Seller shall have 30 days (in each case, the "DP Review Period") to review such DP Statement and the calculation of the Deferred Payment and Deferred Tax Adjustment Amount set set forth therein. Buyer shall provide the Seller with reasonable access to the relevant books and records for the purpose of facilitating the Seller's review of the DP Statement. Buyer shall continue providing such access throughout the DP Review Period. Buyer shall respond promptly and in good faith and as fully and accurately as is reasonably practicable to reasonable inquiries from the Seller related to its review of the DP Statement. If the Seller has accepted such DP Statement in writing or has not given written notice to the Buyer setting forth any objection of the Seller to such DP Statement (an "Objections Statement") on or before the last day of the DP Review Period, then such DP Statement shall be final and binding upon the parties. In the event that the Seller delivers an Objections Statement on or prior to the expiration of the DP Review Period, the Buyer and the Seller shall negotiate in good faith to resolve any objection within 30 days following the receipt by the Buyer of the Objections Statement (the "DP Negotiation Period"). The Objections Statement shall reasonably explain any objection to the DP Statement and the amounts or line items thereof as to which the Seller disagrees (collectively, the "DP Objected Items") and shall include the Seller's proposed calculation of each such amount. The Seller shall provide to Buyer reasonable supporting documentation for each DP Objected Item concurrently with the delivery of the Objections Statement. Except for DP Objected Items, the Seller shall be deemed to have accepted all other amounts contained in the DP Statement, and all such amounts shall be considered final and binding for all purposes hereunder. If, during the DP Negotiation Period, the Seller and the Buyer agree in writing upon any of the DP Objected Items, the amounts so determined shall no longer be considered to be DP Objected Items and will be final and binding on the parties for all purposes hereunder. If the Buyer and the Seller are unable to reach an agreement in writing on any DP Objected Item on or before the last day of the DP Negotiation Period, then the Buyer or the Seller shall submit such matter to the Accounting Referee, and if so submitted, the Buyer and the Seller shall execute such engagement letter or other agreements as reasonably requested by the Accounting Referee.

(c)     The Accounting Referee shall only consider the DP Objected Items on which the Seller and the Buyer have not reached an agreement in writing. The Accounting Referee's determination shall take into account the principles and definitions set forth in this Agreement and Schedule D. The Accounting Referee shall resolve all outstanding DP Objected Items within 20 days after receipt of the Objections Statement, or as soon as practicable thereafter. The Accounting Referee's determination shall be based solely on the presentations to be made by the Buyer and the Seller that are in accordance with the terms and procedures set forth in this Agreement (i.e., not on the basis of an independent review). The Accounting Referee may not assign a value to any item greater than the greatest value for such item claimed by either the Buyer or the Seller or less than the smallest value for such item claimed by either the Buyer or the Seller. The resolution of the dispute by the Accounting Referee shall be final, binding and non-appealable

25

ACTIVE 686403262v1

on the parties hereto, absent manifest error.  For the avoidance of doubt, the Accounting Referee shall act as an expert and not an arbitrator.

(d)     Upon the amount of each Deferred Payment becoming final, conclusive and binding in accordance with this Section 2.04, Buyer shall pay such Deferred Payment to Seller in accordance with Section 2.02(c).  The costs and expenses of the Accounting Referee under this Section 2.04 shall be borne by the Seller Parties, on the one hand, and the Buyer, on the other hand, in the same manner provided in Section 2.03(b)(iv), *mutatis mutandis*.

Section 2.05.   Closing.

(a)     Subject to the terms and conditions of this Agreement, the purchase and sale of the Purchased Interests, and consummation of the transactions contemplated herein (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement on the date of this Agreement (the "Closing Date") remotely by the electronic transmission of documents and wire transfer of funds.  The Closing shall be effective as of the Reference Time.

(b)     All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

(c)     At the Closing, the Buyer shall deliver to the Seller:

(i)     The Adjusted Initial Payment by wire transfer of immediately available funds to an account designated by the Seller;

(ii)     the Limited Liability Company Agreement, duly executed by the Buyer and the Company;

(iii)     the Option Agreement, duly executed by the Buyer;

(iv)     the Employment Agreements, duly executed by the Company;

(v)     a certificate of the Secretary (or equivalent officer) of the Buyer certifying (A) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or equivalent governing body of the Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the Transaction, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction; and (B) the names and signatures of the officers of the Buyer authorized to sign this Agreement, the other Transaction Documents to which the Buyer is a party and the other documents to be delivered hereunder and thereunder; and

(vi)     the Holdco Limited Liability Company Agreement, executed by Buyer; and

(d)     At the Closing, the Seller Parties shall deliver to the Buyer:

26

(i)      An assignment of the Purchased Interests to the Buyer in the form attached hereto as Exhibit D (the "Assignment"), duly executed by the Seller;

(ii)      evidence reasonably satisfactory to Buyer that the Company has cash in its bank accounts in an aggregate amount equal to at least the Minimum Operating Cash Required;

(iii)      evidence of the resignation or removal of all officers and managers of the Company, as applicable, effective upon the Closing, other than the Beneficial Owner;

(iv)      The Restrictive Covenant Agreement, duly executed by the Beneficial Owner.

(v)      the Employment Agreements, duly executed by the Beneficial Owner;

(vi)      the Limited Liability Company Agreement, duly executed by the Seller and the Beneficial Owner;

(vii)      the Option Agreement, duly executed by the Seller and the Beneficial Owner;

(viii)      evidence of termination of Affiliate Contracts (which, for the avoidance of doubt, does not include any Transaction Document) excluding the agreements identified on Schedule C;

(ix)      Payoff Letter with respect to all the Payoff Debts;

(x)      a certificate of the Secretary (or equivalent officer) of the Seller certifying (A) that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or equivalent body) of the Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which the Seller is a party and the consummation of the Transaction, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Transaction; (B) the names and signatures of the officers of the Seller authorized to sign the Transaction Documents and the other documents to be delivered hereunder and thereunder; and (C) that the Restructuring has been performed and completed in accordance with Schedule B;

(xi)      a good standing certificate (or its equivalent) for the Company from the secretary of state or similar Governmental Authority of the jurisdiction under the Laws in which the Company is organized;

(xii)      a duly completed and executed IRS Form W-9 for each Seller Party, in form and substance reasonably acceptable to the Buyer;

(xiii)      a duly executed general release, in form and substance acceptable to the Buyer, from the Company and each holder of Phantom Equity;

27

(xiv)   a broker representation and release letter, in form and substance reasonably acceptable to Buyer, executed by the broker set forth on Section 4.23 of the Disclosure Schedules;

(xv)   grant award agreements in respect of membership interests in Holdco, in form and substance reasonably acceptable to Buyer, executed by each holder thereof, if any as of Closing; and

(xvi)   evidence reasonably satisfactory to Buyer that resolutions (or other necessary and appropriate action, including any plan amendments) have been properly adopted to reflect the withdrawal of OnePitch, LLC as a participating employer in the Benefit Plans effective as of no later than the day before the Closing Date.

Section 2.06.   Withholding Tax.   Notwithstanding any other provision in this Agreement, the Buyer (and any other applicable withholding agent) shall be entitled to deduct and withhold from any payments to be made under any Transaction Documents to the Seller or any other Person such amounts as the Buyer (or such other applicable withholding agent) is required to deduct and withhold under any Tax Laws.   To the extent that amounts are so deducted or withheld, such deducted or withheld amounts shall be treated for all purposes of this Agreement or the applicable Transaction Document as having been paid to the Person in respect of whom such deduction or withholding was made.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLER PARTIES

Except as may otherwise be set forth in the Disclosure Schedules, which shall be organized by Section and Subsection corresponding to the representations and warranties set forth in this Agreement, the Seller Parties, jointly and severally, hereby represent and warrant, as applicable, to the Buyer as follows:

Section 3.01.   Organization and Authority of the Seller Parties.

(a)   The Seller (i) is duly formed, validly existing and in good standing under the Laws of the state of its organization or formation, and (ii) has the requisite corporate or similar power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the Restructuring and the Transaction.   The execution and delivery by the Seller of this Agreement and the other Transaction Documents to which it is a party, its performance hereunder and thereunder, and the consummation by such Seller Party of the Restructuring and the Transaction have been duly authorized by all necessary corporate or similar action on the part of the Seller and no other corporate, shareholder, member, or similar proceedings or actions by the Seller are necessary to authorize the entering into of this Agreement, the other Transaction Documents to which the Seller is a party, or the consummation of the Restructuring or the Transaction.

ACTIVE 686403262v1

(b)      The Beneficial Owner is legally competent to execute and deliver this Agreement and the other Transaction Documents to which the Beneficial Owner is a party, to perform her obligations hereunder and thereunder, and to consummate the Restructuring and the Transaction. The Beneficial Owner has obtained any consent that may be required under applicable Law to consummate the Restructuring and the Transaction.

(c)      This Agreement and the other Transaction Documents to which any of the Seller Parties are a party will be, when delivered, duly executed and delivered by the Seller Parties, and, assuming due authorization, execution and delivery by the other parties hereto and thereto, will constitute a legal, valid and binding obligation of the Seller Parties, enforceable against the Seller Parties in accordance with the terms hereto and thereto, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting enforcement of creditors' rights generally and by general principles of equity (including the possibility of unavailability of specific performance or injunctive relief), regardless of whether applied in a proceeding at Law or in equity (the "General Enforceability Exceptions").

Section 3.02.   Title to Purchased Interests.  The Seller owns 100% of the issued and outstanding Membership Interests of the Company, including the Purchased Interests, free and clear of all Encumbrances, other than the right to share in the proceeds under this Agreement in respect of the phantom equity interests in the amounts and payable to the individuals set forth in Section 3.02 of the Disclosure Schedules. The Beneficial Owner owns 100% of the issued and outstanding capital stock of Seller. Upon consummation of the Transaction on the Closing Date, the Purchased Interests will be owned by the Buyer, free and clear of all Encumbrances.

Section 3.03.   No Conflicts; Consents. Except as set forth in Section 3.03 of the Disclosure Schedules, the execution, delivery and performance by the Seller Parties of the Transaction Documents to which any of the Seller Parties is a party, the Restructuring and the consummation of the Transaction, do not (a) contravene any provision of the Organizational Documents of the Seller or any Law; (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Permit or consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Seller Parties is a party; (c) require, with respect to any of the Seller Parties, the consent or Permit of any Person (including any Governmental Authority) under any Law or agreement which has not already been obtained; or (d) result in the creation or imposition of any Encumbrance on any properties (including Real Property) or assets of the Company.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any of the Seller Parties in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transaction.

Section 3.04.   Brokers or Finders.  Except as set forth in Section 3.03 of the Disclosure Schedules, none of the Seller Parties has entered into any agreement or arrangement entitling any broker, finder, investment banker or other firm or Person to

29

any brokerage, finder's or other fee, commission or expense payable by the Buyer, the Company, or any of their respective Affiliates in connection with the Transaction.

Section 3.05.    Investment; Accredited Investor.    The Beneficial Owner is not acquiring the LLYC Holding Interests with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act.  The Beneficial Owner has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of her investment in the LLYC Holding Interests and participation in the transactions contemplated hereunder, and the Beneficial Owner is capable of bearing the economic risks of such investment, including a complete loss of her investment in the LLYC Holding Interests.  The Beneficial Owner is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act.  The Seller Parties acknowledge that none of Buyer, LLYC Holding or their respective Affiliates has made or shall be deemed to have made, and that the Seller Parties have not relied on any representation or warranty, express or implied, with respect to Buyer, LLYC Holding, the LLYC Holding Interests, other than the representations and warranties that are expressly forth in Article V of this Agreement. The Seller Parties acknowledge that the LLYC Holding Interests and the sale thereof have not been registered under the Laws of the United States.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES
## WITH RESPECT TO THE COMPANY

Except as may otherwise be set forth in the Disclosure Schedules, which shall be organized by Section and Subsection corresponding to the representations and warranties set forth in this Agreement with only those disclosures listed in a Section or Subsection of the Disclosure Schedules modifying the corresponding (and no other) Section or Subsection of this Agreement, the Seller Parties, jointly and severally, hereby represent and warrant, as applicable, to the Buyer as follows:

Section 4.01.    Organization, Authority and Qualification of the Company.

(a)    The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.  The copies of the Organizational Documents of the Company delivered to the Buyer by the Seller Parties are complete and correct copies thereof.  The Organizational Documents of the Company are in full force and effect, and the Company is not in violation of any provision thereof.

(b)    The Company has the requisite limited liability company power and authority to execute the Transaction Documents to which the Company is a party, to perform its obligations thereunder, and to consummate the Restructuring and the Transaction, to own, operate or lease its properties and assets now owned, operated or leased by it, and to carry on its business as it has been and is currently conducted.  The Transaction Documents to which the Company is a party will be, when delivered to the other parties thereto, duly executed and delivered by such Company, and, assuming due authorization, execution and delivery by the other parties thereto, will constitute a legal, valid and binding obligation of such Company, enforceable against such

30

Company in accordance with the terms thereto, except as such enforcement may be limited by the General Enforceability Exceptions.  All limited liability company actions taken by the Company in connection with the Transaction Documents to which the Company is a party will be duly authorized on or prior to the Closing.

Section 4.02.   Capitalization.

(a)     Seller is the sole and exclusive holder of record of the Membership Interests in the Company. The Membership Interests constitute 100% of the total issued and outstanding Equity in the Company.  All of the Membership Interests will have been duly authorized and are validly issued, are fully-paid and non-assessable, and have been issued in compliance with all applicable Laws and any preemptive rights, rights of first refusal or similar rights of any Person. The Membership Interests were not issued in violation of any of the Organizational Documents of the Company or any other agreement, arrangement or commitment to which any of the Seller Parties or the Company is a party.  Upon consummation of the Transaction, the Buyer shall own the Purchased Interests, which shall constitute 80% of the total issued and outstanding Equity in the Company, free and clear of all Encumbrances.

(b)     Except for the Phantom Equity set forth on Section 3.02 of the Disclosure Schedules and the respective rights of the parties to the Option Agreement, there are no outstanding or authorized subscriptions, options, warrants, calls, preemptive rights, conversion or other rights, plans, programs, agreements, arrangements, commitments of any character, trusts, proxies or understandings relating to the sale, issuance, registration or voting of any membership interests or other Equity of the Company, or of any securities or other instruments convertible into, exchangeable for or evidencing the right to purchase any Equity of the Company or under which any Person has a right to participate in a share of the proceeds in connection with the sale of any Equity of the Company under this Agreement.   There are no outstanding agreements or commitments obligating the Company to repurchase, redeem or otherwise acquire, or pay any dividends in respect of, any outstanding Equity of the Company.  There are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the membership interests or other Equity of the Company.  Section 4.02 of the Disclosure Schedules sets forth, for each award of Phantom Equity, (i) the name of the recipient of such award, (ii) the percentage interest in the Company such award represents, (iii) the portion of the Purchase Price payable at Closing in respect of such award expressed as a dollar amount and (iv) the portion of each Deferred Payment, if any, payable in respect of such award expressed as a percentage of the total Deferred Payment.

(c)     The Company does not own, or has any interest in, any shares, ownership interest or Equity in any other Person.

Section 4.03.   Equity Commitments. Except as provided for in this Agreement, (a) neither of the Seller Parties nor any other Person has Equity Commitments outstanding with respect to the Membership Interests, and the Company does not have an obligation, whether currently or contingent upon the occurrence of any event or passage of time, to issue any Equity Commitments with respect to the Membership Interests or other Equity of the Company; (b) no Equity Commitments with respect to the Membership Interests or other Equity of the Company will arise in connection with

31

or as a result of the Restructuring or the Transaction; (c) there are no agreements with respect to the voting or transfer of the Membership Interests or other Equity of the Company, nor is the Company a party to any agreement containing any right of first refusal, right of first offer or right of co-sale relating to the Membership Interests or other Equity of the Company; and (d) the Company is not obligated to redeem or otherwise acquire any of the Membership Interests or other Equity of the Company.

Section 4.04.   Qualifications.   Section 4.04 of the Disclosure Schedules sets forth each jurisdiction in which the Company is licensed or qualified to do business, and the Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary.

Section 4.05.   No Conflicts; Consents. Except as set forth in Section 4.05 of the Disclosure Schedules, the execution, delivery and performance by the Company of the Transaction Documents to which the Company is a party, the Restructuring and the consummation of the Transaction, do not (a) contravene any provision of the Organizational Documents of the Company or any Law; (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Permit or consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, lease, sublease, license, Permit, franchise or other instrument or arrangement to which the Company is a party; (c) require, with respect to the Company, the consent or Permit of any Person (including any Governmental Authority) under any Law or agreement which has not already been obtained; or (d) result in the creation or imposition of any Encumbrance on any properties (including Real Property) or assets of the Company.  Neither the Company nor the Seller Parties have received any notice to the effect that, or otherwise been advised that, the Company is not in compliance with any Law.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Company in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transaction or the Restructuring.

Section 4.06.   Financial Statements. Section 4.06 of the Disclosure Schedules contains complete copies of (i) the unaudited financial statements of the Company consisting of the balance sheet of the Company as of the fiscal year end of the year 2020 and the related statements of income and retained earnings, shareholders' equity and cash flow for the year then ended (the "Unaudited Financial Statements"), (ii) the audited financial statements of the Company consisting of the balance sheet of the Company as of the fiscal year end of the year 2021 and the related statements of income and retained earnings, shareholders' equity and cash flow for the years then ended (the "Audited Financial Statements"), and (iii) the unaudited financial statements consisting of the balance sheet of the Company (the "Balance Sheet") as of December 31, 2022 (the "Interim Financial Statements Date") and the related statements of income and retained earnings, shareholders' or members' equity and cash flow for the applicable period then ended (the "Interim Financial Statements" and, together with the Unaudited

32

Financial Statements, the "Financial Statements").  The Financial Statements have been prepared in accordance with IFRS applied on a consistent basis throughout the periods involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements).  The Financial Statements (a) are consistent with the books and records of the Company (which books and records are correct and complete in all material respects); (b) fairly present the financial condition of the Company and its assets and Liabilities as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated, in each case, in accordance with IFRS, and in the case of the Interim Financial Statements, subject to the exceptions set forth in the preceding sentence; (c) do not include any extraordinary or nonrecurring operation or transaction except as expressly set forth in the notes thereto; and (d) comply with all Laws and Governmental Orders in all material respects.

Section 4.07.   Undisclosed Liabilities. Except as set forth in Section 4.07 of the Disclosure Schedules, the Company does not have any Liabilities , except (a) those which are adequately reflected on, accrued, or reserved against in the Balance Sheet, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Interim Financial Statements Date and which are not, individually or in the aggregate, material in amount (none of which relates to any breach of any contract, claim, lawsuit, tort, infringement, misappropriation or violation of Law).  All Liabilities of the Company as of the Closing are exclusively related to the Business.  Notwithstanding the foregoing, no representation or warranty is made pursuant to this Section 4.07 with respect to any liabilities or obligations relating to or arising from matters that are substantively covered by another representation or warranty contained in this Article 4.

Section 4.08.   Absence of Certain Changes, Events and Conditions.  Except as set forth in Section 4.08 of the Disclosure Schedules, since the Interim Financial Statements Date, and other than in the ordinary course of business consistent with past practice or as required in order to complete the Restructuring, there has not been, with respect to the Company, any:

(a)     event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     issuance, sale or other disposition of, or creation of any Encumbrance on, any Equity of the Company, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any Equity of the Company;

(c)     redemption, purchase or acquisition of any Equity of the Company;

(d)     material change in any method of accounting or accounting practice of the Company, except as required by IFRS;

ACTIVE 686403262v1

(e)     material change in the Company's cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(f)     entry into any Contract that would constitute a Material Contract;

(g)     incurrence, assumption or Guarantee of any Debt for borrowed money;

(h)     transfer, assignment, sale or other disposition of any of the assets shown or reflected in the Balance Sheet or cancellation of any Debts or entitlements;

(i)     material damage, destruction or loss (whether or not covered by insurance) to its property (including Real Property);

(j)     any capital investment in, or any loan to, any other Person;

(k)     acceleration, termination, material modification to or cancellation of any material Contract (including, but not limited to, any Material Contract) to which the Company is a party or by which it is bound;

(l)     any capital expenditures in excess of $5,000 for all commitments in the aggregate;

(m)     other than Permitted Encumbrances, imposition of any Encumbrance upon the Company's properties (including Real Property) or assets, tangible or intangible;

(n)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of its employees, members, directors, officers, managers, consultants or independent contractors, other than as provided for in any written agreements or required by applicable Law, (ii) material change in the terms of employment for any employee or any termination of any employees, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any employee, member, director, officer, manager, consultant or independent contractor;

(o)     adoption, modification or termination of any: (i) employment, severance, retention or other agreement with an employee, (ii) Benefit Plan (except as otherwise expressly contemplated in Section 2.05(d)) or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(p)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any of its members, managers, officers and employees;

(q)     entry into a new line of business or abandonment or discontinuance of existing lines of business;

34

(r)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provision of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(s)     purchase, lease or other acquisition of the right to own, use or lease any property or assets for an amount in excess of $25,000, individually (in the case of a lease, per annum) or $100,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of inventory or supplies in the ordinary course of business consistent with past practice;

(t)     acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets, stock or other Equity of, or by any other manner, any business or any Person or any division thereof;

(u)     action by the Company to (i) make, change or rescind any Tax election, (ii) amend any Tax Return or (iii) take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax Liability of, or reducing any Tax deduction, credit or other benefit or favorable Tax attribute available to, the Company or the Buyer in respect of any Tax period beginning after the Closing Date or, in the case of a Straddle Period, the portion thereof beginning after the Closing Date; or

(v)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

Section 4.09.   Material Contracts.

(a)     Section 4.09(a) of the Disclosure Schedules sets forth a true, complete and correct list of each of the following Contracts (other than Contracts that by their terms may be terminated in the ordinary course of business upon no more than 30 days' notice without penalty or premium) to which the Company is a party or by which the Company or any of its assets is bound and which have not been entirely fulfilled or performed (such Contracts and any amendments, modifications or supplements thereto, collectively, the "Material Contracts"):

(i)     all Contracts that contain restrictions with respect to payment of dividends or any other distribution in respect of the Membership Interests or other Equity of the Company;

(ii)     any Contract that by its terms requires the payment by or on behalf of the Company in excess of $25,000 per annum or the delivery by the Company of goods or services with a fair market value in excess of $25,000 per annum or provides for the Company to receive payments in excess of $25,000 per annum;

(iii)     all Contracts involving a loan (other than accounts receivable owing from trade debtors in the ordinary course of business) or advance to (other than travel and entertainment advances to the employees of the Company extended in the ordinary course of

35

business), or investment in, any Person or any agreement relating to the making of any such loan, advance or investment;

(iv)   any Contract that (A) requires the Company to purchase any product or service from a third party or (B) requires that Company deal exclusively with a third party in connection with the sale or purchase of any product or service;

(v)   any Contract that relates to an acquisition or divestiture of material assets that contains covenants, indemnities or other contractual obligations that could impose a Liability that is material to the Company;

(vi)   any Contract under which the Company has any outstanding Debt or evidencing an Encumbrance on any property or asset of the Company, other than a Permitted Encumbrance;

(vii)   all Contracts under which any Person (other than the Company) has directly or indirectly guaranteed Debt of the Company;

(viii)   any bonds or Contracts of Guarantee in which the Company acts as a surety or guarantor with respect to any obligation (fixed or contingent) of another Person;

(ix)   all Contracts involving any joint venture, partnership, strategic alliance, shareholders' agreement, co-marketing, co-promotion, joint development or similar arrangement;

(x)   all Contracts involving any resolution or settlement of any actual or threatened Action under which the Company has any obligation or Liability that will continue after the Closing Date;

(xi)   any Contract limiting or restraining the Company or any successor thereto from engaging or competing in any manner, in any location or in any business;

(xii)   all Affiliate Contracts;

(xiii)   any Contract providing for the license of or settlement with respect to the Company Intellectual Property (other than off-the-shelf commercially available software and hardware), as well as Intellectual Property license agreements under which the Company is currently a licensee;

(xiv)   any Contract concerning the occupancy, management or operation of any Real Property owned, leased or used by the Company;

(xv)   all collective bargaining agreements entered into by the Company; and

(xvi)   any Contract providing that the Company indemnify any Person in an amount that would be material to such Company, other than any such agreement entered into in the ordinary course of business.

36

(b)     The Company is in material compliance with the terms and provisions of each Material Contract.  The Company has not received notice of any breach, default or notice of termination by any Person under any Material Contract.  A complete copy of each written Material Contract has been provided to the Buyer and a description of each oral Material Contract is set forth in Section 4.09(a) of the Disclosure Schedules.

(c)     Each Material Contract is (i) valid and binding on the Company in accordance with its respective terms and (ii) in full force and effect.  Neither the Company, nor, to the Knowledge of the Seller Parties and the Company, any other party thereto is in material breach of or default under (or is alleged to be in breach of or default under), or has provided, delivered, or received any notice of any intention to terminate, any Material Contract.  To the Knowledge of the Seller Parties, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(d)     Other than as set forth in Section 4.09(d) of the Disclosure Schedules, the Company does not have any Liability for the deferred purchase price of property, goods or services, whether connected or not to the acquisition of any business ("earn-out" or other similar type of payments) or noncompetition agreement.

Section 4.10.   Title to, Condition and Sufficiency of Assets.

(a)     The Company has good and valid title to, or, as applicable, a valid and existing leasehold interest in or license to, all of its properties and assets, including furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property and other assets reflected in the Audited Financial Statements or acquired after the Interim Financial Statements Date, other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Interim Financial Statements Date.  All such properties and assets (including leasehold interests) (i) are free and clear of all Encumbrances other than Permitted Encumbrances; and (ii) include all the tangible and intangible assets and rights required for the operation of the Business as has been and as is currently being conducted by the Company.  During the past three years, there has not been any significant interruption of the Business due to inadequate maintenance or obsolescence of such properties and assets (including leasehold interests).

(b)     Except as set forth in Section 4.10(b) of the Disclosure Schedules, the furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Company are in good operating condition and repair (reasonable wear and tear excepted consistent with the age of such items), and are adequate for the uses to which they are being put, and none of such furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

(c)     Section 4.10(c) of the Disclosure Schedule sets forth a list of all vehicles owned, leased or otherwise used by the Company.

37

Section 4.11.   Real Property. The Company does not own, and has never owned, any Real Property and does not lease, sublease, license or otherwise use, or has the right to lease, sublease, license or otherwise use, any Real Property.

Section 4.12.   Intellectual Property.

(a)   "Intellectual Property" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world, including such property that is owned by the Company (the "Company Intellectual Property") and that in which the Company holds exclusive or non-exclusive rights or interests granted by license from other Persons ("Licensed Intellectual Property"):

(i)   trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications;

(ii)   internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority;

(iii)   original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by Law), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications;

(iv)   confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and

(v)   patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications.

(b)   All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing.

(c)   The Company owns exclusively all right, title and interest in and to the Company Intellectual Property, free and clear of Encumbrances and have the exclusive right to use and license the same, free and clear of any claim or conflict with the Intellectual Property of others and no royalties, honorariums or fees are payable by the Company to any Person by reason of the ownership or use of the Company Intellectual Property.  Without limiting the generality of the foregoing, the Company has entered into binding, written agreements with every current and former employee of the Company and with every current and former independent contractor who

38

is or was involved in the development or creation of any Company Intellectual Property, whereby such employees and independent contractors (i) assign to the Company any ownership interest and right they may have in the Company Intellectual Property; and (ii) acknowledge the Company's exclusive ownership of all Company Intellectual Property.

(d)     The Company Intellectual Property and Licensed Intellectual Property as currently or formerly owned, licensed or used by the Company or proposed to be used, and the Business as currently and formerly conducted and proposed to be conducted have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person.  The Company has not received any communication, and no Action has been instituted, settled or, to the Knowledge of the Seller Parties and the Company, threatened that alleges any such infringement, violation or misappropriation, and none of the Company Intellectual Property is subject to any outstanding Governmental Order.

(e)     To the Knowledge of the Seller Parties and the Company, no Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any of the Company Intellectual Property.

Section 4.13.  Accounts. Subject to proper reserves taken into account as reflected in the Financial Statements, the accounts and notes receivable of the Company are not subject to any dispute, counterclaim, defense, set-off or other claim.  The accounts and notes receivable of the Company are valid and genuine and have arisen solely out of bona fide sales and deliveries of goods, performances of services and other business transactions of the Company, are held free and clear of all Encumbrances other than Permitted Encumbrances and, to the Knowledge of the Seller Parties and the Company, are collectable in the ordinary course of business.  Since the Interim Financial Statements Date, the Company has not (a) with respect to any portion of its trade accounts payable (i) failed to pay its trade accounts payable in the ordinary course of business consistent with past practice or (ii) extended the terms of payment, whether by Contract, amendment, act, deed or course of dealing, of any trade account payable, or (b) with respect to any portion of its accounts and notes receivable, accelerated or delayed collection of such accounts and notes receivable.

Section 4.14.  Customers and Suppliers.

(a)     Section 4.14(a) of the Disclosure Schedules sets forth the 20 principal customers of the Company based on gross revenue for each of calendar year ended December 31, 2021 and December 31, 2022, together with the Dollar amount of goods and/or services sold by the Company to each such customer (collectively, the "Material Customers").  Except as disclosed on Section 4.16(a) of the Disclosure Schedules, no Material Customer has terminated or materially altered its relationship with the Company or has stated its intention to any Seller Party or the Company to not continue to do business or to materially alter its relationship with the Company. The Company does not have any disputes or disagreements with any Material Customer.  To the Knowledge of the Seller Parties and the Company, there exists no set of facts which could reasonably be expected to furnish a basis for any of the Material Customers to not continue to do business or to materially alter their respective relationship with the Company.

39

(b)      Section 4.14(b) of the Disclosure Schedules sets forth the 10 principal suppliers based on expenses to whom the Company has paid consideration for goods or services for each of calendar year ended December 31, 2021 and December 31, 2022, together with the Dollar amount of goods and/or services purchased by the Company from each such supplier (collectively, the "Material Suppliers").  No Material Suppliers sells to or supplies the Company on an exclusive basis or is an employee, or deemed an employee, of the Company.  None of the Material Suppliers' employees, officers or agents are deemed the employees, officers or agents of the Company or cause the Company to be responsible in any way for the Debts, Liabilities or obligations of any Material Supplier.  No Material Supplier has terminated or materially altered its relationship with the Company or has stated its intention to any Seller Party or the Company to not continue to do business or to materially alter its relationship with the Company.  The Company does not have any disputes or disagreements with any Material Supplier.

(c)      Neither of the Seller Parties, the Company or any other Affiliate or agent of the Company, or any other Person acting on behalf of or associated with the Company, acting alone or together, has directly or indirectly given or agreed to give any money, gift or similar benefit to any customer, supplier, purchasing group, employee or agent of any customer or supplier or other Person who was, is or may be in a position to help or hinder the business of the Company (including the Business) or assist the Company in connection with any actual or proposed transaction, in each case (i) in violation of any applicable Law, (ii) if not given in the past, may have had an adverse effect on the assets, business (including the Business), operations or prospects of the Company in any material respect or (iii) if not continued in the future, may adversely affect the assets, business, operations or prospects of the Company in any material respect.

Section 4.15.   Insurance.  Section 4.15 of the Disclosure Schedules sets forth a true and complete list of all current policies, binders, other insurance arrangements or Contracts for the transfer or sharing of insurance risks of fire, Liability, product Liability, umbrella Liability, real and personal property, workers' compensation, vehicular, directors' and officers' Liability, fiduciary Liability and other casualty and property insurance maintained by the Company or relating to the assets, business, operations, employees, officers or managers of the Company (collectively, the "Insurance Policies"), including the amounts of such insurance and annual premiums with respect thereto.  All Insurance Policies (i) are in full force and effect, were in full force and effect during the periods of time that such Insurance Policies purported to be in effect, and shall remain in full force and effect following the consummation of the Transaction and (ii) all premiums due under the Insurance Policies have been timely paid.  The Insurance Policies in effect as of the date of this Agreement include mandated coverage under all Laws as required in any jurisdiction where the Company are conducting any aspect of the Business.  The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based Liability on the part of the Company.  The Company has not received any notice of cancellation or intent to cancel any of the Insurance Policies.  Except as noted in Section 4.15 of the Disclosure Schedules, there are no claims or Actions related to the Business pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.  The Company is not

40

in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy.

Section 4.16.   Legal Proceedings; Governmental Orders.

(a)      Except as set forth on Section 4.16 of the Disclosure Schedules, there are no Actions that are pending or, to the Knowledge of the Seller Parties and the Company, threatened against or by the Company or any of their Affiliates (i) that affect the Company or any of the Company's properties or assets, (ii) that challenge or question the validity of this Agreement, the other Transaction Documents, the Restructuring or the Transaction, or (iii) that seek to enjoin or obtain monetary damages in respect of this Agreement, the other Transaction Documents, the Restructuring or the Transaction.  Section 4.16(a) of the Disclosure Schedules also includes a true and correct listing of all Actions against the Company that were pending, settled or adjudicated since January 1, 2019.

(b)      There are no outstanding Governmental Orders or unsatisfied judgments, penalties or awards against or affecting the Company or any of their respective properties or assets.

Section 4.17.   Compliance with Laws; Permits.

(a)      The Company has complied and, are now complying in all material respects with all Laws and Governmental Orders applicable to the Business, properties or assets.

(b)      The Company possesses all Permits necessary to own, lease and operate, rent, sell, assign and transfer its assets and conduct the Business as currently conducted.  The Permits are valid and in full force and effect.  All fees and charges with respect to such Permits as of the date hereof have been paid in full.  The Company has not received any notice nor does any of the Seller Parties or the Company have Knowledge of any impending or threatened notice from any Governmental Authority (i) asserting that the Company is not in compliance with any Permit or Law or (ii) threatening to suspend, revoke, revise, limit, restrict or terminate any Permit held by the Company or declare any such Permit invalid.

(c)      The Company is in material compliance with all statutes, Laws, ordinances, rules, orders and regulations of federal, state, provincial and local governments related to (i) the development, testing, manufacture, packaging, distribution and marketing of products; (ii) employment, safety and health; and (iii) environmental protection, building, zoning and land use. The Company does not have claims that are pending under any of the Company's warranties or Guarantees, the Company has not received notice of any such claims and, to the Knowledge of the Seller Parties and the Company, no such claims are threatened.  Since January 1, 2019, the Company has not received any written communication from any Governmental Authority or third party that alleges that the Company is not in compliance with any such federal, state, provincial or local Laws, rules or regulations.

(d)      The Company is not subject to levies, assessments or any other Liabilities for unclaimed property under applicable escheat or unclaimed property Laws.

Section 4.18.   Environmental Matters.

41

(a)     The Company is currently and has been in compliance with all Environmental Laws, and neither any of the Seller Parties nor the Company has received from any Person any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements.

(b)     The Company has obtained and is in material compliance with all Environmental Permits necessary for the ownership, lease, operation or use of their respective businesses (including the Business) and all such Environmental Permits are in full force and effect.

(c)     There has been no Release of Hazardous Materials in contravention of any Environmental Law with respect to the Business or assets of the Company.

(d)     The Company has not retained or assumed, by Contract or operation of Law, any Liabilities or obligations of any Person under Environmental Law.

Section 4.19.   Employee Benefit Matters.

(a)     Section 4.19(a) of the Disclosure Schedules contains a true and complete list of each (i) oral or written employment or consulting agreement to or under which the Company is a party or has or may have any actual or contingent Liability or obligation, and (ii) compensation or benefit plan, program, agreement or arrangement which is or has been maintained, sponsored, contributed to or required to be contributed to by the Company or any of its ERISA Affiliates for the benefit of any current or former employee, director, officer, manager, consultant, independent contractor or member of the Company (or any of their respective dependents or beneficiaries), or under which the Company or any of its ERISA Affiliates has or may have any Liability, or with respect to which the Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise, including, without limitation, any pension, profit sharing, retirement, bonus, deferred compensation, incentive, performance award, phantom equity or Equity, health and welfare, change in control, retention, severance, vacation, paid time off, fringe-benefit and other benefit or compensation  plan, agreement, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA (each, a "Benefit Plan").

(b)     Except as set forth on Section 4.19(a) of the Disclosure Schedules, with respect to each Benefit Plan: (i) each is and has been maintained, operated and administered in all material respects in compliance with its terms and with all applicable Laws, including, but not limited to, ERISA and the Code; (ii) no Actions or disputes are pending or threatened; (iii) no audits, inquiries, reviews, proceedings, claims, or demands are pending with any governmental or regulatory agency; (iv) all premiums, contributions or other payments required to have been made by Law or under the terms of any Benefit Plan or any Contract relating thereto as of the date hereof have been made; (v) all material reports, returns and similar documents required to be filed with any Governmental Authority have been duly and timely filed; (vi) no "prohibited transaction" has occurred within the meaning of the applicable provisions of ERISA or the Code; (vii) there have been no acts or omissions by the Company or any of its ERISA Affiliates that have given or could give rise to any fines, penalties, Taxes or related charges under Sections 502(c), 502(i), 502(l),

42

502(m) or 4071 of ERISA or Section 511 or Chapter 43 of the Code, or under any other applicable Law, for which the Company or any of its ERISA Affiliates may be liable; and (viii) as of the Closing Date, no Benefit Plan has any participating employers other than the Company.

(c)     With respect to each Benefit Plan, the Seller Parties have made available to the Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and Contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the Transaction or otherwise; (iv) copies of the most recent summary plan descriptions, summaries of material modifications, employee handbooks and any other material written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the three most recently filed Form 5500, with schedules attached; (vii) nondiscrimination testing results with respect to the most recently completed plan year; and (viii) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor or Pension Benefit Guaranty Corporation relating to the Benefit Plan.

(d)     No Benefit Plan is, nor does the Company or any of its ERISA Affiliates have any Liability or obligation under: (i) a defined benefit pension plan subject to Section 412 of the Code or Title IV of ERISA; (ii) a multiemployer plan as defined in Section 4001(a)(3), or (iii) a multiple employer plan as defined in Section 413(c) of the Code.

(e)     No Benefit Plan provides medical or death benefits with respect to any employee or former employee of the Company after termination of employment, except as required under Section 4980B of the Code or Part 6 of Title I of ERISA or other applicable Law. No Benefit Plan is a self-insured group health plan.

(f)     The Company is not and will not be obligated to pay change in control, separation, severance, termination or other compensation or benefits as a result of the Restructuring or the Transaction, nor will the Restructuring or the Transaction accelerate the time of payment or vesting, or increase the amount, or require the funding, of any benefit or other compensation due to any Person.

(g)     Neither the Restructuring nor the Transaction will be the direct or indirect cause of any amount or benefit paid or payable being classified as a parachute payment under Section 280G of the Code.

(h)     Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter or with respect to a prototype plan, can rely on an opinion letter from the IRS issued to the prototype plan sponsor to the effect that such Benefit Plan is so qualified, and nothing has occurred that could reasonably be expected to cause the loss of the qualified status of such Benefit Plan.

43

Section 4.20.   <u>Employees, Consultants and Contractors</u>.

(a)   <u>Section 4.20(a)</u> of the Disclosure Schedules contains a list of all individuals who are employees, consultants, or contractors of the Company as of the date hereof, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof.  As of the date hereof, all compensation, including wages, commissions and bonuses, payable and due to employees, consultants, or contractors of the Company for services performed on or prior to the date hereof, have been paid in the ordinary course in accordance with past payroll practices and there are no outstanding agreements, understandings or commitments of the Company with respect to any commissions, bonuses or increases in compensation.

(b)   Except as set forth in <u>Section 4.20(b)</u> of the Disclosure Schedules, the Company is not a party to, bound by, or currently negotiating any (i) employment agreement, consulting agreement or any other agreement or Contract with any of its employees or contractors or (ii) collective bargaining agreement or other similar type of agreement or Contract with a Union, works council or labor organization (collectively, "<u>Union</u>"), and there is not, and there has never been, any Union representing or purporting to represent any employee of the Company, and, to the Knowledge of the Seller Parties and the Company, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining.  There has never been, nor, to the Knowledge of each Seller Party and the Company, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting the Company or any of their respective employees.  The Company does not have any duty to bargain with any Union.

(c)   All individuals characterized and treated by the Company as consultants or independent contractors are properly classified as independent contractors and not as employees under all applicable Laws.  The Company does not have any direct or indirect Liability as a result of any misclassification of any Person as an independent contractor rather than as an "<u>employee</u>".  Except as set forth in <u>Section 4.20(c)</u> of the Disclosure Schedules, all employees (and, if applicable, Persons wrongly misclassified as independent contractors rather than as "<u>employees</u>") of the Company are employed on an "<u>at-will</u>" basis or pursuant to the terms of agreements that are terminable by the Company immediately without incurring any Liability (other than earned but unpaid compensation).

(d)   The Company has fewer than one hundred employees, in the aggregate, has never been subject to the WARN Act, and/or the WARN Act's state equivalents, and has no plans to undertake any action in the future that would trigger the WARN Act.

(e)   Except as set forth in <u>Section 4.20(e)</u> of the Disclosure Schedules, the Company has calculated and accurately paid all Taxes, fees and charges due to any Governmental Authority with respect to the employment of, or services provided by, its employees, consultants, or contractors.

*ACTIVE 686403262v1*

Section 4.21.   Taxes.   Except as set forth on Section 4.21 of the Disclosure Schedules:

(a)   The Company has timely filed all income and other material Tax Returns which it has been required to be filed by the Company with the appropriate Tax Authority.  The Company has timely paid all Taxes due and payable (whether or not shown or required to be shown on any Tax Return).  All such Tax Returns are true, correct and complete in all material respects.

(b)   The Company has not filed or requested any extension of time within which to file any Tax Return, which Tax Return has not been filed.

(c)   The Company has withheld or collected and timely paid to the appropriate Tax Authority all Taxes required to have been withheld or collected and paid in connection with (i) amounts paid or received or owing to any employee, independent contractor, creditor, stockholder, member, partner or other Person and (ii) sales, use, ad valorem, and value added Taxes.

(d)   There are no pending claims, assessments, deficiencies or audits with respect to any Taxes owed or allegedly owed by the Company or any Tax Returns of the Company and, to the Knowledge of the Seller Parties, no such claim, assessment, deficiency or audit is threatened in writing by any Tax Authority.

(e)   The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect.

(f)   There are no Encumbrances for Taxes upon or pending or, to the Knowledge of the Seller Parties and the Company, threatened against any assets of the Company, other than Permitted Encumbrances.

(g)   No claim has ever been made by any Tax Authority in a jurisdiction in which the Company does not file Tax Returns that such Company is or may be subject to taxation by that jurisdiction.

(h)   No Seller Party is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)   At all times since its inception, and continuing until the date of the Reorganization, the Company was properly treated as an "S corporation" within the meaning of Section 1361(a)(1) of the Code (and any corresponding or similar applicable provision of state, local, foreign or other income Tax Law).  Beginning on the date the Reorganization was consummated, and at all times thereafter, the Company has been classified as either a qualified subchapter S subsidiary under Code Section 1361(b)(3)(B) or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3(b)(1)(ii) and has not filed an election to be treated as a corporation for U.S. federal and applicable state, local or foreign income tax purposes.  As of immediately prior to the Closing on the Closing Date, the Company is a disregarded entity for U.S. federal and applicable state, local or foreign income tax purposes.  The Restructuring has been

45

consummated at the times described in, and in all respects in accordance with, the description of the Restructuring set forth in Schedule B to this Agreement.

(j)     Neither the Company nor the Buyer will be required to include any item of income in, or exclude any item of deduction from, taxable income for any Tax period (or portion thereof) ending on or after the Closing Date as a result of any: (i) change in method of accounting for a Tax period ending on or prior to the Closing Date or the use of an improper method of accounting on or prior to the Closing Date (including for the avoidance of doubt any adjustments under Section 481 of the Code relating to any of the foregoing); (ii) agreement entered into with any Governmental Authority (including a "closing agreement" under Section 7121 of the Code) on or prior to the Closing Date; (iii) installment sale or transaction reported as an open transaction for U.S. federal income Tax purposes (or any similar doctrine under state, local, or non-U.S. applicable Laws) made on or prior to the Closing Date; (iv)  prepaid amount, deposit or advance payment received on or prior to the Closing Date, or (v) election to defer income under the Code (or any corresponding or similar provision of state, local or foreign Law) made by the Company at or prior to the Closing Date.

(k)     The Company has not, pursuant to any COVID-19 Measure, (i) deferred until after the Closing the payment of any payroll Taxes the due date for the original payment of which was at or prior to the Closing, (ii) claimed any "employee retention credit", or (iii) applied for forgiveness of a Paycheck Protection Program loan.

(l)     The Company is not a party to or bound by any Tax allocation,  sharing, indemnity or gross-up agreements, (other than a contract entered into in the ordinary course of business the primary purpose of which is not related to Taxes).  The Company does not have any liability for Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any corresponding provisions of state, local or foreign Tax law), or as a transferee or successor, or by contract, applicable Law or otherwise.

(m)     The Company has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for Tax-deferred treatment under Section 355 of the Code.

(n)     Company has not participated in a "listed transaction" within the meaning of Section 6707A(c)(2).

(o)     The Company has never held and does not currently hold, directly or indirectly, an equity interest in any entity.

(p)     For purposes of this Section 4.21, any reference to the Company shall be deemed to include any Person that merged with or was liquidated or converted into the Company.

(q)     Notwithstanding anything to the contrary herein, except for the representations made in clauses (i), (j), (k), (l), (n), and (o) of this Section 4.21, no representations are made under this Section 4.21 with respect to taxable periods other than Pre-Closing Tax Periods.

46

Section 4.22.   Books and Records. The minute books of the Company have been made available to the Buyer, are complete and correct in all material respects, have been maintained in all material respects in accordance with sound business practices, and comply in all material respects with all Laws and Governmental Orders.

Section 4.23.   Brokers or Finders.  Except as set forth on Section 4.23 of the Disclosure Schedule, the Company has not entered into any agreement or arrangement entitling any broker, finder, investment banker or other firm or Person to any brokerage, finder's or other fee, commission or expense payable by the Buyer, the Company or any of their respective Affiliates (other than Seller Parties, which shall be responsible for payment of such fees, commissions and expenses) in connection with the Restructuring or the Transaction.

Section 4.24.   Affiliate Transactions. Section 4.24 of the Disclosure Schedules lists all existing Contracts or other arrangements or transactions between the Company, on the one hand, and (a) the Seller or any of its respective Affiliates, (b) the Beneficial Owner or her respective immediate family members or Affiliates or (c) the directors, managers, officers, employees, consultants or agents (or any immediate family member thereof), as applicable, of the Seller Parties or any of their respective Affiliates, on the other hand (collectively, the "Affiliate Contracts").

Section 4.25.   Patriot Act / Economic Sanctions. The Seller Parties and the Company are in compliance with the requirements of Executive Order No. 13224, 66 Fed Reg. 49079 (September 25, 2001) and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury and in any enabling legislation or other executive orders in respect thereof.  To the Knowledge of the Seller Parties and the Company, each customer, distributor, supplier and Person with whom the Company has done business or engaged in any transaction: (a) is not currently identified on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control, Department of the Treasury, or on any other similar list maintained by the Office of Foreign Assets Control, Department of Treasury pursuant to any authorizing statute, executive order or regulation; and (b) is not a Person with whom a citizen of the United States or U.S. entity is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States Law or executive order of the President of the United States.

Section 4.26.   No Illegal Payments. The Seller Parties, the Company and, to the Knowledge of the Seller Parties and the Company, each director, manager, officer, employee and agent of the Company, is in compliance with: (a) applicable Laws relating to illegal payments and bribes; and (b) applicable Laws relating to illegal political contributions, including all requirements of the United States Foreign Corrupt Practices Act of 1977, and the regulations thereunder, as amended from time to time.  Without limiting the generality of the foregoing, none of the Seller Parties, the Company nor, to the Knowledge of the Seller Parties and the Company, any of their officers, employees or Representatives has corruptly or otherwise offered, paid, promised to pay, or authorized the payment of any money, or offered, given, promised to give, or authorized

47

the giving of anything of value to: (i) any government or similar official for purposes of (A) (1) influencing any act or decision of such official in his or her official capacity, (2) inducing such official to do or omit to do any act in violation of the lawful duty of such official, or (3) securing any improper advantage; or (B) inducing such official to use his or her influence with a Governmental Authority to affect or influence any act or decision of such Governmental Authority, in order to assist any of the Seller Parties or the Company in obtaining or retaining business for or with, or directing business to, any Person or; (ii) any political party or official thereof or any candidate for political office for purposes of (A) (1) influencing any act or decision of such party, official, or candidate in its or his or her official capacity, (2) inducing such party, official, or candidate to do or omit to do an act in violation of the lawful duty of such party, official, or candidate, or (3) securing any improper advantage; or (B) inducing such party, official, or candidate to use its or his or her influence with a Governmental Authority to affect or influence any act or decision of such Governmental Authority in order to assist any of the Seller Parties or the Company in obtaining or retaining business for or with, or directing business to, any Person; or (iii) any Person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any official, to any political party or official thereof, or to any candidate for political office, for purposes of (A) (1) influencing any act or decision of such official, political party, party official, or candidate in his or her or its official capacity, (2) inducing such official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such official, political party, party official, or candidate, or (3) securing any improper advantage; or (B) inducing such official, political party, party official, or candidate to use his or her or its influence with a Governmental Authority to affect or influence any act or decision of such Governmental Authority, in order to assist any of the Seller Parties or the Company in obtaining or retaining business for or with, or directing business to, any Person.  There have been no false or fictitious entries made in the books or records of the Company relating to any offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, including any bribe, kickback or other illegal or improper payment, and none of the Seller Parties or the Company has established or maintained a secret or unrecorded fund. The Company has instituted and maintain policies and procedures designed to ensure compliance with the United States Foreign Corrupt Practices Act of 1977, and the regulations thereunder, as amended from time to time.

Section 4.27.   Anti-Money Laundering. The operations of the Company are and have been, conducted in compliance with all anti-money laundering Laws, rules and regulations to which the Company is subject (collectively, "Money Laundering Laws") and no investigation, action, suit or proceeding before any Governmental Authority involving the Company with respect to Money Laundering Laws is pending and, to the Knowledge of each Seller Party and the Company, no such actions, suits or proceedings are threatened.

Section 4.28.   EXCLUSIVITY     OF     REPRESENTATIONS     AND WARRANTIES. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE III AND

48

ARTICLE IV OF THIS AGREEMENT (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) AND IN ANY OTHER TRANSACTION DOCUMENT TO WHICH A SELLER PARTY IS A PARTY, NO SELLER PARTY (NOR ANY OTHER PERSON) MAKES OR HAS MADE ANY REPRESENTATION OR WARRANTY IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY. EACH SELLER PARTY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PURCHASER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), INCLUDING AS TO THE CONDITION, VALUE OR QUALITY OF THE COMPANY'S BUSINESSES OR ASSETS, BUYER SHALL RELY SOLELY ON ITS OWN EXAMINATION AND INVESTIGATION THEREOF AS WELL AS THE REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN ANY OTHER TRANSACTION DOCUMENT TO WHICH A SELLER PARTY IS A PARTY. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE III AND THIS ARTICLE IV ARE QUALIFIED IN THEIR ENTIRETY BY, AND SHALL NOT BE DEEMED TO BE INACCURATE OR THE SCHEDULES RELATED THERETO INCOMPLETE AS A RESULT OF, THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL THE PROVISIONS OF THIS SECTION 4.28 LIMIT ANY CLAIM BASED ON FRAUD, INTENTIONAL MISREPRESENTATION OR WILLFUL MISCONDUCT.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller Parties as follows:

Section 5.01.   Organization and Authority of the Buyer.

(a)   The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of Delaware and has the requisite corporate or similar power and authority to execute and deliver this Agreement and the other Transaction Documents to which the Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the Transaction.

(b)   The execution and delivery by the Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by the Buyer of its obligations hereunder and thereunder, and the consummation by the Buyer of the Transaction have been duly authorized by all necessary corporate or similar action on the part of the Buyer and no other corporate, shareholder, member or similar proceedings or actions by the Buyer are necessary to authorize and consummate this Agreement, the other Transaction Documents to which Buyer is a party, or the Transaction.

(c)   This Agreement and the other Transaction Documents to which the Buyer is a party will be, when delivered to the Seller, duly executed by the Buyer, and, assuming due

49

authorization, execution and delivery by the other parties hereto and thereto, will constitute a legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with the terms hereto and thereto, except as such enforcement may be limited by the General Enforceability Exceptions.

Section 5.02.    No Conflicts; Consents. The execution, delivery and performance by the Buyer of this Agreement and the other Transaction Documents to which the Buyer is a party, and the consummation of the Transaction, do not and will not: (a) contravene any provision of the Organizational Documents of such Buyer or any Law; (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Permit or consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, lease, sublease, license, Permit, franchise or other instrument or arrangement to which the Buyer is a party; or (c) require, with respect to the Buyer, the consent or Permit of any Person (including any Governmental Authority) under any Law or agreement which has not already been obtained.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transaction.

Section 5.03.    Investment Purpose. The Buyer is acquiring the Purchased Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  The Buyer acknowledges that the Purchased Interests are not registered under the Securities Act of 1933, as amended, or any state securities Laws, and that the Purchased Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities Laws and regulations, as applicable.

Section 5.04.    Brokers or Finders. The Buyer has not entered into any agreement or arrangement entitling any broker, finder, investment banker or other firm or Person to any brokerage, finder's or other fee, commission or expense payable by the Seller Parties or the Company in connection with the Transaction.

Section 5.05.    Legal Proceedings. There are no Actions pending or, to the Knowledge of the Buyer, threatened against or by Buyer or any of its Affiliates that (a) challenge or question the validity of this Agreement or the consummation of the Transaction or (b) seek to enjoin, prevent or otherwise delay or obtain monetary damages in respect of this Agreement or the consummation of the Transaction.

Section 5.06.    No Additional Representations; Disclaimer

(a)    Buyer acknowledges and agrees that it (i) is an informed and sophisticated Buyer with such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase of the Purchased Interest, and that it has engaged expert advisors experienced in the evaluation and purchase of companies such as the Company,

50

and (ii) has conducted its own independent review and analysis of and has evaluated such documents, information and other material as it has deemed necessary to enable it to make an informed and intelligent decision and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects of the Company.

(b)      Buyer acknowledges and agrees that it is not relying nor has it relied on any express or implied representations or warranties except for those expressly made by the seller parties in Article III and Article IV, and that only those representations and warranties in Article III and Article IV shall have any legal effect.  Without limiting the foregoing, and except in the event of fraud, intentional misrepresentation or willful misconduct, Buyer further acknowledges and agrees that it is not relying nor has it relied on any projections, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) of the Company heretofore or hereafter delivered to or made available to Buyer or any of its agents, representatives, lenders or affiliates and neither Company, the Seller Parties nor any other person will have or be subject to any liability or indemnification obligations to Buyer or any of its agents, representatives, lenders or affiliates, or any other person, resulting from such delivery or availability or any subsequent use. For the avoidance of doubt, in no event shall the provisions of this Section limit any claim based on fraud, intentional misrepresentation or willful misconduct.

## ARTICLE VI
## COVENANTS

Section 6.01.   Conduct of the Business Prior to Closing.

(a)      Until the Closing or the earlier termination of this Agreement in accordance with its terms, the Seller Parties shall cause the Company to, and the Company shall:  (i) conduct its business (including the Business) in the ordinary course of business consistent with past practice, (ii) exercise commercially reasonable efforts to preserve the relationships of the Company with Persons having significant relations therewith, (iii) maintain and operate its properties in a good and workmanlike manner, and (iv) pay or cause to be paid all costs and expenses (including but not limited to insurance premiums) incurred in connection therewith in a manner consistent with past practice.

(b)      Except as otherwise expressly permitted in this Agreement or as may be required in order to complete the Restructuring, without the prior written consent of the Buyer, which consent shall not be unreasonably withheld, the Seller Parties shall cause the Company to not, and the Company shall not:

(i)      purchase or sell any Membership Interests, shares, capital stock or other Equity of the Company or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such Membership Interests, shares, capital stock or other Equity;

(ii)      lease, license, assign, sell, transfer or otherwise dispose of any of its properties, rights, businesses or assets (including by merger, consolidation or acquisition of stock

51

or assets) excluding in all cases sales of inventory and obsolete equipment in the ordinary course of business;

(iii)    adopt any plan of merger, consolidation, reorganization, liquidation or dissolution other than in connection with the Restructuring or filing of a petition in bankruptcy under any provision of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(iv)    create, incur, assume, Guarantee or otherwise become liable or obligated with respect to any Debt other than pursuant to current credit facilities, or make any loan or advance to, or any investment in, any Person;

(v)    incur any Encumbrances on any properties, rights or assets of the Company, in each case, other than Permitted Encumbrances in the ordinary course of business consistent with past practice;

(vi)    enter into any new lease for any Real Property, vehicles or any other personal property or modify, renew, extend or terminate any existing lease for any Real Property, vehicles or any other personal property or purchase or acquire or enter into any agreement to purchase or acquire any Real Property, vehicles or any other personal property of the Company, excluding in all cases acquisition of inventory in the ordinary course of business consistent with past practice;

(vii)    (A) declare, set aside or pay any dividends or distributions on, or make any other distributions in respect of, any Membership Interests, shares, capital stock or Equity of the Company, (B) split, combine or reclassify any of its outstanding Membership Interests, shares, capital stock or Equity of the Company or issue or authorize the issuance of any shares, capital stock or Equity of the Company, (C) purchase, redeem or otherwise acquire or dispose of any Membership Interests, shares, capital stock or Equity of the Company, or (D) issue, sell, transfer, grant, pledge, dispose of or otherwise encumber any Membership Interests, shares, capital stock or Equity of the Company;

(viii)    (A) establish, adopt, enter into any plan, agreement, program, policy, trust, fund or other arrangement that would be a Benefit Plan if it were in existence as of the date of this Agreement or amend or terminate any Benefit Plan, except as required by Law, or take any action to accelerate vesting or time of payment under, or release any restrictions applicable under, any of the foregoing for any current or former employee, director, officer, manager or independent contractor of the Company, (B) increase the compensation or fringe benefits of any current or former employee, director, officer, manager or independent contractor of the Company, (C) accelerate any right under any Benefit Plan to or grant any severance or termination pay to any current or former employee, director, officer, manager or independent contractor of the Company , or (D) loan any money or other property to any current or former employee, director, officer, manager or independent contractor of the Company ;

(ix)    make any change in its accounting methods, policies or practices (other than such changes that have been required by Law or IFRS);

52

(x)      make or change any election relating to Taxes, change an annual accounting period or adopt or change any accounting method relating to Taxes, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment relating to the Company, surrender any right to claim a refund, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to the Company, become a member of a consolidated group, or fail to timely pay any Tax (including any estimated Tax) when due, in each case except as contemplated by the Restructuring;

(xi)      enter into, amend, supplement, waive, modify, terminate, annul, cancel, allow to lapse, assign, convey, encumber or otherwise transfer, in each case in any material respect, in whole or in part, rights and interests in or under any Material Contracts or enter into any Contract that would be a Material Contract if in effect on the date of this Agreement;

(xii)      compromise, settle, grant any waiver or release relating to or otherwise adjust any right or claim with respect to any pending or threatened Action (A) relating to the Restructuring or the Transaction or (B) against the Company;

(xiii)    amend any Organizational Documents of the Company;

(xiv)    sell, license, sublicense, covenant not to sue under, abandon, assign, transfer, disclose, encumber or otherwise grant any rights under any of the Company Intellectual Property to any Person, other than in the ordinary course of business consistent with past practice;

(xv)      allow its levels of inventory to vary in any material respect from the levels customarily maintained;

(xvi)    materially shorten or lengthen the customary payment and collection cycles, as the case may be, for any of the Company's trade accounts payable and receivables; or

(xvii)   agree or commit to do any of the foregoing.

Section 6.02.   Access to Books and Records. During the period commencing on the date hereof and ending on the earlier termination of this Agreement in accordance with its terms, the Seller Parties shall cause the Company, and the Company shall, give the Buyer and their Affiliates and their respective Representatives reasonable access, during normal business hours, upon reasonable advance notice, to the officers, directors, premises, properties, books, records, financial statements, and Tax Returns of the Company.  The reasonable access described in this Section 6.02 shall be conducted in such manner as not to unreasonably interfere with the conduct of the business of the Company.

Section 6.03.   Notice Regarding Changes. The Company and the Seller Parties shall promptly inform the Buyer in writing of any change in facts and circumstances that could reasonably be expected to cause a Material Adverse Effect.  The Buyer shall promptly inform the Seller Parties in writing of any change in facts and circumstances that could reasonably be expected to render any of the representations and warranties made herein by the Buyer inaccurate or misleading in any material respect if such

53

representations and warranties had been made upon the occurrence of the fact or circumstance in question.

Section 6.04.   Confidentiality. After the Closing, each Seller Party shall, and shall cause his or its respective Affiliates to, hold, and shall use his or its reasonable best efforts to cause his or its respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business or the Company, except to the extent that the Seller Parties can show that such information (a) is generally available to and known by the public through no fault of any of the Seller Parties, any of their Affiliates or their respective Representatives; or (b) is lawfully acquired by the Seller Parties, any of their Affiliates or their respective Representatives after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If any of the Seller Parties or any of their Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller Parties shall promptly notify the Buyer in writing and shall disclose only that portion of such information which the Seller Parties are advised by their counsel in writing is legally required to be disclosed, provided that the Seller Parties shall use reasonable best efforts to first notify the Buyer to allow it to cause the Company to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

Section 6.05.   Conditions; Consents and Approvals. Each party hereto shall use all commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the Transaction as promptly as practicable, including the satisfaction, but not the waiver, of the closing conditions set forth in Article VIII.  The Seller Parties shall, as promptly as practicable, use their commercially reasonable efforts to obtain, or cause to be obtained, the consents and Permits set forth in Section 4.05 of the Disclosure Schedules and any other consents and Permits from all Governmental Authorities and other Persons that may be or become necessary for their execution and delivery of the Transaction Documents or the performance of their respective obligations hereunder or thereunder.  Each party hereto shall cooperate fully with each other party hereto and its or his Affiliates in promptly seeking to obtain all such consents and Permits.  The parties hereto shall not willfully take any action that will or may be reasonably expected to have the effect of delaying, impairing or impeding the receipt of any required consents or Permits.

Section 6.06.   Termination of Affiliate Contracts. The Company and the Seller Parties shall cause, prior to the Closing, that all Affiliate Contracts be settled and terminated with the exception of those Affiliate Contracts set forth on Schedule C.

Section 6.07.   The Seller Parties' Release and Waiver. Each of the Seller Parties, for herself, her immediate family members, itself, its or her Affiliates and their respective equityholders, directors, officers and employees (collectively, the "Seller Releasing Parties"), hereby fully and irrevocably waive, release and discharge the Company from any and all Liabilities to, and any and all Actions against, the Seller

54

Releasing Parties, in all capacities arising at or prior to the Closing, whether arising under any agreement or understanding (in effect on or prior to the Closing, and including under any indemnification agreements), at Law or in equity, and such Seller Releasing Party shall not seek to recover any amounts in connection therewith or thereunder from the Company; provided, however, that this release expressly does not extend to, and shall not be interpreted to in any way to release, waive, impair or limit any rights or claims of the Seller Releasing Parties or obligations of Buyer relating to or arising out of this Agreement or any Transaction Document or any of the provisions set forth herein or therein. In no event may any of the Seller Releasing Parties seek contribution or indemnification from Buyer in respect of any payments required to be made by any of the Seller Releasing Parties pursuant to this Agreement. Without limiting the generality of the foregoing, the Seller Parties, on behalf of themselves and the other Seller Releasing Parties, specifically waive the provisions of California Civil Code Section 1542 ("Section 1542"), which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Seller Parties, on behalf of themselves and the other Seller Releasing Parties, expressly, knowingly, and intentionally waives any and all rights, benefits, and protections of Section 1542, and of any other state or federal statute or common law principle limiting the scope of a general release.

Section 6.08. Continued Use of the Company Name and References to Beneficial Owner in Connection with the Company. The Beneficial Owner acknowledges and agrees that the Company has and shall retain the perpetual, irrevocable, worldwide, royalty-free, fully paid right and non-exclusive license to continue using the Company's current legal entity name, which includes the Beneficial Owner's personal name, as its legal entity name following the Closing. Additionally, the Company and its successors and assigns, as well as Buyer and its affiliates, successors and assigns, when referring to the Company, have, shall retain and are hereby granted the perpetual, irrevocable, worldwide, royalty-free, fully paid right and non-exclusive license to use the Beneficial Owner's name, likeness and biographical information pertaining to the Company in descriptions of the Company's history and in referring to the Beneficial Owner as a founder and employee of the Company following the Closing. The Beneficial Owner acknowledges and agrees that the Company shall not be obligated to continue using its current legal entity name and may change such name through appropriate Company action in accordance with the Limited Liability Company Agreement and applicable Law but without any separate or additional consent or approval from the Beneficial Owner being required.

Section 6.09. Further Assurances. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such

55

ACTIVE 686403262v1

additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

## ARTICLE VII
## TAX MATTERS

Section 7.01.   Tax Covenants.

(a)      All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties, interest, additions and other similar amounts) ("Transfer Taxes") incurred in connection with this Agreement, the Restructuring and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid equally by the Seller and Buyer (50/50).  The party primarily responsible under applicable Tax Law to file any Tax Return with respect to any Transfer Tax  shall timely prepare such Tax Return or other document with respect to such Transfer Taxes (and the other parties shall cooperate with respect thereto as necessary) (the "Preparing Party").  At least thirty (30) days prior to filing any such Tax Return, the Preparing Party  shall submit a copy of such Tax Return to the non-preparing party for review and approval.  The Preparing Party  shall timely file such Tax Return and Seller and Buyer shall be each responsible for 50% of all costs and fees associated with filing such Tax Returns. The non-preparing party shall promptly reimburse the Preparing Party for its share of such costs and fees within seven (7) days of receiving a request for reimbursement from the Preparing Party.

(b)      The Company, the Seller Parties and the Buyer understand and agree that (i) the sale and purchase of the Purchased Interests shall be treated as a transaction governed by Revenue Ruling 99-5, Situation 1, (ii) the Reorganization shall be treated as a "reorganization" described in Section 368(a)(1)(F) of the Code, and (iii) the Conversion shall be treated as a conversion of a QSub, that was disregarded for U.S. federal income Tax purposes, to a limited liability company, that is also disregarded for U.S. federal income Tax purposes, (iv) to the maximum extent permitted  by law, any Transaction Expenses shall be treated and reported as income Tax deductions for the taxable period of Seller in which the Effective Date occurs and Tax deductions which are not permitted to be so treated shall be specially allocated to Seller by the Company and shall not be treated or reported as income Tax deductions of Purchaser or any Affiliate of Purchaser, and (v) any right of the Seller to the Deferred Payments shall be treated as deferred contingent purchase price for the purchase and sale of the Purchased Equity Interests eligible for installment sale treatment under Section 453 of the Code (and any corresponding provision of state or local or non-U.S. law).  The Buyer shall prepare an allocation of the Purchase Price (and all Liabilities of the Company and any capitalized costs) among the assets of the Company in accordance with Section 1060 of the Code and the Treasury Regulations related thereto (and any similar provision of state, local or non-U.S. Law, as appropriate) and in accordance with the methodology set forth on Exhibit E (the "Allocation Schedule").  The Seller Parties shall timely and properly prepare, execute, file and deliver all documents, forms and other information as the Buyer may reasonably request to prepare the Allocation Schedule.  The Buyer shall deliver the Allocation Schedule to the Seller Parties for Seller Parties' review within one-hundred twenty (120) days after the Closing Date.  Within forty-five (45) days after the receipt of such draft Allocation Schedule, the Seller Parties shall propose to the Buyer in writing any

56

objections or proposed changes to such draft Allocation Schedule (and in the event that no such changes are proposed in writing to the Buyer within such time period, the Seller Parties shall be deemed to have agreed to, and accepted, the Allocation Schedule).  In the event of objections or proposed changes, the Seller Parties and the Buyer shall attempt in good faith to resolve any differences between them with respect to the Allocation Schedule within twenty (20) days after the Buyer's receipt of a timely written notice of objection or proposed changes from the Seller Parties.  If the Seller Parties and the Buyer fail to reach an agreement within such time period, then those matters and amounts remaining in dispute (the "Disputed Allocation Amounts") shall be submitted to the Accounting Referee who, acting as an expert and not an arbitrator, shall resolve the Disputed Allocation Amounts only and make any necessary adjustments to the Allocation Schedule. The Accounting Referee shall only consider the Disputed Allocation Amounts.  The Accounting Referee shall take into account the principles and definitions set forth in this Agreement and Exhibit E.   The Accounting Referee's determination shall be based solely on the presentations to be made by the Buyer and the Seller that are in accordance with the terms and procedures set forth in this Agreement (i.e., not on the basis of an independent review). The Accounting Referee may not assign a value to any item greater than the greatest value for such item claimed by either the Buyer or the Seller or less than the smallest value for such item claimed by either the Buyer or the Seller. The resolution of the dispute by the Accounting Referee shall be final, binding and non-appealable on the parties hereto, absent manifest error.  The Accounting Referee shall make a determination as soon as practicable within thirty (30) days (or such other time as the Buyer and the Seller Parties agree in writing) following its engagement and the Accounting Referee resolution of the Disputed Allocation Amounts and any resulting adjustments to the Allocation Schedule shall be final and binding on the parties. The costs and expenses of the Accounting Referee shall be paid as provided in Section 2.03(c)(iv). No income, loss, expense or other items of the Company allocable to a Pre-Closing Tax Period or relating to Transaction Expenses or any Phantom Equity Payment shall be allocated to the Buyer for Tax purposes, whether on IRS Form K-1 or otherwise. The Buyer, the Seller Parties, the Company, and their Affiliates shall report, act and file Tax Returns (including, but not limited to, Internal Revenue Service Forms 8594) in all respects and for all purposes consistent with this Section 7.01(b) (including, for the avoidance of doubt, treating the sale and purchase of the Purchased Interests as the purchase by the Buyer from the Seller of an interest in each of the Company's assets and the contribution by the Buyer and the Seller of their respective interests in the Company's assets to a partnership in exchange for ownership interests in the partnership in accordance with Revenue Ruling 99-5, Situation 1) and the Allocation Schedule and shall not take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with this Section 7.01(b) or the Allocation Schedule, in each case unless required to do so by applicable Law or otherwise required as a result of a "determination" as defined in Section 1313(a) of the Code, or similar provision under applicable state or local Tax Law.

Section 7.02.  Tax Indemnification. The representations and warranties in Section 4.21 (Taxes) shall survive the Closing and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 90 days.  The Seller Parties shall jointly and severally pay when due and indemnify and defend the Buyer and each Buyer Indemnitee against, and shall hold them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the

57

Buyer Indemnitees based upon, arising out of, with respect to or by reason of all Indemnified Taxes. For the avoidance of doubt, to the extent that the Buyer elects to participate in a Tax Claim or the VDPC or reviews Tax Returns and other written materials in connection therewith, fees and expenses incurred by Buyer in connection with such participation or review, including fees and expenses incurred by Buyer to employ counsel and/or accountants of its choice for such purpose, shall not constitute Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of Indemnified Taxes.

Section 7.03.   Straddle Period. In the case of Taxes that are payable with respect any Straddle Period, the portion of any such Taxes attributable to a Pre-Closing Tax Period for purposes of this Agreement shall be:

(a)      in the case of property Taxes and other similar Taxes imposed on a periodic basis, the amount attributable to the portion of the Straddle Period ending on the Closing Date shall equal the Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period; and

(b)      in the case of all other Taxes (including income Taxes, sales Taxes, employment Taxes, withholding Taxes), the amount attributable to the portion of the Straddle Period ending on the Closing Date shall be determined as if the Company filed a separate Tax Return with respect to such Taxes for the portion of the Straddle Period ending as of the end of the day on the Closing Date using a "closing of the books methodology."

Section 7.04.   Contests. Notwithstanding anything herein to the contrary, Seller shall control the conduct and resolution of any claim or action relating to income Taxes with respect to any Pre-Closing Tax Period (including for the avoidance of doubt the portion of any Straddle Period ending on and including the Closing Date) or in respect of which an indemnity may be sought pursuant to this Article VII (a "Tax Claim"); Seller may not settle any Tax Claim that could reasonably be expected to have an adverse effect on the Company or Buyer related to tax positions for any Tax period beginning on or after the Closing Date or the portion of any Straddle Period beginning the day after the Closing Date based upon the resolution of such Tax Claim without Buyer's consent, which shall not be unreasonably withheld or delayed. Buyer and Seller agree to give prompt written notice to each other of the receipt of any written notice which involves a Tax Claim; provided, however, that the failure to give such notice shall not affect the indemnification provided hereunder unless (and then solely to the extent) the party hereto who was entitled to receive such notice has been materially prejudiced by such failure. Buyer shall be entitled to participate in the defense of a Tax Claim related to the VDCP in accordance with Section 7.10 and of any Tax Claim that could reasonably be expected to have an adverse effect on the Company or Buyer based upon the resolution of such Tax Claim and to employ counsel of its choice for such purpose, the fees and expenses of which shall be borne solely by Buyer; provided, however, that regardless of if Buyer has the right to participate in a Tax Claim pursuant to the preceding clause, Seller shall keep Buyer fully informed of all material communications

58

and conferences and all material developments regarding the Tax Claim. In the case of a conflict between this Section 7.04 and Article IX , this Section 7.04 shall govern.

Section 7.05.   Cooperation and Exchange of Information. The Seller Parties and the Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the others in filing any Tax Return pursuant to this Article VII or in connection with any audit or other proceeding in respect of Taxes. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by tax authorities.  The Seller Parties and the Buyer shall retain all material Tax Returns, schedules and work papers, records and other documents in their possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate.  Prior to transferring, destroying or discarding any material Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date, the Seller Parties or the Buyer (as the case may be) shall provide the other party with reasonable written notice and offer the other party the opportunity to take custody of such materials.  References in this Article VII to the Company shall include any Person that merged with or was liquidated or converted into the Company.

Section 7.06.  Tax   Treatment   of   Indemnification   Payments.   Any indemnification payments pursuant to this Article VII shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

Section 7.07.   Survival. Notwithstanding anything in this Agreement to the contrary, the provisions of Section 4.21 and this Article VII, including, for the avoidance of doubt, the Seller Parties' indemnification obligations pursuant to Section 7.02, shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 90 days.

Section 7.08.   Overlap. To the extent that any obligation or responsibility pursuant to Article IX may overlap with an obligation or responsibility pursuant to this Article VII relating to any Tax, the provisions of this Article VII shall govern.

Section 7.09.   Tax Refunds.  Any refunds of any Taxes (or credits or other recoveries in lieu of such refunds) with respect to periods (or portions thereof) ending on or prior to the Closing Date (including for the avoidance of doubt the pre-Closing portion of any Straddle Period), shall, other than to the extent included in the calculation of the Purchase Price, belong to Seller and be paid to Seller promptly upon any credit thereof to, or receipt or recovery thereof by, Buyer, the Company or any of their Affiliates; provided, however, that if any such refund or credit is subsequently reduced or disallowed, Seller shall promptly reimburse Buyer, the Company or any of their Affiliates, as applicable, for the amount of any reduction or disallowance of such refund or credit.  If requested by Seller, Buyer, shall, and shall cause the Company to, reasonably cooperate with Seller, at Seller's expense, in filing any Tax Return necessary to claim such Tax credits or refunds (including filing amended Tax Returns).

59

Section 7.10.   <u>Amendments and Voluntary Disclosures</u>.

(a) <u>In General.</u> Except as provided in Section 7.10(b), unless required pursuant to a Governmental Order or by applicable Law, none of Buyer, the Company, or any of their Affiliates shall, without the prior written consent of Seller, (i) amend any Tax Return relating to a taxable period (or portion thereof) ending on or before the Closing Date, including without limitation any Tax Return relating to a Straddle Period, (ii) make any other Tax election or take any other action that has the effect of increasing the amount of Taxes attributable to a taxable period (or portion thereof) ending on or prior to the Closing Date, or (iii) make a voluntary disclosure to any Tax Authority with respect to any Tax or Tax Returns of the Company for any taxable period (or portion thereof) ending on or prior to the Closing Date.

(b)   <u>New York State and City Voluntary Disclosure Compliance Programs.</u>   Prior to the Closing, the Company engaged Hodgson Russ LLP and submitted an application to participate in the New York Department of Taxation and Finance's Voluntary Disclosure Compliance Program (the "NYS VDCP").  For a period of sixty (60) days following the Closing, the Beneficial Owner shall have the right to cause the Company, through Hodgson Russ, to submit an application to participate in the New York City Department of Finance Voluntary Disclosure and Compliance Program (the "NYC VDCP" and, together with the NYS VDCP, the "VDCPs").

(i) Following the Closing, the Beneficial Owner, as president and sole shareholder of the Company during the tax years at issue, shall, in collaboration with Hodgson Russ, promptly and diligently pursue all actions of the Company required pursuant to the VDCPs, provided, however, that Buyer shall be entitled to participate in the defense of a Tax Claim related to or arising from the subject of the VDCPs and permitted to review drafts of any material written submissions made in connection with the VDCPs, including copies of Tax Returns, and to employ accountants and counsel of its choice for such purpose, the fees and expenses of which shall be borne solely by Buyer. In addition, Buyer shall be kept reasonably informed of the status of developments with respect to the Company's participation in the VDCPs.

(ii)  If the Company is unable to participate in the VDCP, the Company shall file returns and the Beneficial Owner shall remit any Taxes for any Pre-Closing Tax Period owed to New York State, and the Beneficial Owner and/or Seller shall employ accountants of its choice for such purpose, the fees and expenses of which shall be borne solely by the Beneficial Owner.

(iii)  In connection with filing New York State or City Tax Returns relating to Pre-Closing Tax Periods (whether filed through the VDCPs or otherwise), the Company shall amend its California S Corporation Franchise or Income Tax Returns to reflect the amount of its income properly sourced to New York and issue corrected Schedule K-1 (100S) to the Beneficial Owner, and the Beneficial Owner and/or Seller shall  employ accountants of its choice for such purpose, the fees and expenses of which shall be borne solely by the Beneficial Owner.  To the extent such amended returns reflect an overpayment of Tax, the Company shall request a refund of such amount and

60

promptly pay such amount to the Beneficial Owner upon receipt; provided, however, that if any such refund is subsequently reduced or disallowed, the Beneficial Owner shall promptly reimburse the Company for the amount of any such reduction or disallowance.

(iv) For the avoidance of doubt, all (A) Taxes for Pre-Closing Tax Periods arising from or relating to the VDCPs and the subject thereof (including for the avoidance of doubt, all interest and penalties), and (B) costs, fees and expenses relating to the VDCPs, the Company's participation therein and the subject thereof and the filing of amended Tax Returns in California pursuant to this Section 7.10(b), including, for the avoidance of doubt, those costs, fees and expenses of Hodgson Russ and the accountants employed by Beneficial Owner and/or Seller shall be "Indemnified Taxes" and shall be borne entirely by the Seller and/or Beneficial Owner.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.01.   Conditions to Obligations of All Parties. The obligations of each party to consummate the Transaction shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the Restructuring or Transaction illegal, otherwise restraining or prohibiting consummation of the Restructuring or Transaction or causing the Restructuring or Transaction to be rescinded following completion thereof.

Section 8.02.   Conditions to Obligations of the Buyer. The obligations of the Buyer to consummate the Transaction shall be subject to the fulfillment or waiver by the Buyer, at or prior to the Closing, of each of the following conditions:

(a)     The Seller Parties' Fundamental Representations shall be true and correct in all respects at and as of the Closing.  All other representations and warranties of the Seller Parties contained in this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality, Material Adverse Effect or similar qualifications) or in all material respects (in the case of any other representation or warranty) at and as of the Closing (except for such representations and warranties that are made as of another specific date which shall be required to be true and correct in all respects or in all material respects, as applicable, only as of such date), and the Seller Parties and the Company shall have performed and satisfied in all material respects all agreements and covenants required by this Agreement to be performed and satisfied by any Seller Party or the Company at or prior to the Closing.

(b)     No Action shall have been commenced against Seller Parties or the Company that would prevent the Closing.

61

(c)    All consents and Permits of any Person (including any Governmental Authority) that are listed in Section 4.05 of the Disclosure Schedules shall have been received in form and substance reasonably satisfactory to the Buyer, executed counterparts thereof shall have been delivered to the Buyer at or prior to the Closing, and no such consent or Permit shall have been revoked.

(d)    The Seller Parties shall have delivered to the Buyer the documents or instruments set forth in Section 2.05(d).

Section 8.03.    Conditions to Obligations of the Seller Parties. The obligations of the Seller Parties to consummate the Transaction shall be subject to the fulfillment or waiver by the Seller Parties, at or prior to the Closing, of each of the following conditions:

(a)    The Buyer's Fundamental Representations shall be true and correct in all respects at and as of the Closing.  All other representations and warranties of the Buyer contained in this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality, Material Adverse Effect or similar qualifications) or in all material respects (in the case of any other representation or warranty) at and as of the Closing (except for such representations and warranties that are made as of another specific date which shall be required to be true and correct in all respects or in all material respects, as applicable, only as of such date), and the Buyer shall have performed and satisfied in all material respects all agreements and covenants required by this Agreement to be performed and satisfied by the Buyer at or prior to the Closing.

(b)    The Buyer shall have delivered to the Seller Parties the documents or instruments set forth in Section 2.05(c).

## ARTICLE IX
## INDEMNIFICATION

Section 9.01.    Survival. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein (other than any representations or warranties contained in Section 4.21, which are subject to Article VII) shall survive the Closing and shall remain in full force and effect until the eighteen (18) month anniversary of the Closing Date; provided that (a) the Seller Parties' Fundamental Representations and the Buyer's Fundamental Representations shall survive the Closing and shall remain in full force and effect indefinitely and (b) the representations and warranties in Section 4.20 (Employees, Consultants and Contractors) shall survive the Closing and shall remain in full force and effect for a period of four (4) years following the Closing. All covenants and agreements of the parties contained herein (other than any covenants or agreements contained in Article VII which are subject to Article VII) shall survive the Closing and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 90 days.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the

62

applicable survival period shall not thereafter be barred by the expiration of the relevant representation, warranty or covenant and such claims shall survive until finally resolved.

Section 9.02.   Indemnification by the Seller Parties. Subject to the other terms and conditions of this Article IX, the Seller Parties shall jointly and severally indemnify and defend the Buyer and its Affiliates (including the Company) and their respective Representatives (collectively, the "Buyer Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of any of the Seller Parties contained in this Agreement or in any certificate or instrument delivered by or on behalf of the Seller Parties or the Company pursuant to this Agreement (other than in respect of Section 4.21, it being understood that the sole remedy for any such inaccuracy in or breach thereof shall be pursuant to Article VII);

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Seller Parties or the Company pursuant to this Agreement (other than any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in Article VII, it being understood that the sole remedy for any such breach, violation or failure shall be pursuant to Article VII);

(c)     any Transaction Expenses or Debt (other than to the extent such Transaction Expenses or Debt were included in the calculation of the Final Adjusted Initial Payment pursuant to Section 2.03); or

(d)     any matters set forth on Schedule 9.02(e).

Section 9.03.   Indemnification by Buyer.   Subject to the other terms and conditions of this Article IX, Buyer indemnify and defend the Seller Parties and their respective Representatives (collectively, the "Seller Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement; or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement (other than any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in Article VII, it being understood that the sole remedy for any such breach, violation or failure shall be pursuant to Article VII).

63

Section 9.04.   Certain Limitations. The indemnification provided for in Section 9.02 and Section 9.03 shall be subject to the following limitations:

(a)      The Seller Parties' liability to the Buyer Indemnitees under Section 9.02(a) shall not be subject to the limitations set forth in this Section 9.04(a) with respect to (i) a claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of Seller's Fundamental Representation or (ii) fraud, bad faith or willful misconduct of any Seller Party ((i) and (ii), collectively, the "Buyer Exclusions").  Except for the Buyer Exclusions, as provided in the preceding sentence, the Seller Parties shall not be liable to the Buyer Indemnitees under Section 9.02(a) (A) until the aggregate amount of all Losses in respect of indemnification under Section 9.02(a) exceeds $45,000 ("Floor Amount"), and (B) in excess of $1,350,000 ("Cap Amount"); provided, however, that the Floor Amount shall not apply with respect to any claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of Section 4.13(b), with respect to which the Buyer Indemnitees shall be entitled to recover from the first dollar. Except with respect to Buyer Exclusions, if the Floor Amount is exceeded, the Seller Parties shall be liable to the Buyer Indemnitees under Section 9.02(a) for all such Losses in excess of the Floor Amount but not exceeding the Cap Amount; provided, however that with respect to any claim for indemnification under Section 9.02(a) based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of (x) Section 4.13(b), the Buyer Indemnitees shall be entitled to recover from the first dollar up to and including the Cap Amount and (y) Section 4.20 (Employees, Consultants and Contractors), the Buyer Indemnitees shall be entitled to recover for all such Losses in excess of the Floor Amount up to and including $2,700,000.

(b)      The Buyer's liability to the Seller Indemnitees under Section 9.03(a) shall not be subject to the limitations set forth in this Section 9.04(b) with respect to (i) a claim for indemnification based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of Buyer's Fundamental Representation or (ii) fraud, bad faith or willful misconduct of Buyer ((i) and (ii), collectively, the "Seller Exclusions").  Except for the Seller Exclusions, as provided in the preceding sentence, Buyer shall not be liable to the Seller Indemnitees under Section 9.03(a) (A) until the aggregate amount of all Losses in respect of indemnification under Section 9.03(a) exceeds the Floor Amount, and (B) in excess of the Cap Amount. Except with respect to the Seller Exclusions, if the Floor Amount is exceeded, Buyer shall be liable to the Buyer Indemnitees under Section 9.03(a) for all such Losses in excess of the Floor Amount but not exceeding the Cap Amount.

(c)      For purposes of calculating the amount of Losses under this Article IX, (but not for purposes of determining whether a representation or warranty has been breached), the representations and warranties contained in this Agreement shall be deemed to have been made without any qualifications as to materiality, Material Adverse Effect or similar qualifications.

(d)      For all purposes of this Agreement, Losses shall be net of any insurance actually recovered by any Indemnified Party from insurance policies in connection with the facts giving rise to the right of indemnification, net of any out-of-pocket costs of the Indemnified Party associated with receiving such recovery.

(e)      Notwithstanding anything to the contrary contained in this Agreement, any amount payable pursuant to the indemnification obligations of this Agreement shall be paid

64

ACTIVE 686403262v1

without duplication, and in no event shall any party be indemnified more than once under different provisions of this Agreement for the same Losses (i.e., there is no "double recovery").

(f)    Notwithstanding anything to the contrary in this Article IX, the Buyer Indemnitees shall not be entitled to indemnification under this Article IX with respect to any Losses to the extent they were accounted for in the calculation of any adjustment to the Adjusted Initial Payment pursuant to Section 2.03.

Section 9.05.    Indemnification Procedures. The party making a claim under this Article IX is referred to as the "Indemnified Party", and the party against whom such claims are asserted under this Article IX is referred to as the "Indemnifying Party".

(a)    *Third Party Claims*. If any Indemnified Party receives notice of the assertion or commencement of any Action, audit, claim, demand or assessment made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third Party Claim") against such Indemnified Party with respect to which the Indemnifying Party may be obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 15 calendar days after receipt of such notice of such Third Party Claim.  The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is prejudiced by reason of such failure.  Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, and shall include copies of all material written evidence thereof.  The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own reputable counsel, and the Indemnified Party shall cooperate in good faith in such defense; provided, that if the Indemnifying Party is a Seller Party, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that seeks an injunction or other equitable relief against the Indemnified Party.  In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 9.05(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party.  The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof.  The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, provided, that if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.  If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to Section 9.05(b), pay, compromise, or defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim.  The Seller Parties and the Buyer shall cooperate with each other in all

65

reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     *Settlement of Third Party Claims*. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed.  If the Indemnified Party has assumed the defense pursuant to Section 9.05(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)     *Direct Claims*. Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is prejudiced by reason of such failure.  Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party.  The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim.  If the Indemnifying Party does not so respond within such 30 day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

(d)     *Tax Claims*. Notwithstanding any other provision of this Agreement, the control of any claim, assertion, event or proceeding in respect of Taxes of the Company (including, but not limited to, any such claim in respect of a breach of the representations and warranties in Section 4.21 hereof or any breach or violation of or failure to fully perform any covenant, agreement, undertaking or obligation in Article VII) shall be governed exclusively by Article VII hereof.

Section 9.06.   Tax Treatment of Indemnification Payments. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

Section 9.07.   Effect of Investigation. The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty

66

*ACTIVE 686403262v1*

is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in Section 8.02.

Section 9.08.   Right to Set-Off.   Upon written notice to the Seller Parties specifying in reasonable detail the basis therefor, the Buyer and any Buyer Indemnitees may set-off any amount to which any Buyer Indemnitees may be entitled under this Agreement against amounts otherwise payable to any Seller Party by the Buyer or any of its Affiliates under this Agreement or any other Transaction Document.  The exercise of a right of set-off by the Buyer in good faith, whether or not ultimately determined to be justified, will not constitute a breach of this Agreement or any other Transaction Document; provided, however that in the event there is a final determination (whether by mutual agreement of the Parties, a court of competent jurisdiction, an arbitrator or by the Accounting Referee) that the Seller Parties did not owe Buyer or any Buyer Indemnitees the amount that has been set-off, Buyer shall promptly pay (or cause to be paid) to the applicable Seller Party all such amounts that are so determined to have been incorrectly set-off, plus simple interest at a rate of twelve percent (12%) per annum accruing from the date such set-off was made through the date any such incorrectly set-off amounts are paid in full.  Neither the exercise of, nor the failure to exercise, such right of set-off will constitute an election of remedies or limit the Buyer or any of its Affiliates in any manner in the enforcement of any other remedies that may be available to it.

Section 9.09.   Exclusive Remedy.  Each Party acknowledges and agrees that an Indemnified Party's sole and exclusive remedy for any monetary Losses after the Closing with respect to this Agreement shall be pursuant to the provisions set forth in this Article IX; provided, however, that the foregoing clause of this sentence shall not be deemed a waiver by or otherwise prevent or limit a Party from (a) initiating any Action (i) to enforce any right to equitable relief, specific performance or injunctive relief or any right or remedy with respect to a claim of fraud, willful misconduct or intentional misrepresentation or (ii) under Section 2.03 or Section 2.04 to enforce any decision or determination of the Accounting Referee, or (b) exercising its rights under Section 9.08.

**ARTICLE X**
**TERMINATION**

Section 10.01. Grounds for Termination. This Agreement may be terminated:

(a)      at any time prior to the Closing Date by mutual written agreement of the Buyer and the Seller Parties;

(b)      by the Buyer or the Seller Parties if any Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the Restructuring or Transaction illegal, otherwise restraining or prohibiting consummation of the Restructuring or Transaction or causing the Restructuring or Transaction to be rescinded following completion thereof;

*ACTIVE 686403262v1*

(c)      by the Buyer, if the Company or any of the Seller Parties breach or fail to perform in any material respect any of their representations, warranties or covenants contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 8.01 or Section 8.02 and (ii) cannot be or has not been cured within 15 Business Days following delivery to the Seller Parties of written notice of such breach or failure to perform, unless in respect of this clause (ii) the failure or impossibility results primarily from the Buyer breaching this Agreement;

(d)      by the Seller Parties, if the Buyer breaches or fail to perform in any material respect any of its representations, warranties or covenants contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 8.01 or Section 8.03 and (ii) cannot be or has not been cured within 15 Business Days following delivery to the Buyer of written notice of such breach or failure to perform, unless in respect of this clause (ii) the failure or impossibility results primarily from any of the Seller Parties breaching this Agreement.

Section 10.02. Effect of Termination. Upon a termination of this Agreement in accordance with Section 10.01, each party's further rights and obligations hereunder, other than the Surviving Provisions, shall terminate, but termination shall not affect any rights or obligations of a party which may have accrued prior to such termination. Nothing in this Section 10.02 shall relieve any party of any Liability for any breach of this Agreement.

### ARTICLE XI
### MISCELLANEOUS

Section 11.01. Expenses. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transaction shall be paid by the party incurring such costs and expenses. For the avoidance of doubt, all Transaction Expenses shall be borne by the Seller Parties.

Section 11.02. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.02):

68

| | |
|---|---|
| If to any of the Seller Parties: | Rebecca Bamberger<br>2855 5th Avenue, #802,<br>San Diego, CA 92103<br>E-mail: rebecca@bamtheagency.com |
| *with a copy to*: | Sheppard, Mullin, Richter & Hampton LLP<br>Address:  12275 El Camino Real, Suite 100<br>San Diego, CA 92130<br>E-mail:  slasala@sheppardmullin.com |
| If to the Company or Buyer: | c/o Llorente & Cuenca S.L.<br>Calle Lagasca 88<br>28001 Madrid, Spain<br>Attention: Juan Pablo Ocaña<br>E-mail: jpocana@llorenteycuenca.com |
| *with a copy to*: | Greenberg Traurig, P.A.<br>Address: 333 S.E. 2nd Avenue<br>Suite 4400<br>Miami, FL 33131<br>Attention:   Antonio Peña, Esq.<br>E-mail:      antonio@gtlaw.com |

Section 11.03. <u>Interpretation</u>. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 11.04. <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 11.05. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

69

Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transaction be consummated as originally contemplated to the greatest extent possible.

Section 11.06. <u>Entire Agreement</u>. This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

Section 11.07. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The Seller Parties may not assign any of their rights or obligations hereunder without the prior written consent of the Buyer.  The Buyer is permitted to assign their rights or obligations hereunder to any Affiliate without the prior written consent of the Seller Parties.  No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 11.08. <u>No Third-Party Beneficiaries</u>. Except as provided in <u>Section 7.02</u> and <u>Article IX</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 11.09. <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 11.10. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement shall be governed by and construed in accordance with the internal Laws of the state of Delaware without giving effect to any choice or conflict of Law provision or rule (whether of the state of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the state of Delaware.

70

(b)      ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTION MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTION. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10(c).

Section 11.11. Specific Performance. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at Law or in equity.

Section 11.12. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

71

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers, where applicable, thereunto duly authorized.

**BUYER:**

**LLORENTE & CUENCA USA, INC.**

By: _Alejandro Romero Paniagua_

Name:  Alejandro Romero Paniagua
Title: Authorized Signatory

*[Signature Page to Membership Interest Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers, where applicable, thereunto duly authorized.

<u>**SELLER:**</u>

**RBW HOLDCO, INC.**

By: _Rebecca Bamberger_

Name: Rebecca Bamberger

Title: Authorized Signatory

*[Signature Page to Membership Interest Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers, where applicable, thereunto duly authorized.

<u>COMPANY</u>:

**REBECCA BAMBERGER WORKS, LLC**

DocuSigned by:

By: _Rebecca Bamberger_____

Name: Rebecca Bamberger

Title: Authorized Signatory

*[Signature Page to Membership Interest Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers, where applicable, thereunto duly authorized.

**BENEFICIAL OWNER:**

DocuSigned by:

*Rebecca Bamberger*

Rebecca Bamberger

*[Signature Page to Membership Interest Purchase Agreement]*

## SCHEDULE A
## EXCEPTIONS TO IFRS; EXAMPLE CALCULATION OF NET WORKING CAPITAL

Exceptions to IFRS

None.

Example Calculation of Net Working Capital

See attached (Excel file entitled "Datapack Project San Diego NFP and WK Adjustment calculations)

**SCHEDULE B**
**RESTRUCTURING**

1.  Beneficial Owner formed Seller and was issued 100% of the equity interests of Seller. Beneficial Owner then contributed 100% of the issued and outstanding equity of the Company to Seller as a capital contribution to Seller. Immediately thereafter, Seller applied for an "employer identification number."

2.  Seller timely filed IRS Form 8869 to treat the Company as a "qualified subchapter S subsidiary" under the Code, checking yes on line 14 of IRS Form 8869 to indicate the election being made in combination with a section 368(a)(1)(F) reorganization described in Rev. Rul. 2008-18. The election on IRS Form 8869 was filed by overnight delivery on the date of the contribution described in Step 1 utilizing a private delivery service designated by the IRS to meet the "timely mailing as timely filing" rule for tax returns and reflected the effective date of such election as of the date of the contribution described in Step 1. It is intended that Steps 1 and 2 when combined should be treated as a reorganization under Section 368(a)(1)(F) of the Code (the "Reorganization").

3.  At least one day following the later of the effective date of the election described in Step 2 or receipt of evidence of delivery to the IRS of Form 8869 as described in Step 2, Seller caused the Company to convert into a limited liability company by causing the Company, on March 28, 2023, to submit (i) a Certificate of Conversion to the California Secretary of State and a Certificate of Conversion from a Corporation to a Limited Liability Company and (ii) a Certification of Formation of Limited Liability Company to the Delaware Secretary of State, to convert from a California corporation to a Delaware limited liability company (the "Conversion").

*ACTIVE 684044473v13*

## SCHEDULE C
## AFFILIATE CONTRACTS EXEMPT FROM TERMINATION

None.

**SCHEDULE D**
**ADJUSTMENTS TO EBITDA**

The following items, notwithstanding that they may be included as expenses in the calculation of the Company's net income, will not be included as expenses in the calculation of Recurrent Normalized EBITDA:

(a) any general or administrative overhead charge assessed by Buyer or any of its Affiliates to the Company including, without limitation, costs associated with human resources administration, legal, compliance, risk and other similar corporate overhead services and functions and "Company Platform Costs" as defined in the Limited Liability Company Agreement, except to the extent such costs replace costs (measured on an aggregate, annual basis) incurred by the Company in 2022;

(b) any expenses incurred to finance or otherwise in connection with the transactions contemplated hereby;

(c) any losses of Buyer or any Affiliate thereof as to which a claim is made under this Agreement and as to which Buyer or its Affiliates are paid or reimbursed (by indemnity, contribution or otherwise);

(d) any expense, depreciation or amortization deductions caused by the write up of the Company's assets related to the transactions contemplated hereby;  and

(e)  the amount of any exceptional, normalized or non-recurring result of the Company, as determined in accordance with the Accounting Principles.

To the extent included as income in the calculation of the Company's net income, the amount of any exceptional, normalized or non-recurring result of the Company, as determined in accordance with the Accounting Principles, will not be included as income in the calculation of Recurrent Normalized EBITDA.

*ACTIVE 684044473v13*

Calculation of 2021 Recurrent Normalized EBITDA

| USD in thousand | FY21 |
|---|---|
| **Reported EBITDA** | 1,823 |
| *As a % of revenues* | |
| **Management adjustment** | (5) |
| (1) Talent recruitment costs | 0 |
| (2) Bussines development travels | (5) |
| (3) Other operating expenses | |
| **Crowe adjustment** | (61) |
| (4) Loan interest | 9 |
| (5) Rentals | |
| (6) Operations travels | (7) |
| (7) Bad debt | |
| (8) Professional auditing services | (50) |
| (9) Renting of facilities | (12) |
| | |
| **Adjusted EBITDA** | 1,758 |

For the avoidance of doubt, Recurrent Normalized EBITDA shall not be calculated with any limitations on the amount of any third party audit fees and costs.

**SCHEDULE 2.02(a)(iii)**
**Payoff Debt**

| Holder of Payoff Debt | Estimated Amount of Payoff Debt | Paid By |
|---|---|---|
| Chase Bank (SBA Loan) | $52,898.53 | The Company |
| **Total** | **$52,898.53** | |
| | | |
| FineWise Bank/Mulligan Funding, LLC | $97,101.47 | The Company |
| | $113,009.28 | Buyer, on behalf of Seller and the Company |
| **Total** | **$210,110.75** | |
| | | |
| Celtic Line of Credit | $197,778.04 | Buyer, on behalf of Seller |
| **Total** | **$197,778.04** | |
| | | |
| **Total Payoff Debt** | **$460,787.32** | |

## SCHEDULE 9.02(e)
## SPECIAL INDEMNITIES

1.   That certain case styled *Beach v. Rebecca Bamberger Works, Inc.*, Case No. 37-2022-00043326, Superior Court of California, San Diego.

2.   The Phantom Equity, including any portion of the Phantom Equity Payments payable at Closing to the extent not deducted from the Final Adjusted Initial Payment and any portion of the Phantom Equity Payments payable with respect to any Deferred Payment to the extent not deducted from the corresponding Deferred Payment; provided, however, that any failure by Buyer to make a Phantom Equity Payment in respect of any Deferred Payment to the extent such failure constitutes a breach of this Agreement is excluded from this special indemnity.

3.   OnePitch, LLC's participation in the Company's Benefit Plans with respect to the period prior to the Closing.

4.   The termination of Michael Fountain's employment with the Company.

5.   Any failure of the Seller Parties or the Company to effectuate the Conversion (as defined in Schedule B of this Agreement) prior to the Closing.

**EXHIBIT A**
**FORM OF EMPLOYMENT AGREEMENT**

[Attached]

*ACTIVE 684044473v13*

Final Form

**EMPLOYMENT AGREEMENT**

This Employment Agreement (this "**Agreement**"), dated as of March __, 2023 ("**Effective Date**"), is entered into by and between Rebecca Bamberger, a California resident ("**Executive**"), and Rebecca Bamberger Works, LLC, a Delaware limited liability company ("**Employer**").

**W I T N E S S E T H:**

**WHEREAS**, the Executive is the Chief Executive Officer of the Employer; and

**WHEREAS**, as a result of the transactions contemplated by that certain Membership Interest Purchase Agreement (the "**Membership Interest Purchase Agreement**") entered into on or about the Effective Date by and among Executive, Employer, Llorente & Cuenca USA, Inc. and RBW Holdco, Inc., and to provide for the growth and future well-being of Employer, the parties have determined that Employer shall continue to be engaged in the Business (as defined below) and Executive shall provide services to, and have the responsibilities, duties and time commitments with, Employer as set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the respective covenants and agreements set forth below, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATIONS**

**1.1** **Definitions**.

In addition to the definitions contained within the body of this Agreement, the following terms shall have the following meanings.

(a) "**Accrued Amounts**" means (i) any earned but unpaid Annual Salary, (ii) any earned but unused vacation time under Employer's vacation policy, as in effect from time-to-time, and (iii) any business expenses approved by Employer and incurred in the performance of Executive's employment duties but not yet reimbursed.

(b) "**Affiliates**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(c) "**Agreement**" has the meaning set forth in the preamble.

(d) "**Annual Salary**" has the meaning set forth in Section 2.4(a).

(e) "**Board"** means the board of managers of Employer.

*ACTIVE 684927030v16*

(f)     "**Business**" means the business of the Employer which consists of providing marketing and public relations services.

(g)     "**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California, or Madrid, Spain are authorized or required by law to be closed for business.

(h)     "**Cause**" means:

(i)     The willful engaging by Executive in any action or inaction which is materially injurious to Employer and/or any of Employer's Affiliates, monetarily or otherwise;

(ii)    the commission of a criminal act by Executive against any of Employer and/or any of Employer's Affiliates or against any third party if in connection with, or related to, the scope of her employment or services provided in connection with the terms hereunder, including but not limited to fraud, embezzlement, or theft;

(iii)   the arrest, conviction, plea of no contest or *nolo contendere*, deferred adjudication, unadjudicated probation, or charge of Executive for any felony or any crime involving dishonesty, moral turpitude, fraud, embezzlement, or theft;

(iv)    a material failure of Executive to perform Executive's responsibilities as directed by Employer, as determined by Employer in good faith;

(v)     the failure of Executive to achieve goals or objectives established in advance by Employer in consultation with Executive in respect of two consecutive fiscal years of Employer, as determined by Employer in good faith; or

(vi)    Executive's material breach of this Agreement.

The foregoing is an exclusive list of all acts or omissions that the Employer may consider as grounds for the termination of the Term of Employment for Cause.  The Board shall provide Executive with 30 days advance written notice reasonably detailing the basis for the termination of the Term of Employment for Cause solely on the basis of clause (i), (iv), or (vi) above.  During the 30 day period after Executive has received such notice, Executive shall have, prior to the expiration of such 30 day period, an opportunity to (x) cure or remedy such alleged Cause events and (y) present her case to the full Board (with the assistance of her own counsel) before any termination for such alleged Cause events is finalized by a vote of a majority of the Board; provided, that in the case of clause (i) above, (A) Employer may suspend Executive without pay during such 30 day period and (B) if a majority of the Board ultimately determines not to terminate Executive for Cause, Employer shall pay Executive the portion of her Annual Salary that was not paid during such suspension, plus simple interest at an annual rate of three percent (3%) on such unpaid amount, in the next regular payroll of Employer.

(i)      "**Code**" means the Internal Revenue Code of 1986, as amended.

(j)      "**Competitive Business**" means any Person, business or enterprise, other than Employer and/or its Affiliates, that engages, directly or indirectly, in any portion of the Business; provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

(k)      "**Confidential Information**" means all trade secrets and information disclosed to Executive or known by Executive as a consequence of or through the unique position of her employment or relationship with Employer or any of Employer's Affiliates (including information conceived, originated, discovered or developed by Executive and information acquired by Employer or any of its Affiliates from others) prior to or after the Effective Date, and that is not generally or publicly known (other than as a result of unauthorized disclosure by Executive), about Employer or any of its Affiliates or the Business.  Confidential Information includes, but is not limited to, inventions, ideas, designs, computer programs, circuits, schematics, formulas, algorithms, trade secrets, works of authorship, mask works, developmental or experimental work, processes, techniques, improvements, methods of manufacturing, know-how, data, financial information and forecasts, product plans, marketing plans and strategies, price lists, customer lists, client information, client lists of any existing or prospective customer, data, distributor lists, documentation, and buyer lists of any of Employer or any of its Affiliates, and other information, in whatever form disclosed, relating to any of Employer or any of its Affiliates or the Business, including, but not limited to, financial statements, financial projections, business plans, listings and contractual obligations and terms thereof, components of intellectual property, unique designs, methods of manufacturing or other technology of any of Employer or any of its Affiliates. Confidential Information shall not include (i) information that is generally available to and known by the public at the time of disclosure to Executive, provided that such disclosure is through no direct or indirect fault of the Executive or person(s) acting on Executive's behalf, or (ii) information that is lawfully received from a third party that is not bound by a confidentiality agreement or other obligations of secrecy.

(l)      "**Disability**" means Executive's disability within the meaning of any long-term disability plan maintained by Employer or any of its Affiliates and covering Executive then in effect, or Executive's inability for a period of 90 consecutive days, either with or without a reasonable accommodation, to perform  her duties hereunder as a result of physical or mental illness, loss of legal capacity, or any other cause beyond Executive's control.

(m)      "**Effective Date**" has the meaning set forth in the preamble.

(n)      "**Employer**" has the meaning set forth in the preamble.

(o)     "**Executive**" has the meaning set forth in the preamble.

(p)     "**Good Reason**" means termination of the Term of Employment by Executive after the occurrence of any one or more of the following without Executive's prior written consent: (i) Employer's material breach of this Agreement without the Executive's consent, (ii) a reduction in Executive's Annual Salary (other than as part of an across-the-board reduction of salaries by Employer), (iii) relocation of Executive's primary workplace to a location that is more than 20 miles away from the Location of the Business, or (iv) a material reduction in Executive's title, role, authority or reporting relationship. In order for a resignation to constitute a resignation for "Good Reason," (1) Executive shall give Employer written notice of her intention to resign with Good Reason within 30 days following the initial occurrence of the circumstances that purportedly gave rise to Good Reason, which written notice shall describe such circumstances in reasonable detail, (2) Employer shall have a period of 30 days following receipt of such written notice to cure such circumstances, and (3) if Employer fails or refuses to cure such circumstances, Executive must resign within 30 days following the end of such cure period.

(q)     "**Location of the Business**" has the meaning set forth in Section 2.3.

(r)     "**Payment Commencement Date**" has the meaning set forth in Section 3.5.

(s)     "**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, government or any agency or political subdivision thereof.

(t)     "**Release**" has the meaning set forth in Section 3.5.

(u)     "**Restrictive Covenants**" means the covenants contained in ARTICLE IV of this Agreement.

(v)     "**Salary Continuation Payments**" has the meaning set forth in Section 3.5.

(w)     "**Section 409A**" has the meaning set forth in Section 3.6(a).

(x)     "**Taxable Reimbursements**" has the meaning set forth in Section 3.6(d)(i).

(y)     "**Term**" means the term of this Agreement, as specified in Section 2.1.

(z)     "**Term of Employment**" means the period during which Executive is employed by Employer.  The Term of Employment shall coincide with the Term and any termination of this Agreement shall automatically result in the termination of Executive's employment with Employer, the termination of the Term of Employment, and the termination of the Term.  Likewise, any termination of Executive's employment shall result in the termination of the Term of Employment, the termination of the Term, and the termination of this Agreement, except for those provisions of this Agreement that survive termination in accordance with their terms.

(aa)   "**Without Cause**" means termination by Employer of the Term of Employment at Employer's sole discretion for any reason, other than by reason of Executive's death or Disability, and other than a termination of the Term of Employment by Employer for Cause.  For the avoidance of doubt, any automatic termination of the Term of Employment per the terms of this Agreement or applicable law, including any failure to renew the Term by Executive or Employer shall not be deemed a termination "Without Cause."

(bb)   "**Work Product**" has the meaning set forth in Section 4.3.

## ARTICLE II
## EMPLOYMENT AND DUTIES

**2.1**   **Term**.  The term of this Agreement will be for the period commencing on the Effective Date and continuing through the fifth (5th) anniversary of the Effective Date (the "**Initial Term**"), which shall automatically renew for successive one (1) year periods (each, a "**Renewal Term**"), unless terminated by either party upon at least sixty (60) days' written notice prior to the commencement of any Renewal Term and subject to early termination pursuant to the provisions of ARTICLE III (the period starting on the Effective Date, as extended by each Renewal Term and ending on such earliest period, the "**Term**").

**2.2**   **Position, Duties and Services**.  Executive will continue to serve as Chief Executive Officer of Employer and shall be Employer's most senior executive officer.  Executive will have such authority, responsibilities and duties that are consistent with such position and shall report directly to the Board. Executive shall devote Executive's full business time, attention and effort to the performance of Executive's duties as Chief Executive Officer, and shall perform the duties and carry out the responsibilities assigned to Executive, to the best of Executive's ability, in a diligent, trustworthy and businesslike manner for the purpose of advancing Employer and the Business. Employer shall indemnify Executive to the maximum extent permitted by law (including advancement of expenses) for costs, expenses and other damages incurred only in connection with claims brought or threatened directly by a third party or indirectly pursuant to a derivative claim against Executive in her capacity as an officer, director, manager or employee of Employer as long as Executive's interests and defenses are not adverse to Employer's interests and defenses, and shall cover Executive under any directors and officers errors and omissions liability insurance policy unless Executive engages in behavior excluded from coverage under such policy. The provisions of the immediately preceding sentence shall survive any termination of this Agreement or the Term.

**2.3**   **Location of the Business**.  During the Term of Employment, Executive will carry out her position, duties and services in the county of San Diego, California, or such other location as may be mutually agreed in writing by Employer and Executive from time to time (the "**Location of the Business**").

**2.4**     **Compensation**.

(a)          Annual Salary. Employer shall pay Executive an annual rate of salary of $225,000 in periodic installments in accordance with Employer's customary payroll practices, but no less frequently than monthly. Executive's annual salary, as may be increased (but not decreased, except as provided below) by Employer, in its sole discretion, or decreased at the election of Executive, in Executive's sole discretion, or by Employer, in its sole discretion, as part of an across-the-board reduction of salaries by Employer, from time to time, is hereinafter referred to as "**Annual Salary**".

(b)          Employee Plans.  During the Term, Executive and/or Executive's family, as applicable, will be eligible for participation in the employee plans and fringe benefits equivalent to those generally offered by Employer in the U.S. to its employees, including health, dental and vision insurance, and retirement plan participation.

(c)          Vacation Time. During the Term, Executive shall be eligible for unlimited flexible time off in accordance with Employer's usual policies regarding vacation in effect at such time; provided that Executive shall coordinate any time off in advance with the Board. Notwithstanding the foregoing, the Company reserves the right to amend or terminate such policies at any time in its sole discretion, subject to applicable law.

**ARTICLE III**
**EARLY TERMINATION**

**3.1     Death**.  Upon the death of Executive during the Term, this Agreement will terminate and Executive's estate will be entitled to payment of (i) the Accrued Amounts and (ii) any benefits accrued up to the date of her death payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

**3.2     Disability**.  In the event of Executive's Disability during the Term, Employer may terminate the Term of Employment in which case Executive will be entitled to payment of (i) the Accrued Amounts, (ii) any long-term disability benefits to which Executive may be entitled pursuant to the terms and conditions of any long-term disability policy or plan provided to Executive in which Executive has elected to participate, and (iii) any other accrued benefits payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

**3.3     Termination for Cause or Voluntary Resignation by Executive for Any Reason, Other than Good Reason**.  If the Term of Employment is terminated by Employer for Cause, or is terminated by Executive for any reason other than Good Reason, Employer will pay Executive through the end of the Term (i) the Accrued Amounts, and (ii) any vested but unpaid benefits payable pursuant to the terms of the benefit plans in which Executive is a participant, subject to

any forfeiture as a result of such termination under the terms of the benefit plans, as may be permissible under applicable law.

**3.4     Termination Without Cause or for Good Reason**.

(a)     If, during the Term, the Term of Employment is terminated by Employer Without Cause or is terminated by Executive for Good Reason, Employer will pay Executive (i) the Accrued Amounts and (ii) any vested but unpaid benefits payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

(b)     Additionally, if, during the Term, the Term of Employment is terminated by Employer Without Cause or is terminated by Executive for Good Reason, provided Executive (i) complies with her post-termination obligations under this Agreement (including but not limited to the Restrictive Covenants applicable to the period after the Term) and that certain Restrictive Covenant Agreement of even date herewith by and between an Affiliate of Employer and the Executive, and (ii) signs and does not revoke a general release in the form of Exhibit A, Employer will pay Executive, under the terms set forth in Section 3.5 the following: the Annual Salary that would otherwise have been payable to Executive through (A) twelve months after the date the Term of Employment was terminated if termination occurs on or before December 31, 2025 or (B) six months after the date the Term of Employment was terminated if termination occurs after December 31, 2025, but in no event longer than the remainder of the Initial Term or Renewal Term (the "**Severance Period**") paid in accordance with Employer's normal payroll practices through the end of the Severance Period (provided that the first installment shall be in an amount to cover the time period from the commencement of the Severance Period through the date of such first payment).  In addition, if Executive elects to continue her Employer-sponsored health insurance benefit under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("**COBRA**"), Employee shall each month receive direct payment or reimbursement for the excess of the cost of such coverage for the Severance Period over the amount Executive would have otherwise been required to contribute if she had continued on Employer's applicable health insurance plan(s) as an employee with her then-current coverage election; provided, however, that if direct payment or reimbursement would result in penalties or other adverse tax consequences under applicable health plan nondiscrimination or other requirements, Employer shall instead provide Executive a monthly taxable payment for each applicable month during the Severance Period in the amount of the subsidy for such month (payable on Employer's first payroll date of each applicable month); provided, further, however, that such payments paid by Employer as reimbursement for such COBRA premium payments shall end upon the earlier of Executive becoming eligible for coverage under another employer's benefit plans or through self-employment.

**3.5     Release of Claims; Compliance with Article IV**.  Any salary continuation payments due to Executive under Section 3.4(b) of this Agreement (the "**Salary Continuation Payments**") shall be subject to the conditions that (i) Executive continues to comply with all obligations under ARTICLE IV of this Agreement applicable to the period after the Term and any continuing obligations under any other agreement with Employer or any of its Affiliates that she is party to, including but not limited to that certain restrictive covenant agreement entered on the date hereof

by and between the Employer and the Executive; and (ii) Executive executes and does not revoke a general release of claims provided by Employer at the time of termination (the "**Release**") in substantially the form attached hereto as Exhibit A, and the Release becoming effective within fifty-two (52) days after the termination date (or such earlier date as may be required by Employer). Payment of any Salary Continuation Payments shall commence on the first payroll date after the Release becomes irrevocable or, if earlier, the 60th day following the date of termination, provided, that if the 60-day period following the date of termination crosses calendar years, if necessary to comply with Section 409A of the Internal Revenue Code, payment shall not commence until the second calendar year (the commencement date, "**Payment Commencement Date**").  Any Salary Continuation Payments that are so delayed shall be paid on the Payment Commencement Date.

**3.6    Compliance with Section 409A**.

(a)            General.  It is the intention of both Employer and Executive that the benefits and rights to which Executive could be entitled pursuant to this Agreement comply with Section 409A of the Code and the treasury regulations and other guidance promulgated or issued thereunder ("**Section 409A**"), to the extent that the requirements of Section 409A are applicable thereto, and the provisions of this Agreement shall be construed in a manner consistent with that intention.  If Executive or Employer believes, at any time, that any such benefit or right that is subject to Section 409A does not so comply, it or she shall promptly advise the other and shall negotiate reasonably and in good faith to amend the terms of such benefits and rights such that they comply with Section 409A (with the most limited possible economic effect on Executive and on Employer).

(b)            6 Month Delay if Specified Employee.  If Executive is a "specified employee", as that term is defined in Section 409A, then no payment or benefit that is payable on account of Executive's "separation from service", as that term is defined for purposes of Section 409A, shall be made before the date that is six months after Executive's "separation from service" (or, if earlier, the date of Executive's death) if and only to the extent that such payment or benefit constitutes deferred compensation (or may be nonqualified deferred compensation) under Section 409A and such deferral is required to comply with the requirements of Section 409A.  Any payment or benefit delayed by reason of the prior sentence shall be paid out or provided in a single lump sum at the end of such required delay period in order to catch up to the original payment schedule.  Payments that qualify for the "short term deferral" exception or the "separation pay" exception to Section 409A contained in applicable treasury regulation under Section 409A shall not be subject to this deferral requirement.

(c)            Treatment of Each Installment as a Separate Payment. For purposes of applying the provisions of Section 409A to this Agreement, each separately identified amount to which Executive is entitled under this Agreement shall be treated as a separate payment.  In

addition, to the extent permissible under Section 409A, any series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

(d)    Taxable Reimbursements and In-Kind Benefits.

(i)    Any reimbursements by Employer to Executive of any eligible expenses under this Agreement that are not excludable from Executive's income for Federal income tax purposes (the "**Taxable Reimbursements**") shall be made by no later than the last day of the taxable year of Executive following the year in which the expense was incurred.

(ii)    The amount of any Taxable Reimbursements and the value of any in-kind benefits to be provided to Executive, during any taxable year of Executive shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year of Executive.

(iii)    The right to Taxable Reimbursement, or in-kind benefits, shall not be subject to liquidation or exchange for another benefit.

(e)    Distributions on Account of Separation from Service.  If and to the extent required to comply with Section 409A, no payment or benefit required to be paid under this Agreement on account of termination of Executive's employment shall be made unless and until Executive incurs a "separation from service" within the meaning of Section 409A.

(f)    No Acceleration of Payments.    Neither Employer nor Executive, individually or in combination, may accelerate any payment or benefit that is subject to Section 409A, except in compliance with Section 409A and the provisions of this Agreement, and no amount that is subject to Section 409A shall be paid prior to the earliest date on which it may be paid without violating Section 409A.

(g)    No Guaranty of 409A Compliance. Notwithstanding the foregoing, Employer does not make any representation to Executive that the payments or benefits provided under this Agreement are exempt from, or satisfy, the requirements of Section 409A, and Employer shall have no liability or other obligation to indemnify or hold harmless Executive or any beneficiary of Executive for any tax, additional tax, interest or penalties that Executive or any beneficiary of Executive may incur in the event that any provision of this Agreement, or any amendment or modification thereof, is deemed to violate any of the requirements of Section 409A.

## ARTICLE IV
## RESTRICTIVE COVENANTS

**4.1    Restrictive Covenants**.  Executive covenants that during the Term of Employment, Executive will not, either on her own account, jointly with another, or for or on behalf of any Person (other than Employer or any of its Affiliates), directly or indirectly:

(a)      own, manage or control, or become engaged or serve as a shareholder, bondholder, creditor, officer, director, partner, member, employee, agent, consultant, advisor, or representative of, any Competitive Business; provided, however, that Executive and her Affiliates may passively hold up to 1% of the outstanding publicly-traded securities of a Person engaged in a Competitive Business for investment purposes only;

(b)      solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any Competitive Business, or promote or assist, financially or otherwise, any Person engaged in any Competitive Business;

(c)      circumvent any acquisition, investment, venture or other business opportunities of Employer;

(d)      recruit, induce, solicit, or employ, or in any manner attempt to recruit, induce, solicit, or employ, any Person that is at such time, or during the previous 12 month period was, an employee, independent contractor, or consultant of any of Employer or any of its Affiliates, for the purpose of participating in a Competitive Business;

(e)      solicit any Person that is at such time, or during the previous two year period was, (i) a customer, supplier or business associate of any of Employer or any of its Affiliates, or (ii) a Person from whom any of Employer or any of its Affiliates solicited business or with whom any of Employer or any of its Affiliates discussed a potential business relationship, in each case, for the purpose of offering or providing services or products which are competitive with services or products provided by any of Employer with respect to the Business or which are otherwise competitive with any services or products provided (including, without limitation, products in any stage of development prior to the Effective Date) by any of Employer;

(f)      cause or seek to cause to be terminated or adversely affected, or otherwise interfere with, any agreement or arrangement of any kind to which any of Employer or any of its Affiliates is a party or from which they benefit; or

(g)      seek to interfere with or adversely affect the ongoing relationships between any of Employer or any of its Affiliates, on the one hand, and their suppliers, customers and professional and business contacts, on the other hand.

**4.2      Confidential Information**.

(a)      Executive shall not at any time divulge, communicate, or use to the detriment of any of Employer or any of its Affiliates or for the benefit of any other Person or Persons, or misuse in any way, any Confidential Information pertaining to any of Employer or any of its Affiliates and/or the Business.  Any Confidential Information or data now or hereafter acquired by Executive with respect to the Business engaged in by any of Employer or any of its Affiliates (which shall include, but not be limited to, information concerning any of Employer's or any of its Affiliates' financial condition, prospects, technology, customers, suppliers, sources of leads and methods of doing business) shall be deemed a valuable, special and unique asset of Employer that is received by Executive in confidence and as a fiduciary, and Executive shall remain a fiduciary to Employer with respect to all of such information. Notwithstanding the foregoing, nothing herein shall be

deemed to restrict Executive from disclosing Confidential Information as required to perform her duties under this Agreement or to the extent required by law.  If any Person makes a demand on Executive purporting to legally compel her to divulge any Confidential Information, Executive immediately shall give notice of the demand to Employer so that Employer may first assess whether to challenge the demand prior to Executive's divulging of such Confidential Information.  Executive shall not divulge such Confidential Information until Employer has concluded not to challenge the demand, or has exhausted its challenge, including appeals, if any.  Upon the termination of the Term of Employment, or upon request by Employer, Executive shall deliver promptly to Employer all memoranda, notes, records, reports, manuals, drawings, designs, computer files in any media, electronically store information, and other documents (and all copies thereof) containing Confidential Information or business information pertaining to any of Employer or any of its Affiliates, or the Business.

(b)     Notwithstanding anything contained herein to the contrary, nothing contained in this Agreement is intended to prohibit or restrict Executive from exercising rights under the Defend Trade Secrets Act of 2016, which provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  If Executive files a lawsuit for retaliation by Employer for reporting a suspected violation of law, Executive may disclose Employer's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive (1) files any document containing the trade secret under seal; and (2) does not disclose the trade secret, except pursuant to court order.

**4.3**     <u>**Ownership of Developments**</u>.  All processes, concepts, techniques, inventions and works of authorship, including new contributions, improvements, formats, packages, programs, systems, machines, compositions of matter manufactured, developments, applications and discoveries, and all copyrights, patents, trade secrets, or other intellectual property rights associated therewith conceived, invented, made, developed or created by Executive during the Term of Employment either during the course of performing work for Employer, its subsidiaries, or any of its Affiliates, or their clients, or which are related in any manner to the business (commercial or experimental) of any of Employer, its subsidiaries, or any of its Affiliates or their clients (collectively, the "**Work Product**") shall belong exclusively to Employer and shall, to the extent possible, be considered a work made by Executive for hire for Employer within the meaning of Title 17 of the United States Code.  To the extent the Work Product may not be considered work made by Executive for hire for Employer, Executive agrees to assign, and automatically shall be deemed to assign at the time of creation of Work Product, without any requirement of further consideration, any right, title, or interest Executive may have in such Work Product. Upon the request of Employer, Executive shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment. Executive shall further: (i) promptly disclose the Work Product to Employer; (ii) assign to Employer, without additional compensation, all patent or other rights to such Work Product for the United States and foreign

countries; (iii) sign all papers necessary to carry out the foregoing; and (iv) give testimony in support of her inventions, all at the sole cost and expense of Employer. Executive hereby appoints any member of the Board of Employer as Executive's attorney-in-fact to execute documents on her behalf for this purpose. I agree that this appointment is coupled with an interest and will not be revocable. Notwithstanding the foregoing, and pursuant to California Labor Code section 2872, this Agreement does not apply to any invention which qualifies fully under the provisions of California Labor Code section 2870 (as set forth in Exhibit B).

**4.4** **Books and Records**.  All books, records, data, information, and accounts relating in any manner to any of Employer or any of its Affiliates, the Business, or the customers or clients of any of Employer or any of its Affiliates, whether prepared by Executive or otherwise coming into Executive's possession, shall be the exclusive property of Employer and shall be returned immediately to Employer on termination of the Term of Employment or on Employer's request at any time.

**4.5** **Non-Disparagement**. Except in the good faith performance of Executive's duties to Employer and its Affiliates while Executive is employed by Employer or any of its Affiliates and, in such case, solely in internal communications with other officers of Employer and other members of the Board, Executive agrees to not make any statement or issue any communication, written or otherwise, directly or indirectly, that disparages, criticizes, or otherwise reflects adversely on or encourages any adverse action whatsoever against Employer, including but not limited to Employer's products, services, finances, financial condition, capabilities or other aspect of its Business. Nothing contained in this Agreement in any way restricts or prevents Executive from (1) exercising Executive's rights under Section 7 of the National Labor Relations Act, (2) testifying truthfully in any legal proceeding, including, but not limited to, responding to any inquiries made by the EEOC or any government agency or making true and accurate statements in any good faith claim, suit, action or proceeding against Employer or any of its Affiliates, or (3) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Executive has reason to believe is unlawful.  Employer shall cause its and its Affiliates' respective officers and managers to not make any statement or issue any communication, written or otherwise, directly or indirectly, that disparages, criticizes, or otherwise reflects adversely on or encourages any adverse action whatsoever against Executive, except for true and accurate statements in any good faith claim, suit, action or proceeding against Executive or in connection with Employer's or its Affiliates' good faith assessment of Executive's performance of her duties to the Company and its Affiliates.

**4.6** **Reformation by Court**.  In the event that a court of competent jurisdiction shall determine that any provision of this ARTICLE IV is invalid or more restrictive than permitted under the governing law of such jurisdiction, then only as to enforcement of this ARTICLE IV and related definitions in Section 1.1 within the jurisdiction of such court, such provision shall be interpreted or reformed and enforced as if it provided for the maximum restriction permitted under such governing law.

**4.7**     **Breach of Restrictive Covenants**. In the event that Executive is in material breach of any of her obligations under this ARTICLE IV, Executive agrees that such a material breach could cause irreparable injury to Employer, and that if Employer shall bring legal proceedings against Executive to enforce any restrictive covenant, Employer shall be entitled to seek all available civil remedies, at law or in equity, including without limitation, an injunction without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy and without the necessity of posting any bond or other security, in addition to any other available remedies such as damages and attorney's fees and costs.

**ARTICLE V**
**MISCELLANEOUS**

**5.1**     **Executive Representations, Warranties and Covenants**.   Executive hereby warrants, represents and covenants that: (a) neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms of this Agreement, shall conflict with or constitute a breach of the terms, conditions or provisions of any agreement or instrument to which Executive is now a party or by which she is bound, or constitute a default under any of the foregoing; (b) Executive has the right and authority to enter into this Agreement and to perform all of the terms, covenants, provisions and conditions herein to be performed by Executive; and (c) Executive knows of no facts which would prevent Executive from complying with the terms of this Agreement.  Executive has not entered into, and agrees that she will not enter into, any agreement either written or oral in conflict with this Agreement. Executive further represents and warrants that during the Term of Employment, Executive shall not improperly use or disclose any confidential or trade secret information, if any, of any former employer or any other Person to whom Executive has an obligation of confidentiality, and Executive will not bring onto the premises of any of Employer or its Affiliates any unpublished documents or any proprietary or confidential information or materials belonging to any former employer or any other Person to whom Executive has an obligation of confidentiality unless expressly consented to in writing by that former employer or Person.

**5.2**     **Future Cooperation**. Executive agrees to reasonably cooperate with, and without cost to, Employer with respect to any investigations, legal proceedings, or other matters which arose during or after Executive's employment with Employer.  Executive agrees to remain available to participate, provide Employer with any relevant documentation in Executive's custody, control or possession, and if necessary, provide testimony in any such matters.  Employer will pay for or promptly reimburse Executive for any reasonable expenses, not including attorneys' fees (unless otherwise required by applicable law), Executive incurs in connection with such cooperation, provided Employer has agreed in advance to such expenses. This cooperation provision shall survive the termination of this Agreement.

*ACTIVE 684927030v16*                                          13

**5.3**     **Right to Review and Seek Counsel; Construction.**  Executive hereby acknowledges that she has been provided with a copy of this Agreement for review prior to signing it, that she has been given the opportunity to have this Agreement reviewed by her own attorney prior to signing it, that she understands the purposes and effects of this Agreement, and that she has been given a signed copy of this Agreement for her records.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event that an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**5.4**     **Governing Law; Submission to Jurisdiction**.

(a)                 This Agreement shall be governed by and construed in accordance with the internal laws of the state of California without giving effect to any choice or conflict of law provision or rule (whether of the state of California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the state of California. The terms of this Agreement will prevail and govern in the event of any conflict with any other agreement or policy relating to Executive's employment with Employer.

(b)                 ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL OR STATE COURTS WITHIN THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE CITY OF SAN DIEGO AND COUNTY OF SAN DIEGO, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**5.5**     **Amendment and Waiver**.  The provisions of this Agreement may be amended, modified or waived only with the prior written consent of the board of managers of Employer and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement will be construed as a waiver of such provisions or affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

**5.6**     **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to

*ACTIVE 684927030v16*                    14

effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**5.7** **Entire Agreement**.  This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such employment in any way.

**5.8** **Withholding of Taxes and Other Executive Deductions**.  Employer may withhold from any benefits and payments made pursuant to this Agreement all federal, state, city, and other taxes as may be required pursuant to any law or governmental regulation or ruling and all other normal employee deductions made with respect to Employer's employees generally.

**5.9** **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**5.10** **Construction**.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party.

**5.11** **Survival**.  The provisions of ARTICLE III, ARTICLE IV and ARTICLE V of this Agreement shall survive the termination or expiration of this Agreement or the termination of the Term of Employment pursuant to this Agreement in accordance with their terms.

**5.12** **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have executed this Employment Agreement as of the Effective Date.

EMPLOYER:

REBECCA BAMBERGER WORKS, LLC

By: _____
Name: _____
Title: _____

EXECUTIVE:

_____
Rebecca Bamberger

*[Signature Page to Employment Agreement]*

**EXHIBIT A**
**FORM OF RELEASE**

**GENERAL RELEASE OF CLAIMS**

1. <u>Release of Claims</u>. Rebecca Bamberger ("**Executive**"), for herself and her family, heirs, executors, administrators, legal representatives and their respective successors and assigns, in exchange for the consideration received pursuant to Section 3.4 the employment agreement to which this release is attached as Exhibit A (the "**Agreement**"), and for other consideration the receipt and sufficiency of which are hereby acknowledged, does hereby release and forever discharge Rebecca Bamberger Works, LLC, a Delaware limited liability company ("**Employer**") and each of its direct and indirect subsidiaries, Affiliates (as defined in the Agreement), successors and assigns, as well as each of such entities' current or former directors, officers, employees, shareholders, direct or indirect equity owners, agents, alleged joint employers, benefits plans, benefit plan fiduciaries, and insurers, together with anyone acting in concert with any of them (collectively, the "**Released Parties**") from any and all actions, causes of action, suits, controversies, claims and demands whatsoever, arising from the beginning of time through the date on which Executive signs this General Release of Claims for or by reason of any matter related to Executive's employment with Employer and its subsidiaries and/or Affiliates or the termination of such employment, whether for tort, breach of express or implied contract (including without limitation the implied contractual covenant of good faith and fair dealing), wrongful discharge, intentional and/or negligent infliction of emotional distress, defamation, injuries incurred on the job or incurred as a result of loss of employment or otherwise, as well as all claims arising under other federal, state or local laws, statutes, regulations or ordinances governing labor or employment including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, as amended, the Family Medical Leave Act, as amended, 42 U.S.C. § 1981, the Americans with Disabilities Act, as amended, the Age Discrimination in Employment Act ("**ADEA**"), as amended by the Older Workers Benefit Protection Act ("**OWBPA**"), and the Employee Retirement Income Security Act, as amended, the California Worker Adjustment and Retraining Notification Act; the California Business & Professions Code; the California Family Rights Act; the California Labor Code; the California Industrial Welfare Commission Wage Orders; the California Fair Employment and Housing Act; and the California and United States Constitutions (collectively, the "**Released Claims**"). Notwithstanding anything to the contrary contained herein, this release and waiver does not apply to, and Executive does not hereby release: (i) any rights to the receipt of employee benefits which vested on or prior to the date of this release; (ii) the right to receive Salary Continuation Payments as set forth in the Agreement; and (iii) any rights of Executive pursuant to the Membership Interest Purchase Agreement (as defined in the Agreement). If any claim is not subject to release, to the extent permitted by law, Executive waives any right or ability to be a class or collective action representative or to otherwise participate or recover any damages, injunctive, declaratory, monetary, or other relief, in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Employer or any of the other Released Parties is a party. Executive represents

Executive is not an "aggrieved employee" for any purpose including under the California Private Attorneys' General Act ("**PAGA**"), and therefore Employer is not liable for any penalties pursuant to PAGA for any conduct arising during or out of Executive's employment with Employer.

2.      Unknown Claims. Executive understands that Executive is releasing claims that Executive may not now know about and that is Executive's knowing and voluntary intent. If Executive later discovers facts different from or in addition to those facts Executive currently knows or believes to be true, this Agreement, the waivers and releases will nevertheless remain effective in all respects. Executive expressly waives any and all rights under Section 1542 of the California Civil Code, and any like provision or principal of common law in any foreign jurisdiction.  Section 1542 provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

3.      Executive's Protected Rights; Non-Interference. Notwithstanding the above, the Released Claims do not include any claim for vested and accrued benefits under any benefit plan governed by the Employment Retirement income Security Act of 1974, as amended; any claim for unemployment or state disability insurance benefits or worker compensation benefits; any claim of breach of the terms of this Agreement; claims that may arise after the execution of this Agreement; any claims for benefits under any directors' and officers' liability policy maintained by Employer or its subsidiaries or affiliated companies in accordance with the terms of such policy; or any other claims that cannot lawfully be released as a matter of law or public policy. Additionally, nothing in this Agreement waives Employee's right to file a charge, cooperate or participate in an investigation or proceeding conducted by an administrative or regulatory agency, such as the Equal Employment Opportunity Commission ("**EEOC**"), to file an unfair labor practice charge under the National Labor Relations Act, to make disclosures that are required by law, or to testify truthfully, when required or requested to attend the proceeding pursuant to a court order, subpoena, or written request from an administrative agency or the legislature.  However, the consideration provided to Executive in exchange for this General Release of Claims shall be the sole relief provided to Executive by the Released Parties for the Released Claims and Executive agrees to waive any monetary or other personal relief against the Released Parties in connection with any such claim, charge, or proceeding. Nothing in this General Release of Claims shall be interpreted to prohibit or prevent Executive from receiving a bounty or similar award for providing information to a government agency (such as the U.S. Securities and Exchange Commission) or filing or participating in any whistleblower complaint filed with the U.S. Securities and Exchange Commission.

4.      Promise Not To Sue. Executive represents that she has not filed (or transferred to any Person (as defined in the Agreement) her right to file) any claim released in the Released Claims and, to the maximum extent permitted by applicable law and subject to the protected rights described above, covenants and agrees that she will never individually or with any Person file, or

commence the filing of (or transfer to any Person the right to file or commence filing of), any charges, lawsuits, complaints or proceedings with any governmental agency or against the Released Parties with respect to any of the Released Claims.

5.    No Admission of Liability. Executive understands and agrees that nothing in this General Release of Claims shall be deemed or construed at any time for any purpose as an admission by Employer, or evidence of any liability or unlawful conduct of any kind, or breach of any duty or monies owed to Executive or any other person.

6.    Executive's Representations and Warranties. Executive represents, warrants and confirms the following: (a) Executive has been paid all wages and other compensation that Executive has earned or become entitled to during Executive's employment with Employer, including but not limited to, all wages, salary, commissions, vacation and paid time off, reimbursable expenses, and any and all other benefits and compensation; (b) Executive has not sustained any workplace injury or illness as of Executive's Execution Date for which Executive has not already filed a claim; (c) Executive has not engaged in and is not aware of any unlawful conduct or misconduct contrary to or relating to the business of Employer; (d) Executive knows of no present claim Employee has that has not been released by this General Release of Claims; and (e) Executive has not sold, assigned, transferred or otherwise disposed of (or purported to assign or transfer) any of the claims, demands, obligations, or rights that are the subject of this General Release of Claims.

7.    [Waiver of ADEA Claims; Time to Consider. Executive acknowledges the Released Claims includes a waiver of rights and claims which Executive may have arising under the Age Discrimination in Employment Act of 1967, as amended. Executive understands that Employee has [twenty-one (21) calendar days] to consider this General Release of Claims (the "**Consideration Period**"). If Executive signs this General Release of Claims before the expiration of the Consideration Period, Executive acknowledges that Executive has done so knowingly and voluntarily, with full knowledge Executive is waiving any unused portion of the Consideration Period. If Executive has not communicated Executive's acceptance of this offer to Employer by emailing the executed and dated General Release of Claims to _____ before the expiration of this Consideration Period, this offer automatically expires. Executive has seven (7) calendar days from the date on which Executive signs this General Release of Claims to revoke the General Release of Claims. Executive must submit such revocation to Employer by emailing _____. This General Release of Claims does not become effective or enforceable until the eighth (8th) calendar day after Executive signs this General Release of Claims without revoking it (the "**Effective Date**").  Any changes to this General Release of Claims, whether material or not, shall not restart the Consideration Period. Executive further agrees and acknowledges Executive has consulted with or has had an opportunity to consult with an independent attorney of Executive's choosing before signing this General Release of Claims, and has been advised in writing to do so by the Employer.][1]

8.    [Voluntary Execution; Effective Date. Executive acknowledges Executive had a period of not less than five (5) business days from receipt of this General Release of Claims to consider whether to execute this General Release of Claims and to consult an attorney. This

---

[1] Note to Draft: To be inserted if Beck is at least 40 years old at the time the release is to be signed.

General Release of Claims becomes effective and binding when Executive has signed and returned the fully and properly executed General Release of Claims to the Employer.][2]

9.      Miscellaneous. Executive acknowledges that this General Release of Claims will be governed by and construed and enforced in accordance with the internal laws of the State of California applicable to contracts and instruments made and to be performed entirely within such State. If any portion or provision of this General Release of Claims is determined to be invalid or unenforceable by any court of competent jurisdiction, the remainder of this General Release of Claims shall be unimpaired and the invalid or unenforceable portion or provision shall be deemed severed or modified so that it is valid and enforceable and consistent with the parties' general intent insofar as possible, and the Parties agree to enter into a full and general release of all claims by Employee that is not invalid. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS GENERAL RELEASE OF CLAIMS OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE STATE OR FEDERAL COURTS OF THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE CITY OF SAN DIEGO AND COUNTY OF SAN DIEGO, AND EXECUTIVE IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  EXECUTIVE IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Executive acknowledges that she has read this General Release of Claims, that she has been advised that she should consult with an attorney before she executes this General Release of Claims, that she is receiving good and valuable consideration to which she would not otherwise be entitled in exchange for her execution of this General Release of Claims, and that she understands all of its terms and executes it voluntarily and with full knowledge of its significance and the consequences thereof. In the event Executive revokes her release of the Released Claims, Executive shall forfeit all Salary Continuation Payments set forth in Sections 3.4 and 3.5 of the Agreement.

IN WITNESS WHEREOF, Executive has signed and executed this General Release of Claims as of the date below (the "**Execution Date**").


_____
Rebecca Bamberger

Date:_____

---

[2] Note to Draft: To be inserted if Beck is under 40 years old at the time the release is to be signed.

**EXHIBIT B**

**California Labor Code Section 2870 Notice:**

a.        Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

i.        Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

ii.        Result from any work performed by the employee for the employer.

b.        To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**EXHIBIT B**
**FORM OF LIMITED LIABILITY COMPANY AGREEMENT**

[Attached]

*ACTIVE 684044473v13*

Final Form

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**REBECCA BAMBERGER WORKS, LLC**

*ACTIVE 684118884v10*

**TABLE OF CONTENTS**

Page

Article I DEFINITIONS ...........................................................................................................................2

    1.1    Definitions.............................................................................................................................2

    1.2    Other Definitions ...............................................................................................................11

    1.3    Interpretation and Rules of Construction .........................................................................11

Article II ORGANIZATION; PURPOSES ...........................................................................................12

    2.1    Formation...........................................................................................................................12

    2.2    Name ..................................................................................................................................12

    2.3    Maintenance of Existence ..................................................................................................12

    2.4    Registered Office ...............................................................................................................12

    2.5    Purpose...............................................................................................................................13

    2.6    Title to Property; Units as Personal Property ...................................................................13

    2.7    Term...................................................................................................................................13

Article III UNITS ..................................................................................................................................13

    3.1    Units Generally ..................................................................................................................13

    3.2    Authorization and Issuance of Class A Units ....................................................................13

    3.3    Authorization and Issuance of Class B Units ....................................................................13

    3.4    New Units ..........................................................................................................................14

    3.5    Certification of Units .........................................................................................................14

Article IV MEMBERS............................................................................................................................15

    4.1    Members; Percentage Interests .........................................................................................15

    4.2    Additional Capital Contributions......................................................................................15

    4.3    Withdrawal of Capital Contributions................................................................................17

    4.4    Capital Accounts................................................................................................................17

    4.5    Voting ................................................................................................................................18

    4.6    Pre-Emptive Rights............................................................................................................18

    4.7    Restrictive Covenants ........................................................................................................19

    4.8    No Duty on New Business or Corporate Opportunities.....................................................21

    4.9    Company Platform Costs ....................................................................................................21

Article V ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS ......................................21

    5.1    Allocation of Profits and Losses .......................................................................................21

    5.2    Special Allocations ............................................................................................................22

    5.3    Loss Limitation..................................................................................................................24

i

5.4    Other Allocation Rules ...................................................................................................24

5.5    Distributions...................................................................................................................25

5.6    Amounts Withheld .........................................................................................................26

5.7    Tax Distributions ..........................................................................................................26

Article VI MANAGEMENT ...........................................................................................................26

6.1    Appointment and Term of Board of Managers.............................................................26

6.2    Meetings........................................................................................................................27

6.3    Quorum and Voting ......................................................................................................27

6.4    Written Consent of the Board in Lieu of a Meeting .....................................................28

6.5    Authority of the Board ..................................................................................................28

6.6    Limited Liability ...........................................................................................................28

6.7    Authority to Bind Company..........................................................................................28

6.8    Indemnification .............................................................................................................29

6.9    Major Decisions............................................................................................................29

Article VII TRANSFER ..................................................................................................................30

7.1    General..........................................................................................................................30

7.2    Substitute Member ........................................................................................................30

7.3    Effect of Admission as a Substitute Member ...............................................................31

7.4    Improper Transfer .........................................................................................................31

7.5    Permitted Transfers.......................................................................................................31

7.6    Right of First Refusal....................................................................................................32

7.7    Drag-Along Right .........................................................................................................32

7.8    Tag-Along Right ...........................................................................................................33

7.9    Put Right .......................................................................................................................34

7.10    Call Right ......................................................................................................................34

7.11    Holdco Class B Units Redemption Rights....................................................................34

Article VIII DISSOLUTION AND WINDING UP OF THE COMPANY ......................................34

8.1    Dissolution of the Company .........................................................................................34

8.2    Winding Up of the Company.........................................................................................35

8.3    Negative Capital Accounts ...........................................................................................35

Article IX BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS, FISCAL YEAR, BANKING AND TAX MATTERS MEMBER ...................................................................................................35

9.1    Accounting, Books and Records....................................................................................35

9.2    Inspection .....................................................................................................................35

9.3    Reports..........................................................................................................................35

*ACTIVE 684118884v10*

| | | |
|---|---|---|
| 9.4 | Company Funds | 36 |
| 9.5 | Partnership Representative | 36 |
| 9.6 | Tax Matters | 38 |
| Article X MISCELLANEOUS | | 39 |
| 10.1 | Amendment | 39 |
| 10.2 | Notices | 39 |
| 10.3 | Governing Law; Venue; Attorneys' Fees | 40 |
| 10.4 | Entire Agreement | 41 |
| 10.5 | Counterparts | 41 |
| 10.6 | Non-Waiver | 41 |
| 10.7 | Further Assurances | 41 |
| 10.8 | Guaranty | 41 |

| | |
|---|---|
| Exhibit A | Members, Addresses, Number of Units and Percentage of Interests |
| Exhibit B | Form of Joinder |
| Exhibit C | Option Agreement |
| Exhibit D | Holdco LLC Agreement |
| Exhibit E | Form of Reserve Class B Units Grant Agreement |
| Exhibit F | Form of Corresponding Holdco Class B Units Grant Agreement |

iii

*ACTIVE 684118884v10*

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# REBECCA BAMBERGER WORKS, LLC

THE LIMITED LIABILITY COMPANY INTERESTS AND UNITS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY SIMILAR STATE STATUTE IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION AS PROVIDED IN THOSE STATUTES.

THE SALE OR OTHER DISPOSITION OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS IS RESTRICTED, AS SET FORTH IN THIS OPERATING AGREEMENT, AND THE EFFECTIVENESS OF ANY SUCH SALE OR OTHER DISPOSITION MAY BE CONDITIONED UPON THE RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE STATUTES.

BY ACQUIRING LIMITED LIABILITY COMPANY INTERESTS OR UNITS REPRESENTED BY THIS OPERATING AGREEMENT, A MEMBER REPRESENTS THAT IT WILL NOT SELL OR OTHERWISE DISPOSE OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID STATUTES AND THE RULES AND REGULATIONS THEREUNDER.

*ACTIVE 684118884v10*

Final Form

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## REBECCA BAMBERGER WORKS, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (the "Agreement") is made effective as of March __, 2023 (the "Effective Date"), by and among Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "Company"), Llorente & Cuenca USA, Inc., a Delaware corporation ("LLYC"), RBW Holdco, Inc., a California corporation ("Newco"), BAM Management Holdco, LLC, a Delaware limited liability company ("Holdco" and collectively with LLYC and Newco, the "Members"), Rebecca Bamberger, a California resident, the "Newco Guarantor"), and such other Persons as may be admitted as a member of the Company pursuant to the terms of this Agreement by executing a Joinder Agreement.

## R E C I T A L S

WHEREAS, the Company was initially formed as a California corporation upon the filing of its articles of incorporation with the California Secretary of State on October 19, 2006 (the "Predecessor Articles");

WHEREAS, the Company previously entered into a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "Code"), as contemplated by Revenue Ruling 2008-18, Situation 1, pursuant to which the Company's sole shareholder formed Newco, contributed all of the Company's outstanding stock to Newco and Newco filed a timely election to treat the Company as a qualified subchapter S Subsidiary ("QSUB" and such election, the "QSUB Election" (such reorganization, the "F Reorg");

WHEREAS, no earlier than one business following delivery of the QSUB Election by a private delivery service designated by the IRS to the Ogden Internal Revenue Submission Processing Center, the Company was converted into a Delaware limited liability company upon the filing of its certificate of conversion and certificate of formation with the Delaware Secretary of State on March 28, 2023 (the "Certificate of Formation") and concurrently therewith the Company entered into an operating agreement with its member (the "Initial Operating Agreement") (the "Conversion" and together with the F Reorg, the "Restructuring");

WHEREAS, in connection with a certain Membership Interests Purchase Agreement, dated of even date herewith, by and among the Company, Newco, the Newco Guarantor and LLYC (the "Membership Interest Purchase Agreement"), LLYC acquired from Newco on the Effective Date 80% of the issued and outstanding Interests (as defined below) of the Company; and

WHEREAS, the Members intend to enter into this Agreement in order to amend and restate the Initial Operating Agreement in its entirely and to define and express all of their respective rights and obligations with respect to, among other matters (i) their Interests in the Company, and (ii) the operation of the Company as a limited liability company.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises, covenants and agreements contained herein, and for other good and valuable

*ACTIVE 684118884v10*

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows and the Members hereby adopt this Agreement to be the limited liability company agreement of the Company under the laws of the State of Delaware:

# ARTICLE I

## DEFINITIONS

1.1     Definitions.  Capitalized terms used in this Agreement shall have the following meaning (and if not defined below, such capitalized terms shall have the meaning ascribed thereto in the Purchase Agreement):

"Accounting Firm" means an independent accounting firm of international recognized standing selected by the Board.

"Acquisition Income or Loss" means revenues, expenses, earnings or losses attributable to any business acquisition (whether by way of a share purchase, asset purchase or otherwise) made by the Company, either directly or indirectly (whether through a subsidiary or otherwise) at any time on or after the Effective Date.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq.*, as amended.

"Additional Capital Contribution" means, with respect to each Member, any Capital Contribution made by such Member to the Company after the Effective Date in accordance with Section 4.2.

"Adjusted Capital Account" means, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(a)     Add to such Capital Account the following items:

(i)     The amount, if any, that such Member is obligated to contribute to the Company upon liquidation of such Member's Interest; and

(ii)     The amount that such Member is unconditionally obligated to restore within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3) or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Subtract from such Capital Account such Member's share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

2

"Additional Class B Units" means those Class B Units issued to any Person following the Effective Date that are not Reserve Class B Units.

"Adjusted Capital Account Deficit" means, with respect to any Member, the negative balance, if any, in such Member's Adjusted Capital Account.

"Affiliate" means, with respect to any specified Person, a Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Approved Sale" has the meaning set forth in Section 7.7(a).

"Assumed Tax Rate" means, with respect to a particular item of income, gain, loss, deduction or expense, the highest combined marginal federal, state and local income tax rate applicable to individuals resident in California with respect to such item for the period in which it is allocated, taking into account the character of the relevant item (e.g., ordinary, capital or otherwise), increased by the highest marginal state income or gross receipts Tax applicable to S corporations in California. For the avoidance of doubt, the Assumed Tax Rate applies to all Members regardless of their particular circumstances.

"Board" has the meaning set forth in Section 6.1(a).

"Book Value" means, with respect to any Company property, the Company's adjusted basis for U.S. federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g), except that (a) the Book Value of any Company property contributed or deemed contributed to the Company shall initially be the Fair Market Value of such property as of the date of contribution and (b) the Book Value of any Company property shall be increased (or decreased) to reflect any adjustments to the adjusted tax basis of such property pursuant to Sections 732(d), 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

"Business" means the business of providing marketing and public relations services.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California, or Madrid, Spain are authorized or required by law to be closed for business.

"Capital Account" means, with respect to any Member, such Member's Capital Account determined in accordance with Section 4.4.

"Capital Call Notice" has the meaning set forth in Section 4.2(b).

3

*ACTIVE 684118884v10*

"Capital Contributions" means, with respect to any Member, the amount of money and the Fair Market Value of any property (other than money) contributed to the Company with respect to the Units in the Company held or purchased by that Member, including Additional Capital Contributions.

"Cash Available for Distribution" means, for any Fiscal Year or other lesser period, the excess of (a) the amount of gross cash receipts received by the Company (including from any reserves previously established that the Board determines are no longer required by the Company), less (b) (i) all expenditures made and to be made by the Company for such Fiscal Year or period, (ii) any reserves established or increased by the Board that the Board deem reasonably necessary for the operation of the Company, and (iii) amounts received by the Company as Capital Contributions which amounts the Company retains in its bank accounts (including, without limitation, any Additional Capital Contributions made pursuant to Section 4.2)

"Certificate of Formation" has the meaning set forth in the recitals.

"Class A Member" means a Member that holds Class A Units.

"Class A Percentage Interest" means a Class A Member's Interest in the Company's Class A Units expressed as a percentage.  The Class A Percentage Interest of each Class A Member shall equal (i) the total number of Class A Units owned by the Class A Member, divided by (ii) the total number of Class A Units owned by all Class A Members.

"Class A Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class A Units" in this Agreement.

"Class B Member" means a Member that holds Class B Units.

"Class B Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class B Units" in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Minimum Gain" has the meaning set forth in Section 5.2(a).

"Company Nonrecourse Liability" has the meaning set forth in Section 5.2(d).

"Competitive Business" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that the Company has taken concrete steps towards providing or selling in the Business); provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

4

*ACTIVE 684118884v10*

"Corresponding Holdco Class B Unit" means in respect of a Class B Unit issued by the Company, the Holdco "Class B Unit", issued pursuant to the terms of the Holdco LLC Agreement, held by the Person designated by the Company to which such Class B Unit relates.

"Corresponding Holdco Class B Units Grant Agreements" has the meaning set forth in Section 3.3(b).

"Covered Person" means any Person who is (i) a Member, (ii) an officer, director, limited liability company manager, trustee, employee, agent or representative of a Member or of any controlling Affiliate, shareholder, partner or member of a Member, (iii) the Partnership Representative, or (iv) a director, limited liability company manager (including a Manager), officer, partnership representative, agent or representative of the Company or any of its subsidiaries, in each case in such Person's capacity as such.

"EBIT" means, for any specified period, the consolidated net income (or loss) generated by the Company's operations (including Acquisition Income or Loss), determined in accordance with GAAP, *plus*, to the extent deducted in computing the Company's net income or loss:

(i)  interest expense (including imputed interest in capital lease payments); *plus*

(ii)  federal, state, or local income Taxes and state franchise Taxes to the extent based upon net income and not revenue; *plus*

(iii)  the non-cash cost of any equity granted to employees of the Company by the Company, or other derivative securities granted during the applicable period, valued in accordance with Statement of Financial Accounting Standards No. 123(R); *plus*

(iv)  any non-cash impairment charges; *plus*

(v)  any gains or losses attributable to the sale of any assets (other than inventories); *plus*

(vi)  extraordinary losses, the cumulative effect of a change in accounting principles and unrealized losses.

With the exception of Acquisition Income or Loss, in calculating the amount of EBIT, no account shall be taken of any item which, in accordance with GAAP would be classified as an "*extraordinary item*" or which is a non-recurring item out of the ordinary course of business.

"Effective Date" has the meaning set forth in the Preamble.

"Fair Market Value" means with respect to (i) the Company the amount that the Company would receive in an all-cash sale of all of its assets and businesses as a going concern (free and clear of all liens and after payment of indebtedness for borrowed money) in an arms-length transaction with an unaffiliated third party consummated on the day immediately preceding the date on which the event occurred which necessitated the determination of the Fair Market Value (assuming that all of the proceeds from such sale were paid directly to the Company other than an amount of such proceeds necessary to pay transfer taxes payable in connection with such sale,

5

which amount will not be received or deemed received by the Company), and (ii) any other item, the price (in cash or other consideration) at which said item would be sold in a sales transaction between a willing buyer and a willing seller negotiating on arms'-length terms. After a determination of Fair Market Value of the Company is made as provided in (i) above, the Fair Market Value of a Unit will be determined by making a calculation reflecting the cash distributions which would be made to the Members in accordance with this Agreement in respect of such Unit if the Company were deemed to receive the Fair Market Value of all of its assets and businesses as a going concern (free and clear of all liens and after payment of indebtedness for borrowed money) in an arms-length transaction with an unaffiliated third party in cash and then distributed the same to the Members in accordance with the terms of this Agreement incident to the liquidation of the Company after payment to all of the Company's creditors from such cash receipts other than payments to creditors who hold evidence of indebtedness for borrowed money, the payment of which is already reflected in the calculation of the Fair Market Value and assuming that all of the convertible debt and other convertible securities were repaid or converted (whichever yields more cash to the holders of such convertible securities) and all options to acquire Units (whether or not currently exercisable) that have an exercise price below the Fair Market Value of such Units were exercised and the exercise price paid. The Fair Market Value of an item described in (ii) above shall be deemed for all purposes to be equal to the Fair Market Value of such item as determined by the Board and specified in writing pursuant to a duly adopted resolution of the Board, so long as such determination is reasonable and made in good faith by the Board.

"Fiscal Year" means (i) the period commencing on the Effective Date and ending on December 31, 2023, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) such other fiscal year of the Company as shall be selected by the Board after the Effective Date.

"Fully Participating Member" has the meaning set forth in Section 4.6.

"Funding Notice" has the meaning set forth in Section 4.2(a).

"GAAP" means the United States of America generally accepted accounting principles, consistently applied (except as may be required by changes in such principles).

"Holdco" has the meaning set forth in the Preamble.

"Holdco LLC Agreement" means the limited liability company operating agreement of Holdco in the form attached hereto as Exhibit D.

"Holdco Member" means any member of Holdco other than LLYC or any transferee of LLYC's membership interest in Holdco.

"Holdco Redemption Event" means the occurrence of any of the following: (a) the termination of employment, consultancy services or any other services agreement or arrangement of any Holdco Member with the Company or any of its subsidiaries, for any reason; (b) the exercise of the Option Agreement by LLYC or Newco; (c) the sale of a majority of the issued and outstanding Interests of the Company or capital stock of an Affiliate of the Company that results in a change of control of the Company; or (d) upon the fifth anniversary of the grant of such Class B Units. As used in this definition, the term "control" means the possession, directly or indirectly,

6

of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Hurdle Amount" means, with respect to each Class B Unit, an amount equal to the amount determined by the Board to be necessary to cause such Class B Unit to constitute a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Revenue Procedure 2001-43, 2001-2 C.B. 191. The Hurdle Amount with respect to each Class B Unit shall be determined by the Board in its discretion and may be adjusted by the Board in its discretion to take into account the effects of additional Capital Contributions, distributions, issuances of Units, redemptions of Units and other changes in capital structure.

"Indemnitee" has the meaning set forth in Section 6.8(a).

"Interest" means a Member's economic rights, voting rights, other interest in the Company as a Member as provided in this Agreement or the Act (based on the type, class, or series of Unit or Units held by such Member).

"IRS" means the United States Internal Revenue Services.

"LLYC America" means Llorente & Cuenca América S.L.

"LLYC Group" means LLYC America and its Affiliates.

"LLYC Managers" has the meaning set forth in Section 6.1(b).

"LLYC Parent" means Llorente & Cuenca, S.A.

"LLYC Platform" means the business platform of the LLYC Group for the benefit of all the entities comprising the LLYC Group, which benefits include but are not limited to, the use of LLYC Group's intellectual property, infrastructure, logistics, management services, networks, know-how, human resources and professional development, client development, marketing, information and technology, and accounting and financial services.

"LLYC Platform Costs" means all costs and expenses incurred by the LLYC Group, taken as a whole, in developing, using, updating and operating the LLYC Platform.

"Major Decision" has the meaning set forth in Section 6.9(a).

"Manager" has the meaning set forth in Section 6.1(a).

"Member" means each of the Persons listed on Exhibit A hereto, and any Person admitted to the Company as a Member following the Effective Date; but, in each case, only for so long as such Person is the owner of one or more Units.

"Member Nonrecourse Debt" has the meaning set forth in Section 5.2(e).

"Member Nonrecourse Debt Minimum Gain" has the meaning set forth in Section 5.2(b).

"Members' Schedule" has the meaning set forth in Section 4.1(a).

7

*ACTIVE 684118884v10*

"Membership Interest Purchase Agreement" has the meaning set forth in the recitals.

"New Units" has the meaning set forth in Section 3.4.

"Newco" has the meaning set forth in the Preamble.

"Newco Guarantor" has the meaning set forth in the Preamble.

"Non-Participating Member" has the meaning set forth in Section 4.2(c).

"Offered Price" has the meaning set forth in Section 7.6(b).

"Option Agreement" means the option agreement entered into on the date of this Agreement by and among LLYC, Newco, the Newco Guarantor, and the Company, attached hereto as Exhibit C.

"Participating Member" has the meaning set forth in Section 4.2(c).

"Partnership Representative" has the meaning set forth in Section 9.5.

"Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, together with any guidance issued thereunder or successor provisions, and any similar provision of state, local or non-U.S. tax laws.

"Percentage Interest" means a Member's Interest in the Company expressed as a percentage.  The Percentage Interest of each Member shall equal (i) the total number of Units owned by the Member, divided by (ii) the total number of Units owned by all Members.  The Percentage Interests of the Members are set forth on Exhibit A as of the Effective Date.

"Permitted Transfer" has the meaning set forth in Section 7.5.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, government or any agency or political subdivision thereof.

"Predecessor Articles" has the meaning set forth in the recitals.

"Pre-Emptive Acceptance Notice" has the meaning set forth in Section 4.6.

"Pre-Emptive Exercise Period" has the meaning set forth in Section 4.6.

"Pre-Emptive Issuance Notice" has the meaning set forth in Section 4.6.

"Pre-Emptive Member" has the meaning set forth in Section 4.6.

"Pre-Emptive Prospective Purchaser" has the meaning set forth in Section 4.6.

"Profits" and "Losses" shall mean, for each Taxable Year or other period, an amount equal to the Company's taxable income, gain or loss for that year or other period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction

8

required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments (without duplication):

(i)    Any income of the Company that is exempt from federal income tax or otherwise described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to that taxable income or loss;

(ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*) and non-deductible syndication costs described in Code Section 709, and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from that taxable income or loss;

(iii)    In the event the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of that adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of that asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of notwithstanding that the adjusted tax basis of that property differs from its Gross Asset Value;

(v)    Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required to be taken into account pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of that adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Proposed Purchaser" has the meaning set forth in Section 7.6(b).

"Purchase Notice" has the meaning set forth in Section 7.6(c).

"Regulations" or "Regs" means the federal income tax regulations promulgated under the Code by the United States Department of the Treasury or any amendment or successor provision to those regulations, including temporary regulations.

"Reserve Class B Units" means an aggregate of up to 420,000 Class B Units to be granted by the Company to Holdco pursuant to the terms of Section 3.3(b).

9

"Reserve Class B Units Grant Agreements" has the meaning set forth in Section 3.3(b).

"Reserve Class B Units Grantee Notice" has the meaning set forth in Section 3.3(b).

"Restricted Parties" means, collectively, Newco, the Newco Guarantor, the Class B Members, and their respective equity holders.

"Restricted Territory" means the United States and any other jurisdiction where the Company or any of its Affiliates conducts business.

"ROFR Member" has the meaning set forth in Section 7.6(a).

"ROFR Period" has the meaning set forth in Section 7.6(c).

"Subject Units" has the meaning set forth in Section 7.6(a).

"Substitute Member" means any Person who (i) holds Units, and (ii) has been admitted as a Member pursuant to Section 7.2.

"Tag-Along Member" has the meaning set forth in Section 7.8(a).

"Tag-Along Notice" has the meaning set forth in Section 7.8(a).

"Target Capital Balance" means, with respect to a Member, the net amount which would be distributed to such Member under this Agreement in a hypothetical liquidation of the Company on the last day of a period for which an allocation is to be made, determined as if the Company were to sell all of its assets for cash in an amount equal to their Book Value and distribute the net proceeds of such sale to the Members, after providing for the claims of creditors, pursuant to the provisions of this Agreement relating to a liquidation, dissolution or winding-up of the Company pursuant to Article VIII. To the extent applicable, the Target Capital Balance of a Member shall be reduced (below zero if necessary) by the sum of such Member's share of the Company's "partnership minimum gain" under Regs. §1.704-2(g), such Member's "partner nonrecourse debt minimum gain" under Regs. §1.704-2(i)(3), and the amount, if any, such Member would be required to contribute in the foregoing hypothetical liquidation. Nothing in this paragraph shall require any Member to be liable to the Company or any Person for any amount.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, surtax, employee or other withholding, or other tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"Tax Amount" means an amount of cash equal to (a) the product of (i) excess of the Board's estimate of the cumulative amounts of each class of income and gain allocated to a Member (including taxable income and gain attributable to Section 704(c) allocations) since the Effective Date over the cumulative amounts of each class of deduction, loss and expense allocated to such

10

Member since the Effective Date, multiplied by (ii) the Assumed Tax Rate applicable to such Member with respect to such classes of income and gain, minus (b) the cumulative amount of distributions previously made to such Member since the Effective Date pursuant to this Agreement.

"Taxable Year" means the Company's accounting period for U.S. federal income tax purposes, determined pursuant to Section 9.6(a).

"Territory" means the United States of America and anywhere else the Company or any of its subsidiaries is conducting the Business.

"Transfer" means any transfer, assignment, sale, conveyance, lease, partition, pledge or grant of a security interest in a Member's Interest in the Company, and includes any "involuntary transfer" such as a sale of any part of an Interest therein in connection with any bankruptcy or similar insolvency proceedings, or a divorce or other marital settlement involving any Member, or any other disposition or encumbrance of a Member's Interest.  For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges) of the stock, partnership, membership or other ownership interests of any Member that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Member, and any similar transactions involving the stock or other ownership interests of such Member), the effect of which is that the Persons who owned more than fifty percent (50%) of the outstanding stock or other ownership interests in such Member as of the Effective Date no longer control such Member, including loss of control as a result of not owning more than fifty percent (50%) of such stock or other ownership interests, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Member.  Capitalized terms containing such word as a root, such as "Transferee" or "Transferring," shall have corresponding meanings in this Agreement.

"Transferring Member" has the meaning set forth in Section 7.6(a).

"Unit" means a unit representing a fractional part of the Interests of the Members and shall include all types, classes, and series of Units issued hereunder, including the Class A Units and the Class B Units; provided, that any type, class, or series of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in this Agreement with respect to such type, class, or series of Unit and the Interests represented by such type, class, or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

1.2     Other Definitions.  As used in this Agreement, accounting terms to the extent they are not defined in this Agreement, have the respective meanings given to them under GAAP.

1.3     Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

11

(a)     when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation;"

(d)     the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular Article or Section of this Agreement;

(e)     all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; and

(g)     references to a Person are also to its successors and permitted assigns.

## ARTICLE II
## ORGANIZATION; PURPOSES

2.1     <u>Formation</u>.

(a)     The Members hereby acknowledge the formation and continuing existence of the Company under and pursuant to the Act.

(b)     This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     <u>Name</u>.  The name of the Company is "Rebecca Bamberger Works, LLC".  The Company's name may be changed at any time by the Board, and notice of any such change shall be given to each Member within a reasonable time thereafter.

2.3     <u>Maintenance of Existence</u>.  The Company shall do all other things that are required or advisable to maintain the Company as a limited liability company existing pursuant to the Act.

2.4     <u>Registered Office</u>.  The registered office of the Company shall be as set forth in the Certificate of Formation.

12

2.5     Purpose.  The purpose of the Company shall be to engage in any lawful business that may be engaged in by a limited liability company organized under the Act, as such business activities may be determined by the Board from time to time.  The Company shall have the authority, all the powers of a limited liability company under the Act and the power to do all things necessary or convenient to accomplish its purpose and to operate its business as described in this Agreement.  Without limiting the foregoing, the Company's primary purpose is to operate the Business.

2.6     Title to Property; Units as Personal Property.  All of the Company's right, title and interest in tangible property, intangible property, real property, personal property and other assets acquired or developed by the Company shall be held in the name of the Company as an entity and no Member, by reason of its Interest or otherwise, shall have a personal ownership or other interest in any assets or property of the Company.  Each Member's Units in the Company shall be considered personal property for all purposes.

2.7     Term.  The term of the Company commenced on the date when its Predecessor Articles were filed with the California Secretary of State and shall be perpetual unless dissolved sooner pursuant to Section 8.1.

## ARTICLE III
## UNITS

3.1     Units Generally.  The Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes, or series. The Company is initially authorized to issue the Units authorized under Section 3.2 and Section 3.3 on the date hereof. Each type, class, or series of Units shall have the privileges, preference, duties, liabilities, obligations, and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class, or series.

3.2     Authorization and Issuance of Class A Units.  The Company is hereby authorized to issue Units designated as Class A Units. As of the date hereof, Class A Units are issued and outstanding to the Class A Members in the amounts set forth on the Members Schedule opposite each such Class A Member's name. The Class A Units shall entitle its holder to vote on all matters required or permitted to be voted on by the Members.

3.3     Authorization and Issuance of Class B Units.

(a)     The Company is hereby authorized to issue Units designated as Class B Units. As of the date hereof, Class B Units are issued and outstanding to the Class B Members in the amounts set forth on the Members Schedule opposite each such Class B Member's name.

(b)     Newco shall have the right, exercisable within thirty (30) calendar days from the Effective Date, to cause the Company to grant Reserve Class B Units to Holdco and Holdco to subsequently grant an equal number of Corresponding Holdco Class B Units to up to four employees or consultants of the Company designated by Newco and reasonably acceptable to the Company, by delivering written notice to the Company and Holdco setting forth (i) the names of each employee or consultant to be granted Corresponding Holdco Class B Units and (ii) the number of Corresponding Holdco Class B Units to be granted to each such employee or consultant

13

*ACTIVE 684118884v10*

(the "Reserve Class B Units Grantee Notice").  As soon as reasonably practicable following the receipt of the Reserve Class B Units Grantee Notice by the Company and Holdco, (i) the Board shall determine the Hurdle Amount for such Reserve Class B Units, (ii) the Company shall grant such Reserve Class B Units to Holdco pursuant to a grant agreement in the form attached hereto as Exhibit E, to be executed by the Company, Holdco and each such the employee or consultant (the "Reserve Class B Units Grant Agreements"), and (iii) Holdco shall grant such Corresponding Holdco Class B Units to each such the employee or consultant pursuant to a grant agreement in the form attached hereto as Exhibit F, to be executed by Holdco and each such employee or consultant (the "Corresponding Holdco Class B Units Grant Agreements"), in accordance with the terms of the Holdco LLC Agreement.

(c)    Unless otherwise set forth in the Reserve Class B Units Grant Agreements, the Corresponding Holdco Class B Units Grant Agreements, or in a written instrument approved by the Board and executed by a Holdco Member, the number of Class B Units held by Holdco that corresponds to any Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco shall be automatically forfeited and shall be redeemed by the Company in accordance with Section 7.11 upon termination of such Holdco Member's employment or service with the Company or any of its Affiliates for any reason. The Class B Units shall be non-voting.

(d)    Each Person who receives a Class B Unit shall make a timely and effective protective election under Section 83(b) of the Code with respect to such Class B Units and shall promptly provide a copy of such election to the Company. The Members and the Company intend that each Class B Unit shall constitute a "profits interest" under IRS Revenue Procedures 93-27 and 2001-43 and such other Treasury Regulations or authorities as may be promulgated with respect to profits interests and similar equity interests, and this Agreement shall be interpreted and applied consistently with such intent. The Board is authorized to take such actions as it may deem necessary in its sole discretion to carry out such intent, including the making of any elections, filing of any documentation, or amending of this Agreement. The Members agree to take such actions as may be reasonably requested by the Company in connection therewith.

3.4    New Units.  In addition to the Class A Units and Class B Units authorized on the date hereof pursuant to Section 3.2 and Section 3.3, the Company is hereby authorized to issue or sell to any Person, for consideration and on other terms and conditions, in each case, as determined by the Board, any Units (including any new type, class, or series of Class A Units or Class B Units) that are not authorized on the date hereof, including Units with different rights, privileges, or preferences (collectively, "New Units").

3.5    Certification of Units.

(a)    The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Members.

(b)    In the event that the Board shall issue certificates representing Units in accordance with Section 3.5(a), then in addition to any other legend required by applicable law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

14

ACTIVE 684118884v10

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
## MEMBERS

4.1    Members; Percentage Interests.

(a)    The Board shall maintain a schedule of all Members, their respective mailing addresses, the number of Units held by each of them, their Percentage Interests and such additional information as may be required pursuant to this Agreement (the "Members' Schedule") and shall update the Members' Schedule upon the issuance or Transfer of any Units (including New Units) to any new or existing Member.  A copy of the Members' Schedule as of the execution of this Agreement is attached hereto as Exhibit A.

(b)    Upon any issuance of additional Units (including New Units) or Transfer of any Units (in either case in accordance with the provisions of this Agreement), the Board shall, without the requirement to obtain the consent of any other Member, amend this Agreement and the Members Schedule solely to reflect such issuance or Transfer, and if applicable, admission of a new Member.

4.2    Additional Capital Contributions.

(a)    In the event the Company requires additional funds, any member of the Board may deliver written notice thereof to the other members of the Board to determine whether to request an Additional Capital Contribution from the existing Class A Members, which notice (a "Funding Notice") shall specify the uses for such additional funds and shall call for a meeting of the Board to be held not later than two (2) Business Days following the date of the Funding Notice.

(b)    If the Board determines to seek Additional Capital Contributions from the existing Class A Members, then the Board shall provide notice thereof (a "Capital Call Notice") to each Class A Member setting forth each Class A Member's *pro rata* share of such Additional Capital Contribution (determined by multiplying each Class A Member's Class A Percentage Interest by the amount of such Additional Capital Contribution)  and the anticipated closing date

15

ACTIVE 684118884v10

for such funding, which shall not be less than ten (10) Business Days following the date of the Capital Call Notice (unless, in the determination of the Board acting reasonably, the circumstances giving rise to such Additional Capital Contribution require that funding thereof occur sooner, in which case the Board in its sole and absolute discretion may specify a shorter funding period).

(c)     If any Class A Member fails to make an Additional Capital Contribution required under a Capital Call Notice (a "Non-Participating Member"), then each other Class A Member ("Participating Member") (x) may withdraw such Class A Member's required Additional Capital Contribution and (y) has the right (but not the obligation) to fund its own and any Non-Participating Member's required and unfunded Additional Capital Contribution as an Additional Capital Contribution or as a loan to the Company, which loan shall accrue interest at a rate comparable to prevailing interest rates charged by commercial lenders at the time such loan is made and shall be represented either by a promissory note or appropriate entries in the financial statements or other books and records of the Company.  If more than one Participating Member elects to fund (whether as a loan or as an Additional Capital Contribution) the amount of the Additional Capital Contribution failed to be made by a Non-Participating Member under this Section 4.2, then each such Participating Member shall have the right to fund its *pro rata* share of such unfunded amount (determined by multiplying such unfunded amount by a fraction, the numerator of which is the total number of Class A Units owned by such Participating Member and the denominator of which is the total number of Class A Units owned by all Participating Members who exercise their right to make such funding).  For the avoidance of doubt, the foregoing provisions are not intended to create any obligation of a Member to any creditor of, or other claimant against, the Company or to any other third party, and no creditor, claimant, or other third party shall be deemed a third-party beneficiary or have any other right or claim against a Member by virtue of this provision or any other provision of this Agreement.

(d)     In exchange for any Additional Capital Contribution made by any Class A Member in accordance with this Agreement, the Company shall issue additional Class A Units to such Member at a per Class A Unit price equal to the Fair Market Value thereof determined as of immediately after the associated Additional Capital Contribution made by such Class A Member. The Board shall cause the update of Exhibit A from time to time to reflect any changes to the information set forth thereon made in accordance with the terms of this Agreement.  Any updates or revisions to Exhibit A in accordance with this Agreement shall not constitute an amendment of this Agreement for purposes of Section 10.1.

(e)     With respect to any guaranty that a Member or any of its Affiliates may provide to a third party with respect to any Company indebtedness in accordance with this Agreement, the Company, its receiver or its trustee shall indemnify, hold harmless and pay all judgments and claims against any guarantor, or its successors and assigns, for any liability, loss or damage incurred by them in making payments with respect to such indebtedness or obligation, including reasonable costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage, provided that any such indemnification shall be recoverable only from assets of the Company and not from the assets of any Member.  The indemnification provided herein shall survive the termination of this Agreement and the dissolution of the Company.

16

4.3     Withdrawal of Capital Contributions.  No Member shall have the right to withdraw or reduce such Member's Capital Contribution, or to receive any distributions from the Company, except as otherwise provided herein.  No Member shall have the right to demand or receive any Company property.  No Member shall have priority over any other Member with respect to the return of Capital Contributions, allocations of Profits or Losses or any other distributions, except as expressly provided in this Agreement.

4.4     Capital Accounts.

(a)     A separate Capital Account will be maintained for each Member in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv).

(b)     A "Capital Account" means, with respect to any Member, the Capital Account maintained for that Member which equals, as of the Effective Date, the amount set forth on Exhibit A for each Member, and shall be maintained in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited (A) the Member's Capital Contributions, (B) the Member's allocative share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section 5.2 hereof and (C) the amount of any Company liabilities assumed by the Member or that are secured by any property distributed to the Member.  The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2);

(ii)     To each Member's Capital Account there shall be debited (A) the amount of money and the Fair Market Value of any property distributed to the Member pursuant to any provision of this Agreement, (B) the Member's allocative share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section 5.2 hereof, and (C) the amount of any liabilities of the Member assumed by the Company or that are secured by any property contributed by the Member to the Company;

(iii)     In the event Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units; and

(iv)     In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with that Regulation.  In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts or any debits

17

*ACTIVE 684118884v10*

or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Members), the Board may make the modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Article VIII hereof upon the dissolution of the Company.  The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(*q*) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

4.5    Voting.  Except as otherwise expressly provided by this Agreement or as otherwise required by the Act or applicable law, (a) each Class A Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under this Agreement; and (b) no Class B Units shall entitle the holder thereof to vote on any matters required or permitted to be voted on by the Members.

4.6    Pre-Emptive Rights.  Except for issuances of Units in connection with an Approved Sale in which such Member is required to sell all of such Member's Units or issuances Class B Units, in the event the Company intends to issue Units to any Person, each Member of the Company (each, a "Pre-Emptive Member") shall have the right to purchase its, his or her applicable *pro rata* portion of such class of Units that the Company proposes to issue (so if such right is exercised, the proportion that the number of Units of such class held by such Member immediately prior to such issuance bears to the aggregate number of such class of Units issued and outstanding immediately prior to such issuance of such Pre-Emptive Member shall not be diluted in connection with the issuance of any additional Units).  The Company shall give written notice (a "Pre-Emptive Issuance Notice") of such proposed issuance or sale by the Company of Units to the Pre-Emptive Members within ten (10) Business Days following any meeting of the Board at which any such issuance or sale by the Company is approved.  The Pre-Emptive Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including:

(a)    the number and description of Units proposed to be issued;

(b)    the proposed issuance date, which shall be at least ten (10) Business Days from the date of the Pre-Emptive Issuance Notice;

(c)    the identity of the prospective purchaser, if available (a "Pre-Emptive Prospective Purchaser");

(d)    the proposed purchase price per Unit of the Units;

(e)    if the consideration to be paid by the Pre-Emptive Prospective Purchaser includes non-cash consideration, the Board's good-faith determination of the fair market value thereof; and

(f)    a current copy of the Members' Schedule.

18

Each Pre-Emptive Member shall have the right, for a period of ten (10) Business Days following the receipt of an Issuance Notice (the "Pre-Emptive Exercise Period"), to elect irrevocably to purchase all or any portion of its, his or her *pro rata* portion of such Units to be issued (so if such right is exercised, the proportion that the number of Units of such class held by such Member immediately prior to such issuance bears to the aggregate number of such class of Units issued and outstanding immediately prior to such issuance of such Pre-Emptive Member shall not be diluted in connection with the issuance of any additional Units) of the Units to be issued at a per Unit purchase price equal to the per Unit purchase price set forth in the Pre-Emptive Issuance Notice by delivering a written notice to the Company (a "Pre-Emptive Acceptance Notice") specifying the number of Units such Pre-Emptive Member desires to purchase.  The delivery of a Pre-Emptive Acceptance Notice by a Pre-Emptive Member shall be a binding and irrevocable offer by such Pre-Emptive Member to purchase the Units described therein.  If all the Units offered to a Pre-Emptive Member are not fully subscribed, the Company shall offer to each Pre-Emptive Member subscribing its, his or her full *pro rata* portion of such class of Units upon the terms set forth in this Section 4.6 (a "Fully Participating Member") a portion of such remaining Units equal to the quotient obtained by dividing (A) the number of Units of such class held by such Fully Participating Member, by (B) the number of Units of such class held by all Fully Participating Members who wish to subscribe for such remaining Units; provided that such Fully Participating Member exercises his, her or its rights to purchase such additional Units within ten (10) Business Days after receipt of such offer.  The failure of a Pre-Emptive Member to deliver a Pre-Emptive Acceptance Notice by the end of the Pre-Emptive Exercise Period shall constitute a waiver of such Pre-Emptive Member's rights under this Section with respect to the issuance of such Units, but shall not affect such Pre-Emptive Member's rights with respect to any future issuances of Units.  Upon the expiration of the offering periods described above, the Company shall be entitled to issue and sell such Units that the Pre-Emptive Members have not elected to subscribe during the one hundred and twenty (120) days following such expiration at a price not less than one hundred percent (100%) of the price set forth in the Pre-Emptive Issuance Notice and on other terms and conditions not materially more favorable to the purchasers thereof than those initially offered to the Pre-Emptive Members.  Any Units offered by the Company after such period of one hundred and twenty (120) days must be reoffered to the Pre-Emptive Members pursuant to the terms of this Section 4.6.

4.7     Restrictive Covenants.

(a)     Confidentiality. The Restricted Parties shall, and shall cause each of their respective Affiliates to, maintain, at all times (including after any time that such Restricted Party ceases to be a Member), the confidentiality of all information furnished to such Restricted Party pertaining to the Company ("Confidential Information"), other than information that such Restricted Party can demonstrate (a) is or becomes generally available to the public other than as a result of a disclosure by such Restricted Party or such Restricted Party's Affiliates or officers, directors, limited liability company managers, trustees, employees, agents or representatives; (b) becomes available to such Restricted Party on a non-confidential basis from a third party who is not known by such Restricted Party to be prohibited by any obligation of confidentiality owed to the Company from transmitting the information to such Restricted Party; or (c) was already in the possession of such Restricted Party or such Restricted Party's Affiliate prior to their becoming a Restricted Party; provided, however, that the prohibitions set forth in this Section 4.7(a) shall not prohibit disclosure of Confidential Information if required to be disclosed by a court of competent

19

jurisdiction, administrative body, or governmental body or by subpoena, summons, or legal process, or by applicable law; provided that, to the extent permitted by applicable law, the Restricted Party required to make such disclosure shall provide to the Board prompt notice of such disclosure.

(b)     Non-Compete; Non-Solicit.  In light of the Restricted Parties' access to Confidential Information and position of trust and confidence with the Company, each  Restricted Party, for themselves and their respective equity holders, hereby covenants and agrees that, during the period of such Restricted Party's continued employment or other engagement with the Company (including as Member or holder of Class B Units) or any subsidiary of the Company, they shall not, and shall cause their respective Affiliates (including their respective equity holders) to not, directly or indirectly, (i) invest, acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, consultant, partner, agent, representative, lender, or otherwise), consult with, render services for, use or authorize the use of their name in connection with, provide any Intellectual Property to any Person engaged in, operate or in any manner engaged in, directly or indirectly, a Competitive Business, anywhere in the Restricted Territory; provided, however, that neither the Restricted Parties nor any of their respective Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person, (ii) hire, employ, engage, recruit, solicit, induce, encourage, contact or approach for employment or engagement any Person that served as an employee,  consultant or other service provider to the Company, any subsidiary of the Company, Buyer or any Affiliate of Buyer at any time when such Restricted Party owned Interests or any other equity ownership of the Company or any of its subsidiaries, or was otherwise engaged with the Company, any subsidiary of the Company, Buyer or any Affiliate of Buyer, or take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any such Person to terminate their employment or engagement with the Company, any of its subsidiaries, Buyer or any of its Affiliates, or (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by Buyer, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of Buyer, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business relation of Buyer, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person.

(c)     Non-Disparagement.  The Restricted Parties, for themselves, and their respective Affiliates (including their equity holders), hereby covenant and agree to not, directly or indirectly, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Company, any of its subsidiaries, or their respective Affiliates, make any statement or any other expressions on television, radio, the internet or other media or to any third party, including in communications with any customers, vendors, prospects, sales representatives or distributors, which are in any way disparaging of the Company, any of its subsidiaries, the Business, Buyer or any of their respective Affiliates (including, in the case of Buyer, LLYC Parent and LLYC Partners, S.L.).  Nothing in this Section 4.7(c) shall limit any Restricted Party's ability

20

to make true and accurate statements or communications in connection with any disclosure such Restricted Party reasonably believes is required pursuant to applicable Law.

(d)    Remedies.  In the event of a breach of this Section 4.7, the Restricted Parties recognize that monetary damages shall be inadequate to compensate the Company, and the Company shall be entitled, without the posting of a bond or similar security or the necessity of showing actual damages, to an injunction or other equitable relief restraining such breach, with the costs (including reasonable attorneys' fees) of securing such injunction to be borne by such Restricted Party.  Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove. Each Restricted Party, for themselves and  their equity holders, hereby acknowledge (i) the necessity of protection against the prohibited actions described in this Section 4.7 in order to protect the value of the Company's business (including the goodwill inherent therein), (ii) that the nature and scope of such protection have been carefully considered by the parties hereto and (iii) that the covenants set forth in this Section 4.7 will not interfere with such Restricted Parties' ability to earn a living. If any court of competent jurisdiction determines that any of the restrictions in this Section 4.7 are too broad or the geographic area covered too extensive, the other provisions of this Section 4.7 shall nonetheless stand, and such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

4.8    No Duty on New Business or Corporate Opportunities.  The Members expressly acknowledge and agree that (a) neither LLYC nor any of its Affiliates (including the LLYC Managers) will be obligated to present new business or corporate opportunities to the Company or its subsidiaries, (b) none of the other Members or their respective Affiliates (including Newco and Holdco) will acquire or be entitled to any interest or participation in any such new business or corporate opportunities as a result of the participation of LLYC or any of its Affiliates (including any LLYC Managers) in such new business or corporate opportunities, (c) the involvement of LLYC or any of its Affiliates (including the LLYC Managers) in any new business or corporate opportunity will not constitute a conflict of interest by any such Persons with respect to the Company, its subsidiaries or its Members, and (d) they are hereby expressly waiving (to the fullest extent permitted by applicable law) any rights to assert any claim that such involvement by LLYC or any of its Affiliates (including the LLYC Managers) in any new business or corporate opportunity breaches any fiduciary or other duty or obligation owed to the Company or any Member.

4.9    Company Platform Costs.  The Members acknowledge that the Company will have access to and benefit from the LLYC Platform and therefore agree that the Company shall pay its share of the LLYC Platform Costs, which shall be allocated among the companies in the LLYC Group in good faith and on a consistent basis.

# ARTICLE V
# ALLOCATION OF
# PROFITS AND LOSSES; DISTRIBUTIONS

5.1    Allocation of Profits and Losses.

21

(a)     The remaining amount of Profits and Losses and items thereof after making the special allocations set forth in Section 5.2 shall be allocated among the Members in such manner and in such amounts as shall cause the Capital Account balance of each Member to equal (or come as closely as possible to equaling) the Target Capital Balance of such Member.

5.2     Special Allocations.  The Company shall make the following special allocations in the following order:

(a)     Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a Taxable Year so that an allocation is required by Regulations Section 1.704-2(f), each Member shall be specially allocated items of income and gain for that Taxable Year (and, if necessary, subsequent Taxable Years) equal to the Member's share of the net decrease in Company Minimum Gain as determined by Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.2(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and this shall be interpreted consistently therewith.  The term "Company Minimum Gain" shall have the meaning of "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

(b)     Member Nonrecourse Debt Minimum Gain Chargeback.  Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article V, if there is a net decrease in the Member Nonrecourse Debt Minimum Gain attributable to any Member Nonrecourse Debt during any Taxable Year, any Member who has a share of that Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income or gain for that Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.2(b) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted in a manner consistent with that Regulation.  The term "Member Nonrecourse Debt Minimum Gain" shall have the meaning of "partner nonrecourse debt minimum gain" set forth in Regulations Section 1.704-2(i)(3).

(c)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain for such Taxable Year shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 5.2(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit at the end of the relevant Taxable Year after all other allocations

22

provided for in this Article V have been tentatively made as if this Section 5.2(c) was not in the Agreement.

(d)    Allocation of Nonrecourse Liability Deductions. Deductions attributable to any Company Nonrecourse Liability for any Taxable Year shall be specially allocated among the Members in proportion to their respective Percentage Interests. The term "Company Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3) for a nonrecourse liability of a partnership.

(e)    Member Nonrecourse Debt Deductions. Deductions attributable to any Member Nonrecourse Debt shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member nonrecourse deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). The term "Member Nonrecourse Debt" has the same meaning as partner nonrecourse debt in Regulations Section 1.704-2(b)(4).

(f)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)($m$)($4$) or Section 1.704-1(b)(2)(iv)($m$)($2$), respectively, to be taken into account in determining Capital Accounts, the amount of the adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) and that gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

(g)    Imputed Interest. If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483 or 1271 through 1288 or corresponding provisions of subsequent federal income tax law, any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, as appropriate.

(h)    Contributed Property; Tax Allocations; Code Section 704(c). Each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as those items are allocated for book purposes under this Article V. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of that property to the Company for federal income tax purposes and its initial Book Value (as determined in accordance with the definition of Book Value). In the event the Book Value of any Company asset is adjusted pursuant to the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to that asset shall take account of any variation between the adjusted basis of that asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Allocations described in this Section 5.2(h) shall be made utilizing the "remedial method" except to the extent another method permissible under Regulations Section 1.704-3 and

23

in conformity with Regulations Sections 1.704-1(b)(2)(iv)(*f*) and 1.704-1(b)(4)(i) is adopted by the Board.

5.3     Loss Limitation.  Losses allocated pursuant to Section 5.2 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Taxable Year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 5.2 hereof, the limitation set forth in this Section 5.3 shall be applied on a Member by Member basis, and Losses not allocable to any Member as a result of that limitation shall be allocated to the other Members in accordance with the positive balances in those Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(*d*) .

5.4     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other items allocable to any period (including, without limitation, on the admission of Members to the Company on different dates), Profits, Losses and any other items shall be determined for each Taxable Year pursuant to income tax accounting methods adopted by the Board for the Company consistently applied and shall be allocated among the Members in the manner provided in this Agreement. Prior to making allocations for a period, Capital Accounts shall be adjusted to reflect all contributions, distributions and other events during the period that affect Capital Account balances other than said allocations.

(b)     The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Company income and loss for income tax purposes.

(c)     Subject in all cases to applicable law, if there is a Transfer of Units in accordance with this Agreement, for purposes of allocations of Profits and Losses and distributions of cash and property, the effective date of the Transfer as to the Company will be the effective date stated in the Transfer instrument or such other date as the assignor and assignee agree, but not earlier than the date the Board receives notification of the Transfer, or, in the case of an involuntary Transfer, the date of the operative event. Distributions of cash and property with respect to any Units shall be made to the Person who is shown as the holder of such Units in the Company's books at the time of the distribution.

(d)     In the event of a change in a Member's Percentage Interest during the course of a Taxable Year, allocations to said Member of Profits, Losses and other items arising during such Taxable Year shall be made among the Members using such method as may be determined by the Board in good faith which is reasonable and complies with the Treasury Regulations and this Agreement. An agreement between a transferor and transferee of Units relating to such method of allocation shall be followed by the Board, unless the Board determines in good faith that the method so agreed to does not comply with the Treasury Regulations, is not consistent with this Agreement, is unreasonable or otherwise presents an undue burden on the Company.

*ACTIVE 684118884v10*

5.5     Distributions.

(a)     Except as otherwise provided herein, the Board shall determine in its sole discretion the timing and the aggregate amount of all distributions of Cash Available for Distribution to be made by the Company to the Members.  In accordance with the foregoing, the Board shall cause the Company to distribute at least fifty percent (50%) of the Cash Available for Distribution to its Members.  All Cash Available for Distribution that is distributed, and any other amounts or items that are distributed, to the Members shall be distributed as follows:

(i)     to each Class A Member that is not Newco, ratably upon the proportion that the number of Class A Units held by such Class A Member immediately prior to such distribution bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b)) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b);

(ii)     to Newco, ratably upon the proportion that the number of Class A Units held by Newco immediately prior to such distribution and the number of Reserve Class B Units issued and outstanding for which the applicable Hurdle Amount has not been exceeded pursuant to Section 5.5(b) immediately prior to such distribution bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b)) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b);

(iii)     to each Class B Member, ratably upon the proportion that the number of Reserve Class B Units held by such Class B Member immediately prior to such distribution and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b) bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b)) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b); and

(iv)     to each Class B Member, ratably upon the proportion that the number of Additional Class B Units held by such Class B Member immediately prior to such distribution and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b) bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b)) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to Section 5.5(b).

(b)     Notwithstanding anything contained in Section 5.5(a) to the contrary, no Class B Member shall be entitled to receive any distributions pursuant to Section 5.5(a)(ii) or Section 5.5(a)(iv) unless and until the aggregate amount of cash distributed in respect of all Units

25

entitled to distributions exceeds the Hurdle Amount applicable to the Class B Units held by such Class B Member and any amount otherwise distributable to such Class B Member but for the foregoing limitation shall instead be distributed to other Members as if such distribution were a new distribution pursuant to Section 5.5(a).

(c)    If the Company distributes property other than cash to its Members, the amount of such distribution shall be deemed to be equal to the Fair Market Value of the property distributed, net of any liabilities that said property may be subject to or which may be assumed by the Members in connection therewith. Said Fair Market Value shall be determined by the Board in good faith. For the avoidance of doubt, these distributions will be made in accordance with Section 5.5(a) above.

(d)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distributions if such distribution would violate Section 18-607 of the Act or other any other applicable law.

5.6    Amounts Withheld.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which that amount was withheld pursuant to this Section 5.6 for all purposes under this Agreement.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state, local or foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any amounts to the Members with respect to which the amount was withheld.

5.7    Tax Distributions.  Subject to the Act and any restrictions contained in any loan or credit facility to which the Company is bound, the Board of Managers shall make quarterly distributions  to the extent of Cash Available for Distribution (each, a "Tax Distribution") at the same time, and with the same priority, to the Members pro rata in proportion to their respective Tax Amounts, until each Member has received an amount equal to its Tax Amount.  The Board will use commercially reasonable efforts to cause the business of the Company and any subsidiaries to be operated in a manner such that the Company has, or will have available to it, sufficient Cash Available for Distribution to pay applicable Tax Distributions each quarter. Any Tax Distributions will be treated as an advance against, and shall reduce, any distributions otherwise to be made to the recipient Member under this Agreement.

## ARTICLE VI
## MANAGEMENT

6.1    Appointment and Term of Board of Managers.

(a)    The Company shall be managed by a board of managers (each such person, individually referred to as "Manager" and collectively as the "Board").  Except as otherwise provided herein, the Board shall have the exclusive right to manage the business of the Company and is hereby authorized to take any action of any kind and to do anything and everything it deems necessary in conjunction therewith.

26

(b)      The Board shall consist of three (3) individuals.  LLYC shall have the right to designate two (2) members of the Board, one of whom shall be the chairman of the Board, as determined by LLYC in its sole discretion, and as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, Newco shall have the right to designate one (1) member of the Board.  If Newco holds a Class A Percentage Interest of less than fifteen percent (15%) and Newco Guarantor is no longer the Chief Executive Officer of the Company, LLYC shall have the right to designate the remaining member of the Board.  As of the Effective Date, the members of the Board designated by LLYC are Alejandro Romero Paniagua and Jose Luis Di Girolamo (the "LLYC Managers"), and the member of the Board designated by Newco is Rebecca Bamberger (the "Newco Manager").  As of the Effective Date, the chairman of the Board is Alejandro Romero Paniagua.

(c)      Each Manager shall serve until his or her removal, resignation, death or disability.  If any Manager ceases to serve as a Manager for any reason, a replacement Manager shall be designated by the Members that had the right to appoint the departing Manager. A Manager may only be removed for any reason by a vote of the majority of the Members that had the right to appoint such Manager.

(d)      At any time, and from time to time, the Board may appoint other officers, agents or other delegates of the Company, with such powers, authority and responsibilities as the Board delegate to them.  Any officer, agent or other delegate of the Company may be removed at any time, with or without cause, by action of the Board and his or her replacement, if any, may be approved by the Board at the time of such removal.

(e)      Managers need not be residents of the State of Delaware or any other particular state or country.

6.2      Meetings.  The Board shall hold regular meetings, not less frequently than annually to discuss the business and affairs of the Company.  The chairman of the Board shall fix the times and places for regular meetings of the Board at the first Board meeting each year, and no notice of such regularly pre-scheduled meetings need be given.  A special meeting of the Board shall be held whenever called by the chairman of the Board, at such time and place as shall be specified in the notice or waiver thereof.  Notice of each special meeting shall be given by the chairman of the Board to each other Manager personally or by, e-mailing, faxing or telephoning the same not later than forty eight (48) hours prior to the special meeting.  Meetings of the Board, regular or special, may be held at any place within or outside the State of Delaware.  Members of the Board may participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in Person at such meeting.

6.3      Quorum and Voting.  A majority of the members of the Board shall constitute a quorum for the transaction of business in any meeting of the Board.  Each Manager shall be entitled to cast a single vote.  Except as otherwise provided by this Agreement, the affirmative vote by Managers representing a majority of the members of the Board shall be the act of the Board.  Notice of any meeting need not be given to any Manager who shall submit, either before or after such meeting, a waiver of notice.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting for the express purpose of

27

objecting at the beginning thereof to the transaction of any business because the meeting is not properly called or convened.

6.4     Written Consent of the Board in Lieu of a Meeting.  Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a majority of the members of the Board consent thereto in writing; provided, however, that the Board shall exercise good faith efforts to allow each Manager to promptly provide his or her input before consenting in writing to such action.  Notwithstanding the immediately preceding sentence, as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, no Major Decision shall be adopted without the written consent of Newco.

6.5     Authority of the Board.  Except as otherwise specifically provided herein, the Board shall have exclusive, full and complete authority, exercisable in its reasonable but sole discretion, to make all decisions in the ordinary course of business of the Company, as well as to make decisions not in the ordinary course of business of the Company.

6.6     Limited Liability.  Neither any Manager nor any officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, unlawful acts or a wrongful taking by the Manager or officer.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied or imposed by applicable law or in equity, all of which duties are hereby agreed to be eliminated to the maximum extent permitted by applicable law (including any and all fiduciary duties imposed by the Act, including the duties of loyalty and care), and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement; provided, that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement, and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict, waive or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

6.7     Authority to Bind Company.  Each officer, employee, agent and other Person to which the Board delegates such authority in accordance with the terms of this Agreement, is authorized, in the name and on behalf of the Company, to sign and deliver all contracts, agreements, leases, notes, mortgages and other documents and instruments which are necessary, appropriate or convenient for the conduct of the Company's day-to-day business and the furtherance of its purposes; provided, however, that so long as Newco remains a Member of the Company, the Board shall obtain the prior written consent of Newco (not to be unreasonably withheld, conditioned or delayed) prior to the Board authorizing, or the Company or any subsidiary of the Company entering into any loan, credit facility or other agreement which could have the effect of prohibiting, , limiting or restricting Tax Distributions.

28

6.8     Indemnification.

(a)     General Provisions.  Except as otherwise set forth herein, each Manager, officer, employee, agent and representative of the Company (each herein referred to as an "Indemnitee") shall be indemnified, held harmless and defended by the Company against any claim and/or liability incurred by or imposed upon the Indemnitee in connection with any action to which the Indemnitee may be a party by reason of any action or omission of the Indemnitee in connection with the conduct of Company affairs.  The indemnification set forth herein shall not extend to actions or omissions of the Indemnitee (or its employee) which shall have been finally adjudicated (by settlement or otherwise) in any such action, suit or proceeding to have constituted actual fraud, willful misconduct or gross negligence.  In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement.  The foregoing right of indemnification shall be in addition to any rights to which any Indemnitee may otherwise be entitled and shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnitee.  Any indemnification hereunder is to be made only out of the assets of the Company and no Member shall have any personal liability on account of such indemnification.

(b)     Advance Payment of Expenses.  The Company shall pay the expenses incurred by an Indemnitee in defending a civil or criminal action, suit or proceeding, or in investigating or opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding as incurred and in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by such Indemnitee to repay such payment if such Indemnitee shall be determined to be not entitled to indemnification therefor as provided herein; provided, however, that in such instance the Indemnitee is not commencing an action, suit, or proceeding against the Company, or defending an action, suit or proceeding commenced against such Indemnitee by the Company or any Member thereof or opposing a claim by the Company or any Member thereof arising in connection with any such potential or threatened actions suit or proceeding.

6.9     Major Decisions.

(a)     Overall Major Decisions.  A Major Decision may be proposed by any Manager or Class A Member, but as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, the prior written consent of Newco (which consent may be withheld, conditioned or delayed in Newco's sole and absolute discretion) shall be necessary for the Company to adopt, approve, or take any action in furtherance of, any Major Decision, except if in connection with an Approved Sale in which Newco will no longer be a Member upon its consummation.  As used herein, a "Major Decision" shall mean each of the following:

(i)     incurring of any debt or loan by, or encumbering any of the assets of, the Company in an amount exceeding US $500,000 or pledge or grant liens on any assets or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person, in any transaction or a series of related transactions;

29

ACTIVE 684118884v10

(ii)    entering into or effecting any transaction or a series of related transactions involving the direct or indirect redemption, purchase or acquisition of any Units of the Company, except with respect to a purchase of Units owned by Newco pursuant to the Option Agreement;

(iii)    other than with respect to any contract, agreement, arrangement, commitment or transaction stated in this Agreement, entering into or amending any contract, agreement, arrangement, commitment or transaction with an Affiliate of LLYC on terms materially less favorable to the Company than those that would apply on an arms-length basis;

(iv)    adopting any material change to the Business of the Company or the taking of any action with the intention of causing any such material change;

(v)    voluntarily commencing any liquidation, dissolution, winding-up, bankruptcy, insolvency or similar proceedings with respect to the Company;

(vi)    commencing any insolvency proceedings or acknowledge insolvency in respect to the Company;

(vii)    the conversion of the Company to a corporation or other form of entity; and

(viii)    the Company's engaging in an initial public offering.

## ARTICLE VII
## TRANSFER

7.1    General.  No Member shall Transfer any Units now or hereafter owned (of record or beneficially) by such Member except in accordance with the terms and conditions of this Article VII.

7.2    Substitute Member.  No Unit or Interest otherwise Transferable pursuant to the terms of this Article VII shall be Transferred until the Board has been satisfied as to the following conditions precedent:

(a)    No Termination of the Company.  Such Transfer, alone or when combined with other transactions, will not result in a termination of the Company within the meaning of section 708 of the Code.

(b)    No Publicly Traded Partnership.  Such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of section 7704 of the Code and the Regulations promulgated thereunder and would not make the Company ineligible for "safe harbor" treatment as not a "publicly traded partnership" under Section 7704 of the Code and the Regulations promulgated thereunder.

(c)    Compliance with Applicable Laws.  Such Transfer would not (i) affect the classification of the Company for income tax purposes or have other adverse tax consequences to

30

the Company or any Members, (ii) cause the Company or any Member to become subject to regulation under either the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or (iii) violate or cause the Company to violate applicable law, including applicable state and federal securities laws.

(d)      Receipt of Information.  The Board shall have received from the Transferee such information regarding the Transferee as the Board may reasonably request.

(e)      Joinder.  The Transferee shall execute a joinder, agreeing to be bound by the terms and conditions of this Agreement in substantially the form of Exhibit B hereto and, to the extent the Option Agreement has not terminated, the Option Agreement in form and substance reasonably acceptable to LLYC.

7.3      Effect of Admission as a Substitute Member.  Unless and until admitted as a Substitute Member pursuant to Section 7.2, a Transferee of a Member's Units shall not be entitled to exercise any rights of a Member of the Company or to receive distributions hereunder.  A Transferee who has become a Substitute Member shall have, to the extent of the Interest Transferred to it, all the rights and powers of the Transferring Member, as applicable, for which it is substituted and shall be subject to the restrictions and liabilities of the Transferring Member, as applicable, under this Agreement and the Act.

7.4      Improper Transfer.  If a Member or any other Person Transfers an Interest and such Transfer is not permitted under this Article VII, then, subject to the consent of the non-Transferring Members (which may be withheld for any reason), such Interest shall be forfeited to the Company as of the Transfer date for no consideration.

7.5      Permitted Transfers.

(a)      Notwithstanding any other provision of this Agreement to the contrary, Transfers of Units and Interests are permitted to an Affiliate of such Member ("Permitted Transfer") and a Permitted Transfer is not subject to the terms of Section 7.6; provided, that (a) the Member wishing to Transfer shall provide written notice to the Company, which shall include a detailed description of the proposed Permitted Transfer and such information as may be required for the Company to determine that the Transfer being proposed qualifies as a Permitted Transfer, and (b) upon determination by the Company that such Transfer is a Permitted Transfer, which determination shall be made in good faith by the Board as promptly as practicable, the Board shall provide a consent notice to the transferring Member and, upon compliance with the provisions of Section 7.2, such Permitted Transfer shall be consummated and the Transferee of Units admitted as a Member of the Company.

(b)      If, following any such Permitted Transfer pursuant to this Section 7.5, such Member holds its Interest through several Affiliates:  (i) all those Affiliates shall be treated as a single Member for the purposes of determining such Member's rights and obligations under this Agreement; (ii) each of the transferring Member's Affiliates shall be deemed to act jointly and severally for all legal purposes; and (iii) the other Members and the Company shall be entitled to rely upon any written notice or other delivery that it receives from any of the transferring Member's Affiliates as though such written notice or delivery had been executed and delivered by all of the

31

transferring Member's Affiliates and any such written notice (A) shall be effective and binding upon the transferring Member's Affiliates, and (B) shall constitute conclusive evidence of a joint decision (acting in concert) by all of the transferring Member's Affiliates.

7.6     Right of First Refusal.

(a)     Other than in respect of a Permitted Transfer, if any Member (the "Transferring Member") proposes to Transfer all or a portion of its Units other than Class B Units (the "Subject Units") to any Person, then the Transferring Member shall furnish to each other Member, other than any Member that is only a Class B Member (each, a "ROFR Member"), a written notice of such proposed sale (an "Offer Notice").

(b)     The Offer Notice must include (i) the price at which the Transferring Member is prepared to sell the Subject Units (the "Offered Price"), (ii) the identity of the proposed Transferee (the "Proposed Purchaser") of the Subject Units, (iii) the proposed date, time and location of closing, and (iv) all other material terms and conditions of the proposed sale.

(c)     The ROFR Members shall have the right to elect to purchase all, but not less than all, of the Subject Units at the Offered Price within thirty (30) calendar days following the date of the Offer Notice (the "ROFR Period") by delivering an irrevocable notice (the "Purchase Notice") to the Transferring Member indicating such ROFR Member's desire to purchase the Subject Units at the Offered Price on the terms and conditions set forth in the Offer Notice.  If more than one ROFR Member elects to purchase the Subject Units under this Section 7.6, then each such ROFR Member shall have the right to purchase its proportionate share of the Subject Units as measured by the *pro rata* portion of Units that are not Class B Units held by such ROFR Members (*i.e.* the proportion that the number of Units (excluding any Class B Units) held by such Member bears to the aggregate number of Units (excluding Class B Units) issued and outstanding at that time).  The failure of the ROFR Members to deliver one or more Purchase Notices to the Transferring Member within the ROFR Period shall be deemed to be a waiver of its rights under this Section 7.6.  If the ROFR Members elect to purchase all, but not less than all, of the Subject Units under this Section 7.6, the ROFR Members and the Transferring Member shall arrange a mutually convenient time (not later than thirty (30) calendar days after the end of the ROFR Period) to consummate the purchase and sale of the Subject Units.

(d)     If the ROFR Members do not elect to purchase all of the Subject Units under this Section 7.6, then the Transferring Member shall be free to sell the Subject Units to the Proposed Purchaser; provided, that (i) the terms of such sale are the same as those set forth in the Offer Notice or, if the terms of such sale are not the same as those set forth in the Offer Notice, the terms of such sale are not more favorable to the Proposed Purchaser than those set forth in the Offer Notice, (ii) such sale is completed within one hundred and twenty (120) calendar days after the end date of the ROFR Period, and (iii) such sale is otherwise permitted under Section 7.2.

7.7     Drag-Along Right.

(a)     If LLYC proposes to Transfer all of its Units, then LLYC may require each other Member to sell all of their Units.  In any such transaction (an "Approved Sale"), each selling Member must receive the same benefits and bear the same burdens as LLYC on a proportionate

32

basis, including, without limitation, participating in purchase price holdbacks, earn outs and other deferred payment arrangements to the same extent as LLYC.

(b)    In order to exercise the rights contemplated by this Section 7.7, LLYC must give written notice to each other Member as soon as practicable, but in no event later than thirty (30) days prior to the anticipated closing date of the Approved Sale.  Such notice must set forth the name of the proposed purchaser, the proposed amount and form of consideration, the proposed date and location of the closing of the sale and the other terms and conditions of the offer, including a copy of the relevant purchase agreement.

(c)    Each selling Member participating in a Transfer pursuant to this Section 7.7 shall (i) receive the same portion of the aggregate proceeds of the Approved Sale as such selling Member would have received if such consideration had been distributed by the Company pursuant to Section 5.5(a); (ii) be provided a copy of the relevant purchase agreement as soon as practicable so such selling Member can participate in the review of the relevant purchase agreement; (iii) make or provide the same representations, warranties, covenants, indemnities and agreements as the Transferring Member makes or provides in connection with the Transfer (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Transferring Member, such selling Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining only to itself, himself or herself); provided, that such representations, warranties, covenants, indemnities and agreements shall be made severally and not jointly; (v) if such Transfer is structured as a merger or consolidation, waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation; and (vi) take all actions as may be reasonably necessary to consummate the Transfer, including, without limitation, entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Transferring Member.

7.8    Tag-Along Right.

(a)    Prior to the consummation of any Transfer of the Subject Units to the Proposed Purchaser pursuant to Section 7.6, each ROFR Member (a "Tag-Along Member") shall have the right to elect to participate as a seller in the Transfer of the Subject Units by delivering within the ROFR Period an irrevocable Notice (the "Tag-Along Notice") to the Transferring Member indicating such Tag-Along Member's decision to not exercise its rights under Section 7.6 and to participate as a seller in such Transfer on the terms and conditions set forth in the Offer Notice.

(b)    The offer of a Tag-Along Member set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member shall be bound and obligated to Transfer its Units under the terms and conditions set forth in this Section 7.8.  The Transferring Member and each Tag-Along Member shall have the right and obligation to Transfer in a Transfer subject to this Section 7.8 the number of Units of the same class as the Subject Units equal to the product of (x) the aggregate number of Units of the same class as the Subject Units that the Proposed Purchaser proposes to buy as stated in the Offer Notice, and (y) a fraction (A) the numerator of which is equal to the number of Units of the same class as the Subject Units held immediately prior to delivery of the Tag-Along Notice by the Transferring Member or each Tag-

33

Along Member, as the case may be, and (B) the denominator of which is equal to the number of Units of the same class as the Subject Units then held by all Members.  The failure of a Tag-Along Member to deliver the Tag-Along Notice to the Transferring Member within the ROFR Period shall be deemed to be a waiver of the rights of such Tag-Along Member under this Section 7.8.

(c)     Each Tag-Along Member participating in a Transfer pursuant to this Section 7.8 shall (i) receive the same consideration per Unit as the Transferring Member after deduction of such Tag-Along Member's proportionate share of the related expenses in connection with such Transfer and for the benefit of the Transferring Member and the Tag-Along Members; (ii) be provided a copy of the relevant purchase agreement as soon as practicable so each Tag-Along Member can participate in the review of the relevant purchase agreement; (iii) make or provide the same representations, warranties, covenants, indemnities and agreements as the Transferring Member makes or provides in connection with the Transfer (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Transferring Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining only to itself), provided, that such representations, warranties, covenants, indemnities and agreements shall be made severally and not jointly; and (v) take all actions as may be reasonably necessary to consummate the Transfer, including, without limitation, entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Transferring Member.

7.9     Put Right. Newco shall have the right to sell the Units owned by Newco to LLYC in accordance with the terms and subject to the conditions set forth in the Option Agreement.

7.10     Call Right. LLYC shall have the right to purchase the Units owned by Newco in accordance with the terms and subject to the conditions set forth in the Option Agreement.

7.11     Holdco Class B Units Redemption Rights. Unless otherwise set forth in the Reserve Class B Units Grant Agreements, the Corresponding Holdco Class B Units Grant Agreements, or in a written instrument approved by the Board and executed by a Holdco Member, upon the occurrence of any Holdco Redemption Event, the Company shall have the right to redeem the portion of Holdco's Class B Units in the Company corresponding to the applicable Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco for consideration in an amount to be determined by the Board, upon which Holdco shall contemporaneously redeem such Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco for the same consideration.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP OF THE COMPANY

8.1     Dissolution of the Company.  The Company shall be dissolved upon the first to occur of any of the following events:

(a)     The Board, in accordance with Section 6.9(a) determines that the Company be dissolved;

ACTIVE 684118884v10

   (b) An order by a court of competent jurisdiction decrees that the Company be dissolved; or

   (c) The cessation of business by the Company.

  8.2 <u>Winding Up of the Company</u>.  The Members shall continue to share distributions and allocations of Profits and Losses during the period of liquidation in accordance with <u>Article V</u>. Any gain or loss realized by the Company upon the sale of property shall be deemed recognized and allocated to the Members in the manner set forth in <u>Article V</u>.  Upon a dissolution of the Company, the Board shall take full account of the Company's assets and liabilities and the assets shall be liquidated as promptly as is consistent with obtaining the fair market value thereof and as shall be necessary to timely make the distributions below described, and the proceeds therefrom, to the extent sufficient therefor, shall first be paid out to creditors, whether by payment or by establishment of due and adequate reserves, in the order of priority as provided by law; and then shall be distributed to the Members in accordance with Section 5.5 of this Agreement.

  8.3 <u>Negative Capital Accounts</u>.  No Member shall have any obligation at any time, during the term of the Company or upon dissolution or liquidation thereof or otherwise, to restore a deficit balance in such Member's Capital Account or make any Capital Contributions to the Company by reason thereof, except as may be required by applicable Law.

**ARTICLE IX**
**BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS,**
**FISCAL YEAR, BANKING AND TAX MATTERS MEMBER**

  9.1 <u>Accounting, Books and Records</u>.  The Company shall maintain at its principal place of business or such other places as the Board shall determine books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with GAAP consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement.  The Company shall use either the cash method or the accrual method of accounting in preparation of its annual reports for tax purposes and shall keep its books and records accordingly.

  9.2 <u>Inspection</u>.  Upon reasonable notice from a Class A Member, which shall not be delivered less than five (5) Business Days before the proposed date for the inspection, the Company shall afford each Class A Member and its representatives access during normal business hours to (i) the Company's properties, offices, and other facilities, and (ii) the corporate, financial and similar records, reports and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members, and to permit each Member and its representatives to examine such documents; provided, that each Class A Member agrees at all times to keep (and shall cause its representatives to keep) all information confidential.

  9.3 <u>Reports</u>.  The Board shall be responsible for the coordination of financial matters of the Company.  The Company shall prepare (or cause to be prepared) and submitted to the Board

35

for its review and approval, at least forty-five (45) days prior to the commencement of each Fiscal Year of the Company, the operating and capital budgets for the Company in respect of each Fiscal Year, which budgets shall contain, *inter alia*, a detailed projection of the gross revenues, gross margins, EBIT, anticipated capital expenditures, net income and net cash-flow from operations for such Fiscal Year (provided that, if the Company shall then have any subsidiaries, such budgets shall be prepared on a consolidated basis for the Company and also on an individual basis for the Company and each of such subsidiaries).

9.4    Company Funds.  All funds of the Company shall be deposited in its name in a separate bank account or accounts at a commercial bank as shall be determined by the Board.

9.5    Partnership Representative.

(a)    Unless otherwise determined by the Board, the Company and each Member designate Llorente & Cuenca USA, Inc. as the "partnership representative" of the Company for purposes of the Partnership Tax Audit Rules (the "Partnership Representative") and authorize and require the Partnership Representative to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities relating to Fiscal Years of the Company commencing on or after the date hereof, including resulting administrative and judicial proceedings, and to expend the Company's funds for professional services and costs associated therewith. The Partnership Representative shall timely appoint an individual who meets the requirements of Treasury Regulation Section 301.6223-1(b)(2) to serve as the as the designated individual through whom the Partnership Representative shall act for all purposes under subchapter C of Chapter 63 of the Code. In addition, (i) the Board shall take, or cause the Company to take, such other actions as may be necessary or advisable pursuant to Treasury Regulations or other guidance to ratify the designation, pursuant to this Section 9.5, of the Partnership Representative (including the designation of a "designated individual" within the meaning of the Partnership Tax Audit Rules through whom any Partnership Representative that is an entity may act, if applicable), and (ii) each other Member agrees to take such other actions as may be reasonably requested by the Partnership Representative to ratify or confirm any such designation pursuant to this Section 9.5. The Partnership Representative shall take such actions and execute and file all statements and forms on behalf of the Company that are permitted or required by the applicable provisions of the Partnership Tax Audit Rules. Each Member agrees to reasonably cooperate with the Partnership Representative in connection with any examination of the Company's affairs by any U.S. federal, state, or local tax authorities, including resulting administrative and judicial proceedings. No Member shall have any claim against the Partnership Representative (or the "designated individual"), any Manager or the Company for any actions taken (or any failures to take action) by such Persons in good faith pursuant to this Section 9.5. Any cost or expense incurred by the Partnership Representative (or the "designated individual") in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  Notwithstanding the foregoing, the Partnership Representative shall be subject to the directions of the Board and shall not take any action that is inconsistent with the directions of the Board. The Partnership Representative shall keep the Board fully informed of all material communications and developments relating to any tax audit or proceeding.

*ACTIVE 684118884v10*

(b)      Unless otherwise agreed to by the Members holding Units with a majority of the Percentage Interests, if the Company receives a notice of final partnership adjustment as described in Section 6226 of the Code, the Partnership Representative shall cause the Company to make the election under Section 6226(a) of the Code with respect to the alternative payment of imputed underpayment by the Company and take other actions such filings, disclosures and notifications necessary to effectuate such election.

(c)      When and as reasonably requested in writing by the Company, each Member, at the Member's own expense, shall preserve and furnish to the Company all documents and information (including any change in mailing address or other contact information, any change in residency for any Tax purpose, and any social security, employer identification or other taxpayer identification number), and shall take such other action as may be reasonably necessary to enable the Company or the Partnership Representative (or any Person on behalf of the Company or the Partnership Representative) to (i) prepare, amend or file any Tax return, (ii) pursue, defend, settle, limit, reduce or otherwise determine any tax or withholding liability (including pursuant to an audit or other Tax proceeding) or (iii) register to do business, collect Tax, or comply with any similar prerequisite to doing business or conducting any other activity in any jurisdiction. In the case of any Taxable Year with respect to which an election under Section 6226 of the Code (or under any other similar or corresponding provisions of any state Tax law) is or will be in effect, each Member shall comply with all provisions of Section 6226 of the Code (and any other similar or corresponding provisions of any state Tax law), including taking such Member's share of any adjustment under Section 6226 of the Code into account on any separate Tax return of such Member, the amendment of all Tax returns affected by such adjustment, and the payment of any increased or additional Tax resulting therefrom.

(d)      The Partnership Representative shall provide Newco with copies of any notice of any administrative or judicial proceeding received by the Partnership Representative from a taxing authority (i) with respect to the income tax liability of the Company and/or (ii) with respect to the income tax liability of the Members in connection with the operations of the Company and shall furnish the final draft of any proposed settlement or other action of any such administrative or judicial proceeding which would have a materially adverse and disproportional effect on Newco (as compared to other Members and without regard to tax attributes or status of the Members unrelated to the Company ) to Newco at least thirty (30) days before execution of such settlement by the Company. The Company shall consider any reasonable comments provided by Newco to the  Company in writing within ten (10) days following receipt of such draft final settlement or other action. Any disagreements regarding Newco's comments on a proposed final settlement agreement or other action described in this Section 9.5(d) shall be submitted for final and binding resolution to a tax partner at a nationally or regionally recognized firm of independent certified public accountants that is independent from the Company and Newco (the "Tax Arbitrator"), as shall be reasonably acceptable to the Partnership Representative and Newco. The Tax Arbitrator shall be selected by mutual agreement of Partnership Representative and Newco; provided that if the Partnership Representative and Newco are unable to agree on a Tax Arbitrator, each party shall select a person qualified to act as a Tax Arbitrator and such individuals together shall select the Tax Arbitrator. The Tax Arbitrator will only consider those matters as to which Partnership Representative and Newco have disagreed and must resolve the matters in accordance with the terms and provisions of this Agreement. The Partnership Representative and Newco shall each submit to the Tax Arbitrator its proposed determination of such matters in dispute, together

37

with such other information relevant to the resolution of such matters as it desires to support its proposal. The Tax Arbitrator shall deliver to Partnership Representative and Newco, as promptly as practicable and in any event within ten (10) calendar days after its appointment, a written report setting forth the resolution of any such disagreement determined in accordance with this Section The Tax Arbitrator shall select as a resolution the position of either Partnership Representative or Newco for each item of disagreement and may not impose an alternative resolution. The determination of the Tax Arbitrator shall be final and binding upon Partnership Representative and Newco. The fees and expenses of the Tax Arbitrator incurred in connection with its review and determination of any dispute pursuant to this Section 9.5(d) shall be borne by the non-prevailing party. The prevailing party also shall be reimbursed by the non-prevailing party for the prevailing party's reasonable attorney's and accountant's fees and costs incurred in connection with the resolution of the dispute, including without limitation, the cost of any valuation or appraisal. The Tax Arbitrator shall determine the prevailing party based upon the Tax Arbitrator's determination of which party's position was closest to the final decision made by the Tax Arbitrator. If the Tax Arbitrator is unwilling to determine the split of fees and expenses among the parties, then the Tax Arbitrator's fees and expenses shall be split evenly among the Company and Newco.

(e)     A Member's obligations under this <u>Section 9.5</u> shall survive such Member's ceasing to be a Member of the Company or the termination, dissolution, liquidation and winding up of the Company.

9.6     <u>Tax Matters</u>.

(a)     <u>Taxable Year; Tax Elections</u>.  The Taxable Year shall be determined by the Board in accordance with Section 706 of the Code. Subject to the other provisions of <u>this Agreement, the Board</u> shall determine whether to make, amend, rescind or revoke any available Tax election, including an election under Section 754 of the Code. Each Member will upon request supply any information necessary to give proper effect to any such election.

(b)     <u>Tax Information</u>.  Promptly after the end of each Taxable Year, the Company shall cause the Accounting Firm to prepare and deliver to each Member a report setting forth in sufficient detail all such additional information and data with respect to business transactions effected by or involving the Company during the Taxable Year as will enable the Company and each Member (with respect to the Company) to timely prepare its federal, state and local income Tax returns in accordance with applicable laws, rules and regulations.

(c)     <u>Tax Treatment.</u> Prior to the consummation of the transactions contemplated by the Membership Interest Purchase Agreement, the Company was a single member limited liability company treated as an entity disregarded from its owner within the meaning of Treasury Regulation Section 301.7701-2(c)(2). Accordingly, LLYC,  Newco, the Closing Class B Members acknowledge and agree that they will report transactions contemplated by the Membership Interest Purchase Agreement in the manner described in Revenue Ruling 99-5, Situation 1. Following the consummation of the transactions contemplated by the  Membership Interest Purchase Agreement, the Company shall be classified as a partnership for U.S. federal income tax purposes and, if applicable, state and local income tax purposes. Except as the Board may otherwise determine, neither the Company nor any Member may make an election for the Company to be taxed as a corporation under the Code or any similar provisions of applicable state law, and no provisions of

38

this Agreement shall be interpreted to authorize any such election. Each Member agrees that it shall not, except as otherwise required by a "determination" within the meaning of Section 1313 of the Code, (a) treat, on such Member's individual income Tax returns, any item of income, gain, loss, deduction or credit relating to such Member's interest in the Company in a manner inconsistent with the treatment of such item by the Company as reflected on the Schedule K-1 or other information statement furnished by the Company to such Member for use in preparing its income Tax returns or (b) file any claim for refund relating to any such item based on, or which would result in, such inconsistent treatment.

## ARTICLE X
## MISCELLANEOUS

10.1    Amendment.  Subject to Section 4.1(b) and Section 4.2(d), the provisions of this Agreement may be amended, modified or waived with the prior written consent of the Board and each Class A Member. In connection with any amendment, modification or waiver, or other approval hereunder, neither the Company, the Board nor any Member will have an obligation to provide any information to any Person whose consent is not required to be obtained in order to effectuate such amendment, modification or waiver; provided (i) that any such Person shall, at the request of the Company, promptly (and in any event, within three (3) Business Days) execute and deliver to the Company any amendment, modification or waiver that has been approved in accordance with this Agreement and (ii) the Company shall deliver to such Person a copy of any such amendment, modification or waiver within seven (7) Business Days of the execution thereof.

10.2    Notices.  Any notice to be given under this Agreement shall be made in writing and sent by fax, Federal Express or another commercial delivery service, addressed as set forth below:

(a)    If to the Company:

**Rebecca Bamberger Works, LLC**
702 Ash Street, Ste 100,
San Diego, CA 92101
Attn:      Rebecca Bamberger
Email:    rebecca@bamtheagency.com

With a copy to (which shall not constitute notice):

**Llorente & Cuenca S.L.**
Calle Lagasca 88
28001, Madrid, España
Attn:      Juan Pablo Ocaña
Email:    jpocana@llorenteycuenca.com

And

*ACTIVE 684118884v10*

**Greenberg Traurig, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Attn:        Antonio Peña
Facsimile: +1 305.961.5804
Email:      antonio@gtlaw.com

(b)      If to any Member, such notice shall be mailed to the address of the Member as set forth on Exhibit A.

(c)      Any such notice shall be deemed to be delivered, given and received for all purposes as of the date delivered if delivered by a commercial delivery service or by confirmed facsimile.

10.3    Governing Law; Venue; Attorneys' Fees.

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

(b)      Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, and such legal action results in a final judgment in favor of one party, the prevailing party shall be entitled to payment from the other party of all of the prevailing party's reasonable attorneys' fees and related costs at all trial and appellate levels.

(c)      EXCEPT AS OTHERWISE PROVIDED HEREIN, ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(d)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES

40

THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.3(D).</u>

10.4    <u>Entire Agreement</u>.  This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.  Furthermore, the parties hereto acknowledge and agree that the recitals to this Agreement are true and correct and constitute an integral portion of, and are hereby incorporated into, this Agreement for all purposes.

10.5    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, including, without limitation, counterparts received via facsimile, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.

10.6    <u>Non-Waiver</u>.  The failure of any party hereto at any time or times to require performance of any provision hereof by any other party hereto shall in no manner affect the right of such party to require such performance at a later time.  No act or omission of any party hereto, other than an express written waiver signed by such party, shall constitute a waiver by such party of any breach of this Agreement or of the provision of this Agreement so breached.  No waiver by a party hereto of the breach of any provision hereof, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of such breach or as a waiver of the provision hereof so breached.

10.7    <u>Further Assurances</u>.  Each of the parties hereto agrees that, forthwith upon the written request of any other party hereto, such party shall execute and deliver such further conveyances, transfers and other documents of every nature and kind whatsoever, cause such meetings to be held, resolutions passed, exercise his vote and influence, do and perform and cause to be done and performed all such further and other acts and things as are within his reasonable power to do and as are reasonably necessary or desirable in order to give full effect to each and every part of this Agreement and the transactions contemplated in this Agreement.

10.8    <u>Guaranty</u>.  In order to induce LLYC to enter into this Agreement and in consideration of the benefits to be derived by the Newco Guarantor from this Agreement and the Option Agreement, the Newco Guarantor hereby unconditionally guarantees to LLYC and the Company the full and prompt payment and performance of all of Newco's obligations under this Agreement and the Option Agreement.  This Section 10.8 shall remain in full force and effect regardless of any amendment, waiver or change to any term of the obligations under this Agreement. Upon default by Newco or failure to perform or comply with any obligation, covenant or agreement under this Agreement to be performed or complied with by Newco, the Newco Guarantor will, immediately after notice of such default or failure, perform or comply therewith or cause the same to be performed or complied with by Newco.  In exercising their rights hereunder

41

or the Option Agreement, the Company and LLYC will not be required to first proceed against, or exhaust their remedies against, Newco under this Agreement or the Option Agreement.

**[SIGNATURES FOLLOW BELOW.]**

42

ACTIVE 684118884v10

**IN WITNESS WHEREOF**, the undersigned have each executed this Agreement as of the Effective Date.

**THE COMPANY:**

**REBECCA BAMBERGER WORKS, LLC**

By:  _____
Name:  Rebecca Bamberger
Title:  Authorized Signatory

*[Signature Page to Operating Agreement]*

43

*ACTIVE 684118884v10*

**NEWCO:**

**RBW HOLDCO, INC.**


By: _____
Name:  Rebecca Bamberger
Title:  Authorized Signatory


**HOLDCO:**

BAM MANAGEMENT HOLDCO, LLC

By: _____
Name:  Alejandro Romero Paniagua
Title: Authorized Signatory


**NEWCO GUARANTOR:**

**Rebecca Bamberger**


_____


*[Signature Page to Operating Agreement]*

44

**LLYC:**

**LLORENTE & CUENCA USA, INC.**


By: _____
Name:  Alejandro Romero Paniagua
Title:  Authorized Signatory

*[Signature Page to Operating Agreement]*

ACTIVE 684118884v10

**EXHIBIT A**

**MEMBERS, ADDRESSES, NUMBER OF UNITS
AND PERCENTAGE INTERESTS
FOR
REBECCA BAMBERGER WORKS, LLC**

| Member | Address | Number and Class of Units | Capital Contributions[1] | Percentage Interest | Capital Account[2] |
|---|---|---|---|---|---|
| RBW Holdco, Inc. | 2855 5th Avenue, #802, San Diego, CA 92103 Attn: Rebecca Bamberger Email: rebecca@bamtheagency.com | 1,580,000 Class A Units | $2,652,311.06 | 16.49% | $2,652,311.06 |
| Llorente & Cuenca USA, Inc. | 600 Brickell Avenue, Suite 2125 Miami, FL Attn: Publio Lorenzo Email: publio.lorenzo@llorenteycuenca.com<br><br>With a copy to (which shall not constitute notice):<br><br>Greenberg Traurig, P.A. 333 S.E. 2nd Avenue, Suite 4400, Miami, Florida 33131 Attn: Antonio Peña antonio@gtlaw.com | 8,000,000 Class A Units | $10,609,244.26 | 83.51% | $10,609,244.26 |
| **Totals** | | **9,580,000 Class A Units** | **$13,261,555.32** | **100%** | **$13,261,555.32** |

---

[1] Subject to adjustment to take into account the actual amount of deferred payments under the Membership Interest Purchase Agreement and any other adjustments to the purchase price under the Membership Interest Purchase Agreement, as appropriate.

[2] Subject to adjustment to take into account the actual amount of deferred payments under the Membership Interest Purchase Agreement and any other adjustments to the purchase price under the Membership Interest Purchase Agreement, as appropriate.

46

ACTIVE 684118884v10

47

*ACTIVE 684118884v10*

**EXHIBIT B**

**FORM OF JOINDER OF MEMBER TO
REBECCA BAMBERGER WORKS, LLC
LIMITED LIABILITY COMPANY OPERATING AGREEMENT]**

By affixing his, her or its, as applicable, signature hereto, the undersigned, as a Member of Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "Company"), hereby joins in the execution of the Company's Limited Liability Company Operating Agreement (the "LLC Agreement"), executed by the Company and its Members (as defined in the LLC Agreement) with an effective date of March __, 2023.  Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement .

The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

**IN WITNESS WHEREOF**, the undersigned has executed this Joinder as of this ___ day of _____, _____.

If Member Is a Business Entity:

_____ ,
a _____

By:_____
Print Name:_____
Title:_____

If Member is an Individual:

Signature:_____
                    Individually
Print Name:_____

Address:_____
         _____
         _____

48

*ACTIVE 684118884v10*

## **EXHIBIT C**

## **OPTION AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

Final Form

**OPTION AGREEMENT**

**by and among**

**Llorente & Cuenca USA, Inc., a Delaware corporation,**

**Rebecca Bamberger Works, LLC, a Delaware limited liability company**

**RBW Holdco, Inc., a California corporation**

**and**

**Rebecca Bamberger**

**dated as of**

**March __, 2023**

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| 1. | Defined Terms | 2 |
| | 1.1 Definitions | 2 |
| 2. | Purchase Option | 8 |
| | 2.1 Purchase Option | 8 |
| | 2.2 Exercise | 9 |
| 3. | Sale Option | 9 |
| | 3.1 Sale Option | 9 |
| | 3.2 Exercise | 9 |
| 4. | Consummation of Sale Transaction | 9 |
| | 4.1 Option Closing and Preliminary Statement | 9 |
| | 4.2 Examination and Review | 10 |
| | 4.3 Negotiation of Documentation After Exercise of a Purchase Option or Sale Option | 11 |
| | 4.4 Governmental Approvals | 12 |
| 5. | Termination | 12 |
| 6. | Miscellaneous | 12 |
| | 6.1 Further Action | 12 |
| | 6.2 Expenses | 12 |
| | 6.3 No Third Party Beneficiaries | 12 |
| | 6.4 General Provisions | 13 |

Exhibit A     -     Form of Option Purchase Agreement

## OPTION AGREEMENT

**THIS OPTION AGREEMENT** (this "**Agreement**") dated as of March __, 2023(the "**Effective Date**"), is entered into by and among Llorente & Cuenca USA, Inc., a Delaware corporation ("**Buyer**"), Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "**Company**"), RBW Holdco, Inc., a California corporation ("**Seller**"), and Rebecca Bamberger, a California resident (the "**Beneficial Owner**", and collectively with Seller, the "**Seller Parties**").

## RECITALS

**WHEREAS**, on the Effective Date, Buyer, the Company and the Seller Parties entered into that certain Membership Interest Purchase Agreement (the "**Purchase Agreement**");

**WHEREAS,** on the Effective Date, the Company, Buyer, the Seller Parties and the other parties thereto entered into that certain Amended and Restated Operating Agreement of the Company (the "**LLC Agreement**"); and

**WHEREAS**, in connection with the execution and delivery of the Purchase Agreement and the LLC Agreement, the Parties now desire enter into this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.    **Defined Terms**.

1.1    Definitions. The terms defined in this Section 1.1 shall, for all purposes of this Agreement, have the respective meanings set forth below.  Other capitalized terms used but not defined herein shall have the respective meanings given to them in the Purchase Agreement.

"**2021-2024 Recurrent Normalized EBITDA**" means an amount equal to the quotient of (a) the sum of (x) 2021 Recurrent Normalized EBITDA, (y) the Recurrent Normalized EBITDA of the Company for the calendar years 2022, 2023 and 2024, divided by (b) four (4).

"**2024-2026 Recurrent Normalized EBITDA**" means an amount equal to the quotient of (a) the sum of the Recurrent Normalized EBITDA of the Company for the calendar years 2024, 2025 and 2026, divided by (b) three (3).

"**Accounting Referee**" means a nationally recognized independent accounting firm that has not provided services to Buyer, Seller or any of their Affiliates during the past three years and mutually agreed to by Buyer and Seller; provided that if they cannot agree on the Accounting Referee within a reasonable period of time, then any Party shall have the right to cause the International Center for Dispute Resolution to appoint the Accounting Referee.

2

*ACTIVE 684264690v10*

"**Adjusted EBITDA**" means an amount equal to the quotient of (a) the sum of the Recurrent Normalized EBITDA of the Company of the two fiscal years immediately preceding the Date of Determination, underlined divided by (b) two.

"**Agreement**" has the meaning set forth in the preamble.

"**Applicable Multiple**" means the multiple to be applied as set forth in the table below based on the Adjusted EBITDA for the two fiscal years immediately preceding the Date of Determination:

| Adjusted EBITDA | Applicable Multiple |
|---|---|
| Equal to or greater than 30% of the Average Revenue of the two fiscal years immediately preceding the Date of Determination. | 8.0 |
| Equal to or greater than 25% but less than 30% of the Average Revenue of the two fiscal years immediately preceding the Date of Determination. | 7.5 |
| Equal to greater than 20% but less than 25% of the Average Revenue of the two fiscal years immediately preceding the Date of Determination. | 7.0 |
| Equal to greater than 15% but less than 20% of the Average Revenue of the two fiscal years immediately preceding the Date of Determination. | 6.5 |
| Less than 15% of the Average Revenue of the two fiscal years immediately preceding the Date of Determination. | 6.0 |

Notwithstanding anything contained herein to the contrary, in the event that (i) the Applicable Multiple used to determine the Enterprise Value would be 8.0 but for this sentence, and (ii) ninety percent (90%) of the Applicable Implicit Multiple would be less than 8.0, then the Applicable Multiple used for the calculation of the Enterprise Value shall instead be 7.5.

"**Applicable Implicit Multiple**" means an amount equal to the quotient of (a) the sum of (i) the average market capitalization of LLYC Parent in the last quarter of the fiscal year immediately preceding the Date of Determination, underlined plus (ii) the net financial position of LLYC Parent as of the last day of the fiscal year immediately preceding the Date of Determination, divided by (b) the LLYC Parent Pro-Forma EBITDA for the fiscal year immediately preceding the Date of Determination (each of which is available here:

3

*ACTIVE 684264690v10*

https://www.bmegrowth.es/ing/Ficha/LLYC__LLORENTE_Y_CUENCA__ES0105591004.aspx#ss_historico)

"**Average Revenue**" means the total revenue of the Company for the two fiscal years immediately preceding the Date of Determination calculated in accordance with the Accounting Principles divided by two (2).

"**Beneficial Owner**" has the meaning set forth in the preamble.

"**Buyer**" has the meaning set forth in the preamble.

"**Cash**" means, with respect to the Company, the amount of (a) all cash on hand, plus (b) the amount of all marketable securities and short term investments (to the extent convertible to cash within thirty (30) days), less (c) the amount of any outbound wires sent (but not yet cleared) or checks written (but not yet cashed), as applicable, less (d) Restricted Cash.

"**Cause**" has the meaning set forth in the Employment Agreement.

"**Company**" has the meaning set forth in the preamble.

"**Date of Determination**" means the Purchase Option Notice Date or Sale Option Notice Date, as applicable.

"**Debt**" means, with respect to the Company, all Liabilities (including all Liabilities in respect of principal, accrued interest, penalties, fees and premiums) of the Company, whether direct or indirect, (a) for borrowed money (including, but not limited to, overdraft facilities), (b) secured by any Encumbrance existing on any property or asset of the Company, (c) evidenced by notes, bonds, debentures or similar documents, (d) for the deferred purchase price of property, goods or services, whether connected or not with the acquisition of any business ("earn-out" or other similar type of payments) or noncompetition agreement, (e) under operating, finance or capital leases (in accordance with IFRS) or any lease-back arrangements, (f) in respect of letters of credit and bankers' acceptances, to the extent of the amount drawn thereon, (g) for Contracts relating to interest rate protection, swap agreements, factoring, hedging and collar agreements or similar type of Contracts, (h) obligations of the Company to pay any dividends or make any other distributions with respect to any of the Membership Interests or other Equity or ownership interests of the Company, (i) accounts payable that are more than fifteen (15) days past due or any accounts payable not arising in the ordinary course of business of the Company, (j) all unpaid wages, salaries, bonuses, unused paid time off, together with the employer portion of all applicable payroll Taxes imposed thereon, (k) owed to suppliers of fixed assets or investments in fixed assets, (l) owed to any Affiliate of the Company, (m) in the nature of premiums (prepayment or otherwise) or penalties in connection with the obligations described in clauses (a) through (l) above, (n) in the nature of Guarantees of the obligations described in clauses (a) through (m) above of any other Person.

"**Disability**" means the Beneficial Owner's inability, due to illness, injury or other disability (either physical or mental) or any other circumstance, to perform her obligations as a

4

Manager or employee of the Company under the LLC Agreement for 180 or more consecutive days.

"**Effective Date**" has the meaning set forth in the preamble.

"**Employment Agreement**" the Employment Agreement between the Beneficial Owner and the Company dated as of the date hereof.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, lease, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Enterprise Value**" means an amount equal to the product of (a) Applicable Multiple, multiplied by (b) the Adjusted EBITDA.

"**Equity Value**" means (a) the Enterprise Value, plus (b) the Option Closing Cash, less (c) the Option Closing Debt.

"**Good Reason**" has the meaning set forth in the Employment Agreement.

"**Hurdle Amount**" has the meaning set forth in the LLC Agreement.

"**LLC Agreement**" has the meaning set forth in the recitals.

"**Member**" has the meaning set forth in the LLC Agreement.

"**Membership Interest**" means a Member's economic rights, voting rights, other interest in the Company as a Member as provided in the LLC Agreement (based on the type, class, or series of Unit or Units held by such Member).

"**Negotiation Period**" has the meaning set forth in Section 4.2(a).

"**Objected Items**" has the meaning set forth in Section 4.2(a).

"**Objection Notice**" has the meaning set forth in Section 4.2(a).

"**Option Closing**" means the closing of the Purchase Option Sale or the Sale Option Sale, as applicable.

"**Option Closing Cash**" means the Cash of the Company as of the open of business on the Date of Determination.

"**Option Closing Date**" means any Purchase Option Closing Date or Sale Option Closing Date, as applicable.

*ACTIVE 684264690v10*

"**Option Closing Debt**" means the Debt of the Company as of the open of business on the Date of Determination.

"**Option Interests**" means all of Seller's (and any transferee of Seller's Membership Interests that executed a joinder to this Agreement pursuant to the terms of the LLC Agreement's) Membership Interest in the Company.

"**Option Purchase Price**" means the amount of cash distributions which would be payable to the Seller in respect of the Option Interests in accordance with the LLC Agreement if the Company were deemed to receive the Equity Value in cash and then distributed the same to the Members in accordance with the terms of LLC Agreement incident to the liquidation of the Company after payment to all of the Company's creditors from such cash receipts (provided that for purpose of calculating such deemed distribution of Equity Value to the Members, the Hurdle Amount for the Reserve Class B Units issued and outstanding will be disregarded and assumed to be zero), other than payments to creditors who hold evidence of Debt, the payment of which is already reflected in the calculation of the Equity Value and assuming that all of the convertible debt and other convertible securities were repaid or converted (whichever yields more cash to the holders of such convertible securities), and all options to acquire Units (whether or not currently exercisable) that have an exercise price below the fair market value of such Units were exercised and the exercise price paid.

"**Option Purchase Agreement**" means the Membership Interest Purchase Agreement, in substantially the form attached hereto as Exhibit A.

"**Parties**" means Buyer, the Company and the Seller Parties.

"**Preliminary Statement**" has the meaning set forth in Section 4.1(b).

"**Purchase Agreement**" has the meaning set forth in the recitals.

"**Purchase Option**" has the meaning set forth in Section 2.1.

"**Purchase Option Closing Date**" has the meaning set forth in Section 2.2.

"**Purchase Option Exercise Periods**" means each of the following: (a) the period beginning on the date of any Purchase Option Triggering Event and ending one year thereafter; (b) the period beginning on the first day of April, 2028 and ending on the last day of such month; (c) the period beginning on the first day of June, 2028 and ending on the last day of such month; (d) the period beginning on the first day of August, 2028 and ending on the last day of such month; (e) the period beginning on the first day of October, 2028 and ending on the last day of such month; (f) the period beginning on the first day of December, 2028 and ending on the last day of such month; (g) the period beginning on the first day of February, 2029 and ending on the last day of such month; (h) the period beginning on the first day of April, 2029 and ending on the last day of such month; (i) the period beginning on the first day of June, 2029 and ending on the last day of such month; (j) the period beginning on the first day of August, 2029 and ending on the last day of such month; (k) the period beginning on the first day of October, 2029 and ending on the last day of such month; (l) the period beginning on the first day of December, 2029 and ending on the

6

last day of such month; (m) the period beginning on the first day of February, 2030 and ending on the last day of such month; (n) the period beginning on the first day of April, 2030 and ending on the last day of such month; (o) the period beginning on the first day of June, 2030 and ending on the last day of such month; (p) the period beginning on the first day of August, 2030 and ending on the last day of such month; (q) the period beginning on the first day of October, 2030 and ending on the last day of such month; (r) the period beginning on the first day of December, 2030 and ending on the last day of such month; and (s) the period beginning on the first day of February, 2031 and ending on the last day of such month.

"**Purchase Option Notice**" has the meaning set forth in Section 2.2.

"**Purchase Option Notice Date**" means the date on which the Purchase Option Notice is delivered to the Company and Seller.

"**Purchase Option Sale**" has the meaning set forth in Section 2.1.

"**Purchase Option Triggering Event**" means any of (i) the Disability of the Beneficial Owner, (ii) the death of the Beneficial Owner, (iii) the termination of the Employment Agreement by either the Company or the Beneficial Owner for any reason.

"**Reserve Class B Units**" has the meaning set forth in the LLC Agreement.

"**Restricted Cash**" means any cash or cash equivalents (i) designated as restricted cash on the Company's balance sheet as of the Date of Determination, prepared in accordance with IFRS, (ii) that is not freely usable by the Company as of the Date of Determination because it is subject to restrictions or limitations on use or distribution by Law, Contract or otherwise, or (iii) held in escrow accounts or as security deposits.

"**Review Period**" has the meaning set forth in Section 4.2(a).

"**Sale Option**" has the meaning set forth in Section 3.1.

"**Sale Option Closing Date**" has the meaning set forth in Section 3.2.

"**Sale Option Condition**" means the condition for the Sale Option to take place that requires that the 2024-2026 Recurrent Normalized EBITDA to be equal to or greater than the 2021-2024 Recurrent Normalized EBITDA; provided, however that such condition shall not be required to be satisfied to exercise the Sale Option in the event of a Sale Option Triggering Event.

"**Sale Option Exercise Periods**" means each of the following: (a) the period beginning on the date of any Sale Option Triggering Event and ending one year thereafter; (b) the period beginning on the first day of May, 2028 and ending on the last day of such month; (c) the period beginning on the first day of July, 2028 and ending on the last day of such month; (d) the period beginning on the first day of September, 2028 and ending on the last day of such month; (e) the period beginning on the first day of November, 2028 and ending on the last day of such month; (f) the period beginning on the first day of January, 2029 and ending on the last day of such month; (g) the period beginning on the first day of March, 2029 and ending on the last day of such month;

7

*ACTIVE 684264690v10*

(h); he period beginning on the first day of May, 2029 and ending on the last day of such month; (i) the period beginning on the first day of July, 2029 and ending on the last day of such month; (j) the period beginning on the first day of September, 2029 and ending on the last day of such month; (k) the period beginning on the first day of November, 2029 and ending on the last day of such month; (l) the period beginning on the first day of January, 2030 and ending on the last day of such month; (m) the period beginning on the first day of March, 2030 and ending on the last day of such month; (n) the period beginning on the first day of May, 2030 and ending on the last day of such month; (o) the period beginning on the first day of July, 2030 and ending on the last day of such month; (p) the period beginning on the first day of September, 2030 and ending on the last day of such month; (q) the period beginning on the first day of November, 2030 and ending on the last day of such month; (r) the period beginning on the first day of January, 2031 and ending on the last day of such month; and (s) the period beginning on the first day of March, 2031 and ending on the last day of such month.

"**Sale Option Notice**" has the meaning set forth in <u>Section 3.2</u>.

"**Sale Option Notice Date**" means the date on which the Sale Option Notice is delivered to Buyer and the Company.

"**Sale Option Sale**" has the meaning set forth in <u>Section 3.1</u>.

"**Sale Option Triggering Event**" means any of (i) the Disability of the Beneficial Owner, (ii) the death of the Beneficial Owner, (iii) the termination of the Employment Agreement by (a) the Company without Cause or for Cause as a result of the failure of Beneficial Owner to achieve goals or objectives established in advance by the Company in consultation with Beneficial Owner in respect of two consecutive fiscal years of the Company, as determined by the Company in good faith, or (b) Beneficial Owner for Good Reason.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Parties**" has the meaning set forth in the preamble.

"**Unit**" or "**Units**" has the meaning set forth in the LLC Agreement.

2.    **Purchase Option**.

2.1    <u>Purchase Option</u>. Subject to the terms and conditions of this Agreement, in addition to any other rights of Buyer set forth in the LLC Agreement to purchase all or a portion of the Option Interests, if Seller has not exercised the Sale Option during any of the Sale Option Exercise Periods, then, during any of the Purchase Option Exercise Periods, Buyer shall have the right and option (the "**Purchase Option**"), but not the obligation, to cause Seller (and/or any other holders of Option Interests) to sell to Buyer (directly or indirectly to a designee), all of the Option Interests in exchange for the aggregate payment to Seller (and/or any other holders of Option Interests) of the Option Purchase Price.  Any sale of the Option Interests caused by the exercise of the Purchase Option shall be referred to herein as a "**Purchase Option Sale**."  The Purchase Option may only be exercised in accordance with, and subject to, the terms and conditions contained in this Agreement.

8

2.2 <u>Exercise</u>. To exercise the Purchase Option, Buyer shall deliver, during the applicable Purchase Option Exercise Period, written notice to each of the Company and Seller of its irrevocable election to exercise the Purchase Option (the "**Purchase Option Notice**"). The Purchase Option Sale shall be consummated on the date proposed by Buyer (the "**Purchase Option Closing Date**"); <u>provided</u>, <u>however</u>, that, unless otherwise agreed in writing by Buyer and Seller, the Purchase Option Closing Date shall be no earlier than five (5) Business Days and no later than twenty (20) Business Days after the date on which the Option Purchase Price has been finally determined in accordance with <u>Section 4.2</u> and all approvals and authorizations, if any, have been obtained in accordance with <u>Section 4.4</u>. On the Purchase Option Closing Date, Buyer will pay the Option Purchase Price for the Option Interests by wire transfer of immediately available funds.

**3.** **<u>Sale Option</u>**.

3.1 <u>Sale Option</u>. Subject to the terms and conditions of this Agreement, if Buyer has not exercised the Purchase Option during any of the Purchase Option Exercise Periods and, except in respect of the Sale Option Triggering Event, the Sale Option Condition has been met, then, during any of the Sale Option Exercise Periods, Seller shall have the right and option (the "**Sale Option**"), but not the obligation, to require Buyer (directly or indirectly through a designee), and Buyer (directly or indirectly through a designee) will be obligated to purchase, all of the Option Interests in exchange for the aggregate payment to Seller (and/or any other holders of Option Interests) of the Option Purchase Price. Any sale of the Option Interests caused by the exercise of the Sale Option shall be referred to herein as a "**Sale Option Sale**." The Sale Option may only be exercised in accordance with, and subject to, the terms and conditions contained in this Agreement.

3.2 <u>Exercise</u>. To exercise the Sale Option, Seller shall deliver, during the applicable Sale Option Exercise Period (subject to the Sale Option Condition having been met (if applicable)), written notice to each of the Company and Buyer of its irrevocable election to exercise the Sale Option (the "**Sale Option Notice**"). The Sale Option Sale shall be consummated on the date proposed by Seller (the "**Sale Option Closing Date**"); <u>provided</u>, <u>however</u>, that, unless otherwise agreed in writing by Buyer and Seller, the Sale Option Closing Date shall be no earlier than five (5) Business Days and no later than fifteen (15) Business Days after the date on which the Option Purchase Price has been finally determined in accordance with <u>Section 4.2</u> and all approvals and authorizations, if any, have been obtained in accordance with <u>Section 4.4</u>. On the Sale Option Closing Date, Buyer will pay the Option Purchase Price for the Option Interests by wire transfer of immediately available funds.

**4.** **<u>Consummation of Sale Transaction</u>**.

4.1 <u>Option Closing and Preliminary Statement</u>.

(a) At the Option Closing, pursuant to the terms of, and in addition to other obligations set forth in, this Agreement and the Option Purchase Agreement, Seller shall cause the sale and transfer of the Option Interests, free and clear of any Encumbrances, to Buyer or Buyer's designee, and Buyer shall in the aggregate pay to Seller (and/or any other holders of Option Interests) the Option Purchase Price.

9

(b)      Within 60 days of either delivering to Seller the Purchase Option Notice or receiving from Seller the Sale Option Notice, Buyer shall deliver to the Seller Parties a statement (the "**Preliminary Statement**") setting forth Buyer's good faith determination of (i) Adjusted EBITDA; (ii) Enterprise Value; (iii) Option Closing Cash; (iv) Option Closing Debt; (v) Equity Value; and (vi) Option Purchase Price.

      4.2      <u>Examination and Review</u>

(a)      Upon receipt of the Preliminary Statement, Seller shall have 45 days (the "**Review Period**") to review the Preliminary Statement and the calculation of Adjusted EBITDA, Enterprise Value, Option Closing Cash, Option Closing Debt, Equity Value and Option Purchase Price.  The Parties shall in good faith cooperate and give reasonable access, during normal business hours and upon reasonable prior notice, to the books, records and other materials of each of the Companies and the personnel of and work papers prepared by any of them or their respective Representatives in connection with the Preliminary Statement, in order to permit the timely and complete review of the Preliminary Statement in accordance with this <u>Section 4.2(a)</u>.  If Seller has accepted the Preliminary Statement in writing or has not given written notice to Buyer setting forth any objection of Seller to the Preliminary Statement (an "**Objection Notice**") on or before the last day of the Review Period, then such Preliminary Statement and the amounts contained therein shall be final and binding upon the Parties.  In the event that Seller timely delivers an Objection Notice, Buyer and Seller shall negotiate in good faith to resolve any objection within 30 days following the receipt by Buyer of the Objection Notice (the "**Negotiation Period**").  The Objection Notice shall reasonably explain any objection to the Preliminary Statement and the amounts or line items thereof as to which Seller disagrees (collectively, the "**Objected Items**") and to the extent then known to Seller, shall include the Dollar amount of each such objection and Seller's proposed calculation of each such amount.  Seller shall provide reasonable supporting documentation for each Objected Item concurrently with the delivery of the Objection Notice.  Except for Objected Items, Seller shall be deemed to have accepted all other amounts contained in the Preliminary Statement, and all such amounts shall be considered final and binding for all purposes hereunder.  If, during the Negotiation Period, Seller and Buyer agree in writing upon any of the Objected Items, the amounts so determined shall no longer be considered to be Objected Items and will be final and binding on the Parties for all purposes hereunder.  If Buyer and Seller are unable to reach an agreement in writing on any Objected Item on or before the last day of the Negotiation Period, then Buyer or Seller may submit such matter to the Accounting Referee.

(b)      The Accounting Referee shall only consider the Objected Items on which Seller and Buyer have not reached an agreement in writing.  The Accounting Referee's determination shall take into account the definitions of Adjusted EBITDA, Enterprise Value, Option Closing Cash, Option Closing Debt, Equity Value and Option Purchase Price contained herein.  The Accounting Referee shall resolve all outstanding Objected Items within 20 days after receipt of the Objection Notice, or as soon as practicable thereafter.  The Accounting Referee's determination shall be based solely on the presentations to be made by Buyer and Seller that are in accordance with the terms and procedures set forth in this Agreement (i.e., not on the basis of an independent review).  The Accounting Referee may not assign a value to any item greater than the greatest value for such item claimed by either Buyer or Seller or less than the smallest value for such item claimed by either Buyer or Seller.  The resolution of the dispute by

10

the Accounting Referee shall be final, binding and non-appealable on the Parties hereto, absent manifest error.  For the avoidance of doubt, the Accounting Referee shall act as an expert and not an arbitrator.

(c)    The costs and expenses of the Accounting Referee shall be borne (i) by Buyer in the proportion that the aggregate Dollar amount of the items that are successfully disputed by Seller (as finally determined by the Accounting Referee) bears to the aggregate Dollar amount of the items submitted to the Accounting Referee, and (ii) by Seller in the proportion that the aggregate Dollar amount of the disputed items that are unsuccessfully disputed by Buyer (as finally determined by the Accounting Referee) bears to the aggregate Dollar amount of the items submitted to the Accounting Referee, in each of (i) and (ii) as determined by the Accounting Referee in its final resolution.

4.3    <u>Negotiation of Documentation After Exercise of a Purchase Option or Sale Option</u>.

(a)    If the Purchase Option or the Sale Option are exercised in accordance with <u>Section 2</u> or <u>Section 3</u>, as applicable, the Company, Buyer and the Seller Parties shall, and shall cause their respective Affiliates to, document and consummate a Purchase Option Sale or a Sale Option Sale as set forth in this <u>Section 4</u>.

(b)    The obligations of Seller under this <u>Section 4</u> shall include: (i) executing and delivering, and causing the holders of Option Interests to execute and deliver, to Buyer and the Company, the Option Purchase Agreement (in substantially the form attached as <u>Exhibit A</u>) and any other agreements, certificates and other documents which are contemplated thereby; (ii) on the Option Closing Date (subject to the terms and conditions in the Option Purchase Agreement), selling, assigning, transferring and delivering to Buyer (and/or to Buyer's designees) all rights, title and interest in, all of the Option Interests, free and clear of any Encumbrances and (ii) taking any other necessary or appropriate action in furtherance of the Purchase Option Sale or Sale Option Sale, as applicable, on the terms and subject to the conditions set forth in this Agreement and the Option Purchase Agreement, including, on the Option Closing Date, the execution and delivery of any other appropriate agreements, certificates, instruments and other documents which are contemplated thereby, including the execution and delivery of instruments of transfer for the Option Interests, in each case as may be reasonably requested by Buyer on or before such Option Closing Date.

(c)    The obligations of Buyer under this <u>Section 4</u> shall include: (i) executing and delivering and, if applicable, causing its Affiliates (including the Company) to execute and deliver, to the Seller Parties the Option Purchase Agreement (in substantially the form attached as <u>Exhibit A</u>) and any other agreements, certificates and other documents which are contemplated thereby; (ii) on the Option Closing Date (subject to the terms and conditions in the Option Purchase Agreement), paying in the aggregate to Seller (and/or any other holders of Option Interests) the Option Purchase Price by wire transfer of immediately available funds to such account(s) as may be designated in writing by Seller; and (iii) taking any other necessary or appropriate action in furtherance of the Purchase Option Sale or Sale Option Sale, as applicable, on the terms and subject to the conditions set forth in this Agreement and the Option Purchase Agreement , including, on the Option Closing Date, the execution and delivery of any other appropriate agreements,

11

certificates, instruments and other documents which are contemplated thereby, in each case as may be reasonably requested by Seller on or before such Option Closing Date.

4.4     Governmental Approvals.  In addition to its other obligations set forth in this Agreement, each of the Parties agrees to (a) take commercially reasonable steps necessary or desirable, and proceed diligently and in good faith and use commercially reasonable efforts, as promptly as practicable, to obtain all consents, approvals or authorizations of, to make all filings with and to give all notices to, all Governmental Authorities required to consummate the transactions contemplated by this Agreement and the Option Purchase Agreements; (b) provide such other information and communications to such Governmental Authorities as such Governmental Authorities may reasonably request; and (c) cooperate with the other Parties as promptly as practicable in obtaining all consents, approvals or authorizations of, making all filings with and giving all notices to, Governmental Authorities required to consummate the transactions contemplated hereby.  Following any Purchase Option Notice Date or a Sale Option Notice Date, each of the Parties will provide prompt notification to the other Parties when any such consent, approval, authorization, filing or notice referred to in clause (a) above is obtained, taken, made or given, as applicable, and will advise the other Parties of any communications (and, unless precluded by Law, provide copies of any such communications that are in writing) with any Governmental Authority regarding any of the transactions contemplated by such Option Purchase Agreement.  Notwithstanding anything to the contrary in this Agreement, no Party shall be required to make any payment to a Governmental Authority to obtain any consent required hereunder.

5.     **Termination**. The Parties acknowledge and agree that this Agreement shall terminate automatically without any further action by any Person, upon the earliest of (a) April 1, 2031; (b) the consummation of a Purchase Option Sale; and (c) the consummation of a Sale Option Sale.

6.     **Miscellaneous**.

6.1     Further Action.  The Parties shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers as may be required to carry out the provisions of this Agreement and to consummate and make effective the transactions contemplated by this Agreement.

6.2     Expenses.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Option Closing shall have occurred.

6.3     No Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12

6.4     <u>General Provisions</u>.    Section 11.02 (*Notices*), Section 11.03 (*Interpretation*), Section 11.04 (*Headings*), Section 11.05 (*Severability*), Section 11.06 *(Entire Agreement*), Section 11.07 (*Successors and Assigns*), Section 11.09 (*Amendment and Modification; Waiver*), Section 11.10 (*Governing Law; Submission to Jurisdiction; Waiver of Jury Trial*), Section 11.11 (*Specific Performance*), and Section 11.12 (*Counterparts*) of the Purchase Agreement are hereby incorporated by reference as if set forth herein, *mutatis mutandis*.

[*Signature Page Follows*]

*ACTIVE 684264690v10*

**IN WITNESS WHEREOF,** each of the Parties has duly executed this Option Agreement as of the day and year first above written.

**BUYER:**

**LLORENTE & CUENCA USA, INC.**

By: _____
Name:  Alejandro Romero Paniagua
Title:  Authorized Signatory

**SELLER:**

**RBW HOLDCO, INC.**

By: _____
Name:  Rebecca Bamberger
Title:  Authorized Signatory

**COMPANY:**

**REBECCA BAMBERGER WORKS, LLC**

By: _____
Name:  Rebecca Bamberger
Title:  Authorized Signatory

**BENEFICIAL OWNER:**

_____
Name:  **REBECCA BAMBERGER**

*ACTIVE 684264690v10*

FINAL FORM

**EXHIBIT A**

**FORM OF OPTION PURCHASE AGREEMENT**

<u>**MEMBERSHIP INTEREST PURCHASE AGREEMENT**</u>

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "**Agreement**") is made as of [•] by and among RBW Holdco, Inc., a California corporation (the "**Seller**"), Rebecca Bamberger, a California resident (the "**Beneficial Owner**", and collectively with the Seller, the "**Seller Parties**"), and Llorente & Cuenca USA, Inc., a Delaware corporation (the "**Buyer**") and Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "**Company**").

**WHEREAS**, on March __, 2023, Buyer, the Company and the Seller Parties entered into that certain Membership Interest Purchase Agreement (the "**Purchase Agreement**"), pursuant to which the Seller agreed to sell, and the Buyer agreed to purchase eighty percent (80%) of the membership interest in the Company;

**WHEREAS,** on March __, 2023, the Company, the Buyer, the Seller Parties and the other parties signatory thereto, entered into that certain Amended and Restated Operating Agreement of the Company (the "**LLC Agreement**");

**WHEREAS**, on March __, 2023, Buyer, the Company and the Seller Parties entered into that certain Option Purchase Agreement (the "**Option Agreement**"), pursuant to which the Buyer granted the Seller the right to sell to the Buyer, and the Seller granted the Buyer the right to purchase from the Seller, all of the Seller's membership interests in the Company; and

**WHEREAS**, the [Buyer / Seller] desires to exercise its right to [purchase / sell] [•], constituting all of the Seller's membership interests in the Company (the "**Purchased Interests**"), free and clear of all Encumbrances.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Defined Terms. Capitalized terms used but not defined herein shall have the respective meanings given to them in the Purchase Agreement.**

2. **Purchase and Sale of Purchase Interests; Closing.**

2.1 <u>Sale of Purchased Interests</u>.  Subject to the terms and conditions of this Agreement, Buyer agrees to purchase from the Seller, and the Seller agrees to sell to Buyer, the Purchased Interests for a total purchase price of $[•] (the "**Purchase Price**"), payable in cash. The purchase and sale of the Purchased Interests shall take place electronically via exchange of documents on the date hereof or such other date agreed to in writing by the Seller and Buyer (which time and place are designated as the "**Closing**", and such date, the "**Closing Date**").

*ACTIVE 684264690v10*

The Company hereby waives any restrictions on the transfer of the Purchased Interests set forth in the LLC Agreement.

2.2 <u>Closing</u>.  At the Closing the Seller shall deliver to the Company a membership interest transfer power consummating the sale of the Purchased Interests to Buyer (the "**Power**") against payment of the Purchase Price by Buyer to the Seller by wire transfer of immediately available funds to an account previously designated by the Seller in writing. Upon execution and delivery of the Power and delivery of payment in full of the Purchase Price, Buyer shall become the legal and beneficial owner of the Purchased Interests and of all rights and interest therein.

3.      **<u>Representations and Warranties of the Seller Parties</u>.  The Seller Parties, jointly and severally, hereby represent and warrant, as applicable, to Buyer and the Company, as follows:**

3.1 <u>Organization and Authority of the Seller Parties</u>.

(a)      The Seller (i) is a corporation duly organized, validly existing and in good standing under the Laws of California, and (ii) has the requisite corporate or similar power and authority to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.  The execution and delivery by the Seller of this Agreement, its performance hereunder, and the consummation by the Seller of the transactions contemplated hereby have been duly authorized by all necessary corporate or similar action on the part of the Seller and no other corporate, shareholder, member, or similar proceedings or actions by the Seller are necessary to authorize the entering into of this Agreement or the consummation of the transactions contemplated hereby.

(b)      The Beneficial Owner is legally competent to execute and deliver this Agreement, to perform her obligations hereunder, and to consummate the transactions contemplated hereby. The Beneficial Owner has obtained any consent that may be required under applicable Law to consummate the transactions contemplated hereby.

(c)      This Agreement, when delivered by the Seller Parties, and, assuming due authorization, execution and delivery by the other parties hereto, will constitute a legal, valid and binding obligation of the Seller Parties, enforceable against the Seller Parties in accordance with the terms hereto, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting enforcement of creditors' rights generally and by general principles of equity (including the possibility of unavailability of specific performance or injunctive relief), regardless of whether applied in a proceeding at Law or in equity (the "**General Enforceability Exceptions**").

3.2 <u>Purchased Interests</u>. The Seller owns the Purchased Interests free and clear of all Encumbrances. The Beneficial Owner owns 100% of the issued and outstanding capital stock of Seller. The Purchased Interest constitutes all of the issued and outstanding membership interest of the Company that is beneficially owned by the Seller Parties and their Affiliates.

2

*ACTIVE 684264690v10*

Upon consummation of the transactions contemplated by this Agreement, on the Closing Date, the Purchased Interests will be owned by Buyer, free and clear of all Encumbrances.

3.3 <u>No Conflicts; Consents</u>. The execution, delivery and performance by the Seller Parties of this Agreement and the consummation of the transactions contemplated hereby, do not (a) contravene any provision of the Organizational Documents of the Seller or any Law; (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Permit or consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Seller Parties is a party; (c) require, with respect to any of the Seller Parties, the consent or Permit of any Person (including any Governmental Authority) under any Law or agreement which has not already been obtained; or (d) result in the creation or imposition of any Encumbrance on any properties (including Real Property) or assets of the Company.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any of the Seller Parties in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

3.4 <u>Brokers or Finders</u>.  None of the Seller Parties has entered into any agreement or arrangement entitling any broker, finder, investment banker or other firm or Person to any brokerage, finder's or other fee, commission or expense payable by Buyer, the Company, or any of their respective Affiliates in connection with the transactions contemplated hereby.

3.5 <u>Disclosure of Information</u>.  The Seller has received all the information it considers necessary or appropriate for deciding whether to sell the Purchased Interests to Buyer pursuant to this Agreement.  Seller Parties acknowledge (i) that neither Buyer, nor any of Buyer Related Parties (as defined below), has made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and purchase of the Purchased Interests or the value of the Purchased Interests, (ii) that the Seller Parties are not relying upon Buyer or any of their Related Parties in making such Seller's decision to sell the Purchased Interests to Buyer pursuant to this Agreement and (iii) that Buyer is relying upon the truth of the representations and warranties by the Seller  Parties in this <u>Section 3</u> in connection with the purchase of the Purchased Interests hereunder. For purposes of this Agreement, "**Related Parties**" shall mean a party's current and former directors, officers, partners, members, managers, employees, attorneys, agents, successors, assigns, stockholders, owners, representatives, predecessors, parents, affiliates, associates and subsidiaries and each of their respective affiliates.

3.6 <u>Continuing Rights</u>.  The Seller Parties hereby acknowledge that, after Closing, the Seller shall have no rights with respect to the Purchased Interests, as a member or option holder of the Company or otherwise, with respect to any future sale, acquisition, merger, liquidation, dissolution, initial public offering or other corporate event regarding the Company or its assets (any of the foregoing, a "**Corporate Event**").  The Seller Parties further expressly acknowledge that any such Corporate Event may result in the payment by the Company or a third party of assets, funds or other proceeds to the Company's securityholders or an increase

3

in the value of the Company's membership interest such that the value attributed to the Company's membership interest in such Corporate Event may be greater than the Purchase Price.

3.7 Tax Consequences.  The Seller Parties have had an opportunity to review the federal, state and local tax consequences of the sale of the Purchased Interests to Buyer and the transactions contemplated under this Agreement with its own tax advisors.  The Seller Parties are relying solely on such advisors and not on any statements or representations of Buyer or the Company (except for the representations and warranties of Buyer contained in Section 4 of this Agreement).  The Seller Parties understand that the Seller (and not Buyer or the Company) shall be responsible for the Seller's own tax liability that may arise as a result of the transactions contemplated under this Agreement.

4.   **Representations, Warranties and Covenants of Buyer.  Buyer hereby represents and warrants to the Seller Parties as follows:**

4.1 Organization and Authority of Buyer.

(a)   Buyer is a corporation duly organized, validly existing and in good standing under the Laws of Delaware and has the requisite corporate or similar power and authority to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated by this Agreement.

(b)   The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of Buyer and no other corporate, shareholder, member or similar proceedings or actions by Buyer are necessary to authorize and consummate this Agreement or the transactions contemplated by this Agreement.

(c)   This Agreement, when delivered by Buyer, and, assuming due authorization, execution and delivery by the other parties hereto, will constitute a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms hereto, except as such enforcement may be limited by the General Enforceability Exceptions.

4.2 No Conflicts; Consents.  The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) contravene any provision of the Organizational Documents of such Buyer or any Law; (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Permit or consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, Contract, lease, sublease, license, Permit, franchise or other instrument or arrangement to which Buyer is a party; or (c) require, with respect to Buyer, the consent or Permit of any Person (including any Governmental Authority) under any Law or agreement which has not already been obtained.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or

4

with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

4.3 <u>Investment Purpose</u>. Buyer is acquiring the Purchased Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Purchased Interests are not registered under the Securities Act of 1933, as amended, or any state securities Laws, and that the Purchased Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities Laws and regulations, as applicable.

4.4 <u>Brokers or Finders</u>. Buyer has not entered into any agreement or arrangement entitling any broker, finder, investment banker or other firm or Person to any brokerage, finder's or other fee, commission or expense payable by the Seller Parties or the Company in connection with the Transaction.

4.5 <u>Legal Proceedings</u>. There are no Actions pending or, to the Knowledge of Buyer, threatened against or by Buyer or any of its Affiliates that (a) challenge or question the validity of this Agreement or the consummation of the transactions contemplated hereby or (b) seek to enjoin, prevent or otherwise delay or obtain monetary damages in respect of this Agreement or the consummation of the transactions contemplated hereby.

5. **Restrictive Covenants.**

5.1 <u>Covenant Not to Solicit or Hire</u>. The Seller Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the second (2nd) anniversary of the Closing Date, except pursuant to a written agreement with the Buyer, the Seller Parties shall not (i) solicit, contact, recruit, induce, or encourage any employee, consultant or other service provider of the Company, any of its subsidiaries, the Buyer or any of their respective Affiliates ("**Restricted Persons**") to leave the employ of or cease providing services to the Buyer, the Company, or any of its subsidiaries or any of their respective Affiliates or subsidiaries, (ii) hire, employ, recruit, or otherwise engage any Restricted Person, or (iii) take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any Restricted Person to terminate his, her or its employment or engagement with the Buyer, the Company or any of its subsidiaries, or any of their respective Affiliates or subsidiaries; <u>provided</u>, that the foregoing shall not prohibit any Person from making general employment solicitations through advertisements in publicly available media so long as such advertisements are not specifically targeted at any Restricted Person and no Restricted Person is hired as a result thereof.

5.2 <u>Non-Competition</u>. The Seller Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the second (2nd) anniversary of the Closing Date, the Seller Parties shall not (i) acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, use or authorize the use of its name in connection with, provide any Intellectual Property to any Person engaged in, operate or in any

5

manner engage in, directly or indirectly, a Competitive Business, anywhere in the United States and any other jurisdiction where the Company or any of its Affiliates conducts business, (ii) take action to interfere with, impair, subvert, disrupt, or alter the relationship, contractual or otherwise, among the Buyer, the Company, their respective Affiliates or their respective subsidiaries and any current or prospective customer, supplier, distributor, developer, service provider, licensor or licensee, or other material business relation of the Buyer, the Company, their respective Affiliates or their respective subsidiaries, (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by the Buyer, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Buyer, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business relation of the Buyer, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person after the Closing Date as it maintained with such Person prior to the Closing Date; provided, however, that neither the Seller Parties nor any of their Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person. For purposes of this Section 5.2, "**Competitive Business**" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that the Company has taken concrete steps towards providing or selling in the Business); provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

5.3 Enforcement.

(a)     The Seller Parties expressly acknowledge and agree that (i) each of the restrictions contained in Sections 5.1 and 5.2 are reasonable in all respects (including with respect to subject matter and time period) and such restrictions are necessary to protect the Buyer's interest in, and value of, the Company's business (including the goodwill inherent therein), (ii) the transactions contemplated by this Agreement constitute good, valid, and binding consideration for the Seller Parties' obligations, covenants, and agreements contained in this Agreement, and (iii) the Buyer would not have entered into this Agreement, the documents entered into in connection herewith, or any of the transactions contemplated thereby or hereby without the restrictions contained in Sections 5.1 and 5.2.

(b)     The Seller Parties expressly acknowledge and agree that the amount of actual damages suffered by the Buyer in the event of an actual or threatened breach of Section 5.1 or Section 5.2 would be difficult or impossible to accurately calculate and there will be irreparable damages to the Buyer in the event of such an actual or threatened breach. Consequently, the Seller Parties expressly acknowledge and agree that, in addition to any other

6

ACTIVE 684264690v10

remedy or relief to which the Buyer may be entitled, in the event of a breach or threatened breach of Section 5.1 or Section 5.2, the Buyer and its successors and assigns shall be entitled to an injunction or injunctions to prevent breaches of any of the terms or provisions of Section 5.1 or Section 5.2, and to enforce specifically the performance by the Seller Parties, and hereby agrees to waive any defense in any suit that the Buyer has an adequate remedy at Law and hereby agrees to waive any requirement to post any bond in connection with obtaining such relief.

(c)     If the final judgment of a court of competent jurisdiction declares that any term or provision of Section 5.1 or Section 5.2 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and Sections 5.1 and 5.2 shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The parties hereto intend that the covenants of Sections 5.1 and 5.2 shall be deemed to be a series of separate covenants, one for each county or province of each and every state, commonwealth, territory or jurisdiction of each county or province anywhere in the world and one for each month of the restricted period specified therein.

(d)     Notwithstanding anything to the contrary set forth herein, the parties acknowledge and agree that Section 5.3 is not intended to be, and is not, an admission or acknowledgement by any Person that money damages or any other monetary payment would be a sufficient remedy for a breach of Section 5.1 or Section 5.2, or that the inability to obtain a monetary remedy by virtue of the limitations in Section 5.3 will limit a party's ability to obtain injunctive relief or specific performance in accordance with Section 5.3.

(e)     The restricted periods set forth in Sections 5.1 and 5.2 shall be tolled, and shall not run, during the period of any breach by the Seller Parties of any of the covenants set forth in Sections 5.1 and 5.2.

6.     **Miscellaneous.**

6.1 Further Assurance. Each party hereby agrees to execute any additional documents and take any additional actions as may be reasonably necessary to carry out the terms of this Agreement.The Seller Parties' Release and Waiver. Each of the Seller Parties, for herself, her immediate family members, itself, its or her Affiliates and their respective equityholders, directors, officers and employees (collectively, the "**Seller Releasing Parties**"), hereby fully and irrevocably waive, release and discharge the Company from any and all Liabilities to, and any and all Actions against, the Seller Releasing Parties, in all capacities arising at or prior to the date hereof, whether arising under any agreement or understanding (in effect on or prior to the date hereof, and including under any indemnification agreements), at Law or in equity, and such Seller Releasing Party shall not seek to recover any amounts in connection therewith or thereunder from the Company; provided, however, that this release expressly does not extend to, and shall not be interpreted to in any way to release, waive, impair or limit any rights or

7

claims of (i) the Beneficial Owner or obligations of the Company relating to or arising out of the Beneficial Owner's Employment Agreement or any of the provisions set forth therein, (ii) the Seller Releasing Parties or obligations of the Buyer or any of its Affiliates relating to or arising out of this Agreement, the Purchase Agreement, the Option Agreement, or any other Transaction Document or any of the provisions set forth herein or therein or (iii) the Seller Releasing Parties or obligations of the Buyer or any of its Affiliates relating to or arising out of the ownership of the Seller of equity interests in LLYC Holding.  In no event may any of the Seller Releasing Parties seek contribution or indemnification from the Buyer in respect of any payments required to be made by any of the Seller Releasing Parties pursuant to this Agreement or the Purchase Agreement. Without limiting the generality of the foregoing, the Seller Parties, on behalf of themselves and the other Seller Releasing Parties, specifically waive the provisions of California Civil Code Section 1542 ("**Section 1542**"), which provides as follows:"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Seller Parties, on behalf of themselves and the other Seller Releasing Parties, expressly, knowingly, and intentionally waives any and all rights, benefits, and protections of Section 1542, and of any other state or federal statute or common law principle limiting the scope of a general release.

6.3 <u>Independent Counsel.</u>  Each of the Seller Parties and Buyer has been provided with an opportunity to consult with its own counsel with respect to this Agreement.

6.4 <u>Expenses.</u>  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

6.5 <u>No Third Party Beneficiaries.</u>  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

6.6 <u>General Provisions</u>.  Section 11.02 (*Notices*), Section 11.03 (*Interpretation*), Section 11.04 (*Headings*), Section 11.05 (*Severability*), Section 11.06 *(Entire Agreement)*, Section 11.07 (*Successors and Assigns*), Section 11.09 (*Amendment and Modification; Waiver*), Section 11.10 (*Governing Law; Submission to Jurisdiction; Waiver of Jury Trial*), Section 11.11 (*Specific Performance*), and Section 11.12 (*Counterparts*) of the Purchase Agreement are hereby incorporated by reference as if set forth herein, *mutatis mutandis*.

[*Signature Page Follows*]

*ACTIVE 684264690v10*

      **IN WITNESS WHEREOF,** each of the parties hereto has duly executed this Membership Interest Purchase Agreement as of the day and year first above written.

**BUYER:**

**LLORENTE & CUENCA USA, INC.**

By: _____
Name: _____
Title: _____

**SELLER:**

**RBW HOLDCO, INC.**

By: _____
Name: _____
Title: _____

**BENEFICIAL OWNER:**

_____
Name:  **REBECCA BAMBERGER**

**COMPANY:**

**REBECCA BAMBERGER WORKS, LLC**

By: _____
Name: _____
Title: _____

*ACTIVE 684264690v10*

**EXHIBIT D**

**HOLDCO LLC AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT E**

**FORM OF RESERVE CLASS B UNITS GRANT AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT F**

**FORM OF CORRESPONDING HOLDCO CLASS B UNITS GRANT AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT C**
**FORM OF OPTION AGREEMENT**

[Attached]

*ACTIVE 684044473v13*

**EXHIBIT D**
**FORM OF ASSIGNMENT**

[Attached]

*ACTIVE 684044473v13*

**Final Form**

## ASSIGNMENT OF MEMBERSHIP INTERESTS

RBW Holdco, Inc., a California corporation ("**Seller**") does hereby assign and transfer unto Llorente & Cuenca USA, Inc., a Delaware corporation ("**Buyer**"), the entirety of Seller's right, title and interest to 80% of the issued and outstanding membership interests (the "**Purchased Interests**") of Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "**Company**").

Seller hereby irrevocably constitutes and appoints the appropriate officer or manager of the Company to transfer the Purchased Interests on the books of the Company to Buyer with full power of substitution in the premises.

Dated effective as of: March ___, 2023.

**RBW Holdco, Inc.**

By: _____
Name: _____
Title: _____

**EXHIBIT E**
**ALLOCATION METHODOLOGY**

[Pending]

**EXHIBIT E**
**ALLOCATION METHODOLOGY**

The Purchase Price and other relevant items required to be allocated pursuant to Section 7.01(b) of the Agreement and applicable law (the "Tax Purchase Price") shall be allocated for income tax purposes among the assets of the Company using the residual method under Treasury Regulation Sections 1.338-6 and 1.338-7, substituting consideration for ADSP. References in this Allocation Methodology to a "Class" of Assets refers to the designated "Class" as defined in Treasury Regulations Section 1.338-6(b)(2). The listing of a class of assets in the table below does not mean that such class of assets is applicable to the transaction. To the extent items below are included as part of the Net Working Capital, the fair market values referred to below for such items shall be equal to with the values used for purposes of calculating such Net Working Capital, as finally determined.

| Class | Amount of Allocation |
|---|---|
| The Tax Purchase Price shall first be allocated to Class I Assets (cash, demand deposits, etc.) to the extent thereof, including for the avoidance of doubt, cash on hand, Restricted Cash, and Minimum Operating Cash Required. | Fair market value, which the parties agree shall be equal to the amounts thereof as of the Closing Date. |
| Second, any remaining Tax Purchase Price shall be allocated to any Assets that are Class II (marketable stock, government securities, etc.) to the extent thereof, in proportion to and to the extent of their fair market values as of the Closing Date. | Fair market value, which the parties agree shall be equal to the amounts thereof taken into account for purposes of calculating Net Working Capital, as finally determined. |
| Third, any remaining Tax Purchase Price shall be allocated to Assets that are Class III assets (i.e., accounts receivable) in proportion to and to the extent of their fair market values. | Fair market value, which the parties agree shall be equal to the amounts thereof taken into account for purposes of calculating Net Working Capital, as finally determined. |
| Fourth, any remaining Tax Purchase Price shall be allocated in proportion to and to the extent of the fair market values as of the Closing Date to Assets that are Class IV assets (inventory, etc.) | Fair market value, which the parties agree shall be equal to the amounts thereof taken into account for purposes of calculating Net Working Capital, as finally determined. |
| Fifth, any remaining Tax Purchase Price shall be allocated to Assets that are Class V assets (all assets other than Class I, II, III, IV, VI, and VII assets) in proportion to and to the extent of their fair market values as of the Closing Date. | Fair market value, which the parties agree shall be equal to their respective book values as of immediately prior to the Closing. |
| Sixth, any remaining Tax Purchase Price shall be allocated to Assets that are Class VI assets (section 197 intangibles, as defined in Code Section 197, except goodwill and going concern value) in proportion to and to the extent of their fair market values as of the Closing | Fair market value, provided that the parties agree , that the fair market value of any covenants not to compete or solicit and similar undertakings shall be treated as no more than $25,000 in the aggregate. |

-2-

| Class | Amount of Allocation |
|---|---|
| Finally, any remaining Tax Purchase Price shall be allocated to Class VII assets (i.e., goodwill and going concern value). | Any remaining Tax Purchase Price after allocation of Tax Purchase Price to all other Classes of Assets in accordance with this Allocation Methodology. |

**EXHIBIT F**
**FORM OF RESTRICTIVE COVENANT AGREEMENT**

[Attached]

Execution Version

## RESTRICTIVE COVENANT AGREEMENT

THIS RESTRICTIVE COVENANT AGREEMENT (this "Agreement") is made and entered into as of March 30, 2023, by and among Llorente & Cuenca USA Inc., a Delaware corporation ("Buyer"), Rebecca Bamberger, a California resident (the "Beneficial Owner") and RBW Holdco, Inc., a California corporation ("Seller" and jointly with the Beneficial Owner, the "Restricted Parties"), and is effective as of the Closing Date, as such term is defined in the Membership Interest Purchase Agreement entered into by and among Buyer, Rebecca Bamberger Works LLC, a Delaware limited liability company (the "Company"), Seller, and the Beneficial Owner.

## RECITALS

A.     Pursuant to the Purchase Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, eighty percent (80%) of the issued and outstanding Membership Interests of the Company (the "Transaction").

B.     The covenants and agreements set forth herein were a material inducement to Buyer to enter into the Purchase Agreement and to perform its obligations thereunder, and Buyer would not have entered into the Purchase Agreement if the Restricted Parties do not agree to enter into this Agreement and provide the covenants and agreements set forth herein, including the covenants set forth in Section 1.

C.     The Beneficial Owner is an equityholder of Seller and an indirect holder of membership interests of the Company and, as such, will derive and receive certain material tangible and intangible benefits from the consummation of the Transaction, and in consideration of such tangible and intangible benefits to be received by the Restricted Parties, the Restricted Parties have agreed to be subject to certain covenants as set forth herein.

D.     The Company is engaged in the business of providing marketing and public relations services (the "Business").

E.     The Beneficial Owner has been active in the management of the Business and intimately involved with the most highly sensitive and confidential information at the Company concerning operations, finances and strategic planning and as such recognizes that the Beneficial Owner's employment or involvement with a competing entity could have a devastating impact on the financial success of the Company, and that such employment or involvement likely would inevitably involve the disclosure and/or use of Confidential Information.

F.     The Company has substantial relationships with its customers, suppliers, employees and other business relations, and the Restricted Parties have and will continue to have access to such persons and derive substantial value from the Confidential Information of the Company and continuing direct or indirect equity interest in the Company.

G.     Buyer has substantial legitimate business interests necessitating the covenants provided in this Agreement, including (but not limited to) substantial relationships with numerous existing and prospective customers and the goodwill of the Company.

H.     In consideration of Buyer entering into the Purchase Agreement, and as a condition of the Closing, Buyer has required the Restricted Parties to agree to be subject to certain covenants by executing and delivering this Agreement.

1

I.        Buyer would not obtain the benefit of the bargain set forth in the Purchase Agreement as specifically negotiated by the parties thereto, and would be substantially harmed, unless this Agreement were specifically performed and enforced.

J.        Any breach of this Agreement by the Restricted Parties would cause immediate irreparable harm to Buyer and the Company, including, without limitation, by the significant loss of goodwill, if the Restricted Parties were to breach this Agreement, or if this Agreement were not specifically performed.

K.        Capitalized terms used but not defined herein shall have the meanings given to them in the Purchase Agreement.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.        <u>Restrictive Covenants</u>.

1.1        <u>Covenant Not to Solicit or Hire</u>. The Restricted Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the fifth (5th) anniversary of the date hereof, except pursuant to a written agreement with Buyer, the Restricted Parties shall not (i) solicit, contact, recruit, induce, or encourage any employee, consultant or other service provider of the Company, any of its subsidiaries, Buyer or any of their respective Affiliates ("<u>Restricted Persons</u>") to leave the employ of or cease providing services to Buyer, the Company, or any of its subsidiaries or any of their respective Affiliates or subsidiaries, (ii) hire, employ, recruit, or otherwise engage any Restricted Person, or (iii) take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any Restricted Person to terminate his, her or its employment or engagement with Buyer, the Company or any of its subsidiaries, or any of their respective Affiliates or subsidiaries; <u>provided</u>, that the foregoing shall not prohibit any Person from making general employment solicitations through advertisements in publicly available media so long as such advertisements are not specifically targeted at any Restricted Person and no Restricted Person is hired as a result thereof.

1.2        <u>Non-Competition</u>. The Restricted Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the fifth (5th) anniversary of the date hereof, the Restricted Parties shall not directly or indirectly (i) acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, use, register or authorize anyone to use or register Beneficial Owner's name in connection with, provide or otherwise grant any rights with respect to any Intellectual Property to any Person engaged in, operate or in any manner engage in, directly or indirectly, a Competitive Business, anywhere in the United States, (ii) take action to interfere with, impair, subvert, disrupt, or alter the relationship, contractual or otherwise, among Buyer, the Company, their respective Affiliates or their respective subsidiaries and any current or prospective customer, supplier, distributor, developer, service provider, licensor or licensee, or other material business relation of Buyer, the Company, their respective Affiliates or their respective subsidiaries, (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by Buyer, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of Buyer, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the

2

effect of discouraging any lessor, licensor, customer, supplier or other business relation of Buyer, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person after the Closing Date as it maintained with such Person prior to the Closing Date; provided, however, that neither the Restricted Parties nor any of their Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person.

1.3    Confidentiality. The Restricted Parties agree that the Restricted Parties shall keep the Confidential Information strictly confidential and shall not, and shall cause its and its Affiliates' employees, officers, directors, managers and agents not to, disclose (except as expressly permitted by this Agreement) any portion of the Confidential Information to any Person; provided that in the event that any Person subject to confidentiality under this Agreement is compelled by applicable Law (including by request for information or documents in any legal Proceeding, interrogatory, discovery requests, subpoena, civil investigative demand, or similar process or otherwise) to disclose any Confidential Information, the Restricted Parties shall promptly notify (unless prohibited by Law) Buyer in writing of such requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Agreement applicable to such portion of the Confidential Information. If, in the absence of a protective order or the receipt of a waiver hereunder, such Person, on the written opinion of outside legal counsel, is required to disclose any Confidential Information, such Person may disclose only that portion of such Confidential Information that such Person is required to disclose; provided, however, that such Person shall use its reasonable best efforts to obtain a protective order or other assurance that confidential treatment will be accorded such Confidential Information by such Person.

1.4    Non-Disparagement. The Restricted Parties shall not, and shall cause their Affiliates not to, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Company, any of its subsidiaries, the Business, Buyer or any of their respective Affiliates, or in the good faith performance of Restricted Parties' duties to Company and its Affiliates while such Restricted Party is employed by Company or any of its Affiliates (and in such good faith performance, solely in internal communications with other officers of the Company and other members of the board of managers of the Company), make any derogatory or disparaging statement or communication regarding the Company, any of its subsidiaries, or their respective Affiliates or employees.  The Buyer shall cause its and its Affiliates' respective officers and managers not to, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Restricted Parties or any of their respective Affiliates or in connection with the Company's or Buyer's good faith assessment of Beneficial Owner's performance of her duties to the Company and its Affiliates, make any derogatory or disparaging statement or communication regarding the Restricted Parties, or their respective Affiliates.  Nothing in this Section 1.4 shall limit any Restricted Party's or Buyer's or any of their respective Affiliates' ability to make true and accurate statements or communications in connection with any disclosure such party or its Affiliates reasonably believe is required pursuant to applicable Law.

2.    Enforcement.

2.1    The Restricted Parties expressly acknowledge and agree that (A) each of the restrictions contained in Section 1 are reasonable in all respects (including with respect to subject matter and time period) and such restrictions are necessary to protect Buyer's interest in, and value of, the Company's business (including the goodwill inherent therein), (B) the transactions contemplated by this Agreement constitute good, valid, and binding consideration for the Restricted Parties' obligations, covenants, and agreements contained in this Agreement, and (C) Buyer would

3

not have entered into this Agreement, the documents entered into in connection herewith, or any of the transactions contemplated thereby or hereby without the restrictions contained in Section 1.

2.2     The Restricted Parties expressly acknowledge and agree that the amount of actual damages suffered by Buyer in the event of an actual or threatened breach of Section 1 would be difficult or impossible to accurately calculate and there will be irreparable damages to Buyer in the event of such an actual or threatened breach. Consequently, the Restricted Parties expressly acknowledge and agree that, in addition to any other remedy or relief to which Buyer may be entitled, in the event of a breach or threatened breach of Section 1, Buyer and its successors and assigns shall be entitled to an injunction or injunctions to prevent breaches of any of the terms or provisions of Section 1, and to enforce specifically the performance by the Restricted Parties, and hereby agrees to waive any defense in any suit that Buyer has an adequate remedy at Law and hereby agrees to waive any requirement to post any bond in connection with obtaining such relief.

2.3     If the final judgment of a court of competent jurisdiction declares that any term or provision of Section 1 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and Section 1 shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The parties hereto intend that the covenants of Section 1 shall be deemed to be a series of separate covenants, one for each county or province of each and every state, commonwealth, territory or jurisdiction of each county or province anywhere in the world and one for each month of the restricted period specified therein.

2.4     Notwithstanding anything to the contrary set forth herein, the parties acknowledge and agree that Section 2 is not intended to be, and is not, an admission or acknowledgement by any Person that money damages or any other monetary payment would be a sufficient remedy for a breach of Section 1, or that the inability to obtain a monetary remedy by virtue of the limitations in Section 2 will limit a party's ability to obtain injunctive relief or specific performance in accordance with Section 2.

2.5     The restricted period set forth in Section 1 shall be tolled, and shall not run, during the period of any breach by the Restricted Parties of any of the covenants set forth in Section 1.

3.      Definitions.

"Competitive Business" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that the Company has taken concrete steps towards providing or selling in the Business); provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

"Confidential Information" means all information (regardless of whether specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by the Restricted Parties or the respective employees, consultants or advisors of the Restricted Parties or the Company, as the case may be, that relates to the Business, products, operations, financial condition,

4

services, research or development of the Company or any of their respective customers, vendors, suppliers, independent contractors or other business relations, including: (a) internal business information (including information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, the Company their respective clients and suppliers and confidential information; (c) industry research compiled by, or on behalf of, the Company, including identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, the Company; (d) compilations of data and analyses, processes, methods, track and performance records, data and databases relating thereto; (e) personally identifiable information of the Company's customers; and (f) information related to the Company's Intellectual Property and updates of any of the foregoing; provided, however, that "Confidential Information" shall not include any information that (A) is or becomes generally known in the trade or industry or available to the public other than as a result of a breach by the Restricted Parties of this Agreement; (B) becomes available to the Restricted Parties on a non-confidential basis from a source other than the Company, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company or any other party with respect to such information; or (C) is developed by the Restricted Parties without use of or reference to the Confidential Information.

4.    Entire Agreement; Amendment.  This Agreement and the other agreements referred to herein constitute the entire agreement between the parties hereto relating to the subject matter hereof, and all prior agreements, correspondence, discussions and understandings of the parties (whether written or oral) are merged herein and made a part hereof, it being the intention of the parties hereto that this Agreement and the other agreements referred to herein shall serve as the complete and exclusive statement of the terms of their agreement together; provided, that the Restrictive Covenants are independent of, supplemental to and do not modify, supersede or restrict (and shall not be modified, superseded by or restricted by) any non-competition, non-solicitation, non-hire, non-disparagement, confidentiality or other similar covenants in any other current or future agreement to which any of the Restricted Parties are a party unless express written reference is made to the specific provisions hereof which are intended to be superseded.  The recitals to this Agreement are an integral part hereof and are hereby incorporated into this Agreement for all purposes.  No amendment, waiver or modification hereto or hereunder shall be valid unless in a writing signed by an authorized signatory of the party or parties affected thereby.

5.    Waiver.  The waiver by any party of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

6.    Successors and Assigns; Third Party Beneficiaries.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Restricted Parties, Buyer and each of their respective successors and permitted assigns; provided, that this Agreement and the rights and obligations of the Restricted Parties hereunder shall not be assigned or delegated.  Each of Buyer's Affiliates will have the right to enforce all of the covenants of the Restricted Parties under this Agreement as if parties hereto and shall be express third party beneficiaries hereof.  Except as set forth in the preceding sentence, this Agreement is not intended for the benefit of any Person other than the parties hereto, and no such other Person shall be deemed to be a third party beneficiary hereof.

7.    Binding Effect.  This Agreement shall be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.

8.    Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.  Section 11.10 of the Purchase Agreement is incorporated herein by reference, *mutatis, mutandis*.

*ACTIVE 685405026v6*

9.    Partial Invalidity.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law.  If any provision of this Agreement or the application thereof to any person, entity or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.  If it is determined by a court of competent jurisdiction that any covenant in this Agreement is excessive in duration or is unreasonable or unenforceable under applicable Law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the Laws of that jurisdiction.

10.    Notices.    All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10):

|  |  |
|---|---|
| If to Seller or the Beneficial Owner: | Rebecca Bamberger |
| Address: | 2855 5th Avenue, #802, San Diego, CA 92103 |
| E-mail: | rebecca@bamtheagency.com |
| with a copy to: | Sheppard, Mullin, Richter & Hampton LLP |
| Address: | 12275 El Camino Real, Suite 100 San Diego, CA 92130 |
| E-mail: | slasala@sheppardmullin.com |
| Attention: | Stephen LaSala |
| If to Buyer: | Llorente & Cuenca USA, Inc. c/o Llorente & Cuenca S.L. |
| Address: | Calle Lagasca 88 28001 Madrid, Spain |
| E-mail: | jpocana@llorenteycuenca.com |
| Attention: | Juan Pablo Ocaña |
| with a copy to: | Greenberg Traurig, P.A. |
| Address: | 333 SE 2nd Avenue Suite 4400 Miami, FL 33131 |
| E-mail: | antonio@gtlaw.com |
| Attention: | Antonio Peña, Esq. |

11.    Counterparts; Facsimile Copy.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  This Agreement may be executed in facsimile copy or by other electronic means with the same binding effect as the original.

6

12.    <u>Reporting and Disclosures</u>. Each of Buyer and the Restricted Parties understand that nothing in this Agreement is intended, or shall be construed, to prohibit the Restricted Parties from reporting possible violations of federal or state law or regulation to any governmental agency or entity, including, but not limited to, the U.S. Department of Justice, the Securities and Exchange Commission, or any other relevant authority, or making other disclosures that are protected under the whistleblower provisions of applicable laws or regulations. The Restricted Parties understand that, to the extent permitted by such laws or regulations, the Restricted Parties do not require the prior authorization of the Company or Buyer to make any such reports or disclosures and the Restricted Parties are not required to notify the Company or Buyer that the Restricted Parties have made such reports or disclosures.

[<em>Signature page follows</em>]

7

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day, month and year first above written.

**BUYER**:

Llorente & Cuenca USA, Inc.

By: _____

Name: _____

Title: _____

**BENEFICIAL OWNER**:

_____

Rebecca Bamberger

**SELLER**:

RBW Holdco, Inc.

By: _____
Name: _____
Title: _____

**EXHIBIT G**
**FORM OF HOLDCO LIMITED LIABILITY COMPANY AGREEMENT**

[Attached]

*ACTIVE 684044473v13*

Final Form

**OPERATING AGREEMENT**

**OF**

**BAM MANAGEMENT HOLDCO, LLC**

*ACTIVE 685825781v8*

TABLE OF CONTENTS

Article I

DEFINITIONS

1.1      Definitions..................................................................................................................1
1.2      Other Definitions .......................................................................................................5
1.3      Interpretations and Rules of Construction .................................................................5

Article II

FORMATION; ORGANIZATION

2.1      Formation....................................................................................................................6
2.2      Name ...........................................................................................................................6
2.3      Purpose and Powers ....................................................................................................6
2.4      Office ..........................................................................................................................6
2.5      Term ............................................................................................................................6
2.6      Ownership of Company Property ................................................................................6
2.7      Registered Office and Registered Agent.....................................................................6
2.8      No State Law Partnership ...........................................................................................7

Article III

UNITS, CAPITAL CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT
OF CAPITAL ACCOUNTS

3.1      Units Generally ..........................................................................................................7
3.2      Authorization and Issuance of Class A Units ............................................................7
3.3      Authorization and Issuance of Class B Units .............................................................7
3.4      Terms of Class B Units ...............................................................................................8
3.5      Nature of Interests.......................................................................................................9
3.6      Capital Accounts .........................................................................................................9
3.7      Negative Capital Accounts .........................................................................................9
3.8      Certification of Units ..................................................................................................9

Article IV

ALLOCATIONS

4.1      Allocations of Net Income and Net Loss...................................................................10
4.2      Tax Allocations..........................................................................................................11
4.3      Other Allocations .......................................................................................................11

## Article V

## DISTRIBUTIONS

5.1      General ........................................................................................................12
5.2      Distributions to Class B Members ............................................................12
5.3      Distributions to Class A Members ............................................................12
5.4      Tax Distributions ......................................................................................12
5.5      Receipt of Fair Value ................................................................................12
5.6      Withholding ..............................................................................................12

## Article VI

## MANAGEMENT OF THE COMPANY; INFORMATION

6.1      Management by the Manager ......................................................................14
6.2      Expenses; Compensation of Manager ........................................................14
6.3      Restriction on Capitalization Information .................................................14
6.4      Limited Liability .......................................................................................14
6.5      Indemnification .........................................................................................15

## Article VII

## MEMBERS

7.1      No Agency or Authority ............................................................................16
7.2      Power of Attorney .....................................................................................16
7.3      Voting ........................................................................................................16
7.4      Transfer of Units .......................................................................................16
7.5      No Resignation, Withdrawal or Borrowing ..............................................17
7.6      Admission of Additional Members ...........................................................18
7.7      Company's Repurchase Rights on Termination of Employment, Sale of Corresponding RBW Class B Units, or Otherwise ..................................18
7.8      Exchange of Units of the Company for Corresponding Units of RBW ....18
7.9      Restrictive Covenants ...............................................................................19

## Article VIII

## BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS, FISCAL YEAR, BANKING AND TAX MATTERS

8.1      Accounting, Books and Records ................................................................20
8.2      Reports, Returns and Audits .....................................................................21
8.3      Fiscal Year ................................................................................................21
8.4      Method of Accounting ...............................................................................21
8.5      Company Funds .........................................................................................21
8.6      Partnership Representative ........................................................................21

*ACTIVE 685825781v8*

8.7       Other Information ...................................................................................................22

## Article IX

## DISSOLUTION OF THE COMPANY

9.1       Dissolution ...........................................................................................................22
9.2       Winding Up of the Company.................................................................................22
9.3       Liability for Return of Capital Contributions .......................................................23

## Article X

## MISCELLANEOUS

10.1      Amendment............................................................................................................23
10.2      Notices ..................................................................................................................23
10.3      Entire Agreement..................................................................................................24
10.4      Governing Law; Venue; Attorney's Fees .............................................................24
10.5      Counterparts ..........................................................................................................25
10.6      No-Waiver..............................................................................................................25
10.7      Further Assurances................................................................................................25
10.8      Spouses of Members ..............................................................................................25

Schedule A     Members
Exhibit A      Joinder Agreement
Exhibit B      Spousal Consent

# OPERATING AGREEMENT

## OF

## BAM MANAGEMENT HOLDCO, LLC

THE LIMITED LIABILITY COMPANY INTERESTS AND UNITS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY SIMILAR STATE STATUTE IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION AS PROVIDED IN THOSE STATUTES.

THE SALE OR OTHER DISPOSITION OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS IS RESTRICTED, AS SET FORTH IN THIS OPERATING AGREEMENT, AND THE EFFECTIVENESS OF ANY SUCH SALE OR OTHER DISPOSITION MAY BE CONDITIONED UPON THE RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE STATUTES.

BY ACQUIRING LIMITED LIABILITY COMPANY INTERESTS OR UNITS REPRESENTED BY THIS OPERATING AGREEMENT, A MEMBER REPRESENTS THAT IT WILL NOT SELL OR OTHERWISE DISPOSE OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID STATUTES AND THE RULES AND REGULATIONS THEREUNDER

**OPERATING AGREEMENT**
**OF**
**BAM MANAGEMENT HOLDCO, LLC**

THIS OPERATING AGREEMENT (the "Agreement") is made effective as of March __, 2023 (the "Effective Date"), by and among BAM Management Holdco, LLC, a Delaware limited liability company (the "Company"), Llorente & Cuenca USA, Inc., a Delaware corporation ("LLYC") , and the Persons named in Schedule A attached hereto and made a part hereof (together with LLYC, each a "Member" and collectively, the "Members"), and such other Persons as may be admitted as a member of the Company pursuant to the terms of this Agreement by executing a Joinder Agreement.

**RECITALS**

**WHEREAS**, the Company was formed as a limited liability company under the Act, as amended, by the filing of a certificate of formation with the Secretary of State of the State of Delaware on March 20, 2023 (the "Certificate of Formation"); and

**WHEREAS**, the Members intend to enter into this Agreement in order to define and express all of their respective rights and obligations with respect to, among other matters (i) their Interests in the Company, and (ii) the operation of the Company as a limited liability company.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**

**DEFINITIONS**

1.1    Definitions.  Capitalized terms used in this Agreement shall have the following meaning:

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq*., as amended.

"Adjusted Capital Account Balance" of a Member as of any date means the balance in such Member's Capital Account as of such date (a) increased by any amount such Member is deemed obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-l(b)(2)(ii)(c) or is deemed obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Treasury Regulation Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) reduced by any allocations or distributions to such Member described in Treasury Regulation Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with Treasury Regulation Section 1.704-1(b)(2)(ii)(d) to the extent relevant thereto and is to be interpreted consistently therewith.

1

ACTIVE 685825781v8

"Affiliate" means, with respect to any specified Person, a Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Agreement, as amended, supplemented or restated from time to time.

"Book Value" of an asset means its adjusted basis for federal income tax purposes, subject to the following provisions. The initial Book Value of an asset contributed by a Member is its gross Fair Market Value as initially recorded on the Company's books. Company assets shall be revalued (i) when and as contemplated by Treasury Regulations Section 1.704-1(b)(2)(iv)(e), and, (ii) if the Manager determines in its discretion that a revaluation is necessary to reflect economic arrangements among Members, when and as contemplated by Treasury Regulations Section 1.704-1(b)(2)(iv)(f). Upon any such revaluation, Book Values shall be adjusted to equal the revalued amounts. Book Values shall be reduced for cost recovery deductions, determined pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3). This paragraph is to be interpreted in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv) and the Book Value of an asset shall be determined in a manner consistent with said Treasury Regulations.

"Business" means the business of providing marketing and public relations services.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California, or Madrid, Spain are authorized or required by law to be closed for business.

"Capital Account" of a Member means the account maintained by the Company for each Member pursuant to Section 3.6 of which the initial balance for each Member is set forth on Schedule A.

"Capital Contributions" of a Member means the amount of cash and/or the Fair Market Value of property (net of liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) contributed by such Member to the Company, as set forth on Schedule A, as such Schedule may be amended from time to time.

"Certificate of Formation" has the meaning set forth in the recitals.

"Class A Member" means a Member that holds Class A Units.

"Class A Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class A Units" in this Agreement.

"Class B Member" means a Member that holds Class B Units.

"Class B Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class B Units" in this Agreement. The

2

Company shall issue one (or fraction of one) Class B Unit to the appropriate Member in exchange for each Corresponding RBW Class B Unit (or fractional Corresponding RBW Class B Unit) issued to the Company by RBW in accordance with the terms and conditions of the applicable Corresponding RBW Class B Unit grant agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble to this Agreement.

"Competitive Business" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that RBW has taken concrete steps towards providing or selling in the Business).

"Confidential Information" has the meaning set forth in Section 7.9(a).

"Corresponding RBW Class B Unit" means in respect of a Class B Unit issued by the Company, the RBW "Class B Unit", issued pursuant to the terms of the RBW LLC Agreement, held by the Company to which such Class B Unit relates.

"Covered Person" means any Person who is (i) a Member, (ii) an officer, director, limited liability company manager, trustee, employee, agent or representative of a Member or of any controlling Affiliate, shareholder, partner or member of a Member, (iii) the Partnership Representative, or (iv) a director, limited liability company manager (including the Manager), officer, partnership representative, agent or representative of the Company or any of its subsidiaries, in each case in such Person's capacity as such.

"Designated Member" means that Member of the Company who is designated in the Corresponding RBW Class B Unit grant agreement to receive a grant of Class B Units from the Company.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Fair Market Value" means with respect to any item, the price (in cash or other consideration) at which said item would be sold in a sales transaction between a willing buyer and a willing seller negotiating on arms'-length terms. The Fair Market Value of an item shall be deemed for all purposes to be equal to the Fair Market Value of such item as determined by the Manager and specified in writing pursuant to a duly adopted resolution of the Manager, so long as such determination is reasonable and made in good faith by the Manager.

"Fiscal Year" has the meaning set forth in Section 8.3.

"GAAP" means the United States of America generally accepted accounting principles, consistently applied (except as may be required by changes in such principles).

"Indemnitee" has the meaning set forth in Section 6.5(a).

3

ACTIVE 685825781v8

"Interest" means a Member's economic rights, voting rights, other interest in the Company as a Member as provided in this Agreement or the Act (based on the type, class, or series of Unit or Units held by such Member).

"Joinder Agreement" has the meaning set forth in Section 3.3(b).

"LLYC" means Llorente & Cuenca USA, Inc., a Delaware corporation.

"Manager" has the meaning set forth in Section 6.1.

"Member" means each of the Persons listed on Schedule A hereto, and any Person admitted to the Company as a Member following the Effective Date; but, in each case, only for so long as such Person is the owner of one or more Units.

"Net Income" and "Net Loss" for each Fiscal Year or part thereof means the income and loss of the Company for that period as allocated to the Company from RBW, plus any other income or loss recognized by the Company for income tax purposes.

"Partnership Representative" has the meaning set forth in Section 8.6.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, government or any agency or political subdivision thereof.

"RBW" means Rebecca Bamberger Works, LLC, a Delaware limited liability company.

"RBW LLC Agreement" means the Amended and Restated Operating Agreement of RBW, effective as of March __, 2023, as the same may be amended from time to time.

"Restricted Parties" means, collectively, the Class B Members, and their respective equity holders.

"Restricted Territory" means the United States and any other jurisdiction where the Company or any of its Affiliates conducts business.

"Spousal Consent" has the meaning set forth in Section 10.8.

"Substitute Member" means any Person who (i) holds Units, and (ii) has been admitted as a Member pursuant to Section 7.4(b).

"Tax Distributions" means distributions made to the members of RBW pursuant to Section 5.7 of the RBW LLC Agreement.

"Transfer" means any transfer, assignment, sale, conveyance, lease, partition, pledge or grant of a security interest in a Member's Interest in the Company, and includes any "involuntary transfer" such as a sale of any part of an Interest therein in connection with any bankruptcy or similar insolvency proceedings, or a divorce or other marital settlement involving any Member, or any other disposition or encumbrance of a Member's Interest.  For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges) of the stock, partnership,

4

membership or other ownership interests of any Member that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Member, and any similar transactions involving the stock or other ownership interests of such Member), the effect of which is that the Persons who owned more than fifty percent (50%) of the outstanding stock or other ownership interests in such Member as of the Effective Date no longer control such Member, including loss of control as a result of not owning more than fifty percent (50%) of such stock or other ownership interests, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Member. Capitalized terms containing such word as a root, such as "Transferee" or "Transferring," shall have corresponding meanings in this Agreement.

"Treasury Regulations" means the final and temporary income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unit" means a unit representing a fractional part of the Interests of the Members and shall include all types, classes, and series of Units issued hereunder, including the Class A Units and the Class B Units; provided, that any type, class, or series of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in this Agreement with respect to such type, class, or series of Unit and the Interests represented by such type, class, or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

"Withheld Amount" has the meaning set forth in Section 5.6(b).

1.2     Other Definitions. As used in this Agreement, accounting terms to the extent they are not defined in this Agreement, have the respective meanings given to them under GAAP.

1.3     Interpretations and Rules of Construction. In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)     when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation;"

(d)     the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular Article or Section of this Agreement;

5

(e) all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; and

(g) references to a Person are also to its successors and permitted assigns.

## ARTICLE II

## FORMATION; ORGANIZATION

2.1 Formation. The Company was organized as a limited liability company by the filing of the Certificate of Formation pursuant to the Act with the Secretary of State of Delaware on March 20, 2023.

2.2 Name. The name of the Company is "BAM Management Holdco, LLC" and shall operate under such name, or such other name as may from time to time be selected by the Manager.

2.3 Purpose and Powers. The Company is formed to engage in the business of acquiring, owning and disposing equity interests in RBW, as well as to engage in any other business activity permitted by the Act and approved by the Manager. The Company shall have the power and authority to take any and all actions necessary, appropriate, desirable, advisable, incidental or convenient to, or for the furtherance of, the purposes set forth in this Section 2.3, directly or indirectly through other Persons, alone or with others.

2.4 Office. The principal place of business of the Company shall be located at such location as the Manager may determine from time to time. The Manager may establish other places of business of the Company when and where required by or advisable for the Company's business.

2.5 Term. The term of the Company commenced with the filing of the Certificate of Formation with the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with this Agreement and the Act.

2.6 Ownership of Company Property. All property acquired by the Company, real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest therein solely due to its capacity as a Member.

2.7 Registered Office and Registered Agent. The registered agent and registered office of the Company required by the Act to be maintained in the State of Delaware shall be as provided in the Certificate of Formation or such other registered agent or office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by applicable law.

6

2.8     No State Law Partnership.  The Company (a) shall be taxed as a partnership for all applicable federal, state and local income tax purposes and (b) shall not be a partnership or joint venture for any other purpose, and no Member shall, by virtue of this Agreement, be a partner or joint venturer of any other Member.

## ARTICLE III

### UNITS, CAPITAL CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT OF CAPITAL ACCOUNTS

3.1     Units Generally.

(a)     The Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes, or series. The Company is initially authorized to issue the Class A Units authorized under Section 3.2 and the Class B Units authorized under Section 3.3 on the date hereof. Each type, class, or series of Units shall have the privileges, preference, duties, liabilities, obligations, and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class, or series. No Units or other Interests shall be issued unless they have been authorized for issuance by the Manager under the terms of this Agreement.  The total number of Units the Company shall have the authority to issue shall not be limited.

(b)     The names, number and class of Units are set forth on Schedule A attached hereto and incorporated herein.  The Company shall amend and revise Schedule A from time to time to properly reflect any changes to the information included therein, including to reflect the admission or substitution of Members, the withdrawal of any Members, any cancellation or forfeiture of Class B Units, any reduction in Units of any Member, Transfers of Units or the issuance of additional Units, in each case in accordance with, and subject to the express terms and conditions of, this Agreement.  For the avoidance of doubt, any such amendment or revision to Schedule A or to the Company's records to reflect information regarding Members shall be deemed not to be an amendment to this Agreement for purposes of Section 10.1.

(c)     After the Effective Date, no Member shall be required to make any Capital Contributions to the Company.

3.2     Authorization and Issuance of Class A Units.  The Company is hereby authorized to issue Units designated as Class A Units. As of the date hereof, the Class A Units are issued and outstanding to the Class A Members in the amounts set forth on Schedule A opposite each such Class A Member's name. The Class A Units shall entitle its holder to vote on all matters required or permitted to be voted on by the Members.

3.3     Authorization and Issuance of Class B Units.

(a)     On the Effective Date, upon the issuance of the Corresponding RBW Class B Units by RBW to the Company, the Company shall, in turn, grant, to the Designated Member set forth in the grant agreement governing the Corresponding RBW Class B Unit, one (or fraction thereof) Class B Unit for each Corresponding RBW Class B Unit so granted to the

7

Company. As of the date hereof, the Class B Units are issued and outstanding to the Class B Members in the amounts set forth on Schedule A opposite each such Class B Member's name. The Class B Units shall be non-voting.

(b)     Upon each subsequent date that RBW shall issue any Corresponding RBW Class B Unit to the Company, the Company shall, in turn, issue to the Designated Member set forth in the grant agreement governing such Corresponding RBW Class B Unit, one (or fraction thereof) Class B Unit for each Corresponding RBW Class B Unit so issued to the Company.

(c)     Notwithstanding anything herein to the contrary, with respect to each issuance of Class B Units to a Designated Member under Sections 3.3(a) and (b), the Manager shall cause the Company to issue the Class B Units to the Designated Member having the same economic characteristics as the Corresponding RBW Class B Unit issued by RBW to the Company pursuant to, and in accordance with, the terms and conditions of this Agreement, the RBW LLC Agreement and any applicable grant agreement governing the Corresponding RBW Class B Units or such Class B Units. The determination of Units held by the Company corresponding to a Member's Class B Units shall be made by the Manager; provided, that to the extent any Person who so receives such Units is not an existing Member, such Person shall be admitted as an additional Member with the consent of the Manager by executing a joinder to this Agreement in substantially the form of Exhibit A hereto (the "Joinder Agreement").

(d)     Each Person who receives a Class B Unit shall make a timely and effective protective election under Section 83(b) of the Code with respect to such Class B Units and shall promptly provide a copy of such election to the Company. The Members and the Company intend that each Class B Unit shall constitute a "profits interest" under IRS Revenue Procedures 93-27 and 2001-43 and such other Treasury Regulations or authorities as may be promulgated with respect to profits interests and similar equity interests, and this Agreement shall be interpreted and applied consistently with such intent. The Manager is authorized to take such actions as it may deem necessary in its sole discretion to carry out such intent, including the making of any elections, filing of any documentation, or amending of this Agreement. The Members agree to take such actions as may be reasonably requested by the Company in connection therewith.

3.4     Terms of Class B Units.   Each Member acquiring Class B Units hereby acknowledges and agrees that (a) each Class B Unit derives various economic and other characteristics from the terms and conditions applicable to the Corresponding RBW Class B Unit as set forth in the RBW LLC Agreement, including without limitation with respect to conditions to issuance, vesting, forfeiture, Transfer, repurchase, cancellation, subdivision, combination, distribution and liquidation; (b) a Class B Unit may be subject to all of the terms and conditions of any applicable grant agreement governing the Corresponding RBW Class B Unit or such Class B Unit and all the terms and conditions applicable to the Corresponding RBW Class B Unit and such Class B Unit as set forth in any such grant agreement, including without limitation with respect to conditions to issuance, vesting, forfeiture, Transfer, repurchase, cancellation, subdivision, combination, distribution and liquidation; and (c) such Member will, as a condition to such Member's right to retain certain of the Class B Units issued to such Member, take all such actions that a Person is required to take under the RBW LLC Agreement or any grant agreement with respect to any elections to be made under the Code.

8

ACTIVE 685825781v8

3.5     Nature of Interests.  The Units and all other Interests shall for all purposes be personal property. No Member has any interest in specific Company property. Each Member hereby waives any and all rights such Person may have to initiate or maintain any suit or action for partition of the Company's assets.

3.6     Capital Accounts.  An individual Capital Account shall be established and maintained for each Member in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall be increased by (a) the amount of money contributed by such Member to the Company, (b) the Fair Market Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), (c) the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member, and (d) allocations to such Member of Net Income (or items thereof). Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Fair Market Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Loss (or items thereof). The Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and, as applicable, in accordance with the other provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) and Section 1.704-1(b)(4). On the Transfer of all or a portion of a Member's Units, the Capital Account of the transferor that is attributable to the Transferred Units shall carry over to the transferee in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(1).

3.7     Negative Capital Accounts.  No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including, without limitation, any such deficit or negative balance as may exist upon and after dissolution of the Company).

3.8     Certification of Units.

(a)     The Manager in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Members.

(b)     In the event that the Manager shall issue certificates representing Units in accordance with Section 3.8(a), then in addition to any other legend required by applicable law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN

9

ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

# ARTICLE IV

## ALLOCATIONS

4.1     Allocations of Net Income and Net Loss.

(a)     Net Income and Net Losses (or items thereof) of the Company for any Fiscal Year or period shall be allocated to the Members in such manner and proportion as may be determined in the discretion of the Manager from time to time, so as to ensure (to the extent possible) that the balances of the Adjusted Capital Accounts of the Members shall reflect the then current entitlement of the Members to receive future distributions in accordance with this Agreement; provided, however, that to the extent the Manager determines it advisable to make such allocations, Net Income and Net Losses (or items thereof) of the Company attributable to a Corresponding RBW Class B Unit, as determined in the discretion of the Manager, shall be allocated to the Designated Member to whom such Corresponding RBW Class B Unit corresponds.  Notwithstanding the foregoing, (i) to the extent that any allocation of Net Losses pursuant to this Section 4.1 would cause or increase a deficit balance in a Member's Adjusted Capital Account, such portion of such Net Losses shall be reallocated among the Members with positive Adjusted Capital Account Balances, pro rata in accordance with such positive balances, until no Member has a positive Adjusted Capital Account Balance, and (ii) to the extent that any allocations were made pursuant to clause (i) above, then Net Income shall be allocated to the Members until the aggregate amount of Net Income allocated under this clause (ii) is equal to the aggregate amount of Net Losses allocated pursuant to clause (i).

(b)     Prior to giving effect to the allocations in Section 4.1(a), appropriate adjustments shall be made to the allocations to the extent required to comply with the "qualified income offset," "minimum gain chargeback," "partner nonrecourse debt minimum gain chargeback," "nonrecourse deductions" and "partner nonrecourse deductions" rules of the Treasury Regulations promulgated pursuant to Section 704(b) of the Code. To the extent permitted by such Treasury Regulations, the allocations in such year and subsequent years shall be further adjusted so that the cumulative effect of all the allocations shall be the same as if all such allocations were made pursuant to the allocation provisions hereof without regard to this Section 4.1(b).

4.2     Tax Allocations.

10

(a)     For federal, state and local income tax purposes, all items of taxable income, gain, loss, and deduction for each Fiscal Year or period shall be allocated among the Members in accordance with the manner in which the corresponding items were allocated under Section 4.1(a) and 4.1(b), except as provided in Sections 4.2(b) and 4.2(c) below.

(b)     If property is contributed to the Company by a Member and there is a difference between the basis of such property to the Company for federal income tax purposes and the Fair Market Value at the time of its contribution, then items of income, gain, deduction and loss with respect to such property, as computed for federal income tax purposes (but not for book purposes), shall be allocated (in any permitted manner determined by the Manager under methods permissible under Treasury Regulations Section 1.704-3 and in conformity with Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(4)(i)) among the Members so as to take account of such book/tax difference as required by Section 704(c) of the Code.

(c)     If property (other than property described in Section 4.2(b) hereof) of the Company is reflected in the Capital Accounts of the Members and on the books of the Company at a Book Value that differs from the adjusted basis of such property for federal income tax purposes by reason of a revaluation of such property in accordance with the definition of "Book Value", then items of income, gain, deduction and loss with respect to such property, as computed for federal income tax purposes (but not for book purposes), shall be allocated (in any permitted manner determined by the Manager under methods permissible under Treasury Regulations Section 1.704-3 and in conformity with Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(4)(i)) among the Members in a manner that takes account of the difference between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as differences between adjusted basis and Fair Market Value are taken into account in determining the Members' shares of tax items under Section 704(c) of the Code.

4.3     Other Allocations.  The foregoing provisions are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied as provided in such Treasury Regulations. If the Manager shall determine that the manner in which the Capital Accounts, or any increases or decreases thereto, are computed, or the manner in which any allocations are made under Section 4.1 and Section 4.2, should be adjusted in order to comply with Section 704(b) and Section 704(c) of the Code and Treasury Regulations thereunder, the Manager shall make such modifications; provided, that the Manager shall not modify the manner of making distributions pursuant to this Agreement. All elections, decisions and other matters concerning the allocations hereunder among the Members, and accounting procedures, not specifically and expressly provided for by the terms of this Agreement, including, but not limited to, the election pursuant to Section 754 of the Code (or corresponding provisions of subsequent law) to adjust the basis of the Company's assets as provided by Sections 734 and 743 of the Code, shall be determined by the Manager.

11

## ARTICLE V

## <u>DISTRIBUTIONS</u>

5.1     <u>General</u>.  Subject to the provisions of <u>Sections 5.2</u>, <u>5.3</u> and <u>5.4</u>, distributions pursuant to this <u>Article V</u> may be made from time to time in the sole discretion of the Manager. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distributions if such distribution would violate Section 18-607 of the Act or any other applicable law.

5.2     <u>Distributions to Class B Members</u>.  Except in connection with a distribution of proceeds in connection with redemptions of Class B Units pursuant to <u>Section 7.7</u>, subject to the provisions of <u>Section 5.4</u>, to the extent that the Company receives a distribution with respect to a Corresponding RBW Class B Unit held by the Company, the Company shall, in turn, distribute such amount to the Designated Member holding the Class B Unit to which such Corresponding RBW Class B Unit relates, subject to the terms and conditions set forth in any applicable grant agreement governing such Corresponding RBW Class B Unit or such Class B Unit.

5.3     <u>Distributions to Class A Members</u>.  Except as otherwise provided in <u>Section 5.2</u>, in connection with a distribution of proceeds in connection with redemptions of Class B Units pursuant to <u>Section 7.7</u>, and as otherwise provided herein, the Manager shall determine when cash will be applied to make distributions to the Class A Members and the aggregate amounts available for distribution. For the avoidance of doubt, any amounts not distributable to any Class B Member pursuant to <u>Section 5.2</u> shall be an amount available for distribution to the Class A Members. Any such amounts or items that are distributed to the Class A Members shall be distributed to each Class A Member ratably upon the proportion that the number of Class A Units held by such Class A Member immediately prior to such distribution bears to the aggregate number of Class A Units issued and outstanding.

5.4     <u>Tax Distributions</u>.  The Members acknowledge that, pursuant to the terms of the RBW LLC Agreement, the Company is entitled to receive Tax Distributions intended to provide each member of RBW with sufficient cash to cover such member's approximate tax liability from an ownership of units of RBW. If the Company receives such a Tax Distribution such amounts shall be distributed among the Class B Members holding the Class B Units to which the Corresponding RBW Class B Units in respect of which the Tax Distribution was made relate as determined by the Manager.  Distributions pursuant to this <u>Section 5.4</u> may be subject to terms, conditions and restrictions at the Manager's discretion to ensure that the Company fully complies with the terms of the RBW LLC Agreement and applicable law.

5.5     <u>Receipt of Fair Value</u>.  Notwithstanding any provision of the Act, no Person that ceases to be a Member of the Company shall be entitled to receive the fair value of such Person's Interest in the Company prior to the dissolution and winding up of the Company.

5.6     <u>Withholding</u>.

(a)     Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise to pay, any

12

withholding or other taxes payable by the Company or any of its Affiliates (pursuant to the Code or any provision of United States federal, state or local or foreign law) with respect to such Member's ownership of Units; and if and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution with respect to such Member's Units. To the extent that the aggregate amount of such payments to a Member for any Fiscal Year exceeds the amount of distributions that such Member would have received for such Fiscal Year, the Company shall notify such Member as to the amount of such excess and such Member shall make a prompt payment to the Company of such amount by wire transfer.

(b)    If the Company transfers property to Members as a distribution and such transfer is subject to withholding or other taxes payable by the Company on behalf of any Member (the "Withheld Amount"), the Company shall notify such Member as to the extent (if any) of the Withheld Amount and such Member shall make a prompt payment to the Company of the Withheld Amount by wire transfer (it being understood that, notwithstanding anything else herein to the contrary, the Company may refrain from transferring property having a Fair Market Value of at least the Withheld Amount until the Company has received payment of such Withheld Amount).

(c)    Any withholdings referred to in this Section 5.6 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Company shall have received an opinion of counsel or other evidence, satisfactory to the Manager, to the effect that a lower rate is applicable, or that no withholding is applicable.

(d)    In the event that the Company receives a payment from or in respect of which tax has been withheld, the Company shall be treated as having received cash in an amount equal to the amount of such withheld tax, and each Member shall be treated as having received as a distribution the portion of such withheld amount that is attributable to such Member, in each case, to the extent such amounts were treated as having been distributed by RBW to the Company pursuant to the RBW LLC Agreement, and distributed to each Member applying the other principles set forth in this Article V.

(e)    Each Member shall, to the fullest extent permitted by applicable law, indemnify and hold harmless the Company and each Person who is or who is deemed to be the responsible withholding agent for United States federal, state, or local or foreign income tax purposes against all claims, liabilities, and expenses of whatever nature (other than any claims, liabilities and expenses in the nature of penalties and accrued interest thereon that result from such Person's gross negligence, willful misconduct, or fraud) relating to the Company's or such Person's obligation to withhold and to pay over, or otherwise to pay, any withholding or other taxes payable by the Company or any of its Affiliates with respect to such Member or as a result of such Member's participation in the Company.

13

## ARTICLE VI

## <u>MANAGEMENT OF THE COMPANY; INFORMATION</u>

6.1     <u>Management by the Manager</u>.

(a)     Except as otherwise provided under this Agreement, the powers of the Company shall be exercised by or under the exclusive authority of, and the business and affairs of the Company shall be managed under the exclusive direction of a single manager (the "<u>Manager</u>"), and such Manager may make all decisions and take all actions for the Company not otherwise provided for in this Agreement. The Manager shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein, including, without limitation, to exercise all of the powers of the Company set forth in this Agreement.

(b)     The Manager may, from time to time, delegate to one or more Persons (including any Member or officer and including through the creation and establishment of one or more other committees) such authority and duties as the Manager may deem advisable.  Any delegation pursuant to this <u>Section 6.1</u> may be revoked at any time by the Manager.

(c)     LLYC shall have the right to designate the Manager. As of the Effective Date, the Manager is Alejandro Romero Paniagua. If the Manager is a natural person, the Manager shall serve until his or her removal, resignation, death or disability.  If any Manager ceases to serve as a Manager for any reason, a replacement Manager shall be designated by LLYC. LLYC may remove the Manager at any time for any reason.

(d)     The Manager need not be a resident of, or incorporated in, the State of Delaware or any other particular state or country.

6.2     <u>Expenses; Compensation of Manager</u>.    The Manager shall receive no compensation for its service as Manager of the Company. The Manager may be paid its expenses, if any. No such payment shall preclude the Manager from serving the Company in any other capacity and receiving compensation therefor.

6.3     <u>Restriction on Capitalization Information</u>.  Each holder of Class B Units agrees that such holder has no right to, and none of the Company, the Manager nor any other Member shall have any duty or obligation to disclose to such holder, any information regarding any Units issued to any other Unit holder, including, without limitation, the information set forth on <u>Schedule A</u> and other information regarding the number or amount thereof.

6.4     <u>Limited Liability</u>.

(a)     Neither the Manager nor any officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, unlawful acts or a wrongful taking by the Manager or officer.

14

(b)     This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied or imposed by applicable law or in equity, all of which duties are hereby agreed to be eliminated to the maximum extent permitted by applicable law (including any and all fiduciary duties imposed by the Act, including the duties of loyalty and care), and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement; provided, that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement, and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing. The provisions of this Agreement, to the extent that they restrict, waive or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

6.5     Indemnification.

(a)     General Provisions. Except as otherwise set forth herein, the Manager and each officer, employee, agent and representative of the Company (each herein referred to as an "Indemnitee") shall be indemnified, held harmless and defended by the Company against any claim and/or liability incurred by or imposed upon the Indemnitee in connection with any action to which the Indemnitee may be a party by reason of any action or omission of the Indemnitee in connection with the conduct of Company affairs. The indemnification set forth herein shall not extend to actions or omissions of the Indemnitee (or its employee) which shall have been finally adjudicated (by settlement or otherwise) in any such action, suit or proceeding to have constituted actual fraud, willful misconduct or gross negligence. In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement. The foregoing right of indemnification shall be in addition to any rights to which any Indemnitee may otherwise be entitled and shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnitee. Any indemnification hereunder is to be made only out of the assets of the Company and no Member shall have any personal liability on account of such indemnification.

(b)     Advance Payment of Expenses. The Company shall pay the expenses incurred by an Indemnitee in defending a civil or criminal action, suit or proceeding, or in investigating or opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding as incurred and in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by such Indemnitee to repay such payment if such Indemnitee shall be determined to be not entitled to indemnification therefor as provided herein; provided, however, that in such instance the Indemnitee is not commencing an action, suit, or proceeding against the Company, or defending an action, suit or proceeding commenced against such Indemnitee by the Company or any Member thereof or opposing a claim by the Company or any Member thereof arising in connection with any such potential or threatened actions suit or proceeding.

15

## ARTICLE VII

## MEMBERS

7.1     No Agency or Authority.  No Member is an agent of or has authority to act for or bind the Company solely by reason of such Member's status as a Member. Any Member who takes any action or purports or attempts to bind the Company in violation of this Section 7.1 shall be solely responsible for any loss and/or expense incurred by the Company, any or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company and each other Member with respect to such loss and/or expense.

7.2     Power of Attorney.  Each of the Members hereby authorizes the Manager, as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file the following:

(a)     all amendments to the Certificate of Formation as may be required under the Act that are duly approved pursuant to Section 10.1;

(b)     any amendment to this Agreement duly approved as provided in Section 10.1;

(c)     any and all instruments, certificates and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company in accordance with the terms of this Agreement (including, but not limited to, a Certificate of Dissolution of the Company); and

(d)     any business certificate, fictitious name certificate or amendment thereto, necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable law.

The power of attorney hereby granted by each of the Members (i) is conditioned upon prior approval of the subject matter thereof by the Manager, and, if so required by the provisions of this Agreement, the Members, and (ii) is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of such Member.

7.3     Voting.  Except as otherwise expressly provided by this Agreement or as otherwise required by the Act or applicable law, (a) each Class A Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under this Agreement; and (b) no Class B Units shall entitle the holder thereof to vote on any matters required or permitted to be voted on by the Members.

7.4     Transfer of Units.

(a)     Restrictions on Transfers.  Except as otherwise provided in this Article VII, no Member may, directly or indirectly, Transfer any of its Units or Interests without the prior written approval of the Manager (except for Transfers by Members to Affiliates of such

16

ACTIVE 685825781v8

transferring Member, but only for so long as such transferee remains an Affiliate of the transferring Member).

(b)    Substitute Member. Notwithstanding Section 7.4(a), no Unit or Interest otherwise Transferable pursuant to the terms of this Article VII shall be Transferred until the Manager has been satisfied as to the following conditions precedent:

(i)    No Termination of the Company.  Such Transfer, alone or when combined with other transactions, will not result in a termination of the Company within the meaning of section 708 of the Code.

(ii)    No Publicly Traded Partnership.  Such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of section 7704 of the Code and the Regulations promulgated thereunder and would not make the Company ineligible for "safe harbor" treatment as not a "publicly traded partnership" under Section 7704 of the Code and the Regulations promulgated thereunder.

(iii)    Compliance with Applicable Laws.  Such Transfer would not (A) affect the classification of the Company for income tax purposes or have other adverse tax consequences to the Company or any Members, (B) cause the Company or any Member to become subject to regulation under either the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or (C) violate or cause the Company to violate applicable law, including applicable state and federal securities laws.

(iv)    Receipt of Information. The Manager shall have received from the Transferee such information regarding the Transferee as the Manager may reasonably request.

(v)    Joinder. The Transferee shall execute a Joinder Agreement, agreeing to be bound by the terms and conditions of this Agreement.

(c)    Effect of Admission as a Substitute Member.  Unless and until admitted as a Substitute Member pursuant to Section 7.4(b), a Transferee of a Member's Units shall not be entitled to exercise any rights of a Member of the Company or to receive distributions hereunder. A Transferee who has become a Substitute Member shall have, to the extent of the Interest Transferred to it, all the rights and powers of the Transferring Member, as applicable, for which it is substituted and shall be subject to the restrictions and liabilities of the Transferring Member, as applicable, under this Agreement and the Act.

(d)    Improper Transfer.  If a Member or any other Person Transfers an Interest and such Transfer is not permitted under this Article VII, then, such Interest shall be forfeited to the Company as of the Transfer date for no consideration.

7.5    No Resignation, Withdrawal or Borrowing.  Except as otherwise provided in this Agreement, no Member may (a) withdraw as a Member of the Company, (b) be required to

17

withdraw as a Member or (c) borrow or withdraw any portion of its Capital Account from the Company.

7.6   Admission of Additional Members.  The Manager may, without the consent of any Member, authorize and cause the Company to issue additional Units or other Interests, including any new class or series of Units, on terms, including relative rights and preferences, established by the Manager, and amend this Agreement and Schedule A as the Manager shall deem necessary or appropriate in connection with the authorization and issuance of such additional Units; provided, however, that the authorization and issuance of additional Units or any new class or series of Units shall be limited to those corresponding units of RBW that are contributed to the Company in accordance with the terms hereof. No Person acquiring any such additional Units that is not currently a Member shall be admitted as a Member unless such Person shall execute and a Joinder Agreement.

7.7   Company's Repurchase Rights on Termination of Employment, Sale of Corresponding RBW Class B Units, or Otherwise.  In the event that (a) RBW purchases any Corresponding RBW Class B Units from the Company in connection with the termination of employment, consulting or other service arrangement of any of the Members, pursuant to any redemption provisions set forth in any applicable grant agreement governing the Corresponding RBW Class B Units, or as otherwise provided in the RBW LLC Agreement, or (b) the Company is obligated to sell or Transfer any of its Corresponding RBW Class B Units to any Person pursuant to the terms of the RBW LLC Agreement, including in connection with an "Approved Sale" (as such term is defined in the RBW LLC Agreement), then the Company shall (i) allocate any resulting Net Income and Net Loss and any applicable special allocations to the Members whose designated Corresponding RBW Class B Units are being Transferred, in proportion to the number of corresponding Class B Units held by such Members, and (ii) distribute all sales proceeds to such Members in redemption of the number of such Member's Class B Units in proportion to the number of Corresponding RBW Class B Units designated to such Member sold by the Company (e.g., if 20% of the Corresponding RBW Class B Units designated to a Member are sold by the Company, then the proceeds of such sale shall be distributed by the Company to such Member in redemption of 20% of such Member's Class B Units).

7.8   Exchange of Units of the Company for Corresponding Units of RBW.  If at any time the Manager determines that it is necessary or desirable for the Company that each Class B Member should exchange such Class B Units for their respective Corresponding RBW Class B Units that were issued to the Company in exchange therefor, the Company, to effect the foregoing, shall cause such Corresponding RBW Class B Units to be distributed to the appropriate Class B Members, with the effect that (i) each such Class B Member shall automatically, with no further action by such Class B Member, withdraw from the Company, without any other distribution of the assets or property of the Company or any other remuneration to such Class B Members, and (ii) simultaneous with the distributions contemplated in the foregoing clause (i), all of the Class B Units beneficially owned by each Class B Member shall be automatically deemed exchanged and cancelled on the books of the Company. In connection with the foregoing, each Class B Member further agrees to execute a release in favor of the Company and each Covered Person in connection therewith, in form and substance satisfactory to the Company.

18

7.9     Restrictive Covenants.

(a)     Confidentiality. The Restricted Parties shall, and shall cause each of their respective Affiliates to, maintain, at all times (including after any time that such Restricted Party ceases to be a Member), the confidentiality of all information furnished to such Restricted Party pertaining to the Company ("Confidential Information"), other than information that such Restricted Party can demonstrate (a) is or becomes generally available to the public other than as a result of a disclosure by such Restricted Party or such Restricted Party's Affiliates or officers, directors, limited liability company managers, trustees, employees, agents or representatives; (b) becomes available to such Restricted Party on a non-confidential basis from a third party who is not known by such Restricted Party to be prohibited by any obligation of confidentiality owed to the Company from transmitting the information to such Restricted Party; or (c) was already in the possession of such Restricted Party or such Restricted Party's Affiliate prior to their becoming a Restricted Party; provided, however, that the prohibitions set forth in this Section 7.9(a) shall not prohibit disclosure of Confidential Information if required to be disclosed by a court of competent jurisdiction, administrative body, or governmental body or by subpoena, summons, or legal process, or by applicable law; provided that, to the extent permitted by applicable law, the Restricted Party required to make such disclosure shall provide to the Manager prompt notice of such disclosure.

(b)     Non-Compete; Non-Solicit.  In light of the Restricted Parties' access to Confidential Information and position of trust and confidence with RBW and the Company, each Restricted Party, for themselves and their respective equity holders, hereby covenants and agrees that, during the period of such Restricted Party's continued employment or other engagement with RBW or the Company (including as Member or holder of Class B Units) or any subsidiary of RBW, they shall not, and shall cause their respective Affiliates (including their respective equity holders) to not, directly or indirectly, (i) invest, acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, consultant, partner, agent, representative, lender, or otherwise), consult with, render services for, use or authorize the use of their name in connection with, provide any intellectual property to any Person engaged in, operate or in any manner engaged in, directly or indirectly, a Competitive Business, anywhere in the Restricted Territory; provided, however, that neither the Restricted Parties nor any of their respective Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person, (ii) hire, employ, engage, recruit, solicit, induce, encourage, contact or approach for employment or engagement any Person that served as an employee,  consultant or other service provider to RBW, the Company, any subsidiary of RBW, LLYC or any Affiliate of LLYC at any time when such Restricted Party owned Interests or any other equity ownership of RBW, the Company or any subsidiary of RBW, or was otherwise engaged with RBW, the Company, any subsidiary of RBW, LLYC or any Affiliate of LLYC, or take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any such Person to terminate their employment or engagement with RBW, the Company, any of subsidiary of RBW, LLYC or any of its Affiliates, or (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by RBW, LLYC, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients,

19

customers or accounts, of RBW, LLYC, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business relation of RBW, LLYC, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person.

(c)    Non-Disparagement.  The Restricted Parties, for themselves, and their respective Affiliates (including their equity holders), hereby covenant and agree to not, directly or indirectly, except for true and accurate statements in any good faith claim, suit, action or proceeding against RBW, the Company, any subsidiary of RBW, or their respective Affiliates, make any statement or any other expressions on television, radio, the internet or other media or to any third party, including in communications with any customers, vendors, prospects, sales representatives or distributors, which are in any way disparaging of RBW, the Company, any subsidiary of RBW, the Business, LLYC or any of their respective Affiliates (including, in the case of LLYC, Llorente & Cuenca S.A. and LLYC Partners, S.L.).  Nothing in this Section 7.9(c) shall limit any Restricted Party's ability to make true and accurate statements or communications in connection with any disclosure such Restricted Party reasonably believes is required pursuant to applicable law.

(d)    Remedies.  In the event of a breach of this Section 7.9, the Restricted Parties recognize that monetary damages shall be inadequate to compensate the Company, and the Company shall be entitled, without the posting of a bond or similar security or the necessity of showing actual damages, to an injunction or other equitable relief restraining such breach, with the costs (including reasonable attorneys' fees) of securing such injunction to be borne by such Restricted Party.  Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove. Each Restricted Party, for themselves and their equity holders, hereby acknowledge (i) the necessity of protection against the prohibited actions described in this Section 7.9 in order to protect the value of the Company's business (including the goodwill inherent therein), (ii) that the nature and scope of such protection have been carefully considered by the parties hereto and (iii) that the covenants set forth in this Section 7.9 will not interfere with such Restricted Parties' ability to earn a living. If any court of competent jurisdiction determines that any of the restrictions in this Section 7.9 are too broad or the geographic area covered too extensive, the other provisions of this Section 7.9 shall nonetheless stand, and such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

## ARTICLE VIII

## BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS, FISCAL YEAR, BANKING AND TAX MATTERS

8.1    Accounting, Books and Records.  Accurate books of account of the Company's affairs shall be maintained at the Company's principal office, including a list of the names and addresses of all Members and the aggregate Units held and Capital Contributions of each Member.

*ACTIVE 685825781v8*

8.2     <u>Reports, Returns and Audits</u>.  The Manager shall cause to be prepared and filed on a timely basis all federal, state and local tax returns required of the Company.  Within a reasonable time after the Company's receipt of tax information received from RBW pursuant to Section 9.6 of the RBW LLC Agreement, the Company shall provide each Member with the information (including Schedule K-1 to IRS Form 1065) necessary for such Member to prepare its tax returns.  The determinations of the Manager with respect to the treatment of any item or its allocation for federal, state or local tax purposes will be binding upon all of the Members so long as such determination is not inconsistent with any express term hereof, and each Member shall report the tax items attributable to its participation in the Company on its income tax returns in a manner consistent with the tax treatment of such items as reported to it by the Company.

8.3     <u>Fiscal Year</u>.  The fiscal year of the Company for both financial reporting and tax purposes (the "<u>Fiscal Year</u>") shall be (i) the period commencing on the Effective Date and ending on December 31, 2023, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) such other fiscal year of the Company as shall be selected by the Manager after the Effective Date; provided, however that the Fiscal Year of the Company shall be the same as the "Fiscal Year" of RBW.

8.4     <u>Method of Accounting</u>.  The books and accounts of the Company shall be maintained using the method of accounting used by RBW for financial reporting purposes and tax purposes.

8.5     <u>Company Funds</u>.  All funds of the Company shall be deposited in its name in a separate bank account or accounts at a commercial bank as shall be determined by the Manager.

8.6     <u>Partnership Representative</u>. Llorente & Cuenca USA, Inc.is hereby appointed the partnership representative of the Company, within the meaning of Section 6223(a) of the Code (the "<u>Partnership Representative</u>"), and the Partnership Representative may appoint a designated individual pursuant to Treasury Regulation Section 301.6223-1(b)(3) (or any successor regulation).  Each Member hereby consents to such designations and agrees that upon the request of the Partnership Representative, such Member will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.  If the Partnership Representative decides to have the Members file amended tax returns pursuant to Section 6225(c)(2)(A) of the Code or apply the alternative procedure to filing amended returns under Section 6225(c)(2)(B) of the Code, all Members shall timely comply with any such requirements.  To the extent that a portion of the tax liabilities imposed under Sections 6221(a) and 6225 of the Code relates to a former Member, the Partnership Representative may require such former Member to indemnify the Company for such former Member's allocable portion of such tax liabilities.  The Company shall indemnify and reimburse the Partnership Representative for all reasonable third-party expenses incurred as the Partnership Representative pursuant to this <u>Section 8.6</u> in performing its duties (including any third-party expenses incurred by the Partnership Representative in connection with an audit of the Company's tax return).  The provisions of this <u>Section 8.6</u> and <u>Section 5.6</u> shall survive the termination of the Company or the termination or transfer of any Member's Units and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members

21

8.7    <u>Other Information</u>.    The Manager, and officers of the Company (with authorization from the Manager) may release such information concerning the operations of the Company to such sources as is customary in the industry or required by applicable law or by order of any regulatory body.

**ARTICLE IX**

**<u>DISSOLUTION OF THE COMPANY</u>**

9.1    <u>Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

(a)    the approval of the Manager and each Class A Member;

(b)    the dissolution of RBW pursuant to the terms of Section 8.1 of the RBW LLC Agreement;

(c)    an order by a court of competent jurisdiction decrees that the Company be dissolved; or

(d)    the sale or distribution by the Company of all or substantially all of its assets.

Any other provision of this Agreement to the contrary notwithstanding, no withdrawal, assignment, removal, bankruptcy, insolvency, death, incompetency, termination, dissolution or distribution with respect to any Member or any Unit will effect a dissolution of the Company.

9.2    <u>Winding Up of the Company</u>.

(a)    The Members shall continue to share distributions and allocations of Net Income and Net Losses during the period of liquidation in accordance with <u>Article IV</u>.  Any gain or loss realized by the Company upon the sale of property shall be deemed recognized and allocated to the Members in the manner set forth in <u>Article IV</u>.  Upon a dissolution of the Company, the Manager shall take full account of the Company's assets and liabilities and the assets shall be liquidated as promptly as is consistent with obtaining the Fair Market Value thereof and as shall be necessary to timely make the distributions below described, and the proceeds therefrom, to the extent sufficient therefor, shall first be paid out to creditors, whether by payment or by establishment of due and adequate reserves, in the order of priority as provided by law; and then shall be distributed to the Members in accordance with <u>Section 5.2</u> and <u>5.3</u>.

(b)    Notwithstanding this <u>Section 9.2</u>, the Manager may, upon dissolution of the Company, distribute the Company's assets to the Members in kind in lieu of liquidating the Company's assets, <u>provided</u> that if any assets of the Company are to be distributed in kind, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(e) and such assets shall be distributed on the basis of the Fair Market Value thereof (without taking Code Section 7701(g) into account) and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled.

22

9.3    Liability for Return of Capital Contributions.  Each Member, by its execution of this Agreement, agrees that liability for the return of its Capital Contribution is limited to the Company's assets and, in the event of an insufficiency of such assets to return the amount of its Capital Contribution, hereby waives any and all claims whatsoever, including any claim for additional contributions that it might otherwise have, against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct) by reason thereof. Each Member shall look solely to the Company and its assets for all distributions with respect to the Company and his, her or its Capital Contribution thereto, and shall have no recourse therefor (upon dissolution or otherwise) against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct).

## ARTICLE X

## MISCELLANEOUS

10.1    Amendment.  Subject to Section 3.1 and Section 7.6, the provisions of this Agreement may be amended, modified or waived with the prior written consent of the Manager and each Class A Member. In connection with any amendment, modification or waiver, or other approval hereunder, neither the Company, the Manager nor any Member will have an obligation to provide any information to any Person whose consent is not required to be obtained in order to effectuate such amendment, modification or waiver; provided (i) that any such Person shall, at the request of the Company, promptly (and in any event, within three (3) Business Days) execute and deliver to the Company any amendment, modification or waiver that has been approved in accordance with this Agreement and (ii) the Company shall deliver to such Person a copy of any such amendment, modification or waiver within seven (7) Business Days of the execution thereof.

10.2    Notices.  Any notice to be given under this Agreement shall be made in writing and sent by fax, Federal Express or another commercial delivery service, addressed as set forth below:

> (a)    If to the Company:
>
> **BAM Management Holdco, LLC**
> 600 Brickell Avenue,
> Suite 2125 Miami, FL
> Attn:    Publio Lorenzo
> Email:    publio.lorenzo@llorenteycuenca.com
>
> With a copy to (which shall not constitute notice):
>
> **Llorente & Cuenca S.L.**
> Calle Lagasca 88
> 28001, Madrid, España
> Attn:    Juan Pablo Ocaña
> Email:    jpocana@llorenteycuenca.com

23

*ACTIVE 685825781v8*

And

**Greenberg Traurig, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Attn:       Antonio Peña
Facsimile: +1 305.961.5804
Email:      antonio@gtlaw.com

(b)    If to any Member, such notice shall be mailed to the address of the Member as set forth on Schedule A.

(c)    Any such notice shall be deemed to be delivered, given and received for all purposes as of the date delivered if delivered by a commercial delivery service or by confirmed facsimile.

10.3    Entire Agreement.  This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.  Furthermore, the parties hereto acknowledge and agree that the recitals to this Agreement are true and correct and constitute an integral portion of, and are hereby incorporated into, this Agreement for all purposes.

10.4    Governing Law; Venue; Attorney's Fees.

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

(b)    Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, and such legal action results in a final judgment in favor of one party, the prevailing party shall be entitled to payment from the other party of all of the prevailing party's reasonable attorneys' fees and related costs at all trial and appellate levels.

(c)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

24

(d)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.4(D).

10.5   Counterparts.  This Agreement may be executed in any number of counterparts, including, without limitation, counterparts received via facsimile, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.

10.6   No-Waiver.  The failure of any party hereto at any time or times to require performance of any provision hereof by any other party hereto shall in no manner affect the right of such party to require such performance at a later time.  No act or omission of any party hereto, other than an express written waiver signed by such party, shall constitute a waiver by such party of any breach of this Agreement or of the provision of this Agreement so breached.  No waiver by a party hereto of the breach of any provision hereof, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of such breach or as a waiver of the provision hereof so breached.

10.7   Further Assurances.  Each of the parties hereto agrees that, forthwith upon the written request of any other party hereto, such party shall execute and deliver such further conveyances, transfers and other documents of every nature and kind whatsoever, cause such meetings to be held, resolutions passed, exercise his vote and influence, do and perform and cause to be done and performed all such further and other acts and things as are within his reasonable power to do and as are reasonably necessary or desirable in order to give full effect to each and every part of this Agreement and the transactions contemplated in this Agreement.

10.8   Spouses of Members.  Spouses of Members who are natural persons do not become Members as a result of such marital relationship.  Each Member who is married represents and warrants that he or she has delivered to the Company a separate consent and agreement executed by his or her spouse in the form of Exhibit B attached hereto (a "Spousal Consent").  Additionally, to the extent not previously delivered and if requested by the Company, each Member who is an individual shall cause his or her spouse to execute and deliver a Spousal Consent.  The signature of a spouse on a Spousal Consent shall not be construed as making such signatory a Member or a party to this Agreement except as may otherwise be set forth in such consent. Each Member who is an individual will certify his or her marital status to the Company at the Company's request.

25

**[Signature page follows]**

26

*ACTIVE 685825781v8*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the date first above written.

<u>**COMPANY**</u>:

**BAM MANAGEMENT HOLDCO, LLC**


By:_____
Name: Alejandro Romero Paniagua
Title: Authorized Signatory


<u>**MEMBER:**</u>


**LLORENTE & CUENCA USA, INC.**


By:_____
Name: Alejandro Romero Paniagua
Title: Authorized Signatory

[*Signature page to Operating Agreement of BAM Management Holdco, LLC*]

## <u>SCHEDULE A</u>

**Schedule of Members**

| Member | Address | Number of Class A Units | Number of Class B Units | Capital Account Balance |
|---|---|---|---|---|
| Llorente & Cuenca USA, Inc. | 600 Brickell Avenue, Suite 2125 Miami, FL<br>Attn:  Publio Lorenzo<br>Email: publio.lorenzo@llorenteycuenca.com<br><br>With a copy to (which shall not constitute notice):<br><br>Greenberg Traurig, P.A.<br>333 S.E. 2nd Avenue, Suite 4400, Miami, Florida  33131<br>Attn:  Antonio Peña<br>    antonio@gtlaw.com | 1 | - | $100.00 |
| **Totals** | - | 1 | - | $100.00 |

*ACTIVE 685825781v8*

**EXHIBIT A**

**FORM OF JOINDER OF MEMBER TO**
**BAM MANAGEMENT HOLDCO, LLC**
**OPERATING AGREEMENT**

By affixing his, her or its, as applicable, signature hereto, the undersigned, in connection with the issuance thereto of Class [●] Units of BAM Management Holdco, LLC, a Delaware limited liability company (the "Company"), hereby joins and agrees to become a party to, and a "Class [●] Member," and "Member" under, that certain Operating Agreement of the Company, with an effective date of [●] [•], 2023 (as amended from time to time, the "LLC Agreement"). Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement and entitled to all of the rights and benefits, and subject to all of the obligations, of a "Class [●] Member," and "Member" under the LLC Agreement. All of the securities of the Company owned, from time to time, by the undersigned, shall be subject to the provisions of the LLC Agreement.The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

**IN WITNESS WHEREOF**, the undersigned has executed this Joinder as of this ___ day of _____, _____.

If Member Is a Business Entity:                    If Member is an Individual:

_____,   Signature:_____

a _____                          Individually

                                               Print Name:_____

By:_____   Address:_____

Print Name:_____               _____

Title:_____               _____

*ACTIVE 685825781v8*

## EXHIBIT B – FORM OF SPOUSAL CONSENT

Dated [●]

Reference is hereby made to Limited Liability Company Agreement of BAM Management Holdco, LLC, a Delaware limited liability company (the "Company"), dated as of [•] (as amended, restated, supplemented or otherwise modified from time to time, the "LLC Agreement"), among *[securityholder's name]* (the "Relevant Securityholder") and the other persons identified therein.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the LLC Agreement.

This Spousal Consent is being delivered pursuant to the LLC Agreement, including, without limitation, Section 10.8 of the LLC Agreement.  The undersigned ("Spouse"), as the spouse of the Relevant Securityholder, hereby acknowledges that Spouse has read the LLC Agreement and has understood its contents, consents to all of the provisions of the LLC Agreement, agrees that the Units held by the Relevant Securityholder and Spouse's interest in such Units are subject to such provisions and, to the extent that Spouse may lawfully do so, Spouse hereby confirms and consents that the Relevant Securityholder may act alone with respect to all matters in connection with the LLC Agreement.  Spouse hereby also confirms and consents that the Relevant Securityholder may enter into agreements pursuant to the LLC Agreement and consent to and execute amendments or restatements thereof (collectively with the LLC Agreement, the "Ancillary Agreements"), without further signature or consent of, or notice to, Spouse.  Spouse hereby further agrees that Spouse will not take any action to oppose or otherwise hinder the operations of the Company or the operation of the provisions of the Ancillary Agreements.

*[Remainder of Page Intentionally Left Blank]*

To the extent of any marital, elective share, community property or other property interest that Spouse may have in the Company or its equity and any other interests related to the Ancillary Agreements, Spouse consents to be bound by the terms of the Ancillary Agreements, including, without limitation, restrictions on transfer and obligations to sell set forth therein.

_____

Name of Spouse:

*ACTIVE 685825781v8*

**EXHIBIT H**
**SAMPLE CALCULATION OF THE DEFERRED TAX ADJUSTMENT AMOUNT**

*ACTIVE 684044473v13*

**EXHIBIT H - Illustration 2 of 2**

**Stock vs Asset Sale -After Tax Cash Calculation - Assumes no PTET credit applies**

| | Deferred Payment | | |
|---|---|---|---|
| | Stock Sale | Asset Sale | |
| Base Proceeds | 7,000,000 | 7,000,000 | |
| Deferred Tax Adjustment Amount | | 100,601 | |
| Tax Basis - 12/31/2022 | | | |
| Total Taxable Gain | 7,000,000 | 7,100,601 | |
| | | | |
| CA S-Corp Entity Level Tax @1.5% | - | 106,509 | 106,509 |
| PTET CA Income Tax Credit @9.3% | | - | - |
| **Total Entity Level Tax** | - | **106,509** | |
| | | | |
| Gain Subject to Ordinary Rate | - | (106,509) | |
| Gain Subject to Capital Gain Rate | 7,000,000 | 7,100,601 | |
| Total Federal Taxable Gain | 7,000,000 | 6,994,092 | |
| | | | |
| Federal Tax - Shareholder Level | | | |
| Ordinary Income @37% | | (39,408) | |
| Capital Gain @20% | 1,400,000 | 1,420,120 | |
| **Total Federal Tax** | **1,400,000** | **1,380,712** | (19,288) |
| | | | |
| CA Tax - Shareholder Level | | | |
| CA Resident Tax @13.3% | 931,000 | 944,380 | |
| PTET Credit @9.3% | - | | |
| **State Shareholder Level Tax** | **931,000** | **944,380** | 13,380 |
| | | | |
| **Total Tax Payable** | **2,331,000** | **2,431,601** | |
| | | | Difference: |
| **Net After Tax Cash to Seller** | **4,669,000** | **4,669,000** | (0) |

Note:  Cell G6 is the amount that will cause the difference between cells F30 and G30 shown in Cell H30 to equal zero. Cell G6 is determined by using the Excel solver function to set Cell H30 to equal zero.

Amounts shown herein are for illustration purposes only.

ACTIVE\686311052.v1

**EXHIBIT H - Illustration 1 of 2**
**Stock vs Asset Sale -After Tax Cash Calculation**

|  | Deferred Payment | | |
| --- | --- | --- | --- |
|  | Stock Sale | Asset Sale | |
| Base Proceeds | 7,000,000 | 7,000,000 | |
| Deferred Tax Adjustment Amount | | - | |
| Tax Basis - 12/31/2022 | | | |
| Total Taxable Gain | 7,000,000 | 7,000,000 | |
|  | | | |
| CA S-Corp Entity Level Tax @1.5% | - | 105,000 | 105,000 |
| PTET CA Income Tax Credit @9.3% | | 651,000 | 651,000 |
| **Total Entity Level Tax** | **-** | **756,000** | |
|  | | | |
| Gain Subject to Ordinary Rate | - | (756,000) | |
| Gain Subject to Capital Gain Rate | 7,000,000 | 7,000,000 | |
| Total Federal Taxable Gain | 7,000,000 | 6,244,000 | |
|  | | | |
| Federal Tax - Shareholder Level | | | |
| Ordinary Income @37% | | (279,720) | |
| Capital Gain @20% | 1,400,000 | 1,400,000 | |
| **Total Federal Tax** | **1,400,000** | **1,120,280** | (279,720) |
|  | | | |
| CA Tax - Shareholder Level | | | |
| CA Resident Tax @13.3% | 931,000 | 931,000 | |
| PTET Credit @9.3% | - | (651,000) | |
| **State Shareholder Level Tax** | **931,000** | **280,000** | (651,000) |
|  | | | |
| **Total Tax Payable** | **2,331,000** | **2,156,280** | |
|  | | | Difference: |
| **Net After Tax Cash to Seller** | **4,669,000** | **4,843,720** | 174,720 |

Note:  Since net after tax cash on line 30 is greater in an asset sale, Cell G6 therefore is zero.

Amounts shown herein are for illustration purposes only.

# EXHIBIT 4

Execution Version

RESTRICTIVE COVENANT AGREEMENT

THIS RESTRICTIVE COVENANT AGREEMENT (this "Agreement") is made and entered into as of March 30, 2023, by and among Llorente & Cuenca USA Inc., a Delaware corporation ("Buyer"), Rebecca Bamberger, a California resident (the "Beneficial Owner") and RBW Holdco, Inc., a California corporation ("Seller" and jointly with the Beneficial Owner, the "Restricted Parties"), and is effective as of the Closing Date, as such term is defined in the Membership Interest Purchase Agreement entered into by and among Buyer, Rebecca Bamberger Works LLC, a Delaware limited liability company (the "Company"), Seller, and the Beneficial Owner.

RECITALS

A.      Pursuant to the Purchase Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, eighty percent (80%) of the issued and outstanding Membership Interests of the Company (the "Transaction").

B.      The covenants and agreements set forth herein were a material inducement to Buyer to enter into the Purchase Agreement and to perform its obligations thereunder, and Buyer would not have entered into the Purchase Agreement if the Restricted Parties do not agree to enter into this Agreement and provide the covenants and agreements set forth herein, including the covenants set forth in Section 1.

C.      The Beneficial Owner is an equityholder of Seller and an indirect holder of membership interests of the Company and, as such, will derive and receive certain material tangible and intangible benefits from the consummation of the Transaction, and in consideration of such tangible and intangible benefits to be received by the Restricted Parties, the Restricted Parties have agreed to be subject to certain covenants as set forth herein.

D.      The Company is engaged in the business of providing marketing and public relations services (the "Business").

E.      The Beneficial Owner has been active in the management of the Business and intimately involved with the most highly sensitive and confidential information at the Company concerning operations, finances and strategic planning and as such recognizes that the Beneficial Owner's employment or involvement with a competing entity could have a devastating impact on the financial success of the Company, and that such employment or involvement likely would inevitably involve the disclosure and/or use of Confidential Information.

F.      The Company has substantial relationships with its customers, suppliers, employees and other business relations, and the Restricted Parties have and will continue to have access to such persons and derive substantial value from the Confidential Information of the Company and continuing direct or indirect equity interest in the Company.

G.      Buyer has substantial legitimate business interests necessitating the covenants provided in this Agreement, including (but not limited to) substantial relationships with numerous existing and prospective customers and the goodwill of the Company.

H.      In consideration of Buyer entering into the Purchase Agreement, and as a condition of the Closing, Buyer has required the Restricted Parties to agree to be subject to certain covenants by executing and delivering this Agreement.

1

*ACTIVE 685405026v6*

I.        Buyer would not obtain the benefit of the bargain set forth in the Purchase Agreement as specifically negotiated by the parties thereto, and would be substantially harmed, unless this Agreement were specifically performed and enforced.

J.        Any breach of this Agreement by the Restricted Parties would cause immediate irreparable harm to Buyer and the Company, including, without limitation, by the significant loss of goodwill, if the Restricted Parties were to breach this Agreement, or if this Agreement were not specifically performed.

K.        Capitalized terms used but not defined herein shall have the meanings given to them in the Purchase Agreement.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.        <u>Restrictive Covenants</u>.

1.1        <u>Covenant Not to Solicit or Hire</u>. The Restricted Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the fifth (5th) anniversary of the date hereof, except pursuant to a written agreement with Buyer, the Restricted Parties shall not (i) solicit, contact, recruit, induce, or encourage any employee, consultant or other service provider of the Company, any of its subsidiaries, Buyer or any of their respective Affiliates ("<u>Restricted Persons</u>") to leave the employ of or cease providing services to Buyer, the Company, or any of its subsidiaries or any of their respective Affiliates or subsidiaries, (ii) hire, employ, recruit, or otherwise engage any Restricted Person, or (iii) take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any Restricted Person to terminate his, her or its employment or engagement with Buyer, the Company or any of its subsidiaries, or any of their respective Affiliates or subsidiaries; <u>provided</u>, that the foregoing shall not prohibit any Person from making general employment solicitations through advertisements in publicly available media so long as such advertisements are not specifically targeted at any Restricted Person and no Restricted Person is hired as a result thereof.

1.2        <u>Non-Competition</u>. The Restricted Parties hereby covenant and agree that during the period beginning on the date of this Agreement and ending on the fifth (5th) anniversary of the date hereof, the Restricted Parties shall not directly or indirectly (i) acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, use, register or authorize anyone to use or register Beneficial Owner's name in connection with, provide or otherwise grant any rights with respect to any Intellectual Property to any Person engaged in, operate or in any manner engage in, directly or indirectly, a Competitive Business, anywhere in the United States, (ii) take action to interfere with, impair, subvert, disrupt, or alter the relationship, contractual or otherwise, among Buyer, the Company, their respective Affiliates or their respective subsidiaries and any current or prospective customer, supplier, distributor, developer, service provider, licensor or licensee, or other material business relation of Buyer, the Company, their respective Affiliates or their respective subsidiaries, (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by Buyer, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of Buyer, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the

2

*ACTIVE 685405026v6*

effect of discouraging any lessor, licensor, customer, supplier or other business relation of Buyer, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person after the Closing Date as it maintained with such Person prior to the Closing Date; provided, however, that neither the Restricted Parties nor any of their Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person.

1.3     Confidentiality. The Restricted Parties agree that the Restricted Parties shall keep the Confidential Information strictly confidential and shall not, and shall cause its and its Affiliates' employees, officers, directors, managers and agents not to, disclose (except as expressly permitted by this Agreement) any portion of the Confidential Information to any Person; provided that in the event that any Person subject to confidentiality under this Agreement is compelled by applicable Law (including by request for information or documents in any legal Proceeding, interrogatory, discovery requests, subpoena, civil investigative demand, or similar process or otherwise) to disclose any Confidential Information, the Restricted Parties shall promptly notify (unless prohibited by Law) Buyer in writing of such requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Agreement applicable to such portion of the Confidential Information. If, in the absence of a protective order or the receipt of a waiver hereunder, such Person, on the written opinion of outside legal counsel, is required to disclose any Confidential Information, such Person may disclose only that portion of such Confidential Information that such Person is required to disclose; provided, however, that such Person shall use its reasonable best efforts to obtain a protective order or other assurance that confidential treatment will be accorded such Confidential Information by such Person.

1.4     Non-Disparagement. The Restricted Parties shall not, and shall cause their Affiliates not to, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Company, any of its subsidiaries, the Business, Buyer or any of their respective Affiliates, or in the good faith performance of Restricted Parties' duties to Company and its Affiliates while such Restricted Party is employed by Company or any of its Affiliates (and in such good faith performance, solely in internal communications with other officers of the Company and other members of the board of managers of the Company), make any derogatory or disparaging statement or communication regarding the Company, any of its subsidiaries, or their respective Affiliates or employees.  The Buyer shall cause its and its Affiliates' respective officers and managers not to, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Restricted Parties or any of their respective Affiliates or in connection with the Company's or Buyer's good faith assessment of Beneficial Owner's performance of her duties to the Company and its Affiliates, make any derogatory or disparaging statement or communication regarding the Restricted Parties, or their respective Affiliates.  Nothing in this Section 1.4 shall limit any Restricted Party's or Buyer's or any of their respective Affiliates' ability to make true and accurate statements or communications in connection with any disclosure such party or its Affiliates reasonably believe is required pursuant to applicable Law.

2.     Enforcement.

2.1     The Restricted Parties expressly acknowledge and agree that (A) each of the restrictions contained in Section 1 are reasonable in all respects (including with respect to subject matter and time period) and such restrictions are necessary to protect Buyer's interest in, and value of, the Company's business (including the goodwill inherent therein), (B) the transactions contemplated by this Agreement constitute good, valid, and binding consideration for the Restricted Parties' obligations, covenants, and agreements contained in this Agreement, and (C) Buyer would

3

not have entered into this Agreement, the documents entered into in connection herewith, or any of the transactions contemplated thereby or hereby without the restrictions contained in Section 1.

2.2    The Restricted Parties expressly acknowledge and agree that the amount of actual damages suffered by Buyer in the event of an actual or threatened breach of Section 1 would be difficult or impossible to accurately calculate and there will be irreparable damages to Buyer in the event of such an actual or threatened breach. Consequently, the Restricted Parties expressly acknowledge and agree that, in addition to any other remedy or relief to which Buyer may be entitled, in the event of a breach or threatened breach of Section 1, Buyer and its successors and assigns shall be entitled to an injunction or injunctions to prevent breaches of any of the terms or provisions of Section 1, and to enforce specifically the performance by the Restricted Parties, and hereby agrees to waive any defense in any suit that Buyer has an adequate remedy at Law and hereby agrees to waive any requirement to post any bond in connection with obtaining such relief.

2.3    If the final judgment of a court of competent jurisdiction declares that any term or provision of Section 1 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and Section 1 shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The parties hereto intend that the covenants of Section 1 shall be deemed to be a series of separate covenants, one for each county or province of each and every state, commonwealth, territory or jurisdiction of each county or province anywhere in the world and one for each month of the restricted period specified therein.

2.4    Notwithstanding anything to the contrary set forth herein, the parties acknowledge and agree that Section 2 is not intended to be, and is not, an admission or acknowledgement by any Person that money damages or any other monetary payment would be a sufficient remedy for a breach of Section 1, or that the inability to obtain a monetary remedy by virtue of the limitations in Section 2 will limit a party's ability to obtain injunctive relief or specific performance in accordance with Section 2.

2.5    The restricted period set forth in Section 1 shall be tolled, and shall not run, during the period of any breach by the Restricted Parties of any of the covenants set forth in Section 1.

3.    Definitions.

"Competitive Business" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that the Company has taken concrete steps towards providing or selling in the Business); provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

"Confidential Information" means all information (regardless of whether specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by the Restricted Parties or the respective employees, consultants or advisors of the Restricted Parties or the Company, as the case may be, that relates to the Business, products, operations, financial condition,

4

ACTIVE 685405026v6

services, research or development of the Company or any of their respective customers, vendors, suppliers, independent contractors or other business relations, including: (a) internal business information (including information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, the Company their respective clients and suppliers and confidential information; (c) industry research compiled by, or on behalf of, the Company, including identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, the Company; (d) compilations of data and analyses, processes, methods, track and performance records, data and databases relating thereto; (e) personally identifiable information of the Company's customers; and (f) information related to the Company's Intellectual Property and updates of any of the foregoing; provided, however, that "Confidential Information" shall not include any information that (A) is or becomes generally known in the trade or industry or available to the public other than as a result of a breach by the Restricted Parties of this Agreement; (B) becomes available to the Restricted Parties on a non-confidential basis from a source other than the Company, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company or any other party with respect to such information; or (C) is developed by the Restricted Parties without use of or reference to the Confidential Information.

4.      Entire Agreement; Amendment.  This Agreement and the other agreements referred to herein constitute the entire agreement between the parties hereto relating to the subject matter hereof, and all prior agreements, correspondence, discussions and understandings of the parties (whether written or oral) are merged herein and made a part hereof, it being the intention of the parties hereto that this Agreement and the other agreements referred to herein shall serve as the complete and exclusive statement of the terms of their agreement together; provided, that the Restrictive Covenants are independent of, supplemental to and do not modify, supersede or restrict (and shall not be modified, superseded by or restricted by) any non-competition, non-solicitation, non-hire, non-disparagement, confidentiality or other similar covenants in any other current or future agreement to which any of the Restricted Parties are a party unless express written reference is made to the specific provisions hereof which are intended to be superseded.  The recitals to this Agreement are an integral part hereof and are hereby incorporated into this Agreement for all purposes.  No amendment, waiver or modification hereto or hereunder shall be valid unless in a writing signed by an authorized signatory of the party or parties affected thereby.

5.      Waiver.  The waiver by any party of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

6.      Successors and Assigns; Third Party Beneficiaries.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Restricted Parties, Buyer and each of their respective successors and permitted assigns; provided, that this Agreement and the rights and obligations of the Restricted Parties hereunder shall not be assigned or delegated.  Each of Buyer's Affiliates will have the right to enforce all of the covenants of the Restricted Parties under this Agreement as if parties hereto and shall be express third party beneficiaries hereof.  Except as set forth in the preceding sentence, this Agreement is not intended for the benefit of any Person other than the parties hereto, and no such other Person shall be deemed to be a third party beneficiary hereof.

7.      Binding Effect.  This Agreement shall be binding upon the parties hereto and their respective heirs, successors, legal representatives and permitted assigns.

8.      Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.  Section 11.10 of the Purchase Agreement is incorporated herein by reference, *mutatis, mutandis*.

5

9.     Partial Invalidity.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law.  If any provision of this Agreement or the application thereof to any person, entity or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by Law.  If it is determined by a court of competent jurisdiction that any covenant in this Agreement is excessive in duration or is unreasonable or unenforceable under applicable Law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the Laws of that jurisdiction.

10.     Notices.     All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10):

| | |
|---|---|
| If to Seller or the Beneficial Owner: | Rebecca Bamberger |
| Address: | 2855 5th Avenue, #802, San Diego, CA 92103 |
| E-mail: | rebecca@bamtheagency.com |
| | |
| with a copy to: | Sheppard, Mullin, Richter & Hampton LLP |
| Address: | 12275 El Camino Real, Suite 100 San Diego, CA 92130 |
| E-mail: | slasala@sheppardmullin.com |
| Attention: | Stephen LaSala |
| | |
| If to Buyer: | Llorente & Cuenca USA, Inc. c/o Llorente & Cuenca S.L. |
| Address: | Calle Lagasca 88 28001 Madrid, Spain |
| E-mail: | jpocana@llorenteycuenca.com |
| Attention: | Juan Pablo Ocaña |
| | |
| with a copy to: | Greenberg Traurig, P.A. |
| Address: | 333 SE 2nd Avenue Suite 4400 Miami, FL 33131 |
| E-mail: | antonio@gtlaw.com |
| Attention: | Antonio Peña, Esq. |

11.     Counterparts; Facsimile Copy.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  This Agreement may be executed in facsimile copy or by other electronic means with the same binding effect as the original.

6

*ACTIVE 685405026v6*

12. <u>Reporting and Disclosures</u>. Each of Buyer and the Restricted Parties understand that nothing in this Agreement is intended, or shall be construed, to prohibit the Restricted Parties from reporting possible violations of federal or state law or regulation to any governmental agency or entity, including, but not limited to, the U.S. Department of Justice, the Securities and Exchange Commission, or any other relevant authority, or making other disclosures that are protected under the whistleblower provisions of applicable laws or regulations. The Restricted Parties understand that, to the extent permitted by such laws or regulations, the Restricted Parties do not require the prior authorization of the Company or Buyer to make any such reports or disclosures and the Restricted Parties are not required to notify the Company or Buyer that the Restricted Parties have made such reports or disclosures.

[*Signature page follows*]

7

*ACTIVE 685405026v6*

DocuSign Envelope ID: 43DD160C-FF45-44E2-A632-A399CB34C5B2

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day, month and year first above written.

**BUYER:**

**LLORENTE & CUENCA USA, INC.**

By: _Alejandro Romero Paniagua_

Name:  Alejandro Romero Paniagua
Title: Authorized Signatory

*Signature Page to Restrictive Covenant Agreement*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day, month and year first above written.

**BENEFICIAL OWNER**

DocuSigned by:

*Rebecca Bamberger*

Rebecca Bamberger

**SELLER:**

**BW HOLDCO, INC.**

DocuSigned by:

By: *Rebecca Bamberger*

Name: Rebecca Bamberger
Title: Authorized Signatory

*[Signature Page to Restrictive Covenant Agreement]*

# EXHIBIT 5

Execution Version

**EMPLOYMENT AGREEMENT**

This Employment Agreement (this "**Agreement**"), dated as of March 30, 2023 ("**Effective Date**"), is entered into by and between Rebecca Bamberger, a California resident ("**Executive**"), and Rebecca Bamberger Works, LLC, a Delaware limited liability company ("**Employer**").

**W I T N E S S E T H:**

**WHEREAS**, the Executive is the Chief Executive Officer of the Employer; and

**WHEREAS**, as a result of the transactions contemplated by that certain Membership Interest Purchase Agreement (the "**Membership Interest Purchase Agreement**") entered into on or about the Effective Date by and among Executive, Employer, Llorente & Cuenca USA, Inc. and RBW Holdco, Inc., and to provide for the growth and future well-being of Employer, the parties have determined that Employer shall continue to be engaged in the Business (as defined below) and Executive shall provide services to, and have the responsibilities, duties and time commitments with, Employer as set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the respective covenants and agreements set forth below, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATIONS**

1.1     **Definitions**.

In addition to the definitions contained within the body of this Agreement, the following terms shall have the following meanings.

(a)     "**Accrued Amounts**" means (i) any earned but unpaid Annual Salary, (ii) any earned but unused vacation time under Employer's vacation policy, as in effect from time-to-time, and (iii) any business expenses approved by Employer and incurred in the performance of Executive's employment duties but not yet reimbursed.

(b)     "**Affiliates**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(c)     "**Agreement**" has the meaning set forth in the preamble.

(d)     "**Annual Salary**" has the meaning set forth in Section 2.4(a).

(e)     "**Board**" means the board of managers of Employer.

*ACTIVE 684927030v16*

(f)     "**Business**" means the business of the Employer which consists of providing marketing and public relations services.

(g)     "**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California, or Madrid, Spain are authorized or required by law to be closed for business.

(h)     "**Cause**" means:

(i)     The willful engaging by Executive in any action or inaction which is materially injurious to Employer and/or any of Employer's Affiliates, monetarily or otherwise;

(ii)    the commission of a criminal act by Executive against any of Employer and/or any of Employer's Affiliates or against any third party if in connection with, or related to, the scope of her employment or services provided in connection with the terms hereunder, including but not limited to fraud, embezzlement, or theft;

(iii)   the arrest, conviction, plea of no contest or *nolo contendere*, deferred adjudication, unadjudicated probation, or charge of Executive for any felony or any crime involving dishonesty, moral turpitude, fraud, embezzlement, or theft;

(iv)    a material failure of Executive to perform Executive's responsibilities as directed by Employer, as determined by Employer in good faith;

(v)     the failure of Executive to achieve goals or objectives established in advance by Employer in consultation with Executive in respect of two consecutive fiscal years of Employer, as determined by Employer in good faith; or

(vi)    Executive's material breach of this Agreement.

The foregoing is an exclusive list of all acts or omissions that the Employer may consider as grounds for the termination of the Term of Employment for Cause.  The Board shall provide Executive with 30 days advance written notice reasonably detailing the basis for the termination of the Term of Employment for Cause solely on the basis of clause (i), (iv), or (vi) above.  During the 30 day period after Executive has received such notice, Executive shall have, prior to the expiration of such 30 day period, an opportunity to (x) cure or remedy such alleged Cause events and (y) present her case to the full Board (with the assistance of her own counsel) before any termination for such alleged Cause events is finalized by a vote of a majority of the Board; provided, that in the case of clause (i) above, (A) Employer may suspend Executive without pay during such 30 day period and (B) if a majority of the Board ultimately determines not to terminate Executive for Cause, Employer shall pay Executive the portion of her Annual Salary that was not paid during such suspension, plus simple interest at an annual rate of three percent (3%) on such unpaid amount, in the next regular payroll of Employer.

(i)      "**Code**" means the Internal Revenue Code of 1986, as amended.

(j)      "**Competitive Business**" means any Person, business or enterprise, other than Employer and/or its Affiliates, that engages, directly or indirectly, in any portion of the Business; provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

(k)      "**Confidential Information**" means all trade secrets and information disclosed to Executive or known by Executive as a consequence of or through the unique position of her employment or relationship with Employer or any of Employer's Affiliates (including information conceived, originated, discovered or developed by Executive and information acquired by Employer or any of its Affiliates from others) prior to or after the Effective Date, and that is not generally or publicly known (other than as a result of unauthorized disclosure by Executive), about Employer or any of its Affiliates or the Business.  Confidential Information includes, but is not limited to, inventions, ideas, designs, computer programs, circuits, schematics, formulas, algorithms, trade secrets, works of authorship, mask works, developmental or experimental work, processes, techniques, improvements, methods of manufacturing, know-how, data, financial information and forecasts, product plans, marketing plans and strategies, price lists, customer lists, client information, client lists of any existing or prospective customer, data, distributor lists, documentation, and buyer lists of any of Employer or any of its Affiliates, and other information, in whatever form disclosed, relating to any of Employer or any of its Affiliates or the Business, including, but not limited to, financial statements, financial projections, business plans, listings and contractual obligations and terms thereof, components of intellectual property, unique designs, methods of manufacturing or other technology of any of Employer or any of its Affiliates. Confidential Information shall not include (i) information that is generally available to and known by the public at the time of disclosure to Executive, provided that such disclosure is through no direct or indirect fault of the Executive or person(s) acting on Executive's behalf, or (ii) information that is lawfully received from a third party that is not bound by a confidentiality agreement or other obligations of secrecy.

(l)      "**Disability**" means Executive's disability within the meaning of any long-term disability plan maintained by Employer or any of its Affiliates and covering Executive then in effect, or Executive's inability for a period of 90 consecutive days, either with or without a reasonable accommodation, to perform  her duties hereunder as a result of physical or mental illness, loss of legal capacity, or any other cause beyond Executive's control.

(m)      "**Effective Date**" has the meaning set forth in the preamble.

(n)      "**Employer**" has the meaning set forth in the preamble.

(o)      "**Executive**" has the meaning set forth in the preamble.

(p)      "**Good Reason**" means termination of the Term of Employment by Executive after the occurrence of any one or more of the following without Executive's prior written consent: (i) Employer's material breach of this Agreement without the Executive's consent, (ii) a reduction in Executive's Annual Salary (other than as part of an across-the-board reduction of salaries by Employer), (iii) relocation of Executive's primary workplace to a location that is more than 20 miles away from the Location of the Business, or (iv) a material reduction in Executive's title, role, authority or reporting relationship. In order for a resignation to constitute a resignation for "Good Reason," (1) Executive shall give Employer written notice of her intention to resign with Good Reason within 30 days following the initial occurrence of the circumstances that purportedly gave rise to Good Reason, which written notice shall describe such circumstances in reasonable detail, (2) Employer shall have a period of 30 days following receipt of such written notice to cure such circumstances, and (3) if Employer fails or refuses to cure such circumstances, Executive must resign within 30 days following the end of such cure period.

(q)      "**Location of the Business**" has the meaning set forth in Section 2.3.

(r)      "**Payment Commencement Date**" has the meaning set forth in Section 3.5.

(s)      "**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, government or any agency or political subdivision thereof.

(t)      "**Release**" has the meaning set forth in Section 3.5.

(u)      "**Restrictive Covenants**" means the covenants contained in ARTICLE IV of this Agreement.

(v)      "**Salary Continuation Payments**" has the meaning set forth in Section 3.5.

(w)      "**Section 409A**" has the meaning set forth in Section 3.6(a).

(x)      "**Taxable Reimbursements**" has the meaning set forth in Section 3.6(d)(i).

(y)      "**Term**" means the term of this Agreement, as specified in Section 2.1.

(z)      "**Term of Employment**" means the period during which Executive is employed by Employer.  The Term of Employment shall coincide with the Term and any termination of this Agreement shall automatically result in the termination of Executive's employment with Employer, the termination of the Term of Employment, and the termination of the Term.  Likewise, any termination of Executive's employment shall result in the termination of the Term of Employment, the termination of the Term, and the termination of this Agreement, except for those provisions of this Agreement that survive termination in accordance with their terms.

*ACTIVE 684927030v16*                                          4

(aa)    "**Without Cause**" means termination by Employer of the Term of Employment at Employer's sole discretion for any reason, other than by reason of Executive's death or Disability, and other than a termination of the Term of Employment by Employer for Cause.  For the avoidance of doubt, any automatic termination of the Term of Employment per the terms of this Agreement or applicable law, including any failure to renew the Term by Executive or Employer shall not be deemed a termination "Without Cause."

(bb)    "**Work Product**" has the meaning set forth in Section 4.3.

## ARTICLE II
## EMPLOYMENT AND DUTIES

**2.1    Term**.  The term of this Agreement will be for the period commencing on the Effective Date and continuing through the fifth (5th) anniversary of the Effective Date (the "**Initial Term**"), which shall automatically renew for successive one (1) year periods (each, a "**Renewal Term**"), unless terminated by either party upon at least sixty (60) days' written notice prior to the commencement of any Renewal Term and subject to early termination pursuant to the provisions of ARTICLE III (the period starting on the Effective Date, as extended by each Renewal Term and ending on such earliest period, the "**Term**").

**2.2    Position, Duties and Services**.  Executive will continue to serve as Chief Executive Officer of Employer and shall be Employer's most senior executive officer.  Executive will have such authority, responsibilities and duties that are consistent with such position and shall report directly to the Board. Executive shall devote Executive's full business time, attention and effort to the performance of Executive's duties as Chief Executive Officer, and shall perform the duties and carry out the responsibilities assigned to Executive, to the best of Executive's ability, in a diligent, trustworthy and businesslike manner for the purpose of advancing Employer and the Business. Employer shall indemnify Executive to the maximum extent permitted by law (including advancement of expenses) for costs, expenses and other damages incurred only in connection with claims brought or threatened directly by a third party or indirectly pursuant to a derivative claim against Executive in her capacity as an officer, director, manager or employee of Employer as long as Executive's interests and defenses are not adverse to Employer's interests and defenses, and shall cover Executive under any directors and officers errors and omissions liability insurance policy unless Executive engages in behavior excluded from coverage under such policy. The provisions of the immediately preceding sentence shall survive any termination of this Agreement or the Term.

**2.3    Location of the Business**.  During the Term of Employment, Executive will carry out her position, duties and services in the county of San Diego, California, or such other location as may be mutually agreed in writing by Employer and Executive from time to time (the "**Location of the Business**").

**2.4**    **Compensation**.

(a)         Annual Salary. Employer shall pay Executive an annual rate of salary of $225,000 in periodic installments in accordance with Employer's customary payroll practices, but no less frequently than monthly. Executive's annual salary, as may be increased (but not decreased, except as provided below) by Employer, in its sole discretion, or decreased at the election of Executive, in Executive's sole discretion, or by Employer, in its sole discretion, as part of an across-the-board reduction of salaries by Employer, from time to time, is hereinafter referred to as "**Annual Salary**".

(b)         Employee Plans.   During the Term, Executive and/or Executive's family, as applicable, will be eligible for participation in the employee plans and fringe benefits equivalent to those generally offered by Employer in the U.S. to its employees, including health, dental and vision insurance, and retirement plan participation.

(c)         Vacation Time. During the Term, Executive shall be eligible for unlimited flexible time off in accordance with Employer's usual policies regarding vacation in effect at such time; provided that Executive shall coordinate any time off in advance with the Board. Notwithstanding the foregoing, the Company reserves the right to amend or terminate such policies at any time in its sole discretion, subject to applicable law.

**ARTICLE III**
**EARLY TERMINATION**

**3.1**    **Death**.  Upon the death of Executive during the Term, this Agreement will terminate and Executive's estate will be entitled to payment of (i) the Accrued Amounts and (ii) any benefits accrued up to the date of her death payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

**3.2**    **Disability**.   In the event of Executive's Disability during the Term, Employer may terminate the Term of Employment in which case Executive will be entitled to payment of (i) the Accrued Amounts, (ii) any long-term disability benefits to which Executive may be entitled pursuant to the terms and conditions of any long-term disability policy or plan provided to Executive in which Executive has elected to participate, and (iii) any other accrued benefits payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

**3.3**    **Termination for Cause or Voluntary Resignation by Executive for Any Reason, Other than Good Reason**.  If the Term of Employment is terminated by Employer for Cause, or is terminated by Executive for any reason other than Good Reason, Employer will pay Executive through the end of the Term (i) the Accrued Amounts, and (ii) any vested but unpaid benefits payable pursuant to the terms of the benefit plans in which Executive is a participant, subject to

any forfeiture as a result of such termination under the terms of the benefit plans, as may be permissible under applicable law.

**3.4**     **Termination Without Cause or for Good Reason**.

(a)     If, during the Term, the Term of Employment is terminated by Employer Without Cause or is terminated by Executive for Good Reason, Employer will pay Executive (i) the Accrued Amounts and (ii) any vested but unpaid benefits payable pursuant to the terms and conditions of the benefit plans in which Executive is a participant.

(b)     Additionally, if, during the Term, the Term of Employment is terminated by Employer Without Cause or is terminated by Executive for Good Reason, provided Executive (i) complies with her post-termination obligations under this Agreement (including but not limited to the Restrictive Covenants applicable to the period after the Term) and that certain Restrictive Covenant Agreement of even date herewith by and between an Affiliate of Employer and the Executive, and (ii) signs and does not revoke a general release in the form of Exhibit A, Employer will pay Executive, under the terms set forth in Section 3.5 the following: the Annual Salary that would otherwise have been payable to Executive through (A) twelve months after the date the Term of Employment was terminated if termination occurs on or before December 31, 2025 or (B) six months after the date the Term of Employment was terminated if termination occurs after December 31, 2025, but in no event longer than the remainder of the Initial Term or Renewal Term (the "**Severance Period**") paid in accordance with Employer's normal payroll practices through the end of the Severance Period (provided that the first installment shall be in an amount to cover the time period from the commencement of the Severance Period through the date of such first payment).  In addition, if Executive elects to continue her Employer-sponsored health insurance benefit under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("**COBRA**"), Employee shall each month receive direct payment or reimbursement for the excess of the cost of such coverage for the Severance Period over the amount Executive would have otherwise been required to contribute if she had continued on Employer's applicable health insurance plan(s) as an employee with her then-current coverage election; provided, however, that if direct payment or reimbursement would result in penalties or other adverse tax consequences under applicable health plan nondiscrimination or other requirements, Employer shall instead provide Executive a monthly taxable payment for each applicable month during the Severance Period in the amount of the subsidy for such month (payable on Employer's first payroll date of each applicable month); provided, further, however, that such payments paid by Employer as reimbursement for such COBRA premium payments shall end upon the earlier of Executive becoming eligible for coverage under another employer's benefit plans or through self-employment.

**3.5**     **Release of Claims; Compliance with Article IV**.  Any salary continuation payments due to Executive under Section 3.4(b) of this Agreement (the "**Salary Continuation Payments**") shall be subject to the conditions that (i) Executive continues to comply with all obligations under ARTICLE IV of this Agreement applicable to the period after the Term and any continuing obligations under any other agreement with Employer or any of its Affiliates that she is party to, including but not limited to that certain restrictive covenant agreement entered on the date hereof

by and between the Employer and the Executive; and (ii) Executive executes and does not revoke a general release of claims provided by Employer at the time of termination (the "**Release**") in substantially the form attached hereto as Exhibit A, and the Release becoming effective within fifty-two (52) days after the termination date (or such earlier date as may be required by Employer). Payment of any Salary Continuation Payments shall commence on the first payroll date after the Release becomes irrevocable or, if earlier, the 60th day following the date of termination, provided, that if the 60-day period following the date of termination crosses calendar years, if necessary to comply with Section 409A of the Internal Revenue Code, payment shall not commence until the second calendar year (the commencement date, "**Payment Commencement Date**").  Any Salary Continuation Payments that are so delayed shall be paid on the Payment Commencement Date.

**3.6    Compliance with Section 409A**.

(a)            General.  It is the intention of both Employer and Executive that the benefits and rights to which Executive could be entitled pursuant to this Agreement comply with Section 409A of the Code and the treasury regulations and other guidance promulgated or issued thereunder ("**Section 409A**"), to the extent that the requirements of Section 409A are applicable thereto, and the provisions of this Agreement shall be construed in a manner consistent with that intention.  If Executive or Employer believes, at any time, that any such benefit or right that is subject to Section 409A does not so comply, it or she shall promptly advise the other and shall negotiate reasonably and in good faith to amend the terms of such benefits and rights such that they comply with Section 409A (with the most limited possible economic effect on Executive and on Employer).

(b)            6 Month Delay if Specified Employee.  If Executive is a "specified employee", as that term is defined in Section 409A, then no payment or benefit that is payable on account of Executive's "separation from service", as that term is defined for purposes of Section 409A, shall be made before the date that is six months after Executive's "separation from service" (or, if earlier, the date of Executive's death) if and only to the extent that such payment or benefit constitutes deferred compensation (or may be nonqualified deferred compensation) under Section 409A and such deferral is required to comply with the requirements of Section 409A.  Any payment or benefit delayed by reason of the prior sentence shall be paid out or provided in a single lump sum at the end of such required delay period in order to catch up to the original payment schedule.  Payments that qualify for the "short term deferral" exception or the "separation pay" exception to Section 409A contained in applicable treasury regulation under Section 409A shall not be subject to this deferral requirement.

(c)            Treatment of Each Installment as a Separate Payment. For purposes of applying the provisions of Section 409A to this Agreement, each separately identified amount to which Executive is entitled under this Agreement shall be treated as a separate payment.  In

addition, to the extent permissible under Section 409A, any series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

(d)      Taxable Reimbursements and In-Kind Benefits.

(i)      Any reimbursements by Employer to Executive of any eligible expenses under this Agreement that are not excludable from Executive's income for Federal income tax purposes (the "**Taxable Reimbursements**") shall be made by no later than the last day of the taxable year of Executive following the year in which the expense was incurred.

(ii)      The amount of any Taxable Reimbursements and the value of any in-kind benefits to be provided to Executive, during any taxable year of Executive shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year of Executive.

(iii)      The right to Taxable Reimbursement, or in-kind benefits, shall not be subject to liquidation or exchange for another benefit.

(e)      Distributions on Account of Separation from Service.  If and to the extent required to comply with Section 409A, no payment or benefit required to be paid under this Agreement on account of termination of Executive's employment shall be made unless and until Executive incurs a "separation from service" within the meaning of Section 409A.

(f)      No Acceleration of Payments.  Neither Employer nor Executive, individually or in combination, may accelerate any payment or benefit that is subject to Section 409A, except in compliance with Section 409A and the provisions of this Agreement, and no amount that is subject to Section 409A shall be paid prior to the earliest date on which it may be paid without violating Section 409A.

(g)      No Guaranty of 409A Compliance. Notwithstanding the foregoing, Employer does not make any representation to Executive that the payments or benefits provided under this Agreement are exempt from, or satisfy, the requirements of Section 409A, and Employer shall have no liability or other obligation to indemnify or hold harmless Executive or any beneficiary of Executive for any tax, additional tax, interest or penalties that Executive or any beneficiary of Executive may incur in the event that any provision of this Agreement, or any amendment or modification thereof, is deemed to violate any of the requirements of Section 409A.

## ARTICLE IV
## RESTRICTIVE COVENANTS

**4.1      Restrictive Covenants**.  Executive covenants that during the Term of Employment, Executive will not, either on her own account, jointly with another, or for or on behalf of any Person (other than Employer or any of its Affiliates), directly or indirectly:

(a)     own, manage or control, or become engaged or serve as a shareholder, bondholder, creditor, officer, director, partner, member, employee, agent, consultant, advisor, or representative of, any Competitive Business; provided, however, that Executive and her Affiliates may passively hold up to 1% of the outstanding publicly-traded securities of a Person engaged in a Competitive Business for investment purposes only;

(b)     solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any Competitive Business, or promote or assist, financially or otherwise, any Person engaged in any Competitive Business;

(c)     circumvent any acquisition, investment, venture or other business opportunities of Employer;

(d)     recruit, induce, solicit, or employ, or in any manner attempt to recruit, induce, solicit, or employ, any Person that is at such time, or during the previous 12 month period was, an employee, independent contractor, or consultant of any of Employer or any of its Affiliates, for the purpose of participating in a Competitive Business;

(e)     solicit any Person that is at such time, or during the previous two year period was, (i) a customer, supplier or business associate of any of Employer or any of its Affiliates, or (ii) a Person from whom any of Employer or any of its Affiliates solicited business or with whom any of Employer or any of its Affiliates discussed a potential business relationship, in each case, for the purpose of offering or providing services or products which are competitive with services or products provided by any of Employer with respect to the Business or which are otherwise competitive with any services or products provided (including, without limitation, products in any stage of development prior to the Effective Date) by any of Employer;

(f)     cause or seek to cause to be terminated or adversely affected, or otherwise interfere with, any agreement or arrangement of any kind to which any of Employer or any of its Affiliates is a party or from which they benefit; or

(g)     seek to interfere with or adversely affect the ongoing relationships between any of Employer or any of its Affiliates, on the one hand, and their suppliers, customers and professional and business contacts, on the other hand.

**4.2     <u>Confidential Information</u>**.

(a)     Executive shall not at any time divulge, communicate, or use to the detriment of any of Employer or any of its Affiliates or for the benefit of any other Person or Persons, or misuse in any way, any Confidential Information pertaining to any of Employer or any of its Affiliates and/or the Business.  Any Confidential Information or data now or hereafter acquired by Executive with respect to the Business engaged in by any of Employer or any of its Affiliates (which shall include, but not be limited to, information concerning any of Employer's or any of its Affiliates' financial condition, prospects, technology, customers, suppliers, sources of leads and methods of doing business) shall be deemed a valuable, special and unique asset of Employer that is received by Executive in confidence and as a fiduciary, and Executive shall remain a fiduciary to Employer with respect to all of such information. Notwithstanding the foregoing, nothing herein shall be

deemed to restrict Executive from disclosing Confidential Information as required to perform her duties under this Agreement or to the extent required by law.  If any Person makes a demand on Executive purporting to legally compel her to divulge any Confidential Information, Executive immediately shall give notice of the demand to Employer so that Employer may first assess whether to challenge the demand prior to Executive's divulging of such Confidential Information. Executive shall not divulge such Confidential Information until Employer has concluded not to challenge the demand, or has exhausted its challenge, including appeals, if any.  Upon the termination of the Term of Employment, or upon request by Employer, Executive shall deliver promptly to Employer all memoranda, notes, records, reports, manuals, drawings, designs, computer files in any media, electronically store information, and other documents (and all copies thereof) containing Confidential Information or business information pertaining to any of Employer or any of its Affiliates, or the Business.

(b)    Notwithstanding anything contained herein to the contrary, nothing contained in this Agreement is intended to prohibit or restrict Executive from exercising rights under the Defend Trade Secrets Act of 2016, which provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  If Executive files a lawsuit for retaliation by Employer for reporting a suspected violation of law, Executive may disclose Employer's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive (1) files any document containing the trade secret under seal; and (2) does not disclose the trade secret, except pursuant to court order.

**4.3    <u>Ownership of Developments</u>**.  All processes, concepts, techniques, inventions and works of authorship, including new contributions, improvements, formats, packages, programs, systems, machines, compositions of matter manufactured, developments, applications and discoveries, and all copyrights, patents, trade secrets, or other intellectual property rights associated therewith conceived, invented, made, developed or created by Executive during the Term of Employment either during the course of performing work for Employer, its subsidiaries, or any of its Affiliates, or their clients, or which are related in any manner to the business (commercial or experimental) of any of Employer, its subsidiaries, or any of its Affiliates or their clients (collectively, the "**Work Product**") shall belong exclusively to Employer and shall, to the extent possible, be considered a work made by Executive for hire for Employer within the meaning of Title 17 of the United States Code.  To the extent the Work Product may not be considered work made by Executive for hire for Employer, Executive agrees to assign, and automatically shall be deemed to assign at the time of creation of Work Product, without any requirement of further consideration, any right, title, or interest Executive may have in such Work Product. Upon the request of Employer, Executive shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment. Executive shall further: (i) promptly disclose the Work Product to Employer; (ii) assign to Employer, without additional compensation, all patent or other rights to such Work Product for the United States and foreign

countries; (iii) sign all papers necessary to carry out the foregoing; and (iv) give testimony in support of her inventions, all at the sole cost and expense of Employer. Executive hereby appoints any member of the Board of Employer as Executive's attorney-in-fact to execute documents on her behalf for this purpose. I agree that this appointment is coupled with an interest and will not be revocable. Notwithstanding the foregoing, and pursuant to California Labor Code section 2872, this Agreement does not apply to any invention which qualifies fully under the provisions of California Labor Code section 2870 (as set forth in Exhibit B).

**4.4** **Books and Records**.  All books, records, data, information, and accounts relating in any manner to any of Employer or any of its Affiliates, the Business, or the customers or clients of any of Employer or any of its Affiliates, whether prepared by Executive or otherwise coming into Executive's possession, shall be the exclusive property of Employer and shall be returned immediately to Employer on termination of the Term of Employment or on Employer's request at any time.

**4.5** **Non-Disparagement**. Except in the good faith performance of Executive's duties to Employer and its Affiliates while Executive is employed by Employer or any of its Affiliates and, in such case, solely in internal communications with other officers of Employer and other members of the Board, Executive agrees to not make any statement or issue any communication, written or otherwise, directly or indirectly, that disparages, criticizes, or otherwise reflects adversely on or encourages any adverse action whatsoever against Employer, including but not limited to Employer's products, services, finances, financial condition, capabilities or other aspect of its Business. Nothing contained in this Agreement in any way restricts or prevents Executive from (1) exercising Executive's rights under Section 7 of the National Labor Relations Act, (2) testifying truthfully in any legal proceeding, including, but not limited to, responding to any inquiries made by the EEOC or any government agency or making true and accurate statements in any good faith claim, suit, action or proceeding against Employer or any of its Affiliates, or (3) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Executive has reason to believe is unlawful.  Employer shall cause its and its Affiliates' respective officers and managers to not make any statement or issue any communication, written or otherwise, directly or indirectly, that disparages, criticizes, or otherwise reflects adversely on or encourages any adverse action whatsoever against Executive, except for true and accurate statements in any good faith claim, suit, action or proceeding against Executive or in connection with Employer's or its Affiliates' good faith assessment of Executive's performance of her duties to the Company and its Affiliates.

**4.6** **Reformation by Court**.  In the event that a court of competent jurisdiction shall determine that any provision of this ARTICLE IV is invalid or more restrictive than permitted under the governing law of such jurisdiction, then only as to enforcement of this ARTICLE IV and related definitions in Section 1.1 within the jurisdiction of such court, such provision shall be interpreted or reformed and enforced as if it provided for the maximum restriction permitted under such governing law.

**4.7**     **Breach of Restrictive Covenants**. In the event that Executive is in material breach of any of her obligations under this ARTICLE IV, Executive agrees that such a material breach could cause irreparable injury to Employer, and that if Employer shall bring legal proceedings against Executive to enforce any restrictive covenant, Employer shall be entitled to seek all available civil remedies, at law or in equity, including without limitation, an injunction without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy and without the necessity of posting any bond or other security, in addition to any other available remedies such as damages and attorney's fees and costs.

**ARTICLE V**
**MISCELLANEOUS**

**5.1**     **Executive Representations, Warranties and Covenants**.  Executive hereby warrants, represents and covenants that: (a) neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms of this Agreement, shall conflict with or constitute a breach of the terms, conditions or provisions of any agreement or instrument to which Executive is now a party or by which she is bound, or constitute a default under any of the foregoing; (b) Executive has the right and authority to enter into this Agreement and to perform all of the terms, covenants, provisions and conditions herein to be performed by Executive; and (c) Executive knows of no facts which would prevent Executive from complying with the terms of this Agreement.  Executive has not entered into, and agrees that she will not enter into, any agreement either written or oral in conflict with this Agreement. Executive further represents and warrants that during the Term of Employment, Executive shall not improperly use or disclose any confidential or trade secret information, if any, of any former employer or any other Person to whom Executive has an obligation of confidentiality, and Executive will not bring onto the premises of any of Employer or its Affiliates any unpublished documents or any proprietary or confidential information or materials belonging to any former employer or any other Person to whom Executive has an obligation of confidentiality unless expressly consented to in writing by that former employer or Person.

**5.2**     **Future Cooperation**. Executive agrees to reasonably cooperate with, and without cost to, Employer with respect to any investigations, legal proceedings, or other matters which arose during or after Executive's employment with Employer.  Executive agrees to remain available to participate, provide Employer with any relevant documentation in Executive's custody, control or possession, and if necessary, provide testimony in any such matters.  Employer will pay for or promptly reimburse Executive for any reasonable expenses, not including attorneys' fees (unless otherwise required by applicable law), Executive incurs in connection with such cooperation, provided Employer has agreed in advance to such expenses. This cooperation provision shall survive the termination of this Agreement.

**5.3**  **Right to Review and Seek Counsel; Construction.**  Executive hereby acknowledges that she has been provided with a copy of this Agreement for review prior to signing it, that she has been given the opportunity to have this Agreement reviewed by her own attorney prior to signing it, that she understands the purposes and effects of this Agreement, and that she has been given a signed copy of this Agreement for her records.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event that an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**5.4**  **Governing Law; Submission to Jurisdiction**.

(a)  This Agreement shall be governed by and construed in accordance with the internal laws of the state of California without giving effect to any choice or conflict of law provision or rule (whether of the state of California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the state of California. The terms of this Agreement will prevail and govern in the event of any conflict with any other agreement or policy relating to Executive's employment with Employer.

(b)  ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL OR STATE COURTS WITHIN THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE CITY OF SAN DIEGO AND COUNTY OF SAN DIEGO, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**5.5**  **Amendment and Waiver**.  The provisions of this Agreement may be amended, modified or waived only with the prior written consent of the board of managers of Employer and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement will be construed as a waiver of such provisions or affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

**5.6**  **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to

*ACTIVE 684927030v16*                                    14

effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**5.7     Entire Agreement**.   This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such employment in any way.

**5.8     Withholding of Taxes and Other Executive Deductions**.   Employer may withhold from any benefits and payments made pursuant to this Agreement all federal, state, city, and other taxes as may be required pursuant to any law or governmental regulation or ruling and all other normal employee deductions made with respect to Employer's employees generally.

**5.9     Headings**.   The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**5.10     Construction**.   The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party.

**5.11     Survival**.   The provisions of ARTICLE III, ARTICLE IV and ARTICLE V of this Agreement shall survive the termination or expiration of this Agreement or the termination of the Term of Employment pursuant to this Agreement in accordance with their terms.

**5.12     Counterparts**.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 43DD160C-EF45-44E3-A632-A399CB34C5B2

**IN WITNESS WHEREOF**, the parties hereto have executed this Employment Agreement as of the Effective Date.

EMPLOYER:

REBECCA BAMBERGER WORKS, LLC

By: *Alejandro Romero Paniagua*
Name: Alejandro Romero Paniagua
Title: Authorized Signatory

*[Signature Page to Employment Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the Effective Date.

EXECUTIVE:

DocuSigned by:

*Rebecca Bamberger*

BFF524AF3DEE4D5...

Rebecca Bamberger

*[Signature Page to Employment Agreement]*

**EXHIBIT A**
**FORM OF RELEASE**

**GENERAL RELEASE OF CLAIMS**

1. <u>Release of Claims</u>. Rebecca Bamberger ("**Executive**"), for herself and her family, heirs, executors, administrators, legal representatives and their respective successors and assigns, in exchange for the consideration received pursuant to Section 3.4 the employment agreement to which this release is attached as Exhibit A (the "**Agreement**"), and for other consideration the receipt and sufficiency of which are hereby acknowledged, does hereby release and forever discharge Rebecca Bamberger Works, LLC, a Delaware limited liability company ("**Employer**") and each of its direct and indirect subsidiaries, Affiliates (as defined in the Agreement), successors and assigns, as well as each of such entities' current or former directors, officers, employees, shareholders, direct or indirect equity owners, agents, alleged joint employers, benefits plans, benefit plan fiduciaries, and insurers, together with anyone acting in concert with any of them (collectively, the "**Released Parties**") from any and all actions, causes of action, suits, controversies, claims and demands whatsoever, arising from the beginning of time through the date on which Executive signs this General Release of Claims for or by reason of any matter related to Executive's employment with Employer and its subsidiaries and/or Affiliates or the termination of such employment, whether for tort, breach of express or implied contract (including without limitation the implied contractual covenant of good faith and fair dealing), wrongful discharge, intentional and/or negligent infliction of emotional distress, defamation, injuries incurred on the job or incurred as a result of loss of employment or otherwise, as well as all claims arising under other federal, state or local laws, statutes, regulations or ordinances governing labor or employment including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Fair Labor Standards Act, as amended, the Family Medical Leave Act, as amended, 42 U.S.C. § 1981, the Americans with Disabilities Act, as amended, the Age Discrimination in Employment Act ("**ADEA**"), as amended by the Older Workers Benefit Protection Act ("**OWBPA**"), and the Employee Retirement Income Security Act, as amended, the California Worker Adjustment and Retraining Notification Act; the California Business & Professions Code; the California Family Rights Act; the California Labor Code; the California Industrial Welfare Commission Wage Orders; the California Fair Employment and Housing Act; and the California and United States Constitutions (collectively, the "**Released Claims**"). Notwithstanding anything to the contrary contained herein, this release and waiver does not apply to, and Executive does not hereby release: (i) any rights to the receipt of employee benefits which vested on or prior to the date of this release; (ii) the right to receive Salary Continuation Payments as set forth in the Agreement; and (iii) any rights of Executive pursuant to the Membership Interest Purchase Agreement (as defined in the Agreement). If any claim is not subject to release, to the extent permitted by law, Executive waives any right or ability to be a class or collective action representative or to otherwise participate or recover any damages, injunctive, declaratory, monetary, or other relief, in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Employer or any of the other Released Parties is a party. Executive represents

Executive is not an "aggrieved employee" for any purpose including under the California Private Attorneys' General Act ("**PAGA**"), and therefore Employer is not liable for any penalties pursuant to PAGA for any conduct arising during or out of Executive's employment with Employer.

2. <u>Unknown Claims</u>. Executive understands that Executive is releasing claims that Executive may not now know about and that is Executive's knowing and voluntary intent. If Executive later discovers facts different from or in addition to those facts Executive currently knows or believes to be true, this Agreement, the waivers and releases will nevertheless remain effective in all respects. Executive expressly waives any and all rights under Section 1542 of the California Civil Code, and any like provision or principal of common law in any foreign jurisdiction.  Section 1542 provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

3. <u>Executive's Protected Rights; Non-Interference</u>. Notwithstanding the above, the Released Claims do not include any claim for vested and accrued benefits under any benefit plan governed by the Employment Retirement income Security Act of 1974, as amended; any claim for unemployment or state disability insurance benefits or worker compensation benefits; any claim of breach of the terms of this Agreement; claims that may arise after the execution of this Agreement; any claims for benefits under any directors' and officers' liability policy maintained by Employer or its subsidiaries or affiliated companies in accordance with the terms of such policy; or any other claims that cannot lawfully be released as a matter of law or public policy. Additionally, nothing in this Agreement waives Employee's right to file a charge, cooperate or participate in an investigation or proceeding conducted by an administrative or regulatory agency, such as the Equal Employment Opportunity Commission ("**EEOC**"), to file an unfair labor practice charge under the National Labor Relations Act, to make disclosures that are required by law, or to testify truthfully, when required or requested to attend the proceeding pursuant to a court order, subpoena, or written request from an administrative agency or the legislature.  However, the consideration provided to Executive in exchange for this General Release of Claims shall be the sole relief provided to Executive by the Released Parties for the Released Claims and Executive agrees to waive any monetary or other personal relief against the Released Parties in connection with any such claim, charge, or proceeding. Nothing in this General Release of Claims shall be interpreted to prohibit or prevent Executive from receiving a bounty or similar award for providing information to a government agency (such as the U.S. Securities and Exchange Commission) or filing or participating in any whistleblower complaint filed with the U.S. Securities and Exchange Commission.

4. <u>Promise Not To Sue</u>. Executive represents that she has not filed (or transferred to any Person (as defined in the Agreement) her right to file) any claim released in the Released Claims and, to the maximum extent permitted by applicable law and subject to the protected rights described above, covenants and agrees that she will never individually or with any Person file, or

commence the filing of (or transfer to any Person the right to file or commence filing of), any charges, lawsuits, complaints or proceedings with any governmental agency or against the Released Parties with respect to any of the Released Claims.

5.      No Admission of Liability. Executive understands and agrees that nothing in this General Release of Claims shall be deemed or construed at any time for any purpose as an admission by Employer, or evidence of any liability or unlawful conduct of any kind, or breach of any duty or monies owed to Executive or any other person.

6.      Executive's Representations and Warranties. Executive represents, warrants and confirms the following: (a) Executive has been paid all wages and other compensation that Executive has earned or become entitled to during Executive's employment with Employer, including but not limited to, all wages, salary, commissions, vacation and paid time off, reimbursable expenses, and any and all other benefits and compensation; (b) Executive has not sustained any workplace injury or illness as of Executive's Execution Date for which Executive has not already filed a claim; (c) Executive has not engaged in and is not aware of any unlawful conduct or misconduct contrary to or relating to the business of Employer; (d) Executive knows of no present claim Employee has that has not been released by this General Release of Claims; and (e) Executive has not sold, assigned, transferred or otherwise disposed of (or purported to assign or transfer) any of the claims, demands, obligations, or rights that are the subject of this General Release of Claims.

7.      [Waiver of ADEA Claims; Time to Consider. Executive acknowledges the Released Claims includes a waiver of rights and claims which Executive may have arising under the Age Discrimination in Employment Act of 1967, as amended. Executive understands that Employee has [twenty-one (21) calendar days] to consider this General Release of Claims (the "**Consideration Period**"). If Executive signs this General Release of Claims before the expiration of the Consideration Period, Executive acknowledges that Executive has done so knowingly and voluntarily, with full knowledge Executive is waiving any unused portion of the Consideration Period. If Executive has not communicated Executive's acceptance of this offer to Employer by emailing the executed and dated General Release of Claims to _____ before the expiration of this Consideration Period, this offer automatically expires. Executive has seven (7) calendar days from the date on which Executive signs this General Release of Claims to revoke the General Release of Claims. Executive must submit such revocation to Employer by emailing _____. This General Release of Claims does not become effective or enforceable until the eighth (8th) calendar day after Executive signs this General Release of Claims without revoking it (the "**Effective Date**").  Any changes to this General Release of Claims, whether material or not, shall not restart the Consideration Period. Executive further agrees and acknowledges Executive has consulted with or has had an opportunity to consult with an independent attorney of Executive's choosing before signing this General Release of Claims, and has been advised in writing to do so by the Employer.][1]

8.      [Voluntary Execution; Effective Date. Executive acknowledges Executive had a period of not less than five (5) business days from receipt of this General Release of Claims to consider whether to execute this General Release of Claims and to consult an attorney. This

---

[1] Note to Draft: To be inserted if Beck is at least 40 years old at the time the release is to be signed.

General Release of Claims becomes effective and binding when Executive has signed and returned the fully and properly executed General Release of Claims to the Employer.][2]

9.      Miscellaneous. Executive acknowledges that this General Release of Claims will be governed by and construed and enforced in accordance with the internal laws of the State of California applicable to contracts and instruments made and to be performed entirely within such State. If any portion or provision of this General Release of Claims is determined to be invalid or unenforceable by any court of competent jurisdiction, the remainder of this General Release of Claims shall be unimpaired and the invalid or unenforceable portion or provision shall be deemed severed or modified so that it is valid and enforceable and consistent with the parties' general intent insofar as possible, and the Parties agree to enter into a full and general release of all claims by Employee that is not invalid. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS GENERAL RELEASE OF CLAIMS OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE STATE OR FEDERAL COURTS OF THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE CITY OF SAN DIEGO AND COUNTY OF SAN DIEGO, AND EXECUTIVE IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  EXECUTIVE IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Executive acknowledges that she has read this General Release of Claims, that she has been advised that she should consult with an attorney before she executes this General Release of Claims, that she is receiving good and valuable consideration to which she would not otherwise be entitled in exchange for her execution of this General Release of Claims, and that she understands all of its terms and executes it voluntarily and with full knowledge of its significance and the consequences thereof. In the event Executive revokes her release of the Released Claims, Executive shall forfeit all Salary Continuation Payments set forth in Sections 3.4 and 3.5 of the Agreement.

IN WITNESS WHEREOF, Executive has signed and executed this General Release of Claims as of the date below (the "**Execution Date**").

_____
Rebecca Bamberger

Date:_____

---

[2] Note to Draft: To be inserted if Beck is under 40 years old at the time the release is to be signed.

*ACTIVE 684927030v16*                                20

**EXHIBIT B**

**<u>California Labor Code Section 2870 Notice</u>:**

a.       Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

      i.       Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

      ii.       Result from any work performed by the employee for the employer.

b.       To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

# EXHIBIT 6

EXECUTION VERSION

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# REBECCA BAMBERGER WORKS, LLC

*ACTIVE 684118884v10*

**TABLE OF CONTENTS**

Page

Article I DEFINITIONS ...................................................................................................2

   1.1   Definitions............................................................................................................2

   1.2   Other Definitions ..............................................................................................11

   1.3   Interpretation and Rules of Construction.........................................................11

Article II ORGANIZATION; PURPOSES .....................................................................12

   2.1   Formation..........................................................................................................12

   2.2   Name ................................................................................................................12

   2.3   Maintenance of Existence .................................................................................12

   2.4   Registered Office ..............................................................................................12

   2.5   Purpose.............................................................................................................13

   2.6   Title to Property; Units as Personal Property ..................................................13

   2.7   Term.................................................................................................................13

Article III UNITS...........................................................................................................13

   3.1   Units Generally ................................................................................................13

   3.2   Authorization and Issuance of Class A Units ...................................................13

   3.3   Authorization and Issuance of Class B Units ...................................................13

   3.4   New Units ........................................................................................................14

   3.5   Certification of Units ........................................................................................14

Article IV MEMBERS....................................................................................................15

   4.1   Members; Percentage Interests .........................................................................15

   4.2   Additional Capital Contributions.....................................................................15

   4.3   Withdrawal of Capital Contributions................................................................17

   4.4   Capital Accounts..............................................................................................17

   4.5   Voting ..............................................................................................................18

   4.6   Pre-Emptive Rights..........................................................................................18

   4.7   Restrictive Covenants .......................................................................................19

   4.8   No Duty on New Business or Corporate Opportunities.....................................21

   4.9   Company Platform Costs ..................................................................................21

Article V ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS ..............21

   5.1   Allocation of Profits and Losses .......................................................................21

   5.2   Special Allocations ...........................................................................................22

   5.3   Loss Limitation ................................................................................................24

i

| 5.4 | Other Allocation Rules | 24 |
| 5.5 | Distributions | 25 |
| 5.6 | Amounts Withheld | 26 |
| 5.7 | Tax Distributions | 26 |
| **Article VI MANAGEMENT** | | 26 |
| 6.1 | Appointment and Term of Board of Managers | 26 |
| 6.2 | Meetings | 27 |
| 6.3 | Quorum and Voting | 27 |
| 6.4 | Written Consent of the Board in Lieu of a Meeting | 28 |
| 6.5 | Authority of the Board | 28 |
| 6.6 | Limited Liability | 28 |
| 6.7 | Authority to Bind Company | 28 |
| 6.8 | Indemnification | 29 |
| 6.9 | Major Decisions | 29 |
| **Article VII TRANSFER** | | 30 |
| 7.1 | General | 30 |
| 7.2 | Substitute Member | 30 |
| 7.3 | Effect of Admission as a Substitute Member | 31 |
| 7.4 | Improper Transfer | 31 |
| 7.5 | Permitted Transfers | 31 |
| 7.6 | Right of First Refusal | 32 |
| 7.7 | Drag-Along Right | 32 |
| 7.8 | Tag-Along Right | 33 |
| 7.9 | Put Right | 34 |
| 7.10 | Call Right | 34 |
| 7.11 | Holdco Class B Units Redemption Rights | 34 |
| **Article VIII DISSOLUTION AND WINDING UP OF THE COMPANY** | | 34 |
| 8.1 | Dissolution of the Company | 34 |
| 8.2 | Winding Up of the Company | 35 |
| 8.3 | Negative Capital Accounts | 35 |
| **Article IX BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS, FISCAL YEAR, BANKING AND TAX MATTERS MEMBER** | | 35 |
| 9.1 | Accounting, Books and Records | 35 |
| 9.2 | Inspection | 35 |
| 9.3 | Reports | 35 |

ii

9.4    Company Funds ................................................................................................36

9.5    Partnership Representative ...............................................................................36

9.6    Tax Matters .....................................................................................................38

Article X MISCELLANEOUS ................................................................................39

10.1    Amendment ....................................................................................................39

10.2    Notices ...........................................................................................................39

10.3    Governing Law; Venue; Attorneys' Fees .......................................................40

10.4    Entire Agreement ...........................................................................................41

10.5    Counterparts ...................................................................................................41

10.6    Non-Waiver .....................................................................................................41

10.7    Further Assurances ..........................................................................................41

10.8    Guaranty .........................................................................................................41

| Exhibit A | Members, Addresses, Number of Units and Percentage of Interests |
|---|---|
| Exhibit B | Form of Joinder |
| Exhibit C | Option Agreement |
| Exhibit D | Holdco LLC Agreement |
| Exhibit E | Form of Reserve Class B Units Grant Agreement |
| Exhibit F | Form of Corresponding Holdco Class B Units Grant Agreement |

ACTIVE 684118884v10

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# REBECCA BAMBERGER WORKS, LLC

THE LIMITED LIABILITY COMPANY INTERESTS AND UNITS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY SIMILAR STATE STATUTE IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION AS PROVIDED IN THOSE STATUTES.

THE SALE OR OTHER DISPOSITION OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS IS RESTRICTED, AS SET FORTH IN THIS OPERATING AGREEMENT, AND THE EFFECTIVENESS OF ANY SUCH SALE OR OTHER DISPOSITION MAY BE CONDITIONED UPON THE RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE STATUTES.

BY ACQUIRING LIMITED LIABILITY COMPANY INTERESTS OR UNITS REPRESENTED BY THIS OPERATING AGREEMENT, A MEMBER REPRESENTS THAT IT WILL NOT SELL OR OTHERWISE DISPOSE OF THE LIMITED LIABILITY COMPANY INTERESTS OR UNITS WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID STATUTES AND THE RULES AND REGULATIONS THEREUNDER.

*ACTIVE 684118884v10*

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**REBECCA BAMBERGER WORKS, LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT (the "Agreement") is made effective as of March 30, 2023 (the "Effective Date"), by and among Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "Company"), Llorente & Cuenca USA, Inc., a Delaware corporation ("LLYC"), RBW Holdco, Inc., a California corporation ("Newco"), BAM Management Holdco, LLC, a Delaware limited liability company ("Holdco" and collectively with LLYC and Newco, the "Members"), Rebecca Bamberger, a California resident, the "Newco Guarantor"), and such other Persons as may be admitted as a member of the Company pursuant to the terms of this Agreement by executing a Joinder Agreement.

**R E C I T A L S**

**WHEREAS**, the Company was initially formed as a California corporation upon the filing of its articles of incorporation with the California Secretary of State on October 19, 2006 (the "Predecessor Articles");

**WHEREAS,** the Company previously entered into a reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "Code"), as contemplated by Revenue Ruling 2008-18, Situation 1, pursuant to which the Company's sole shareholder formed Newco, contributed all of the Company's outstanding stock to Newco and Newco filed a timely election to treat the Company as a qualified subchapter S Subsidiary ("QSUB" and such election, the "QSUB Election" (such reorganization, the "F Reorg");

**WHEREAS**, no earlier than one business following delivery of the QSUB Election by a private delivery service designated by the IRS to the Ogden Internal Revenue Submission Processing Center, the Company was converted into a Delaware limited liability company upon the filing of its certificate of conversion and certificate of formation with the Delaware Secretary of State on March 28, 2023 (the "Certificate of Formation") and concurrently therewith the Company entered into an operating agreement with its member (the "Initial Operating Agreement") (the "Conversion" and together with the F Reorg, the "Restructuring");

**WHEREAS**, in connection with a certain Membership Interests Purchase Agreement, dated of even date herewith, by and among the Company, Newco, the Newco Guarantor and LLYC (the "Membership Interest Purchase Agreement"), LLYC acquired from Newco on the Effective Date 80% of the issued and outstanding Interests (as defined below) of the Company; and

**WHEREAS**, the Members intend to enter into this Agreement in order to amend and restate the Initial Operating Agreement in its entirely and to define and express all of their respective rights and obligations with respect to, among other matters (i) their Interests in the Company, and (ii) the operation of the Company as a limited liability company.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises, covenants and agreements contained herein, and for other good and valuable

*ACTIVE 684118884v10*

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows and the Members hereby adopt this Agreement to be the limited liability company agreement of the Company under the laws of the State of Delaware:

# ARTICLE I

## DEFINITIONS

1.1     Definitions.  Capitalized terms used in this Agreement shall have the following meaning (and if not defined below, such capitalized terms shall have the meaning ascribed thereto in the Purchase Agreement):

"Accounting Firm" means an independent accounting firm of international recognized standing selected by the Board.

"Acquisition Income or Loss" means revenues, expenses, earnings or losses attributable to any business acquisition (whether by way of a share purchase, asset purchase or otherwise) made by the Company, either directly or indirectly (whether through a subsidiary or otherwise) at any time on or after the Effective Date.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq.*, as amended.

"Additional Capital Contribution" means, with respect to each Member, any Capital Contribution made by such Member to the Company after the Effective Date in accordance with Section 4.2.

"Adjusted Capital Account" means, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(a)     Add to such Capital Account the following items:

(i)     The amount, if any, that such Member is obligated to contribute to the Company upon liquidation of such Member's Interest; and

(ii)     The amount that such Member is unconditionally obligated to restore within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3) or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Subtract from such Capital Account such Member's share of the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

2

"Additional Class B Units" means those Class B Units issued to any Person following the Effective Date that are not Reserve Class B Units.

"Adjusted Capital Account Deficit" means, with respect to any Member, the negative balance, if any, in such Member's Adjusted Capital Account.

"Affiliate" means, with respect to any specified Person, a Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Approved Sale" has the meaning set forth in Section 7.7(a).

"Assumed Tax Rate" means, with respect to a particular item of income, gain, loss, deduction or expense, the highest combined marginal federal, state and local income tax rate applicable to individuals resident in California with respect to such item for the period in which it is allocated, taking into account the character of the relevant item (e.g., ordinary, capital or otherwise), increased by the highest marginal state income or gross receipts Tax applicable to S corporations in California. For the avoidance of doubt, the Assumed Tax Rate applies to all Members regardless of their particular circumstances.

"Board" has the meaning set forth in Section 6.1(a).

"Book Value" means, with respect to any Company property, the Company's adjusted basis for U.S. federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g), except that (a) the Book Value of any Company property contributed or deemed contributed to the Company shall initially be the Fair Market Value of such property as of the date of contribution and (b) the Book Value of any Company property shall be increased (or decreased) to reflect any adjustments to the adjusted tax basis of such property pursuant to Sections 732(d), 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

"Business" means the business of providing marketing and public relations services.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in San Diego, California, or Madrid, Spain are authorized or required by law to be closed for business.

"Capital Account" means, with respect to any Member, such Member's Capital Account determined in accordance with Section 4.4.

"Capital Call Notice" has the meaning set forth in Section 4.2(b).

3

*ACTIVE 684118884v10*

"Capital Contributions" means, with respect to any Member, the amount of money and the Fair Market Value of any property (other than money) contributed to the Company with respect to the Units in the Company held or purchased by that Member, including Additional Capital Contributions.

"Cash Available for Distribution" means, for any Fiscal Year or other lesser period, the excess of (a) the amount of gross cash receipts received by the Company (including from any reserves previously established that the Board determines are no longer required by the Company), less (b) (i) all expenditures made and to be made by the Company for such Fiscal Year or period, (ii) any reserves established or increased by the Board that the Board deem reasonably necessary for the operation of the Company, and (iii) amounts received by the Company as Capital Contributions which amounts the Company retains in its bank accounts (including, without limitation, any Additional Capital Contributions made pursuant to Section 4.2)

"Certificate of Formation" has the meaning set forth in the recitals.

"Class A Member" means a Member that holds Class A Units.

"Class A Percentage Interest" means a Class A Member's Interest in the Company's Class A Units expressed as a percentage.  The Class A Percentage Interest of each Class A Member shall equal (i) the total number of Class A Units owned by the Class A Member, divided by (ii) the total number of Class A Units owned by all Class A Members.

"Class A Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class A Units" in this Agreement.

"Class B Member" means a Member that holds Class B Units.

"Class B Units" means the Units having any privileges, preference, duties, liabilities, obligations, and rights that are specified with respect to "Class B Units" in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Minimum Gain" has the meaning set forth in Section 5.2(a).

"Company Nonrecourse Liability" has the meaning set forth in Section 5.2(d).

"Competitive Business" means any business enterprise or service or product offering, in existence or under development, that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business (or any in-development services or products that the Company has taken concrete steps towards providing or selling in the Business); provided, however, that Competitive Business shall not include the business of (a) providing technology, SaaS or consulting services to public relations professionals, and (b) marketing, development or sale of software for use by public relations professionals, and such businesses are specifically excluded from the definition of Competitive Business.

4

"Corresponding Holdco Class B Unit" means in respect of a Class B Unit issued by the Company, the Holdco "Class B Unit", issued pursuant to the terms of the Holdco LLC Agreement, held by the Person designated by the Company to which such Class B Unit relates.

"Corresponding Holdco Class B Units Grant Agreements" has the meaning set forth in Section 3.3(b).

"Covered Person" means any Person who is (i) a Member, (ii) an officer, director, limited liability company manager, trustee, employee, agent or representative of a Member or of any controlling Affiliate, shareholder, partner or member of a Member, (iii) the Partnership Representative, or (iv) a director, limited liability company manager (including a Manager), officer, partnership representative, agent or representative of the Company or any of its subsidiaries, in each case in such Person's capacity as such.

"EBIT" means, for any specified period, the consolidated net income (or loss) generated by the Company's operations (including Acquisition Income or Loss), determined in accordance with GAAP, *plus*, to the extent deducted in computing the Company's net income or loss:

(i)     interest expense (including imputed interest in capital lease payments); *plus*

(ii)    federal, state, or local income Taxes and state franchise Taxes to the extent based upon net income and not revenue; *plus*

(iii)   the non-cash cost of any equity granted to employees of the Company by the Company, or other derivative securities granted during the applicable period, valued in accordance with Statement of Financial Accounting Standards No. 123(R); *plus*

(iv)    any non-cash impairment charges; *plus*

(v)     any gains or losses attributable to the sale of any assets (other than inventories); *plus*

(vi)    extraordinary losses, the cumulative effect of a change in accounting principles and unrealized losses.

With the exception of Acquisition Income or Loss, in calculating the amount of EBIT, no account shall be taken of any item which, in accordance with GAAP would be classified as an "*extraordinary item*" or which is a non-recurring item out of the ordinary course of business.

"Effective Date" has the meaning set forth in the Preamble.

"Fair Market Value" means with respect to (i) the Company the amount that the Company would receive in an all-cash sale of all of its assets and businesses as a going concern (free and clear of all liens and after payment of indebtedness for borrowed money) in an arms-length transaction with an unaffiliated third party consummated on the day immediately preceding the date on which the event occurred which necessitated the determination of the Fair Market Value (assuming that all of the proceeds from such sale were paid directly to the Company other than an amount of such proceeds necessary to pay transfer taxes payable in connection with such sale,

5

which amount will not be received or deemed received by the Company), and (ii) any other item, the price (in cash or other consideration) at which said item would be sold in a sales transaction between a willing buyer and a willing seller negotiating on arms'-length terms. After a determination of Fair Market Value of the Company is made as provided in (i) above, the Fair Market Value of a Unit will be determined by making a calculation reflecting the cash distributions which would be made to the Members in accordance with this Agreement in respect of such Unit if the Company were deemed to receive the Fair Market Value of all of its assets and businesses as a going concern (free and clear of all liens and after payment of indebtedness for borrowed money) in an arms-length transaction with an unaffiliated third party in cash and then distributed the same to the Members in accordance with the terms of this Agreement incident to the liquidation of the Company after payment to all of the Company's creditors from such cash receipts other than payments to creditors who hold evidence of indebtedness for borrowed money, the payment of which is already reflected in the calculation of the Fair Market Value and assuming that all of the convertible debt and other convertible securities were repaid or converted (whichever yields more cash to the holders of such convertible securities) and all options to acquire Units (whether or not currently exercisable) that have an exercise price below the Fair Market Value of such Units were exercised and the exercise price paid. The Fair Market Value of an item described in (ii) above shall be deemed for all purposes to be equal to the Fair Market Value of such item as determined by the Board and specified in writing pursuant to a duly adopted resolution of the Board, so long as such determination is reasonable and made in good faith by the Board.

"Fiscal Year" means (i) the period commencing on the Effective Date and ending on December 31, 2023, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) such other fiscal year of the Company as shall be selected by the Board after the Effective Date.

"Fully Participating Member" has the meaning set forth in Section 4.6.

"Funding Notice" has the meaning set forth in Section 4.2(a).

"GAAP" means the United States of America generally accepted accounting principles, consistently applied (except as may be required by changes in such principles).

"Holdco" has the meaning set forth in the Preamble.

"Holdco LLC Agreement" means the limited liability company operating agreement of Holdco in the form attached hereto as Exhibit D.

"Holdco Member" means any member of Holdco other than LLYC or any transferee of LLYC's membership interest in Holdco.

"Holdco Redemption Event" means the occurrence of any of the following: (a) the termination of employment, consultancy services or any other services agreement or arrangement of any Holdco Member with the Company or any of its subsidiaries, for any reason; (b) the exercise of the Option Agreement by LLYC or Newco; (c) the sale of a majority of the issued and outstanding Interests of the Company or capital stock of an Affiliate of the Company that results in a change of control of the Company; or (d) upon the fifth anniversary of the grant of such Class B Units. As used in this definition, the term "control" means the possession, directly or indirectly,

6

of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Hurdle Amount" means, with respect to each Class B Unit, an amount equal to the amount determined by the Board to be necessary to cause such Class B Unit to constitute a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Revenue Procedure 2001-43, 2001-2 C.B. 191. The Hurdle Amount with respect to each Class B Unit shall be determined by the Board in its discretion and may be adjusted by the Board in its discretion to take into account the effects of additional Capital Contributions, distributions, issuances of Units, redemptions of Units and other changes in capital structure.

"Indemnitee" has the meaning set forth in Section 6.8(a).

"Interest" means a Member's economic rights, voting rights, other interest in the Company as a Member as provided in this Agreement or the Act (based on the type, class, or series of Unit or Units held by such Member).

"IRS" means the United States Internal Revenue Services.

"LLYC America" means Llorente & Cuenca América S.L.

"LLYC Group" means LLYC America and its Affiliates.

"LLYC Managers" has the meaning set forth in Section 6.1(b).

"LLYC Parent" means Llorente & Cuenca, S.A.

"LLYC Platform" means the business platform of the LLYC Group for the benefit of all the entities comprising the LLYC Group, which benefits include but are not limited to, the use of LLYC Group's intellectual property, infrastructure, logistics, management services, networks, know-how, human resources and professional development, client development, marketing, information and technology, and accounting and financial services.

"LLYC Platform Costs" means all costs and expenses incurred by the LLYC Group, taken as a whole, in developing, using, updating and operating the LLYC Platform.

"Major Decision" has the meaning set forth in Section 6.9(a).

"Manager" has the meaning set forth in Section 6.1(a).

"Member" means each of the Persons listed on Exhibit A hereto, and any Person admitted to the Company as a Member following the Effective Date; but, in each case, only for so long as such Person is the owner of one or more Units.

"Member Nonrecourse Debt" has the meaning set forth in Section 5.2(e).

"Member Nonrecourse Debt Minimum Gain" has the meaning set forth in Section 5.2(b).

"Members' Schedule" has the meaning set forth in Section 4.1(a).

7

*ACTIVE 684118884v10*

"Membership Interest Purchase Agreement" has the meaning set forth in the recitals.

"New Units" has the meaning set forth in Section 3.4.

"Newco" has the meaning set forth in the Preamble.

"Newco Guarantor" has the meaning set forth in the Preamble.

"Non-Participating Member" has the meaning set forth in Section 4.2(c).

"Offered Price" has the meaning set forth in Section 7.6(b).

"Option Agreement" means the option agreement entered into on the date of this Agreement by and among LLYC, Newco, the Newco Guarantor, and the Company, attached hereto as Exhibit C.

"Participating Member" has the meaning set forth in Section 4.2(c).

"Partnership Representative" has the meaning set forth in Section 9.5.

"Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, together with any guidance issued thereunder or successor provisions, and any similar provision of state, local or non-U.S. tax laws.

"Percentage Interest" means a Member's Interest in the Company expressed as a percentage.  The Percentage Interest of each Member shall equal (i) the total number of Units owned by the Member, divided by (ii) the total number of Units owned by all Members.  The Percentage Interests of the Members are set forth on Exhibit A as of the Effective Date.

"Permitted Transfer" has the meaning set forth in Section 7.5.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, government or any agency or political subdivision thereof.

"Predecessor Articles" has the meaning set forth in the recitals.

"Pre-Emptive Acceptance Notice" has the meaning set forth in Section 4.6.

"Pre-Emptive Exercise Period" has the meaning set forth in Section 4.6.

"Pre-Emptive Issuance Notice" has the meaning set forth in Section 4.6.

"Pre-Emptive Member" has the meaning set forth in Section 4.6.

"Pre-Emptive Prospective Purchaser" has the meaning set forth in Section 4.6.

"Profits" and "Losses" shall mean, for each Taxable Year or other period, an amount equal to the Company's taxable income, gain or loss for that year or other period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction

8

ACTIVE 684118884v10

required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments (without duplication):

(i)      Any income of the Company that is exempt from federal income tax or otherwise described in Code Section 705(a)(1)(B) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to that taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*) and non-deductible syndication costs described in Code Section 709, and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from that taxable income or loss;

(iii)    In the event the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of that adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of that asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of notwithstanding that the adjusted tax basis of that property differs from its Gross Asset Value;

(v)      Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required to be taken into account pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest in the Company, the amount of that adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"Proposed Purchaser" has the meaning set forth in Section 7.6(b).

"Purchase Notice" has the meaning set forth in Section 7.6(c).

"Regulations" or "Regs" means the federal income tax regulations promulgated under the Code by the United States Department of the Treasury or any amendment or successor provision to those regulations, including temporary regulations.

"Reserve Class B Units" means an aggregate of up to 420,000 Class B Units to be granted by the Company to Holdco pursuant to the terms of Section 3.3(b).

9

"Reserve Class B Units Grant Agreements" has the meaning set forth in Section 3.3(b).

"Reserve Class B Units Grantee Notice" has the meaning set forth in Section 3.3(b).

"Restricted Parties" means, collectively, Newco, the Newco Guarantor, the Class B Members, and their respective equity holders.

"Restricted Territory" means the United States and any other jurisdiction where the Company or any of its Affiliates conducts business.

"ROFR Member" has the meaning set forth in Section 7.6(a).

"ROFR Period" has the meaning set forth in Section 7.6(c).

"Subject Units" has the meaning set forth in Section 7.6(a).

"Substitute Member" means any Person who (i) holds Units, and (ii) has been admitted as a Member pursuant to Section 7.2.

"Tag-Along Member" has the meaning set forth in Section 7.8(a).

"Tag-Along Notice" has the meaning set forth in Section 7.8(a).

"Target Capital Balance" means, with respect to a Member, the net amount which would be distributed to such Member under this Agreement in a hypothetical liquidation of the Company on the last day of a period for which an allocation is to be made, determined as if the Company were to sell all of its assets for cash in an amount equal to their Book Value and distribute the net proceeds of such sale to the Members, after providing for the claims of creditors, pursuant to the provisions of this Agreement relating to a liquidation, dissolution or winding-up of the Company pursuant to Article VIII. To the extent applicable, the Target Capital Balance of a Member shall be reduced (below zero if necessary) by the sum of such Member's share of the Company's "partnership minimum gain" under Regs. §1.704-2(g), such Member's "partner nonrecourse debt minimum gain" under Regs. §1.704-2(i)(3), and the amount, if any, such Member would be required to contribute in the foregoing hypothetical liquidation. Nothing in this paragraph shall require any Member to be liable to the Company or any Person for any amount.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, surtax, employee or other withholding, or other tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"Tax Amount" means an amount of cash equal to (a) the product of (i) excess of the Board's estimate of the cumulative amounts of each class of income and gain allocated to a Member (including taxable income and gain attributable to Section 704(c) allocations) since the Effective Date over the cumulative amounts of each class of deduction, loss and expense allocated to such

10

Member since the Effective Date, multiplied by (ii) the Assumed Tax Rate applicable to such Member with respect to such classes of income and gain, minus (b) the cumulative amount of distributions previously made to such Member since the Effective Date pursuant to this Agreement.

"Taxable Year" means the Company's accounting period for U.S. federal income tax purposes, determined pursuant to Section 9.6(a).

"Territory" means the United States of America and anywhere else the Company or any of its subsidiaries is conducting the Business.

"Transfer" means any transfer, assignment, sale, conveyance, lease, partition, pledge or grant of a security interest in a Member's Interest in the Company, and includes any "involuntary transfer" such as a sale of any part of an Interest therein in connection with any bankruptcy or similar insolvency proceedings, or a divorce or other marital settlement involving any Member, or any other disposition or encumbrance of a Member's Interest.  For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges) of the stock, partnership, membership or other ownership interests of any Member that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Member, and any similar transactions involving the stock or other ownership interests of such Member), the effect of which is that the Persons who owned more than fifty percent (50%) of the outstanding stock or other ownership interests in such Member as of the Effective Date no longer control such Member, including loss of control as a result of not owning more than fifty percent (50%) of such stock or other ownership interests, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Member.  Capitalized terms containing such word as a root, such as "Transferee" or "Transferring," shall have corresponding meanings in this Agreement.

"Transferring Member" has the meaning set forth in Section 7.6(a).

"Unit" means a unit representing a fractional part of the Interests of the Members and shall include all types, classes, and series of Units issued hereunder, including the Class A Units and the Class B Units; provided, that any type, class, or series of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in this Agreement with respect to such type, class, or series of Unit and the Interests represented by such type, class, or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

1.2    Other Definitions.  As used in this Agreement, accounting terms to the extent they are not defined in this Agreement, have the respective meanings given to them under GAAP.

1.3    Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

11

ACTIVE 684118884v10

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)    the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation;"

(d)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular Article or Section of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; and

(g)    references to a Person are also to its successors and permitted assigns.

## ARTICLE II
## ORGANIZATION; PURPOSES

2.1    <u>Formation</u>.

(a)    The Members hereby acknowledge the formation and continuing existence of the Company under and pursuant to the Act.

(b)    This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2    <u>Name</u>.  The name of the Company is "Rebecca Bamberger Works, LLC".  The Company's name may be changed at any time by the Board, and notice of any such change shall be given to each Member within a reasonable time thereafter.

2.3    <u>Maintenance of Existence</u>.  The Company shall do all other things that are required or advisable to maintain the Company as a limited liability company existing pursuant to the Act.

2.4    <u>Registered Office</u>.  The registered office of the Company shall be as set forth in the Certificate of Formation.

12

2.5     Purpose.  The purpose of the Company shall be to engage in any lawful business that may be engaged in by a limited liability company organized under the Act, as such business activities may be determined by the Board from time to time.  The Company shall have the authority, all the powers of a limited liability company under the Act and the power to do all things necessary or convenient to accomplish its purpose and to operate its business as described in this Agreement.  Without limiting the foregoing, the Company's primary purpose is to operate the Business.

2.6     Title to Property; Units as Personal Property.  All of the Company's right, title and interest in tangible property, intangible property, real property, personal property and other assets acquired or developed by the Company shall be held in the name of the Company as an entity and no Member, by reason of its Interest or otherwise, shall have a personal ownership or other interest in any assets or property of the Company.  Each Member's Units in the Company shall be considered personal property for all purposes.

2.7     Term.  The term of the Company commenced on the date when its Predecessor Articles were filed with the California Secretary of State and shall be perpetual unless dissolved sooner pursuant to Section 8.1.

## ARTICLE III
## UNITS

3.1     Units Generally.  The Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes, or series. The Company is initially authorized to issue the Units authorized under Section 3.2 and Section 3.3 on the date hereof. Each type, class, or series of Units shall have the privileges, preference, duties, liabilities, obligations, and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class, or series.

3.2     Authorization and Issuance of Class A Units.  The Company is hereby authorized to issue Units designated as Class A Units. As of the date hereof, Class A Units are issued and outstanding to the Class A Members in the amounts set forth on the Members Schedule opposite each such Class A Member's name. The Class A Units shall entitle its holder to vote on all matters required or permitted to be voted on by the Members.

3.3     Authorization and Issuance of Class B Units.

(a)     The Company is hereby authorized to issue Units designated as Class B Units. As of the date hereof, Class B Units are issued and outstanding to the Class B Members in the amounts set forth on the Members Schedule opposite each such Class B Member's name.

(b)     Newco shall have the right, exercisable within thirty (30) calendar days from the Effective Date, to cause the Company to grant Reserve Class B Units to Holdco and Holdco to subsequently grant an equal number of Corresponding Holdco Class B Units to up to four employees or consultants of the Company designated by Newco and reasonably acceptable to the Company, by delivering written notice to the Company and Holdco setting forth (i) the names of each employee or consultant to be granted Corresponding Holdco Class B Units and (ii) the number of Corresponding Holdco Class B Units to be granted to each such employee or consultant

13

(the "Reserve Class B Units Grantee Notice"). As soon as reasonably practicable following the receipt of the Reserve Class B Units Grantee Notice by the Company and Holdco, (i) the Board shall determine the Hurdle Amount for such Reserve Class B Units, (ii) the Company shall grant such Reserve Class B Units to Holdco pursuant to a grant agreement in the form attached hereto as Exhibit E, to be executed by the Company, Holdco and each such the employee or consultant (the "Reserve Class B Units Grant Agreements"), and (iii) Holdco shall grant such Corresponding Holdco Class B Units to each such the employee or consultant pursuant to a grant agreement in the form attached hereto as Exhibit F, to be executed by Holdco and each such employee or consultant (the "Corresponding Holdco Class B Units Grant Agreements"), in accordance with the terms of the Holdco LLC Agreement.

(c)     Unless otherwise set forth in the Reserve Class B Units Grant Agreements, the Corresponding Holdco Class B Units Grant Agreements, or in a written instrument approved by the Board and executed by a Holdco Member, the number of Class B Units held by Holdco that corresponds to any Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco shall be automatically forfeited and shall be redeemed by the Company in accordance with Section 7.11 upon termination of such Holdco Member's employment or service with the Company or any of its Affiliates for any reason. The Class B Units shall be non-voting.

(d)     Each Person who receives a Class B Unit shall make a timely and effective protective election under Section 83(b) of the Code with respect to such Class B Units and shall promptly provide a copy of such election to the Company. The Members and the Company intend that each Class B Unit shall constitute a "profits interest" under IRS Revenue Procedures 93-27 and 2001-43 and such other Treasury Regulations or authorities as may be promulgated with respect to profits interests and similar equity interests, and this Agreement shall be interpreted and applied consistently with such intent. The Board is authorized to take such actions as it may deem necessary in its sole discretion to carry out such intent, including the making of any elections, filing of any documentation, or amending of this Agreement. The Members agree to take such actions as may be reasonably requested by the Company in connection therewith.

3.4     New Units. In addition to the Class A Units and Class B Units authorized on the date hereof pursuant to Section 3.2 and Section 3.3, the Company is hereby authorized to issue or sell to any Person, for consideration and on other terms and conditions, in each case, as determined by the Board, any Units (including any new type, class, or series of Class A Units or Class B Units) that are not authorized on the date hereof, including Units with different rights, privileges, or preferences (collectively, "New Units").

3.5     Certification of Units.

(a)     The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Members.

(b)     In the event that the Board shall issue certificates representing Units in accordance with Section 3.5(a), then in addition to any other legend required by applicable law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

14

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
## MEMBERS

4.1   Members; Percentage Interests.

(a)   The Board shall maintain a schedule of all Members, their respective mailing addresses, the number of Units held by each of them, their Percentage Interests and such additional information as may be required pursuant to this Agreement (the "Members' Schedule") and shall update the Members' Schedule upon the issuance or Transfer of any Units (including New Units) to any new or existing Member.  A copy of the Members' Schedule as of the execution of this Agreement is attached hereto as Exhibit A.

(b)   Upon any issuance of additional Units (including New Units) or Transfer of any Units (in either case in accordance with the provisions of this Agreement), the Board shall, without the requirement to obtain the consent of any other Member, amend this Agreement and the Members Schedule solely to reflect such issuance or Transfer, and if applicable, admission of a new Member.

4.2   Additional Capital Contributions.

(a)   In the event the Company requires additional funds, any member of the Board may deliver written notice thereof to the other members of the Board to determine whether to request an Additional Capital Contribution from the existing Class A Members, which notice (a "Funding Notice") shall specify the uses for such additional funds and shall call for a meeting of the Board to be held not later than two (2) Business Days following the date of the Funding Notice.

(b)   If the Board determines to seek Additional Capital Contributions from the existing Class A Members, then the Board shall provide notice thereof (a "Capital Call Notice") to each Class A Member setting forth each Class A Member's *pro rata* share of such Additional Capital Contribution (determined by multiplying each Class A Member's Class A Percentage Interest by the amount of such Additional Capital Contribution)  and the anticipated closing date

15

for such funding, which shall not be less than ten (10) Business Days following the date of the Capital Call Notice (unless, in the determination of the Board acting reasonably, the circumstances giving rise to such Additional Capital Contribution require that funding thereof occur sooner, in which case the Board in its sole and absolute discretion may specify a shorter funding period).

(c)     If any Class A Member fails to make an Additional Capital Contribution required under a Capital Call Notice (a "Non-Participating Member"), then each other Class A Member ("Participating Member") (x) may withdraw such Class A Member's required Additional Capital Contribution and (y) has the right (but not the obligation) to fund its own and any Non-Participating Member's required and unfunded Additional Capital Contribution as an Additional Capital Contribution or as a loan to the Company, which loan shall accrue interest at a rate comparable to prevailing interest rates charged by commercial lenders at the time such loan is made and shall be represented either by a promissory note or appropriate entries in the financial statements or other books and records of the Company.  If more than one Participating Member elects to fund (whether as a loan or as an Additional Capital Contribution) the amount of the Additional Capital Contribution failed to be made by a Non-Participating Member under this Section 4.2, then each such Participating Member shall have the right to fund its *pro rata* share of such unfunded amount (determined by multiplying such unfunded amount by a fraction, the numerator of which is the total number of Class A Units owned by such Participating Member and the denominator of which is the total number of Class A Units owned by all Participating Members who exercise their right to make such funding).  For the avoidance of doubt, the foregoing provisions are not intended to create any obligation of a Member to any creditor of, or other claimant against, the Company or to any other third party, and no creditor, claimant, or other third party shall be deemed a third-party beneficiary or have any other right or claim against a Member by virtue of this provision or any other provision of this Agreement.

(d)     In exchange for any Additional Capital Contribution made by any Class A Member in accordance with this Agreement, the Company shall issue additional Class A Units to such Member at a per Class A Unit price equal to the Fair Market Value thereof determined as of immediately after the associated Additional Capital Contribution made by such Class A Member. The Board shall cause the update of Exhibit A from time to time to reflect any changes to the information set forth thereon made in accordance with the terms of this Agreement.  Any updates or revisions to Exhibit A in accordance with this Agreement shall not constitute an amendment of this Agreement for purposes of Section 10.1.

(e)     With respect to any guaranty that a Member or any of its Affiliates may provide to a third party with respect to any Company indebtedness in accordance with this Agreement, the Company, its receiver or its trustee shall indemnify, hold harmless and pay all judgments and claims against any guarantor, or its successors and assigns, for any liability, loss or damage incurred by them in making payments with respect to such indebtedness or obligation, including reasonable costs and attorneys' fees (which attorneys' fees may be paid as incurred) and any amounts expended in the settlement of any claims of liability, loss or damage, provided that any such indemnification shall be recoverable only from assets of the Company and not from the assets of any Member.  The indemnification provided herein shall survive the termination of this Agreement and the dissolution of the Company.

*ACTIVE 684118884v10*

4.3     <u>Withdrawal of Capital Contributions</u>.  No Member shall have the right to withdraw or reduce such Member's Capital Contribution, or to receive any distributions from the Company, except as otherwise provided herein.  No Member shall have the right to demand or receive any Company property.  No Member shall have priority over any other Member with respect to the return of Capital Contributions, allocations of Profits or Losses or any other distributions, except as expressly provided in this Agreement.

4.4     <u>Capital Accounts</u>.

(a)     A separate Capital Account will be maintained for each Member in accordance with the provisions of Regulations Section 1.704-1(b)(2)(iv).

(b)     A "<u>Capital Account</u>" means, with respect to any Member, the Capital Account maintained for that Member which equals, as of the Effective Date, the amount set forth on <u>Exhibit A</u> for each Member, and shall be maintained in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited (A) the Member's Capital Contributions, (B) the Member's allocative share of Profits and any items in the nature of income or gain that are specially allocated pursuant to <u>Section 5.2</u> hereof and (C) the amount of any Company liabilities assumed by the Member or that are secured by any property distributed to the Member.  The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*c*)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(*d*)(*2*);

(ii)     To each Member's Capital Account there shall be debited (A) the amount of money and the Fair Market Value of any property distributed to the Member pursuant to any provision of this Agreement, (B) the Member's allocative share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to <u>Section 5.2</u> hereof, and (C) the amount of any liabilities of the Member assumed by the Company or that are secured by any property contributed by the Member to the Company;

(iii)     In the event Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units; and

(iv)     In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with that Regulation.  In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts or any debits

17

or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Members), the Board may make the modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Article VIII hereof upon the dissolution of the Company. The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

4.5     Voting. Except as otherwise expressly provided by this Agreement or as otherwise required by the Act or applicable law, (a) each Class A Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under this Agreement; and (b) no Class B Units shall entitle the holder thereof to vote on any matters required or permitted to be voted on by the Members.

4.6     Pre-Emptive Rights. Except for issuances of Units in connection with an Approved Sale in which such Member is required to sell all of such Member's Units or issuances Class B Units, in the event the Company intends to issue Units to any Person, each Member of the Company (each, a "Pre-Emptive Member") shall have the right to purchase its, his or her applicable *pro rata* portion of such class of Units that the Company proposes to issue (so if such right is exercised, the proportion that the number of Units of such class held by such Member immediately prior to such issuance bears to the aggregate number of such class of Units issued and outstanding immediately prior to such issuance of such Pre-Emptive Member shall not be diluted in connection with the issuance of any additional Units). The Company shall give written notice (a "Pre-Emptive Issuance Notice") of such proposed issuance or sale by the Company of Units to the Pre-Emptive Members within ten (10) Business Days following any meeting of the Board at which any such issuance or sale by the Company is approved. The Pre-Emptive Issuance Notice shall set forth the material terms and conditions of the proposed issuance, including:

(a)     the number and description of Units proposed to be issued;

(b)     the proposed issuance date, which shall be at least ten (10) Business Days from the date of the Pre-Emptive Issuance Notice;

(c)     the identity of the prospective purchaser, if available (a "Pre-Emptive Prospective Purchaser");

(d)     the proposed purchase price per Unit of the Units;

(e)     if the consideration to be paid by the Pre-Emptive Prospective Purchaser includes non-cash consideration, the Board's good-faith determination of the fair market value thereof; and

(f)     a current copy of the Members' Schedule.

18

Each Pre-Emptive Member shall have the right, for a period of ten (10) Business Days following the receipt of an Issuance Notice (the "Pre-Emptive Exercise Period"), to elect irrevocably to purchase all or any portion of its, his or her *pro rata* portion of such Units to be issued (so if such right is exercised, the proportion that the number of Units of such class held by such Member immediately prior to such issuance bears to the aggregate number of such class of Units issued and outstanding immediately prior to such issuance of such Pre-Emptive Member shall not be diluted in connection with the issuance of any additional Units) of the Units to be issued at a per Unit purchase price equal to the per Unit purchase price set forth in the Pre-Emptive Issuance Notice by delivering a written notice to the Company (a "Pre-Emptive Acceptance Notice") specifying the number of Units such Pre-Emptive Member desires to purchase. The delivery of a Pre-Emptive Acceptance Notice by a Pre-Emptive Member shall be a binding and irrevocable offer by such Pre-Emptive Member to purchase the Units described therein. If all the Units offered to a Pre-Emptive Member are not fully subscribed, the Company shall offer to each Pre-Emptive Member subscribing its, his or her full *pro rata* portion of such class of Units upon the terms set forth in this Section 4.6 (a "Fully Participating Member") a portion of such remaining Units equal to the quotient obtained by dividing (A) the number of Units of such class held by such Fully Participating Member, by (B) the number of Units of such class held by all Fully Participating Members who wish to subscribe for such remaining Units; provided that such Fully Participating Member exercises his, her or its rights to purchase such additional Units within ten (10) Business Days after receipt of such offer. The failure of a Pre-Emptive Member to deliver a Pre-Emptive Acceptance Notice by the end of the Pre-Emptive Exercise Period shall constitute a waiver of such Pre-Emptive Member's rights under this Section with respect to the issuance of such Units, but shall not affect such Pre-Emptive Member's rights with respect to any future issuances of Units. Upon the expiration of the offering periods described above, the Company shall be entitled to issue and sell such Units that the Pre-Emptive Members have not elected to subscribe during the one hundred and twenty (120) days following such expiration at a price not less than one hundred percent (100%) of the price set forth in the Pre-Emptive Issuance Notice and on other terms and conditions not materially more favorable to the purchasers thereof than those initially offered to the Pre-Emptive Members. Any Units offered by the Company after such period of one hundred and twenty (120) days must be reoffered to the Pre-Emptive Members pursuant to the terms of this Section 4.6.

4.7     Restrictive Covenants.

(a)     Confidentiality. The Restricted Parties shall, and shall cause each of their respective Affiliates to, maintain, at all times (including after any time that such Restricted Party ceases to be a Member), the confidentiality of all information furnished to such Restricted Party pertaining to the Company ("Confidential Information"), other than information that such Restricted Party can demonstrate (a) is or becomes generally available to the public other than as a result of a disclosure by such Restricted Party or such Restricted Party's Affiliates or officers, directors, limited liability company managers, trustees, employees, agents or representatives; (b) becomes available to such Restricted Party on a non-confidential basis from a third party who is not known by such Restricted Party to be prohibited by any obligation of confidentiality owed to the Company from transmitting the information to such Restricted Party; or (c) was already in the possession of such Restricted Party or such Restricted Party's Affiliate prior to their becoming a Restricted Party; provided, however, that the prohibitions set forth in this Section 4.7(a) shall not prohibit disclosure of Confidential Information if required to be disclosed by a court of competent

19

*ACTIVE 684118884v10*

jurisdiction, administrative body, or governmental body or by subpoena, summons, or legal process, or by applicable law; provided that, to the extent permitted by applicable law, the Restricted Party required to make such disclosure shall provide to the Board prompt notice of such disclosure.

(b)     Non-Compete; Non-Solicit.   In light of the Restricted Parties' access to Confidential Information and position of trust and confidence with the Company, each  Restricted Party, for themselves and their respective equity holders, hereby covenants and agrees that, during the period of such Restricted Party's continued employment or other engagement with the Company (including as Member or holder of Class B Units) or any subsidiary of the Company, they shall not, and shall cause their respective Affiliates (including their respective equity holders) to not, directly or indirectly, (i) invest, acquire, finance, own any interest in, manage, control, participate in (whether as an officer, director, employee, consultant, partner, agent, representative, lender, or otherwise), consult with, render services for, use or authorize the use of their name in connection with, provide any Intellectual Property to any Person engaged in, operate or in any manner engaged in, directly or indirectly, a Competitive Business, anywhere in the Restricted Territory; provided, however, that neither the Restricted Parties nor any of their respective Affiliates shall be prohibited from owning up to one percent (1%) of the outstanding stock of any Person that is publicly traded on a national securities exchange or in the over the counter market so long as such Person has no active participation in the business or management of such Person, (ii) hire, employ, engage, recruit, solicit, induce, encourage, contact or approach for employment or engagement any Person that served as an employee,  consultant or other service provider to the Company, any subsidiary of the Company, Buyer or any Affiliate of Buyer at any time when such Restricted Party owned Interests or any other equity ownership of the Company or any of its subsidiaries, or was otherwise engaged with the Company, any subsidiary of the Company, Buyer or any Affiliate of Buyer, or take any other action that is intended to induce or knowingly encourage, or has the direct and intended effect of inducing or encouraging, any such Person to terminate their employment or engagement with the Company, any of its subsidiaries, Buyer or any of its Affiliates, or (iii) divert or take away the business (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by Buyer, the Company, their respective Affiliates or their respective subsidiaries) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of Buyer, the Company, their respective Affiliates or their respective subsidiaries, or otherwise take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business relation of Buyer, the Company and their respective Affiliates or their respective subsidiaries from maintaining the same business relationships with such Person.

(c)     Non-Disparagement.   The Restricted Parties, for themselves, and their respective Affiliates (including their equity holders), hereby covenant and agree to not, directly or indirectly, except for true and accurate statements in any good faith claim, suit, action or proceeding against the Company, any of its subsidiaries, or their respective Affiliates, make any statement or any other expressions on television, radio, the internet or other media or to any third party, including in communications with any customers, vendors, prospects, sales representatives or distributors, which are in any way disparaging of the Company, any of its subsidiaries, the Business, Buyer or any of their respective Affiliates (including, in the case of Buyer, LLYC Parent and LLYC Partners, S.L.).   Nothing in this Section 4.7(c) shall limit any Restricted Party's ability

20

to make true and accurate statements or communications in connection with any disclosure such Restricted Party reasonably believes is required pursuant to applicable Law.

(d)    Remedies.  In the event of a breach of this Section 4.7, the Restricted Parties recognize that monetary damages shall be inadequate to compensate the Company, and the Company shall be entitled, without the posting of a bond or similar security or the necessity of showing actual damages, to an injunction or other equitable relief restraining such breach, with the costs (including reasonable attorneys' fees) of securing such injunction to be borne by such Restricted Party.  Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove. Each Restricted Party, for themselves and  their equity holders, hereby acknowledge (i) the necessity of protection against the prohibited actions described in this Section 4.7 in order to protect the value of the Company's business (including the goodwill inherent therein), (ii) that the nature and scope of such protection have been carefully considered by the parties hereto and (iii) that the covenants set forth in this Section 4.7 will not interfere with such Restricted Parties' ability to earn a living. If any court of competent jurisdiction determines that any of the restrictions in this Section 4.7 are too broad or the geographic area covered too extensive, the other provisions of this Section 4.7 shall nonetheless stand, and such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

4.8    No Duty on New Business or Corporate Opportunities.  The Members expressly acknowledge and agree that (a) neither LLYC nor any of its Affiliates (including the LLYC Managers) will be obligated to present new business or corporate opportunities to the Company or its subsidiaries, (b) none of the other Members or their respective Affiliates (including Newco and Holdco) will acquire or be entitled to any interest or participation in any such new business or corporate opportunities as a result of the participation of LLYC or any of its Affiliates (including any LLYC Managers) in such new business or corporate opportunities, (c) the involvement of LLYC or any of its Affiliates (including the LLYC Managers) in any new business or corporate opportunity will not constitute a conflict of interest by any such Persons with respect to the Company, its subsidiaries or its Members, and (d) they are hereby expressly waiving (to the fullest extent permitted by applicable law) any rights to assert any claim that such involvement by LLYC or any of its Affiliates (including the LLYC Managers) in any new business or corporate opportunity breaches any fiduciary or other duty or obligation owed to the Company or any Member.

4.9    Company Platform Costs.  The Members acknowledge that the Company will have access to and benefit from the LLYC Platform and therefore agree that the Company shall pay its share of the LLYC Platform Costs, which shall be allocated among the companies in the LLYC Group in good faith and on a consistent basis.

**ARTICLE V**
**ALLOCATION OF**
**PROFITS AND LOSSES; DISTRIBUTIONS**

5.1    Allocation of Profits and Losses.

21

(a)    The remaining amount of Profits and Losses and items thereof after making the special allocations set forth in Section 5.2 shall be allocated among the Members in such manner and in such amounts as shall cause the Capital Account balance of each Member to equal (or come as closely as possible to equaling) the Target Capital Balance of such Member.

5.2    Special Allocations.  The Company shall make the following special allocations in the following order:

(a)    Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a Taxable Year so that an allocation is required by Regulations Section 1.704-2(f), each Member shall be specially allocated items of income and gain for that Taxable Year (and, if necessary, subsequent Taxable Years) equal to the Member's share of the net decrease in Company Minimum Gain as determined by Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.2(a) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and this shall be interpreted consistently therewith.  The term "Company Minimum Gain" shall have the meaning of "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

(b)    Member Nonrecourse Debt Minimum Gain Chargeback.  Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article V, if there is a net decrease in the Member Nonrecourse Debt Minimum Gain attributable to any Member Nonrecourse Debt during any Taxable Year, any Member who has a share of that Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income or gain for that Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.2(b) is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted in a manner consistent with that Regulation.  The term "Member Nonrecourse Debt Minimum Gain" shall have the meaning of "partner nonrecourse debt minimum gain" set forth in Regulations Section 1.704-2(i)(3).

(c)    Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain for such Taxable Year shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 5.2(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit at the end of the relevant Taxable Year after all other allocations

22

provided for in this <u>Article V</u> have been tentatively made as if this <u>Section 5.2(c)</u> was not in the Agreement.

(d)   <u>Allocation of Nonrecourse Liability Deductions</u>.  Deductions attributable to any Company Nonrecourse Liability for any Taxable Year shall be specially allocated among the Members in proportion to their respective Percentage Interests.  The term "<u>Company Nonrecourse Liability</u>" has the meaning set forth in Regulations Section 1.704-2(b)(3) for a nonrecourse liability of a partnership.

(e)   <u>Member Nonrecourse Debt Deductions</u>.  Deductions attributable to any Member Nonrecourse Debt shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member nonrecourse deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).  The term "<u>Member Nonrecourse Debt</u>" has the same meaning as partner nonrecourse debt in Regulations Section 1.704-2(b)(4).

(f)   <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)($m$)($4$) or Section 1.704-1(b)(2)(iv)($m$)($2$), respectively, to be taken into account in determining Capital Accounts, the amount of the adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis) and that gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

(g)   <u>Imputed Interest</u>.  If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483 or 1271 through 1288 or corresponding provisions of subsequent federal income tax law, any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to its Capital Account, as appropriate.

(h)   <u>Contributed Property; Tax Allocations; Code Section 704(c)</u>.  Each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as those items are allocated for book purposes under this <u>Article V</u>.  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of that property to the Company for federal income tax purposes and its initial Book Value (as determined in accordance with the definition of Book Value).  In the event the Book Value of any Company asset is adjusted pursuant to the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to that asset shall take account of any variation between the adjusted basis of that asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Allocations described in this <u>Section 5.2(h)</u> shall be made utilizing the "remedial method" except to the extent another method permissible under Regulations Section 1.704-3 and

23

in conformity with Regulations Sections 1.704-1(b)(2)(iv)(*f*) and 1.704-1(b)(4)(i) is adopted by the Board.

5.3     Loss Limitation.  Losses allocated pursuant to Section 5.2 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Taxable Year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 5.2 hereof, the limitation set forth in this Section 5.3 shall be applied on a Member by Member basis, and Losses not allocable to any Member as a result of that limitation shall be allocated to the other Members in accordance with the positive balances in those Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(*d*) .

5.4     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other items allocable to any period (including, without limitation, on the admission of Members to the Company on different dates), Profits, Losses and any other items shall be determined for each Taxable Year pursuant to income tax accounting methods adopted by the Board for the Company consistently applied and shall be allocated among the Members in the manner provided in this Agreement. Prior to making allocations for a period, Capital Accounts shall be adjusted to reflect all contributions, distributions and other events during the period that affect Capital Account balances other than said allocations.

(b)     The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Company income and loss for income tax purposes.

(c)     Subject in all cases to applicable law, if there is a Transfer of Units in accordance with this Agreement, for purposes of allocations of Profits and Losses and distributions of cash and property, the effective date of the Transfer as to the Company will be the effective date stated in the Transfer instrument or such other date as the assignor and assignee agree, but not earlier than the date the Board receives notification of the Transfer, or, in the case of an involuntary Transfer, the date of the operative event. Distributions of cash and property with respect to any Units shall be made to the Person who is shown as the holder of such Units in the Company's books at the time of the distribution.

(d)     In the event of a change in a Member's Percentage Interest during the course of a Taxable Year, allocations to said Member of Profits, Losses and other items arising during such Taxable Year shall be made among the Members using such method as may be determined by the Board in good faith which is reasonable and complies with the Treasury Regulations and this Agreement. An agreement between a transferor and transferee of Units relating to such method of allocation shall be followed by the Board, unless the Board determines in good faith that the method so agreed to does not comply with the Treasury Regulations, is not consistent with this Agreement, is unreasonable or otherwise presents an undue burden on the Company.

5.5 <u>Distributions</u>.

(a) Except as otherwise provided herein, the Board shall determine in its sole discretion the timing and the aggregate amount of all distributions of Cash Available for Distribution to be made by the Company to the Members. In accordance with the foregoing, the Board shall cause the Company to distribute at least fifty percent (50%) of the Cash Available for Distribution to its Members. All Cash Available for Distribution that is distributed, and any other amounts or items that are distributed, to the Members shall be distributed as follows:

(i) to each Class A Member that is not Newco, ratably upon the proportion that the number of Class A Units held by such Class A Member immediately prior to such distribution bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>;

(ii) to Newco, ratably upon the proportion that the number of Class A Units held by Newco immediately prior to such distribution and the number of Reserve Class B Units issued and outstanding for which the applicable Hurdle Amount has <u>not</u> been exceeded pursuant to <u>Section 5.5(b)</u> immediately prior to such distribution bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>;

(iii) to each Class B Member, ratably upon the proportion that the number of Reserve Class B Units held by such Class B Member immediately prior to such distribution and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u> bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>; and

(iv) to each Class B Member, ratably upon the proportion that the number of Additional Class B Units held by such Class B Member immediately prior to such distribution and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u> bears to the aggregate number of (A) Class A Units issued and outstanding, (B) Reserve Class B Units issued and outstanding (whether or not the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>) and (C) Additional Class B Units issued and outstanding and for which the applicable Hurdle Amount has been exceeded pursuant to <u>Section 5.5(b)</u>.

(b) Notwithstanding anything contained in <u>Section 5.5(a)</u> to the contrary, no Class B Member shall be entitled to receive any distributions pursuant to <u>Section 5.5(a)(ii)</u> or <u>Section 5.5(a)(iv)</u> unless and until the aggregate amount of cash distributed in respect of all Units

25

entitled to distributions exceeds the Hurdle Amount applicable to the Class B Units held by such Class B Member and any amount otherwise distributable to such Class B Member but for the foregoing limitation shall instead be distributed to other Members as if such distribution were a new distribution pursuant to Section 5.5(a).

(c)     If the Company distributes property other than cash to its Members, the amount of such distribution shall be deemed to be equal to the Fair Market Value of the property distributed, net of any liabilities that said property may be subject to or which may be assumed by the Members in connection therewith. Said Fair Market Value shall be determined by the Board in good faith. For the avoidance of doubt, these distributions will be made in accordance with Section 5.5(a) above.

(d)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distributions if such distribution would violate Section 18-607 of the Act or other any other applicable law.

5.6     Amounts Withheld.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which that amount was withheld pursuant to this Section 5.6 for all purposes under this Agreement.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state, local or foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any amounts to the Members with respect to which the amount was withheld.

5.7     Tax Distributions.  Subject to the Act and any restrictions contained in any loan or credit facility to which the Company is bound, the Board of Managers shall make quarterly distributions  to the extent of Cash Available for Distribution (each, a "Tax Distribution") at the same time, and with the same priority, to the Members pro rata in proportion to their respective Tax Amounts, until each Member has received an amount equal to its Tax Amount.  The Board will use commercially reasonable efforts to cause the business of the Company and any subsidiaries to be operated in a manner such that the Company has, or will have available to it, sufficient Cash Available for Distribution to pay applicable Tax Distributions each quarter. Any Tax Distributions will be treated as an advance against, and shall reduce, any distributions otherwise to be made to the recipient Member under this Agreement.

## ARTICLE VI
## MANAGEMENT

6.1     Appointment and Term of Board of Managers.

(a)     The Company shall be managed by a board of managers (each such person, individually referred to as "Manager" and collectively as the "Board").  Except as otherwise provided herein, the Board shall have the exclusive right to manage the business of the Company and is hereby authorized to take any action of any kind and to do anything and everything it deems necessary in conjunction therewith.

26

(b)     The Board shall consist of three (3) individuals.  LLYC shall have the right to designate two (2) members of the Board, one of whom shall be the chairman of the Board, as determined by LLYC in its sole discretion, and as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, Newco shall have the right to designate one (1) member of the Board.  If Newco holds a Class A Percentage Interest of less than fifteen percent (15%) and Newco Guarantor is no longer the Chief Executive Officer of the Company, LLYC shall have the right to designate the remaining member of the Board.  As of the Effective Date, the members of the Board designated by LLYC are Alejandro Romero Paniagua and Jose Luis Di Girolamo (the "LLYC Managers"), and the member of the Board designated by Newco is Rebecca Bamberger (the "Newco Manager").  As of the Effective Date, the chairman of the Board is Alejandro Romero Paniagua.

(c)     Each Manager shall serve until his or her removal, resignation, death or disability.  If any Manager ceases to serve as a Manager for any reason, a replacement Manager shall be designated by the Members that had the right to appoint the departing Manager. A Manager may only be removed for any reason by a vote of the majority of the Members that had the right to appoint such Manager.

(d)     At any time, and from time to time, the Board may appoint other officers, agents or other delegates of the Company, with such powers, authority and responsibilities as the Board delegate to them.  Any officer, agent or other delegate of the Company may be removed at any time, with or without cause, by action of the Board and his or her replacement, if any, may be approved by the Board at the time of such removal.

(e)     Managers need not be residents of the State of Delaware or any other particular state or country.

6.2     Meetings.  The Board shall hold regular meetings, not less frequently than annually to discuss the business and affairs of the Company.  The chairman of the Board shall fix the times and places for regular meetings of the Board at the first Board meeting each year, and no notice of such regularly pre-scheduled meetings need be given.  A special meeting of the Board shall be held whenever called by the chairman of the Board, at such time and place as shall be specified in the notice or waiver thereof.  Notice of each special meeting shall be given by the chairman of the Board to each other Manager personally or by, e-mailing, faxing or telephoning the same not later than forty eight (48) hours prior to the special meeting.  Meetings of the Board, regular or special, may be held at any place within or outside the State of Delaware.  Members of the Board may participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in Person at such meeting.

6.3     Quorum and Voting.  A majority of the members of the Board shall constitute a quorum for the transaction of business in any meeting of the Board.  Each Manager shall be entitled to cast a single vote.  Except as otherwise provided by this Agreement, the affirmative vote by Managers representing a majority of the members of the Board shall be the act of the Board.  Notice of any meeting need not be given to any Manager who shall submit, either before or after such meeting, a waiver of notice.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting for the express purpose of

27

*ACTIVE 684118884v10*

objecting at the beginning thereof to the transaction of any business because the meeting is not properly called or convened.

6.4  Written Consent of the Board in Lieu of a Meeting.  Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if a majority of the members of the Board consent thereto in writing; provided, however, that the Board shall exercise good faith efforts to allow each Manager to promptly provide his or her input before consenting in writing to such action.  Notwithstanding the immediately preceding sentence, as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, no Major Decision shall be adopted without the written consent of Newco.

6.5  Authority of the Board.  Except as otherwise specifically provided herein, the Board shall have exclusive, full and complete authority, exercisable in its reasonable but sole discretion, to make all decisions in the ordinary course of business of the Company, as well as to make decisions not in the ordinary course of business of the Company.

6.6  Limited Liability.  Neither any Manager nor any officer shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, unlawful acts or a wrongful taking by the Manager or officer.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied or imposed by applicable law or in equity, all of which duties are hereby agreed to be eliminated to the maximum extent permitted by applicable law (including any and all fiduciary duties imposed by the Act, including the duties of loyalty and care), and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement; provided, that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement, and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict, waive or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

6.7  Authority to Bind Company.  Each officer, employee, agent and other Person to which the Board delegates such authority in accordance with the terms of this Agreement, is authorized, in the name and on behalf of the Company, to sign and deliver all contracts, agreements, leases, notes, mortgages and other documents and instruments which are necessary, appropriate or convenient for the conduct of the Company's day-to-day business and the furtherance of its purposes; provided, however, that so long as Newco remains a Member of the Company, the Board shall obtain the prior written consent of Newco (not to be unreasonably withheld, conditioned or delayed) prior to the Board authorizing, or the Company or any subsidiary of the Company entering into any loan, credit facility or other agreement which could have the effect of prohibiting, , limiting or restricting Tax Distributions.

28

6.8    Indemnification.

(a)    General Provisions.  Except as otherwise set forth herein, each Manager, officer, employee, agent and representative of the Company (each herein referred to as an "Indemnitee") shall be indemnified, held harmless and defended by the Company against any claim and/or liability incurred by or imposed upon the Indemnitee in connection with any action to which the Indemnitee may be a party by reason of any action or omission of the Indemnitee in connection with the conduct of Company affairs.  The indemnification set forth herein shall not extend to actions or omissions of the Indemnitee (or its employee) which shall have been finally adjudicated (by settlement or otherwise) in any such action, suit or proceeding to have constituted actual fraud, willful misconduct or gross negligence.  In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement.  The foregoing right of indemnification shall be in addition to any rights to which any Indemnitee may otherwise be entitled and shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnitee.  Any indemnification hereunder is to be made only out of the assets of the Company and no Member shall have any personal liability on account of such indemnification.

(b)    Advance Payment of Expenses.  The Company shall pay the expenses incurred by an Indemnitee in defending a civil or criminal action, suit or proceeding, or in investigating or opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding as incurred and in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by such Indemnitee to repay such payment if such Indemnitee shall be determined to be not entitled to indemnification therefor as provided herein; provided, however, that in such instance the Indemnitee is not commencing an action, suit, or proceeding against the Company, or defending an action, suit or proceeding commenced against such Indemnitee by the Company or any Member thereof or opposing a claim by the Company or any Member thereof arising in connection with any such potential or threatened actions suit or proceeding.

6.9    Major Decisions.

(a)    Overall Major Decisions.  A Major Decision may be proposed by any Manager or Class A Member, but as long as (i) Newco holds a Class A Percentage Interest of no less than fifteen percent (15%), or (ii) Newco Guarantor is Chief Executive Officer of the Company, the prior written consent of Newco (which consent may be withheld, conditioned or delayed in Newco's sole and absolute discretion) shall be necessary for the Company to adopt, approve, or take any action in furtherance of, any Major Decision, except if in connection with an Approved Sale in which Newco will no longer be a Member upon its consummation.  As used herein, a "Major Decision" shall mean each of the following:

(i)    incurring of any debt or loan by, or encumbering any of the assets of, the Company in an amount exceeding US $500,000 or pledge or grant liens on any assets or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person, in any transaction or a series of related transactions;

29

(ii)    entering into or effecting any transaction or a series of related transactions involving the direct or indirect redemption, purchase or acquisition of any Units of the Company, except with respect to a purchase of Units owned by Newco pursuant to the Option Agreement;

(iii)    other than with respect to any contract, agreement, arrangement, commitment or transaction stated in this Agreement, entering into or amending any contract, agreement, arrangement, commitment or transaction with an Affiliate of LLYC on terms materially less favorable to the Company than those that would apply on an arms-length basis;

(iv)    adopting any material change to the Business of the Company or the taking of any action with the intention of causing any such material change;

(v)    voluntarily commencing any liquidation, dissolution, winding-up, bankruptcy, insolvency or similar proceedings with respect to the Company;

(vi)    commencing any insolvency proceedings or acknowledge insolvency in respect to the Company;

(vii)    the conversion of the Company to a corporation or other form of entity; and

(viii)    the Company's engaging in an initial public offering.

## ARTICLE VII
## TRANSFER

7.1    General.  No Member shall Transfer any Units now or hereafter owned (of record or beneficially) by such Member except in accordance with the terms and conditions of this Article VII.

7.2    Substitute Member.  No Unit or Interest otherwise Transferable pursuant to the terms of this Article VII shall be Transferred until the Board has been satisfied as to the following conditions precedent:

(a)    No Termination of the Company.  Such Transfer, alone or when combined with other transactions, will not result in a termination of the Company within the meaning of section 708 of the Code.

(b)    No Publicly Traded Partnership.  Such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of section 7704 of the Code and the Regulations promulgated thereunder and would not make the Company ineligible for "safe harbor" treatment as not a "publicly traded partnership" under Section 7704 of the Code and the Regulations promulgated thereunder.

(c)    Compliance with Applicable Laws.  Such Transfer would not (i) affect the classification of the Company for income tax purposes or have other adverse tax consequences to

30

the Company or any Members, (ii) cause the Company or any Member to become subject to regulation under either the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or (iii) violate or cause the Company to violate applicable law, including applicable state and federal securities laws.

(d)     Receipt of Information.  The Board shall have received from the Transferee such information regarding the Transferee as the Board may reasonably request.

(e)     Joinder.  The Transferee shall execute a joinder, agreeing to be bound by the terms and conditions of this Agreement in substantially the form of Exhibit B hereto and, to the extent the Option Agreement has not terminated, the Option Agreement in form and substance reasonably acceptable to LLYC.

7.3     Effect of Admission as a Substitute Member.  Unless and until admitted as a Substitute Member pursuant to Section 7.2, a Transferee of a Member's Units shall not be entitled to exercise any rights of a Member of the Company or to receive distributions hereunder.  A Transferee who has become a Substitute Member shall have, to the extent of the Interest Transferred to it, all the rights and powers of the Transferring Member, as applicable, for which it is substituted and shall be subject to the restrictions and liabilities of the Transferring Member, as applicable, under this Agreement and the Act.

7.4     Improper Transfer.  If a Member or any other Person Transfers an Interest and such Transfer is not permitted under this Article VII, then, subject to the consent of the non-Transferring Members (which may be withheld for any reason), such Interest shall be forfeited to the Company as of the Transfer date for no consideration.

7.5     Permitted Transfers.

(a)     Notwithstanding any other provision of this Agreement to the contrary, Transfers of Units and Interests are permitted to an Affiliate of such Member ("Permitted Transfer") and a Permitted Transfer is not subject to the terms of Section 7.6; provided, that (a) the Member wishing to Transfer shall provide written notice to the Company, which shall include a detailed description of the proposed Permitted Transfer and such information as may be required for the Company to determine that the Transfer being proposed qualifies as a Permitted Transfer, and (b) upon determination by the Company that such Transfer is a Permitted Transfer, which determination shall be made in good faith by the Board as promptly as practicable, the Board shall provide a consent notice to the transferring Member and, upon compliance with the provisions of Section 7.2, such Permitted Transfer shall be consummated and the Transferee of Units admitted as a Member of the Company.

(b)     If, following any such Permitted Transfer pursuant to this Section 7.5, such Member holds its Interest through several Affiliates:  (i) all those Affiliates shall be treated as a single Member for the purposes of determining such Member's rights and obligations under this Agreement; (ii) each of the transferring Member's Affiliates shall be deemed to act jointly and severally for all legal purposes; and (iii) the other Members and the Company shall be entitled to rely upon any written notice or other delivery that it receives from any of the transferring Member's Affiliates as though such written notice or delivery had been executed and delivered by all of the

31

transferring Member's Affiliates and any such written notice (A) shall be effective and binding upon the transferring Member's Affiliates, and (B) shall constitute conclusive evidence of a joint decision (acting in concert) by all of the transferring Member's Affiliates.

       7.6     Right of First Refusal.

       (a)     Other than in respect of a Permitted Transfer, if any Member (the "Transferring Member") proposes to Transfer all or a portion of its Units other than Class B Units (the "Subject Units") to any Person, then the Transferring Member shall furnish to each other Member, other than any Member that is only a Class B Member (each, a "ROFR Member"), a written notice of such proposed sale (an "Offer Notice").

       (b)     The Offer Notice must include (i) the price at which the Transferring Member is prepared to sell the Subject Units (the "Offered Price"), (ii) the identity of the proposed Transferee (the "Proposed Purchaser") of the Subject Units, (iii) the proposed date, time and location of closing, and (iv) all other material terms and conditions of the proposed sale.

       (c)     The ROFR Members shall have the right to elect to purchase all, but not less than all, of the Subject Units at the Offered Price within thirty (30) calendar days following the date of the Offer Notice (the "ROFR Period") by delivering an irrevocable notice (the "Purchase Notice") to the Transferring Member indicating such ROFR Member's desire to purchase the Subject Units at the Offered Price on the terms and conditions set forth in the Offer Notice. If more than one ROFR Member elects to purchase the Subject Units under this Section 7.6, then each such ROFR Member shall have the right to purchase its proportionate share of the Subject Units as measured by the *pro rata* portion of Units that are not Class B Units held by such ROFR Members (*i.e.* the proportion that the number of Units (excluding any Class B Units) held by such Member bears to the aggregate number of Units (excluding Class B Units) issued and outstanding at that time). The failure of the ROFR Members to deliver one or more Purchase Notices to the Transferring Member within the ROFR Period shall be deemed to be a waiver of its rights under this Section 7.6. If the ROFR Members elect to purchase all, but not less than all, of the Subject Units under this Section 7.6, the ROFR Members and the Transferring Member shall arrange a mutually convenient time (not later than thirty (30) calendar days after the end of the ROFR Period) to consummate the purchase and sale of the Subject Units.

       (d)     If the ROFR Members do not elect to purchase all of the Subject Units under this Section 7.6, then the Transferring Member shall be free to sell the Subject Units to the Proposed Purchaser; provided, that (i) the terms of such sale are the same as those set forth in the Offer Notice or, if the terms of such sale are not the same as those set forth in the Offer Notice, the terms of such sale are not more favorable to the Proposed Purchaser than those set forth in the Offer Notice, (ii) such sale is completed within one hundred and twenty (120) calendar days after the end date of the ROFR Period, and (iii) such sale is otherwise permitted under Section 7.2.

       7.7     Drag-Along Right.

       (a)     If LLYC proposes to Transfer all of its Units, then LLYC may require each other Member to sell all of their Units. In any such transaction (an "Approved Sale"), each selling Member must receive the same benefits and bear the same burdens as LLYC on a proportionate

basis, including, without limitation, participating in purchase price holdbacks, earn outs and other deferred payment arrangements to the same extent as LLYC.

(b)     In order to exercise the rights contemplated by this Section 7.7, LLYC must give written notice to each other Member as soon as practicable, but in no event later than thirty (30) days prior to the anticipated closing date of the Approved Sale.  Such notice must set forth the name of the proposed purchaser, the proposed amount and form of consideration, the proposed date and location of the closing of the sale and the other terms and conditions of the offer, including a copy of the relevant purchase agreement.

(c)     Each selling Member participating in a Transfer pursuant to this Section 7.7 shall (i) receive the same portion of the aggregate proceeds of the Approved Sale as such selling Member would have received if such consideration had been distributed by the Company pursuant to Section 5.5(a); (ii) be provided a copy of the relevant purchase agreement as soon as practicable so such selling Member can participate in the review of the relevant purchase agreement; (iii) make or provide the same representations, warranties, covenants, indemnities and agreements as the Transferring Member makes or provides in connection with the Transfer (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Transferring Member, such selling Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining only to itself, himself or herself); provided, that such representations, warranties, covenants, indemnities and agreements shall be made severally and not jointly; (v) if such Transfer is structured as a merger or consolidation, waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation; and (vi) take all actions as may be reasonably necessary to consummate the Transfer, including, without limitation, entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Transferring Member.

7.8     Tag-Along Right.

(a)     Prior to the consummation of any Transfer of the Subject Units to the Proposed Purchaser pursuant to Section 7.6, each ROFR Member (a "Tag-Along Member") shall have the right to elect to participate as a seller in the Transfer of the Subject Units by delivering within the ROFR Period an irrevocable Notice (the "Tag-Along Notice") to the Transferring Member indicating such Tag-Along Member's decision to not exercise its rights under Section 7.6 and to participate as a seller in such Transfer on the terms and conditions set forth in the Offer Notice.

(b)     The offer of a Tag-Along Member set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Member shall be bound and obligated to Transfer its Units under the terms and conditions set forth in this Section 7.8.  The Transferring Member and each Tag-Along Member shall have the right and obligation to Transfer in a Transfer subject to this Section 7.8 the number of Units of the same class as the Subject Units equal to the product of (x) the aggregate number of Units of the same class as the Subject Units that the Proposed Purchaser proposes to buy as stated in the Offer Notice, and (y) a fraction (A) the numerator of which is equal to the number of Units of the same class as the Subject Units held immediately prior to delivery of the Tag-Along Notice by the Transferring Member or each Tag-

33

Along Member, as the case may be, and (B) the denominator of which is equal to the number of Units of the same class as the Subject Units then held by all Members.  The failure of a Tag-Along Member to deliver the Tag-Along Notice to the Transferring Member within the ROFR Period shall be deemed to be a waiver of the rights of such Tag-Along Member under this Section 7.8.

(c)    Each Tag-Along Member participating in a Transfer pursuant to this Section 7.8 shall (i) receive the same consideration per Unit as the Transferring Member after deduction of such Tag-Along Member's proportionate share of the related expenses in connection with such Transfer and for the benefit of the Transferring Member and the Tag-Along Members; (ii) be provided a copy of the relevant purchase agreement as soon as practicable so each Tag-Along Member can participate in the review of the relevant purchase agreement; (iii) make or provide the same representations, warranties, covenants, indemnities and agreements as the Transferring Member makes or provides in connection with the Transfer (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Transferring Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining only to itself), provided, that such representations, warranties, covenants, indemnities and agreements shall be made severally and not jointly; and (v) take all actions as may be reasonably necessary to consummate the Transfer, including, without limitation, entering into agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Transferring Member.

7.9    Put Right. Newco shall have the right to sell the Units owned by Newco to LLYC in accordance with the terms and subject to the conditions set forth in the Option Agreement.

7.10    Call Right. LLYC shall have the right to purchase the Units owned by Newco in accordance with the terms and subject to the conditions set forth in the Option Agreement.

7.11    Holdco Class B Units Redemption Rights. Unless otherwise set forth in the Reserve Class B Units Grant Agreements, the Corresponding Holdco Class B Units Grant Agreements, or in a written instrument approved by the Board and executed by a Holdco Member, upon the occurrence of any Holdco Redemption Event, the Company shall have the right to redeem the portion of Holdco's Class B Units in the Company corresponding to the applicable Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco for consideration in an amount to be determined by the Board, upon which Holdco shall contemporaneously redeem such Holdco Member's Corresponding Holdco Class B Units or other membership interests in Holdco for the same consideration.

**ARTICLE VIII**
**DISSOLUTION AND WINDING UP OF THE COMPANY**

8.1    Dissolution of the Company.  The Company shall be dissolved upon the first to occur of any of the following events:

(a)    The Board, in accordance with Section 6.9(a) determines that the Company be dissolved;

34

(b)    An order by a court of competent jurisdiction decrees that the Company be dissolved; or

(c)    The cessation of business by the Company.

8.2    <u>Winding Up of the Company</u>.  The Members shall continue to share distributions and allocations of Profits and Losses during the period of liquidation in accordance with <u>Article V</u>. Any gain or loss realized by the Company upon the sale of property shall be deemed recognized and allocated to the Members in the manner set forth in <u>Article V</u>.  Upon a dissolution of the Company, the Board shall take full account of the Company's assets and liabilities and the assets shall be liquidated as promptly as is consistent with obtaining the fair market value thereof and as shall be necessary to timely make the distributions below described, and the proceeds therefrom, to the extent sufficient therefor, shall first be paid out to creditors, whether by payment or by establishment of due and adequate reserves, in the order of priority as provided by law; and then shall be distributed to the Members in accordance with Section 5.5 of this Agreement.

8.3    <u>Negative Capital Accounts</u>.  No Member shall have any obligation at any time, during the term of the Company or upon dissolution or liquidation thereof or otherwise, to restore a deficit balance in such Member's Capital Account or make any Capital Contributions to the Company by reason thereof, except as may be required by applicable Law.

**ARTICLE IX**
**BOOKS OF ACCOUNTS, ACCOUNTING, REPORTS,**
**FISCAL YEAR, BANKING AND TAX MATTERS MEMBER**

9.1    <u>Accounting, Books and Records</u>.  The Company shall maintain at its principal place of business or such other places as the Board shall determine books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with GAAP consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement.  The Company shall use either the cash method or the accrual method of accounting in preparation of its annual reports for tax purposes and shall keep its books and records accordingly.

9.2    <u>Inspection</u>.  Upon reasonable notice from a Class A Member, which shall not be delivered less than five (5) Business Days before the proposed date for the inspection, the Company shall afford each Class A Member and its representatives access during normal business hours to (i) the Company's properties, offices, and other facilities, and (ii) the corporate, financial and similar records, reports and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members, and to permit each Member and its representatives to examine such documents; provided, that each Class A Member agrees at all times to keep (and shall cause its representatives to keep) all information confidential.

9.3    <u>Reports</u>.  The Board shall be responsible for the coordination of financial matters of the Company.  The Company shall prepare (or cause to be prepared) and submitted to the Board

35

for its review and approval, at least forty-five (45) days prior to the commencement of each Fiscal Year of the Company, the operating and capital budgets for the Company in respect of each Fiscal Year, which budgets shall contain, *inter alia*, a detailed projection of the gross revenues, gross margins, EBIT, anticipated capital expenditures, net income and net cash-flow from operations for such Fiscal Year (provided that, if the Company shall then have any subsidiaries, such budgets shall be prepared on a consolidated basis for the Company and also on an individual basis for the Company and each of such subsidiaries).

9.4    Company Funds.  All funds of the Company shall be deposited in its name in a separate bank account or accounts at a commercial bank as shall be determined by the Board.

9.5    Partnership Representative.

(a)    Unless otherwise determined by the Board, the Company and each Member designate Llorente & Cuenca USA, Inc. as the "partnership representative" of the Company for purposes of the Partnership Tax Audit Rules (the "Partnership Representative") and authorize and require the Partnership Representative to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities relating to Fiscal Years of the Company commencing on or after the date hereof, including resulting administrative and judicial proceedings, and to expend the Company's funds for professional services and costs associated therewith. The Partnership Representative shall timely appoint an individual who meets the requirements of Treasury Regulation Section 301.6223-1(b)(2) to serve as the as the designated individual through whom the Partnership Representative shall act for all purposes under subchapter C of Chapter 63 of the Code. In addition, (i) the Board shall take, or cause the Company to take, such other actions as may be necessary or advisable pursuant to Treasury Regulations or other guidance to ratify the designation, pursuant to this Section 9.5, of the Partnership Representative (including the designation of a "designated individual" within the meaning of the Partnership Tax Audit Rules through whom any Partnership Representative that is an entity may act, if applicable), and (ii) each other Member agrees to take such other actions as may be reasonably requested by the Partnership Representative to ratify or confirm any such designation pursuant to this Section 9.5. The Partnership Representative shall take such actions and execute and file all statements and forms on behalf of the Company that are permitted or required by the applicable provisions of the Partnership Tax Audit Rules. Each Member agrees to reasonably cooperate with the Partnership Representative in connection with any examination of the Company's affairs by any U.S. federal, state, or local tax authorities, including resulting administrative and judicial proceedings. No Member shall have any claim against the Partnership Representative (or the "designated individual"), any Manager or the Company for any actions taken (or any failures to take action) by such Persons in good faith pursuant to this Section 9.5. Any cost or expense incurred by the Partnership Representative (or the "designated individual") in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  Notwithstanding the foregoing, the Partnership Representative shall be subject to the directions of the Board and shall not take any action that is inconsistent with the directions of the Board. The Partnership Representative shall keep the Board fully informed of all material communications and developments relating to any tax audit or proceeding.

*ACTIVE 684118884v10*

(b)        Unless otherwise agreed to by the Members holding Units with a majority of the Percentage Interests, if the Company receives a notice of final partnership adjustment as described in Section 6226 of the Code, the Partnership Representative shall cause the Company to make the election under Section 6226(a) of the Code with respect to the alternative payment of imputed underpayment by the Company and take other actions such filings, disclosures and notifications necessary to effectuate such election.

(c)        When and as reasonably requested in writing by the Company, each Member, at the Member's own expense, shall preserve and furnish to the Company all documents and information (including any change in mailing address or other contact information, any change in residency for any Tax purpose, and any social security, employer identification or other taxpayer identification number), and shall take such other action as may be reasonably necessary to enable the Company or the Partnership Representative (or any Person on behalf of the Company or the Partnership Representative) to (i) prepare, amend or file any Tax return, (ii) pursue, defend, settle, limit, reduce or otherwise determine any tax or withholding liability (including pursuant to an audit or other Tax proceeding) or (iii) register to do business, collect Tax, or comply with any similar prerequisite to doing business or conducting any other activity in any jurisdiction. In the case of any Taxable Year with respect to which an election under Section 6226 of the Code (or under any other similar or corresponding provisions of any state Tax law) is or will be in effect, each Member shall comply with all provisions of Section 6226 of the Code (and any other similar or corresponding provisions of any state Tax law), including taking such Member's share of any adjustment under Section 6226 of the Code into account on any separate Tax return of such Member, the amendment of all Tax returns affected by such adjustment, and the payment of any increased or additional Tax resulting therefrom.

(d)        The Partnership Representative shall provide Newco with copies of any notice of any administrative or judicial proceeding received by the Partnership Representative from a taxing authority (i) with respect to the income tax liability of the Company and/or (ii) with respect to the income tax liability of the Members in connection with the operations of the Company and shall furnish the final draft of any proposed settlement or other action of any such administrative or judicial proceeding which would have a materially adverse and disproportional effect on Newco (as compared to other Members and without regard to tax attributes or status of the Members unrelated to the Company ) to Newco at least thirty (30) days before execution of such settlement by the Company. The Company shall consider any reasonable comments provided by Newco to the  Company in writing within ten (10) days following receipt of such draft final settlement or other action. Any disagreements regarding Newco's comments on a proposed final settlement agreement or other action described in this Section 9.5(d) shall be submitted for final and binding resolution to a tax partner at a nationally or regionally recognized firm of independent certified public accountants that is independent from the Company and Newco (the "Tax Arbitrator"), as shall be reasonably acceptable to the Partnership Representative and Newco. The Tax Arbitrator shall be selected by mutual agreement of Partnership Representative and Newco; provided that if the Partnership Representative and Newco are unable to agree on a Tax Arbitrator, each party shall select a person qualified to act as a Tax Arbitrator and such individuals together shall select the Tax Arbitrator. The Tax Arbitrator will only consider those matters as to which Partnership Representative and Newco have disagreed and must resolve the matters in accordance with the terms and provisions of this Agreement. The Partnership Representative and Newco shall each submit to the Tax Arbitrator its proposed determination of such matters in dispute, together

37

with such other information relevant to the resolution of such matters as it desires to support its proposal. The Tax Arbitrator shall deliver to Partnership Representative and Newco, as promptly as practicable and in any event within ten (10) calendar days after its appointment, a written report setting forth the resolution of any such disagreement determined in accordance with this Section The Tax Arbitrator shall select as a resolution the position of either Partnership Representative or Newco for each item of disagreement and may not impose an alternative resolution. The determination of the Tax Arbitrator shall be final and binding upon Partnership Representative and Newco. The fees and expenses of the Tax Arbitrator incurred in connection with its review and determination of any dispute pursuant to this Section 9.5(d) shall be borne by the non-prevailing party. The prevailing party also shall be reimbursed by the non-prevailing party for the prevailing party's reasonable attorney's and accountant's fees and costs incurred in connection with the resolution of the dispute, including without limitation, the cost of any valuation or appraisal. The Tax Arbitrator shall determine the prevailing party based upon the Tax Arbitrator's determination of which party's position was closest to the final decision made by the Tax Arbitrator. If the Tax Arbitrator is unwilling to determine the split of fees and expenses among the parties, then the Tax Arbitrator's fees and expenses shall be split evenly among the Company and Newco.

(e)     A Member's obligations under this Section 9.5 shall survive such Member's ceasing to be a Member of the Company or the termination, dissolution, liquidation and winding up of the Company.

9.6     Tax Matters.

(a)     Taxable Year; Tax Elections.  The Taxable Year shall be determined by the Board in accordance with Section 706 of the Code. Subject to the other provisions of this Agreement, the Board shall determine whether to make, amend, rescind or revoke any available Tax election, including an election under Section 754 of the Code. Each Member will upon request supply any information necessary to give proper effect to any such election.

(b)     Tax Information.  Promptly after the end of each Taxable Year, the Company shall cause the Accounting Firm to prepare and deliver to each Member a report setting forth in sufficient detail all such additional information and data with respect to business transactions effected by or involving the Company during the Taxable Year as will enable the Company and each Member (with respect to the Company) to timely prepare its federal, state and local income Tax returns in accordance with applicable laws, rules and regulations.

(c)     Tax Treatment. Prior to the consummation of the transactions contemplated by the Membership Interest Purchase Agreement, the Company was a single member limited liability company treated as an entity disregarded from its owner within the meaning of Treasury Regulation Section 301.7701-2(c)(2). Accordingly, LLYC,  Newco, the Closing Class B Members acknowledge and agree that they will report transactions contemplated by the Membership Interest Purchase Agreement in the manner described in Revenue Ruling 99-5, Situation 1. Following the consummation of the transactions contemplated by the  Membership Interest Purchase Agreement, the Company shall be classified as a partnership for U.S. federal income tax purposes and, if applicable, state and local income tax purposes. Except as the Board may otherwise determine, neither the Company nor any Member may make an election for the Company to be taxed as a corporation under the Code or any similar provisions of applicable state law, and no provisions of

38

this Agreement shall be interpreted to authorize any such election. Each Member agrees that it shall not, except as otherwise required by a "determination" within the meaning of Section 1313 of the Code, (a) treat, on such Member's individual income Tax returns, any item of income, gain, loss, deduction or credit relating to such Member's interest in the Company in a manner inconsistent with the treatment of such item by the Company as reflected on the Schedule K-1 or other information statement furnished by the Company to such Member for use in preparing its income Tax returns or (b) file any claim for refund relating to any such item based on, or which would result in, such inconsistent treatment.

## ARTICLE X
## MISCELLANEOUS

10.1    Amendment.  Subject to Section 4.1(b) and Section 4.2(d), the provisions of this Agreement may be amended, modified or waived with the prior written consent of the Board and each Class A Member. In connection with any amendment, modification or waiver, or other approval hereunder, neither the Company, the Board nor any Member will have an obligation to provide any information to any Person whose consent is not required to be obtained in order to effectuate such amendment, modification or waiver; provided (i) that any such Person shall, at the request of the Company, promptly (and in any event, within three (3) Business Days) execute and deliver to the Company any amendment, modification or waiver that has been approved in accordance with this Agreement and (ii) the Company shall deliver to such Person a copy of any such amendment, modification or waiver within seven (7) Business Days of the execution thereof.

10.2    Notices.  Any notice to be given under this Agreement shall be made in writing and sent by fax, Federal Express or another commercial delivery service, addressed as set forth below:

(a)    If to the Company:

**Rebecca Bamberger Works, LLC**
702 Ash Street, Ste 100,
San Diego, CA 92101
Attn:       Rebecca Bamberger
Email:      rebecca@bamtheagency.com

With a copy to (which shall not constitute notice):

**Llorente & Cuenca S.L.**
Calle Lagasca 88
28001, Madrid, España
Attn:       Juan Pablo Ocaña
Email:      jpocana@llorenteycuenca.com

And

39

**Greenberg Traurig, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Attn:      Antonio Peña
Facsimile: +1 305.961.5804
Email:     antonio@gtlaw.com

(b)      If to any Member, such notice shall be mailed to the address of the Member as set forth on Exhibit A.

(c)      Any such notice shall be deemed to be delivered, given and received for all purposes as of the date delivered if delivered by a commercial delivery service or by confirmed facsimile.

10.3    Governing Law; Venue; Attorneys' Fees.

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

(b)      Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, and such legal action results in a final judgment in favor of one party, the prevailing party shall be entitled to payment from the other party of all of the prevailing party's reasonable attorneys' fees and related costs at all trial and appellate levels.

(c)      EXCEPT AS OTHERWISE PROVIDED HEREIN, ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(d)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES

40

THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.3(D).

10.4    Entire Agreement.    This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.    Furthermore, the parties hereto acknowledge and agree that the recitals to this Agreement are true and correct and constitute an integral portion of, and are hereby incorporated into, this Agreement for all purposes.

10.5    Counterparts.    This Agreement may be executed in any number of counterparts, including, without limitation, counterparts received via facsimile, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.

10.6    Non-Waiver.    The failure of any party hereto at any time or times to require performance of any provision hereof by any other party hereto shall in no manner affect the right of such party to require such performance at a later time.    No act or omission of any party hereto, other than an express written waiver signed by such party, shall constitute a waiver by such party of any breach of this Agreement or of the provision of this Agreement so breached.    No waiver by a party hereto of the breach of any provision hereof, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of such breach or as a waiver of the provision hereof so breached.

10.7    Further Assurances.    Each of the parties hereto agrees that, forthwith upon the written request of any other party hereto, such party shall execute and deliver such further conveyances, transfers and other documents of every nature and kind whatsoever, cause such meetings to be held, resolutions passed, exercise his vote and influence, do and perform and cause to be done and performed all such further and other acts and things as are within his reasonable power to do and as are reasonably necessary or desirable in order to give full effect to each and every part of this Agreement and the transactions contemplated in this Agreement.

10.8    Guaranty.    In order to induce LLYC to enter into this Agreement and in consideration of the benefits to be derived by the Newco Guarantor from this Agreement and the Option Agreement, the Newco Guarantor hereby unconditionally guarantees to LLYC and the Company the full and prompt payment and performance of all of Newco's obligations under this Agreement and the Option Agreement.    This Section 10.8 shall remain in full force and effect regardless of any amendment, waiver or change to any term of the obligations under this Agreement.  Upon default by Newco or failure to perform or comply with any obligation, covenant or agreement under this Agreement to be performed or complied with by Newco, the Newco Guarantor will, immediately after notice of such default or failure, perform or comply therewith or cause the same to be performed or complied with by Newco.  In exercising their rights hereunder

41

or the Option Agreement, the Company and LLYC will not be required to first proceed against, or exhaust their remedies against, Newco under this Agreement or the Option Agreement.

**[SIGNATURES FOLLOW BELOW.]**

*ACTIVE 684118884v10*

**IN WITNESS WHEREOF**, the undersigned have each executed this Agreement as of the Effective Date.

**THE COMPANY:**

**REBECCA BAMBERGER WORKS, LLC**

By: _Rebecca Bamberger_

Name:  Rebecca Bamberger

Title:  Authorized Signatory

*[Signature Page to Operating Agreement]*

**IN WITNESS WHEREOF**, the undersigned have each executed this Agreement as of the Effective Date.

**NEWCO:**

**RBW HOLDCO, INC.**

By: _Rebecca Bamberger_
Name:  Rebecca Bamberger
Title:  Authorized Signatory

**NEWCO GUARANTOR:**

**REBECCA BAMBERGER**

_Rebecca Bamberger_
BFE24AF56DFE469...

*[Signature Page to Operating Agreement]*

**IN WITNESS WHEREOF**, the undersigned have each executed this Agreement as of the Effective Date.

**HOLDCO:**

**BAM MANAGEMENT HOLDCO, LLC**

By: _Alejandro Romero Paniagua_
Name:  Alejandro Romero Paniagua
Title:  Authorized Signatory

*[Signature Page to Operating Agreement]*

**IN WITNESS WHEREOF**, the undersigned have each executed this Agreement as of the Effective Date.

**LLYC:**

**LLORENTE & CUENCA USA, INC.**

By: _Alejandro Romero Paniagua_

Name:  Alejandro Romero Paniagua
Title:  Authorized Signatory

*[Signature Page to Operating Agreement]*

## EXHIBIT A

### MEMBERS, ADDRESSES, NUMBER OF UNITS
### AND PERCENTAGE INTERESTS
### FOR
### REBECCA BAMBERGER WORKS, LLC

| Member | Address | Number and Class of Units | Capital Contributions[1] | Percentage Interest | Capital Account[2] |
|---|---|---|---|---|---|
| RBW Holdco, Inc. | 2855 5th Avenue, #802, San Diego, CA 92103 Attn:  Rebecca Bamberger Email:        rebecca@bamtheagency.com | 1,580,000 Class A Units | $2,652,311.06 | 16.49% | $2,652,311.06 |
| Llorente & Cuenca USA, Inc. | 600 Brickell Avenue, Suite 2125 Miami, FL Attn:  Publio Lorenzo Email: publio.lorenzo@llorenteycuenca.com<br><br>With a copy to (which shall not constitute notice):<br><br>Greenberg Traurig, P.A. 333 S.E. 2nd Avenue, Suite 4400, Miami, Florida  33131 Attn:  Antonio Peña antonio@gtlaw.com | 8,000,000 Class A Units | $10,609,244.26 | 83.51% | $10,609,244.26 |
| **Totals** | | **9,580,000 Class A Units** | **$13,261,555.32** | **100%** | **$13,261,555.32** |

[1] Subject to adjustment to take into account the actual amount of deferred payments under the Membership Interest Purchase Agreement and any other adjustments to the purchase price under the Membership Interest Purchase Agreement, as appropriate.

[2] Subject to adjustment to take into account the actual amount of deferred payments under the Membership Interest Purchase Agreement and any other adjustments to the purchase price under the Membership Interest Purchase Agreement, as appropriate.

46

47

*ACTIVE 684118884v10*

**EXHIBIT B**

**FORM OF JOINDER OF MEMBER TO
REBECCA BAMBERGER WORKS, LLC
LIMITED LIABILITY COMPANY OPERATING AGREEMENT]**

By affixing his, her or its, as applicable, signature hereto, the undersigned, as a Member of Rebecca Bamberger Works, LLC, a Delaware limited liability company (the "Company"), hereby joins in the execution of the Company's Limited Liability Company Operating Agreement (the "LLC Agreement"), executed by the Company and its Members (as defined in the LLC Agreement) with an effective date of March 30, 2023.  Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement .

The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

**IN WITNESS WHEREOF**, the undersigned has executed this Joinder as of this ___ day of _____, _____.

If Member Is a Business Entity:

_____,
a _____

By:_____
Print Name:_____
Title:_____

If Member is an Individual:

Signature:_____
                         Individually
Print Name:_____

Address:_____
          _____
          _____

48

*ACTIVE 684118884v10*

**EXHIBIT C**

**OPTION AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT D**

**HOLDCO LLC AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT E**

**FORM OF RESERVE CLASS B UNITS GRANT AGREEMENT**

[See attached.]

*ACTIVE 684118884v10*

**EXHIBIT F**

**FORM OF CORRESPONDING HOLDCO CLASS B UNITS GRANT AGREEMENT**

[See attached.]

# EXHIBIT 7

# [REDACTED]

# EXHIBIT 8

**BAM**

702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice



| BILL TO |
|---------|
| ████████████ ████████████████████ ██████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|-----------|------|-----------|----------|-------|----------|
| 7402 | 08/01/2023 | $20,000.00 | 08/31/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|----------|-----|------|--------|
| **PR Services**<br>PR Services for August 2023 | 1 | 20,000.00 | 20,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████████

**BALANCE DUE**  $20,000.00

For Direct Deposit/ACH/wire information:
Account number: ████████████
Routing number: ████████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ████████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ████████████
If located in New York (upstate) routing: ████████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com



# Invoice

**BILL TO**

████████████

██████████████████

██████████████

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7447 | 09/01/2023 | $20,000.00 | 10/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services** PR Services for September 2023 | 1 | 20,000.00 | 20,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████████

**BALANCE DUE**                     **$20,000.00**

For Direct Deposit/ACH/wire information:
Account number ██████████
Routing number: ██████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ██████████
If located in New York (upstate) routing: ██████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com



# Invoice

| BILL TO |
| --- |
| ███████████ |
| ███████████████ |
| ███████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 7504 | 10/02/2023 | $20,000.00 | 11/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **PR Services**<br>PR Services for October 2023 | 1 | 20,000.00 | 20,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████

**BALANCE DUE**          **$20,000.00**

For Direct Deposit/ACH/wire information:
Account number: ████████
Routing number: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ██████████ (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ████████
If located in New York (upstate) routing: ████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice



### BILL TO

████████████
████████████████████
█████████████████

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7545 | 11/01/2023 | $20,000.00 | 12/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for November 2023 | 1 | 20,000.00 | 20,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ███████████████

**BALANCE DUE**  **$20,000.00**

For Direct Deposit/ACH/wire information:
Account number: █████████
Routing number: █████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: █████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: █████████
If located in New York (upstate) routing: █████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice



| BILL TO |
|---|
| ███████████ |
| ████████████████████ |
| ████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7581 | 12/01/2023 | $20,000.00 | 12/31/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for December 2023 | 1 | 20,000.00 | 20,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID █████████████

**BALANCE DUE**          **$20,000.00**

For Direct Deposit/ACH/wire information:
Account number: █████████
Routing number: █████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: █████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: █████████
If located in New York (upstate) routing: █████████



**BAM**
702 Ash Street., Ste.#100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice

| BILL TO |
|---|
| ███████████ |
| ███████████████ |
| ████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7401 | 08/01/2023 | $30,000.00 | 08/31/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for August 2023 | 1 | 30,000.00 | 30,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████

**BALANCE DUE**

**$30,000.00**

For Direct Deposit/ACH/wire information:
Account number: ████████
Routing number: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ████████ (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ████████
If located in New York (upstate) routing: ████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com



# Invoice

| BILL TO |
|---|
| ██████████████ |
| ████████████████████ |
| ██████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7409 | 09/01/2023 | $30,000.00 | 10/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for September 2023 | 1 | 30,000.00 | 30,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ██████████████

**BALANCE DUE**          **$30,000.00**

For Direct Deposit/ACH/wire information:
Account number: █████████
Routing number: █████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ██████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: █████████
If located in New York (upstate) routing: █████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com



**Invoice**

| BILL TO |
| --- |
| ████████████ |
| ████████████████████ |
| █████████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 7459 | 09/28/2023 | $1,352.77 | 09/28/2023 | Due on receipt | |

| ACTIVITY | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **Reimbursable Expenses**<br>Reimbursable Travel Expenses | 1 | 1,352.77 | 1,352.77 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████████

**BALANCE DUE**                **$1,352.77**

For Direct Deposit/ACH/wire information:
Account number: ██████████
Routing number: ██████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ███████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ███████████
If located in New York (upstate) routing: ███████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice



| BILL TO |
| --- |
| ██████████████ |
| ████████████████████ |
| ████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 7464 | 10/02/2023 | $30,000.00 | 11/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **PR Services**<br>PR Services for October 2023 | 1 | 30,000.00 | 30,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████████

**BALANCE DUE**  **$30,000.00**

For Direct Deposit/ACH/wire information:
Account number: ████████
Routing number: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ██████████  (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ██████████
If located in New York (upstate) routing: ██████████



**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice

BAM

| BILL TO |
|---|
| ██████████ |
| ████████████████ |
| ████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7506 | 10/31/2023 | $1,576.66 | 10/31/2023 | Due on receipt | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Joe coffee - NYC event coffee run | | | 71.12 |
| Lyft - NYC trip | | | 67.85 |
| Breads bakery - NYC trip | | | 16.58 |
| Lyft - Nyc trip | | | 44.79 |
| LGA - NYC trip | | | 27.51 |
| Hudson - NYC trip | | | 44.44 |
| Le Cafe - NYC trip | | | 25.78 |
| Superfruit - NYC trip | | | 42.62 |
| Uber - NYC trip | | | 64.62 |
| Uber - NYC trip | | | 43.31 |
| Airport parking - NYC trip | | | 90.00 |
| LaGuardia - NYC trip | | | 52.19 |
| Uber - NYC trip | | | 77.90 |
| Think coffee - NYC trip | | | 18.95 |
| Public - NYC trip | | | 24.10 |
| Public hotel - Public hotel | | | 13.95 |
| Uber - NYC trip | | | 51.98 |
| Safeway - Ramen and Results event beverages | | | 80.70 |
| Newport Parking Garage - Parking for AMM - NYC Tour | | | 30.00 |
| Dulce de Leche - Pastries for AMM - NYC Tour | | | 36.16 |
| Outro coffee - Lunch | | | 26.10 |
| Alaska - Luggage fee | | | 30.00 |
| Blank Street Coffee - Breakfast | | | 12.08 |
| Doordash - Dinner | | | 25.68 |
| San Diego airport - Breakfast | | | 3.65 |
| Alaska airlines - Plane Wi-Fi | | | 8.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Lyft - Dinner back to hotel | | | 28.85 |
| Lyft - JFK to hotel | | | 89.68 |
| Lyft - Home to SD Airport | | | 50.39 |
| Alaska Airlines - Luggage fee | | | 30.00 |
| Lyft - Hotel to SFO | | | 44.04 |
| IILY cafe - Breakfast | | | 19.21 |
| Lyft - San Diego airport to home | | | 35.84 |
| Turn Cafe - Breakfast | | | 14.40 |
| Doordash / Little Sushi Bar - SF lunch | | | 31.67 |
| Lyft - SF dinner to hotel | | | 11.28 |
| Lyft - Home to SD airport | | | 39.41 |
| Lyft - Susa to Hotel | | | 14.96 |
| Turn Cafe - Breakfast | | | 23.84 |
| Lyft - Hotel to Susa | | | 16.68 |
| Lyft - SFO to hotel | | | 39.37 |
| Uber - NYC trip | | | 51.98 |
| PATH Train - Train to AMM for NYC Tours | | | 5.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ███████████████

**BALANCE DUE**                    **$1,576.66**

For Direct Deposit/ACH/wire information:
Account number: ████████
Routing number: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ██████████   (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: ██████████
If located in New York (upstate) routing: ██████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com



# Invoice

**BAM**

| BILL TO |
|---|
| ███████████ |
| ███████████████ |
| ████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7511 | 11/01/2023 | $30,000.00 | 12/01/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for November 2023 | 1 | 30,000.00 | 30,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████

**BALANCE DUE**          **$30,000.00**

For Direct Deposit/ACH/wire information:
Account number: ████████
Routing number: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ██████████   (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: █████████
If located in New York (upstate) routing: ████████

**BAM**
702 Ash Street., Ste. #100
San Diego, CA  92101 US
finance@bamtheagency.com
www.bamtheagency.com

# Invoice



| BILL TO |
|---|
| ███████████ |
| ████████████████████ |
| █████████████ |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 7553 | 12/01/2023 | $30,000.00 | 12/31/2023 | Net 30 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **PR Services**<br>PR Services for December 2023 | 1 | 30,000.00 | 30,000.00 |

BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ████████████████

**BALANCE DUE**     **$30,000.00**

For Direct Deposit/ACH/wire information:
Account number: █████████
Routing number: █████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant: TBD
International SWIFT/BIC code for Chase: ███████   (USD payments) and
(Foreign Currency payments)
If located in New York (downstate) routing: █████████
If located in New York (upstate) routing: ████████

# EXHIBIT 9
[REDACTED]

# EXHIBIT 10
[REDACTED]

# EXHIBIT 11



**BAM By BIG**

2855 5th Ave
San Diego, CA  92103 USA
+12673535725
mike@bambybig.agency

# INVOICE

BILL TO



EverestLabs

| | | | | | |
|---|---|---|---|---|---|
| INVOICE | | | 0053200082 | | |
| DATE | | | 03/06/2024 | | |
| TERMS | | | Net 30 | | |
| DUE DATE | | | 04/05/2024 | | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | PR Services for | March 2024 | 1 | | 15,750.00 |

BALANCE DUE  **$15,750.00**

# LLYC

**Rebecca Bamberger Works, LLC**
**600 Brickell Avenue, Suite 2125**
**CP: 33131        Miami**
**EIN: 83-0468288**
**PH: + 1 786590 1000**
**www.llorenteycuenca.com**

**NUMBER:**            0053200082
**INVOICE DATE:**    Mar 6, 2024
**DUE DATE:**        Apr 5, 2024
**PURCHASE ORDER NUMBER:**

**EverestLabs**
**94538**
**ID Number: 364809011**

| DESCRIPTION | AMOUNT |
|---|---|
| PR Services March 2024 | 15.750,00 |
| **Total USD** | **15,750.00** |

Please write all checks payable to Rebeca Bamberger Works LLC
**For your convenience, wire transfer funds to:**
Bank: HSBC
Bank Address: 2929 Walden Ave, Depew, NY 14043
ABA Number: (WIRE) █████████
Routing Numberr: (ACH) █████████
Account: █████████
SWIFT: █████████
* If paying more than one invoice, please reference all invoice numbers in wiring instructions *
**Payment terms:**        Net Due in 30 days

53200082

# EXHIBIT 12

202461015166



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**ARTICLES OF ORGANIZATION**
**CA LIMITED LIABILITY COMPANY**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

<table>
<tr><td>For Office Use Only</td></tr>
<tr><td><strong>-FILED-</strong></td></tr>
<tr><td>File No.: 202461015166</td></tr>
<tr><td>Date Filed: 2/16/2024</td></tr>
</table>

| Limited Liability Company Name | |
| --- | --- |
| Limited Liability Company Name | BAM by BIG LLC |

| Initial Street Address of Principal Office of LLC | |
| --- | --- |
| Principal Address | 2855 5TH AVE #802<br>SAN DIEGO, CA 92103 |

| Initial Mailing Address of LLC | |
| --- | --- |
| Mailing Address | 2855 5TH AVE #802<br>SAN DIEGO, CA 92103 |
| Attention | |

| Agent for Service of Process | |
| --- | --- |
| California Registered Corporate Agent (1505) | A BETTER PROFESSIONAL CORPORATION<br>Registered Corporate 1505 Agent |

**Purpose Statement**

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

| Management Structure | |
| --- | --- |
| The LLC will be managed by | All LLC Member(s) |

Additional information and signatures set forth on attached pages, if any, are incorporated herein by reference and made part of this filing.

**Electronic Signature**

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Sam Mazzeo*                                     *02/16/2024*
Organizer Signature                              Date

B2507-5506 02/16/2024 4:04 PM Received by California Secretary of State

# EXHIBIT 13

Phase 1

**Meeting April 1**

- Slack log ins

**Meeting March 28th:**
**Questions, comments, issues:**
- Can't upload profile photos in new Google accounts (RW looking into this)
- Cision PR Newswire + Muck Rack transfers (asked about by CCMF; who can own looking into this?)
- Email transfer and why this is necessary

Notes to broader team:

-----------------------------------

Wednesday, March 13:

- ~~MM: hold meeting with bookkeeping team to prepare invoice strategy~~

Thursday, March 14th

- ~~BB: Team meeting held: 8:30am PT~~
- ~~BB + RW: Set up all email accounts for users under BAMbyBIG.agency~~
- ~~MM: Initiate business transfer with new clients closed as of Mar. 15~~
  - ~~BB: Need legal entity established-DONE~~
  - ~~BB: Need bank account-will have March 15th-DONE~~
  - ~~MM: Need invoicing software (QBO setup and data transfer)~~

> **Commented [1]:** Ability to upload photos to profile is now availabile
>
> **Commented [2]:** thank you!

- MM: Develop MSA template for new legal entity

Friday, March 15th

- BB: meet with FourFin for site transfer
  - MM: Hubspot access to be delegated for website transfer (to confirm)

Monday, March 18th

- BB: send clients emails re change to domain change, decision, accounting, and our continued efforts to provide excellent service under the new brand, CCing practice leads. List of contacts + who to CC found here.
- Team: confirm access to BAMbyBIG.agency email
- Practice leads: reach out to clients after Beck sends her message to offer a conversation if they'd like more info. Confirm they received the email since it came from BAMbyBIG.agency domain.
- Camila: duplicate calendar invites for all BAM upcoming meetings (Monday stand up, Thursday team meeting, DEI meeting, etc.)
- JG: duplicate all event invites
- Practice leads + JV/RQ: start transfer to all client files to BAMbyBIG new Drive
- JV + RW: start transfer of BAM Drive to BAMbyBIG new Drive
- JG: work with FourFin to ensure site transfer

Thursday, March 21st

- Practice Leads: deliver plan for transitions team can help with (recreating calendar invites for clients beyond April 1, etc.)
- Team: upload new signatures in emails from FourFin
- JG: review new website for any tweaks (removal of LLYC mentions)
- BB: message to VC comms community

- ~~JV: meeting with Cavignac (health benefits providers to manage transfer + BIG creation)~~

Monday, March 25th

- DECISION: We will going back to just the use of the BAM logo on ALL docs and digital assets. Until further notice, we will be using BAM by LLYC logo.
- ~~RW: check on aliases for clients~~
- BB: continue messaging to VC comms community
- Team: continue roll out of comms to clients on calls, Slack, and more about the April 1 shift. Do this at LEAST 3 times so there are no surprises
- JG + SP: updates to branded decks/materials with logos changed
- BB: send reminder email to all clients and follow up about invoices
- ~~MM + finance: send new invoices with new banking info~~
- ~~MM: conduct calls to all clients, making sure they got the new invoices and are paying, particularly if they are behind~~

Monday, April 1:

- Practice Leads + JV: Confirm entire BAM Drive has been transferred
- JG + FourFin: New website live
- ~~JG + RW: change all logos on social media~~
- Team: set up auto forwarding to new BAM by BIG email
- Team: begin all communication with clients on new email/new Drive
- RW: Notify team to save Chrome bookmarks and set up new Chrome Profile
- Team: Transfer all docs you own on your personal BAM by LLYC drive to the new BAM by BIG Drive (anything that's outside of BAM Internal + Client folders)

Thursday, April 4:

- BAM Meeting Regroup
- BB: Phase 2 roll out: Q2 projects, 2023 payout, BIG education and aces in their places
- JV: change all emails associated with HR processes from BAM to BAM by BIG (Gusto, 401K, Expensify, BlueShield, Slack, etc.)
- RW, MM: change all logins for marketing, subscriptions, billings, Slack, etc. Anything that is tied to BAM email must be changed

TBD

- RW: remove BAM logo from EVERYWHERE (IG, LinkedIn, X, where else?)  and replace with new logo

Commented [3]: @meghan@bamtheagency.com Thank you for changing the logos back was going off this request

Commented [4]: Yelp, Crunchbase

Commented [5]: let's skip Yelp-can we even delete it?

Commented [6]: Google

Resources:
NEW NEW BAM Drive
Client Folder Transfering Doc

Team FAQ:

**Why are we doing this again?!?** Back in December of 2023, I told LLYC our partnership was over. Despite numerous in person meetings, including my trip to Spain, nothing has developed. We sent a detailed legal letter from our counsel which was also ignored. As such, we are being proactive and taking the next steps at the end of this relationship. In a way, we have now packed up our stuff and left the house. That does not bar our previous partner from texting us, dropping us mail, thinking it's totally our fault and talking about it, etc.

**What about promotions, raises, bonuses, healthcare benefits, 401K, and so on?** Everything stays the same.

**But who do I work for?** Technically, we all work for a new entity called BAM by BIG, but this will be a phase 2 roll out as we graciously continue our

divorce. As soon as more details are available, I'll tell you. There is no action right now to take.

**What happens with the earnout!?** As we no longer have the earn out and our payouts would have been LESS than our profit (see screenshot), we're moving to a profit share based on the 10% equity pool. By June 1, we'll determine what our profit was in order to issue a bonus. We need to navigate this situation first which may have financially damaging impacts. On a positive note, the equity pool is increasing to 14% starting in 2025.

**Does this mean profit doesn't matter?!?** It still does because bonuses will be paid according to it. That said, we will have a self-audit that gives us the best tax benefits while paying each BAMf the most possible.

**What does growth look like for us, what's the "new" 10X if there is one?** Over the next 10 years, we're building BIG. In BIG, the team equity pool is 10%. That means, if a startup we invest in makes it big (ha), and say returns $100 million to BIG after we pay out our LPs, 10% of that $100 million or $10 million, goes to each holder in the equity pool. To be clear, venture is very risky. There will be many startups we invest in that totally fail, but if we do what we've done at BAM, we'll have some ridiculous home runs.

As for BAM, in 10 years, we will aim to do at least $30 million in profit. This assumes a model where we do a conservative growth in profit every year.

Our bigger 10X is a goal that could look like this. What this all means is each person at BAM now has a "double dip" of bonuses in both BAM and BIG.

**Will we ever "sell" again?** It's highly unlikely. As the positioning and strategy of BIG relies on the power of BAM, there is likely no situation where it would make sense to sell ourselves again.

**What about BIG?** BIG is up and rolling, and Regina is on board full time. Our strategy is to "date" LPs this entire rest of the year. Once the election is over, we will extend invitations to those we like. If our timing is really amazing, the landscape for venture will be more positive as this industry, as all things are, swings back and forth. We will then spend 2025 raising as much to a billion dollars as possible and announce the fund size once we hit the deadline of 12 to 18 months. (You are legally only allowed to raise a fund for 12 months once you accept the first check and have an option to extend for another 6 months. This is why some funds don't "hit the target" of what they aim for. It's a race against the clock.)

**What is beyond BIG though?!** My aim is next in politics on a national and federal level per my 100 year plan because politics is the biggest storytelling game there is. It is also a tremendous act of service because of the high price (forever changes your anonymity, for instance) but is for the purpose of getting as many people to see their potentials! (This is my purpose in life.) That said, the impact of serving is likely worth it for the greater human good. Let's see how this decade shakes out, though. Maybe venture is way too fun. If you want to be on a wild ride with me on this 100 year execution, I welcome you to stay on board assuming our values and your purpose aligns.

**What should I do if someone from LLYC reaches out to me?** You can respond in any way you would a former colleague. If something seems odd or aggressive, ask the executive team.

**What should I tell clients?** Our messaging is simple: "Our values guide everything we do and are at BAM. It became obvious that LLYC was not a partner that aligned with our values, so we ended the relationship. We wish them the best."

**What should I tell anyone else?!** You can use the same messaging as for clients and emphasize that no one puts the BAM baby in the corner, ever.

**What happens with the firehouse!?** It will still happen, just not right now or perhaps this year, Erika. :) All things in time.

**NOTE TO CLIENTS:**

Update to BAM website, email, and billing

Hi Kody and Helen-Reaching out with a few updates for you though I know we are wrapping up shortly!

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. **I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for.** In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April Fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

- A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.
- A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly if it applies.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at 619-917-5109. I'll be in touch with further messaging about our transition as needed.

++++

**Holding statement for LLYC**

Hi Fede, Alejandro, and Lusia: Thank you, Fede, for navigating our situation and conversations since December. I'm happy we're aligned with a buy back option where I will buy back BAM.

I wanted to convey that every member at BAM is aware of this coming transition, and we have started a detailed change management plan internally.

I'm in Montana hosting a large event but will be following up with more details and steps soon.

**Commented [7]:** sent

++++

**Follow up for Practice Leads**

Hi X,

[personal intro]

To reiterate, nothing is changing with your team, how we operate, or what we stand for. We're excited to transition into a fresh Google Drive and email. We're getting that set up in the coming days and will be in touch with you with new links, calendar invites, etc.

In the meantime, [ask to schedule a quick 1:1 if you'd like].

-X

# EXHIBIT 14

| | |
|---|---|
| **From:** | Rebecca Bamberger on behalf of Rebecca Bamberger <rebecca@bamtheagency.com> |
| **To:** | ▮▮▮▮ |
| **Cc:** | ▮▮▮▮ ; ▮▮▮ |
| **Subject:** | Re: Update to BAM website, email, and billing |
| **Date:** | Wednesday, March 20, 2024 10:10:33 AM |

Thanks, Darcie! The responses from our clients have been amazing!

On Wed, Mar 20, 2024 at 3:19 AM ▮▮▮▮ <▮▮▮▮▮▮> wrote:

> Thanks for the update and also congratulations on the buy back.
>
> Best,
> ▮▮▮
>
> On Tue, Mar 19, 2024 at 4:59 PM Rebecca Bamberger <
> rebecca@bamtheagency.com> wrote:
>
>> Hi ▮▮▮ and ▮▮▮ -Reaching out with a few updates for you though I know
>> we are wrapping up shortly!
>>
>> In short, we're formally ending our partnership with our acquirer, LLYC,
>> and are in transition to buy back BAM. As you likely know, buy backs are
>> not unheard of. For us, it became overwhelmingly clear in the last several
>> months that our values and operations were much better aligned as a
>> separate entity. We're happy about this transition, to say the least.
>>
>> On April 1, 2024, we'll officially start our BAM by BIG brand which will
>> have the same look, the same entire team, and all the same aspects of BAM.
>> I want to emphasize: Nothing is changing with your team, how we operate, or
>> what we stand for. In fact, this makes us even more enthralled to
>> represent our partners like you and to continue our mission of moving
>> stories forward. In addition, this is absolutely not an April Fools stunt.
>>
>> This change to the new BAM by BIG brand requires a couple of things to
>> note:
>>
>>
>>   -
>>
>>     A new Google suite, domain and email address for the team: The team
>>     will be setting up a new Google Drive, new email alias, shared drive and
>>     will be communicating everything by April 1, 2024.
>>   -
>>
>>     A new invoice and bank account: Please disregard invoices sent by
>>     LLYC if you happen to receive any. A new invoice(s) will be coming from
>>     BAM's finance team via finance@bambybig.agency shortly if it applies.
>>
>>
>> Thank you in advance for navigating this change with us and being the
>> partners we are proud to represent.
>>
>> We're here to answer anything, of course. Please feel free to call or
>> text me at ▮▮▮▮ . I'll be in touch with further messaging about our

>> transition as needed.
>>
>>
>> Beck Bamberger
>>
>> Pronouns: She, Her
>>
>> CEO and founder - San Diego, CA (Pacific Time Zone)
>>
>> Direct: ███████████
>>
>> www.bamtheagency.com
>>
>> Stories Move The World. We Move Stories Forward.
>>
>>
>> BAM is a flexible agency, with teams working across multiple time zones
>> Monday–Thursday. I may be slow to respond on Fridays.
>>
>

--


Beck Bamberger

Pronouns: She, Her

CEO and founder - San Diego, CA (Pacific Time Zone)

Direct: ███████████

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.


BAM is a flexible agency, with teams working across multiple time zones
Monday–Thursday. I may be slow to respond on Fridays.

| | |
|---|---|
| **From:** | Rebecca Bamberger on behalf of Rebecca Bamberger <rebecca@bamtheagency.com> |
| **To:** | ▮▮▮▮▮▮▮ ; ▮▮▮▮▮▮ |
| **Cc:** | ▮▮▮▮▮▮▮ |
| **Subject:** | Update to BAM website, email, and billing |
| **Date:** | Monday, March 18, 2024 6:23:57 PM |

Hi ▮▮ and ▮▮▮ -Reaching out with a few updates for you:

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for. In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April Fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

-

A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.

-

A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at ▮▮▮▮▮▮▮ . I'll be in touch with further messaging about our transition as needed.


Beck Bamberger

Pronouns: She, Her

CEO and founder - San Diego, CA (Pacific Time Zone)

Direct: ▮▮▮▮▮▮

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.


BAM is a flexible agency, with teams working across multiple time zones
Monday–Thursday. I may be slow to respond on Fridays.

| | |
|---|---|
| **From:** | Rebecca Bamberger on behalf of Rebecca Bamberger <rebecca@bamtheagency.com> |
| **To:** | ███████████ ; ███████████ |
| **Cc:** | ███████████ |
| **Subject:** | Update to BAM website, email, and billing |
| **Date:** | Monday, March 18, 2024 3:40:20 PM |

Hi ███ and ███ -Reaching out with a few updates for you:

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for. In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

- 

    A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.
- 

    A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at ███████████ . I'll be in touch with further messaging about our transition as needed.

--

Beck Bamberger

Pronouns: She, Her

CEO and founder - San Diego, CA (Pacific Time Zone)

Direct: ███████████

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.


BAM is a flexible agency, with teams working across multiple time zones
Monday–Thursday. I may be slow to respond on Fridays.

| | |
|---|---|
| **From:** | Rebecca Bamberger on behalf of Rebecca Bamberger <rebecca@bamtheagency.com> |
| **To:** | ███████████ ; ██████████ |
| **Cc:** | ████████ |
| **Subject:** | Update to BAM website, email, and billing |
| **Date:** | Monday, March 18, 2024 3:13:25 PM |

Hi ██████ and ████ : Reaching out with a few updates for you as Brenda mentioned:

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for. In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

-

A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.

-

A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at ██████████ . I'll be in touch with further messaging about our transition as needed.

Beck Bamberger

Pronouns: She, Her

CEO and founder - San Diego, CA (Pacific Time Zone)

Direct: ██████████

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.


BAM is a flexible agency, with teams working across multiple time zones
Monday–Thursday. I may be slow to respond on Fridays.

| | |
|---|---|
| **From:** | Rebecca Bamberger on behalf of Rebecca Bamberger <rebecca@bamtheagency.com> |
| **To:** | ██████████ ; ██████████ |
| **Cc:** | ██████████ |
| **Subject:** | Update to BAM website, email, and billing |
| **Date:** | Monday, March 18, 2024 6:47:34 PM |

Hi ████ and ███ -Reaching out with a few updates for you:

In short, we're formally ending our partnership with our acquirer, LLYC, and are in transition to buy back BAM. As you likely know, buy backs are not unheard of. For us, it became overwhelmingly clear in the last several months that our values and operations were much better aligned as a separate entity. We're happy about this transition, to say the least.

On April 1, 2024, we'll officially start our BAM by BIG brand which will have the same look, the same entire team, and all the same aspects of BAM. I want to emphasize: Nothing is changing with your team, how we operate, or what we stand for. In fact, this makes us even more enthralled to represent our partners like you and to continue our mission of moving stories forward. In addition, this is absolutely not an April Fools stunt.

This change to the new BAM by BIG brand requires a couple of things to note:

-

A new Google suite, domain and email address for the team: The team will be setting up a new Google Drive, new email alias, shared drive and will be communicating everything by April 1, 2024.

-

A new invoice and bank account: Please disregard invoices sent by LLYC if you happen to receive any. A new invoice(s) will be coming from BAM's finance team via finance@bambybig.agency shortly.

Thank you in advance for navigating this change with us and being the partners we are proud to represent.

We're here to answer anything, of course. Please feel free to call or text me at ██████████ . I'll be in touch with further messaging about our transition as needed.

--

Beck Bamberger

Pronouns: She, Her

CEO and founder - San Diego, CA (Pacific Time Zone)

Direct: ██████████

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.


BAM is a flexible agency, with teams working across multiple time zones Monday–Thursday. I may be slow to respond on Fridays.

| From: | Brenda Manea on behalf of Brenda Manea <brenda@bamtheagency.com> |
|---|---|
| To: | ███████████ |
| Cc: | █████ ; █████ ; █████ |
| Subject: | Re: Update to BAM website, email, and billing |
| Date: | Monday, March 18, 2024 6:32:58 PM |

Thank you, Beck!

██ and ██ -- As Beck mentioned, nothing is changing with your team, how we operate, or what we stand for. We're excited to transition into a fresh Google Drive and email. We're getting that set up in the coming days and will be in touch with you with new links, calendar invites, etc. :)

We're happy to answer any q's during our call tomorrow, and if you'd like to speak sooner, give us a ring. Thank you!

-Brenda


On Mon, Mar 18, 2024 at 4:28 PM Rebecca Bamberger <rebecca@bamtheagency.com> wrote:

> Hi ██ and ██ -Reaching out with a few updates for you:
>
> In short, we're formally ending our partnership with our acquirer, LLYC,
> and are in transition to buy back BAM. As you likely know, buy backs are
> not unheard of. For us, it became overwhelmingly clear in the last several
> months that our values and operations were much better aligned as a
> separate entity. We're happy about this transition, to say the least.
>
> On April 1, 2024, we'll officially start our BAM by BIG brand which will
> have the same look, the same entire team, and all the same aspects of BAM.
> I want to emphasize: Nothing is changing with your team, how we operate, or
> what we stand for. In fact, this makes us even more enthralled to
> represent our partners like you and to continue our mission of moving
> stories forward. In addition, this is absolutely not an April Fools stunt.
>
> This change to the new BAM by BIG brand requires a couple of things to
> note:
>
>
> -
>
> A new Google suite, domain and email address for the team: The team
> will be setting up a new Google Drive, new email alias, shared drive and
> will be communicating everything by April 1, 2024.
> -
>
> A new invoice and bank account: Please disregard invoices sent by LLYC
> if you happen to receive any. A new invoice(s) will be coming from BAM's
> finance team via finance@bambybig.agency shortly.
>
>
> Thank you in advance for navigating this change with us and being the
> partners we are proud to represent.

\>

\> We're here to answer anything, of course. Please feel free to call or text

\> me at . I'll be in touch with further messaging about our

\> transition as needed.

\>

\>

\>

\> Beck Bamberger

\>

\> Pronouns: She, Her

\>

\> CEO and founder - San Diego, CA (Pacific Time Zone)

\>

\> Direct:

\>

\> www.bamtheagency.com

\>

\> Stories Move The World. We Move Stories Forward.

\>

\>

\> BAM is a flexible agency, with teams working across multiple time zones

\> Monday–Thursday. I may be slow to respond on Fridays.

\>


--

Brenda Manea

Managing Director - Denver, CO (Mountain Time Zone)

Direct:

www.bamtheagency.com


BAM is a flexible agency, with teams working across multiple time zones
Mon-Thurs.

I may be slow to respond on Fridays.

# EXHIBIT 15

| | |
|---|---|
| **From:** | Laura Nickel on behalf of Laura Nickel <laura@bamtheagency.com> |
| **To:** | ███████████ ; ███████████ |
| **Cc:** | ███████████ ; ███████████ |
| **Subject:** | Re: Update to BAM website, email, and billing |
| **Date:** | Tuesday, March 19, 2024 9:54:36 AM |

Hi ██ and █████ ,

As Beck mentioned, nothing is changing with your team, how we operate, or what we stand for. We're excited to transition into a fresh Google Drive and email. We're getting that set up in the coming days and will be in touch with you with new links, calendar invites, etc. :)

I'm happy to answer any questions or hop on a call!

Thank you,

Laura and team

Laura Nickel (she/her)

Managing Director – Chicago (Central Time Zone)

Direct: ███████████

www.bamtheagency.com

Stories Move The World. We Move Stories Forward.

BAM is a flexible agency, with teams working across multiple time zones Monday–Thursday. I may be slow to respond on Fridays.

On Mon, Mar 18, 2024 at 5:23 PM Rebecca Bamberger <rebecca@bamtheagency.com> wrote:

> Hi ██ and █████ -Reaching out with a few updates for you:
>
> In short, we're formally ending our partnership with our acquirer, LLYC,
> and are in transition to buy back BAM. As you likely know, buy backs are
> not unheard of. For us, it became overwhelmingly clear in the last several
> months that our values and operations were much better aligned as a
> separate entity. We're happy about this transition, to say the least.
>
> On April 1, 2024, we'll officially start our BAM by BIG brand which will
> have the same look, the same entire team, and all the same aspects of BAM.
> I want to emphasize: Nothing is changing with your team, how we operate, or
> what we stand for. In fact, this makes us even more enthralled to
> represent our partners like you and to continue our mission of moving
> stories forward. In addition, this is absolutely not an April Fools stunt.
>

> This change to the new BAM by BIG brand requires a couple of things to
> note:
>
>
> -
>
> A new Google suite, domain and email address for the team: The team
> will be setting up a new Google Drive, new email alias, shared drive and
> will be communicating everything by April 1, 2024.
> -
>
> A new invoice and bank account: Please disregard invoices sent by LLYC
> if you happen to receive any. A new invoice(s) will be coming from BAM's
> finance team via finance@bambybig.agency shortly.
>
>
> Thank you in advance for navigating this change with us and being the
> partners we are proud to represent.
>
> We're here to answer anything, of course. Please feel free to call or text
> me at ▮▮▮▮▮▮▮. I'll be in touch with further messaging about our
> transition as needed.
>
>
> Beck Bamberger
>
> Pronouns: She, Her
>
> CEO and founder - San Diego, CA (Pacific Time Zone)
>
> Direct: ▮▮▮▮▮▮▮
>
> www.bamtheagency.com
>
> Stories Move The World. We Move Stories Forward.
>
>
> BAM is a flexible agency, with teams working across multiple time zones
> Monday–Thursday. I may be slow to respond on Fridays.
>

| | |
|---|---|
| **From:** | Brenda Manea on behalf of Brenda Manea <brenda@bamtheagency.com> |
| **To:** | Rebecca Bamberger |
| **Cc:** | ████████████ ; ████████████ |
| **Subject:** | Re: Update to BAM website, email, and billing |
| **Date:** | Monday, March 18, 2024 3:37:20 PM |

Thank you, Beck!

████ and ███ -- As Beck mentioned, nothing is changing with your team, how we operate, or what we stand for. We're excited to transition into a fresh Google Drive and email. We're getting that set up in the coming days and will be in touch with you with new links, calendar invites, etc. :)

████, pinging you on Slack already. ████, if you have any follow up questions, give us a ring! Thank you!

-Brenda

On Mon, Mar 18, 2024 at 1:13 PM Rebecca Bamberger <rebecca@bamtheagency.com> wrote:

> Hi ████ and ███ : Reaching out with a few updates for you as Brenda
> mentioned:
>
> In short, we're formally ending our partnership with our acquirer, LLYC,
> and are in transition to buy back BAM. As you likely know, buy backs are
> not unheard of. For us, it became overwhelmingly clear in the last several
> months that our values and operations were much better aligned as a
> separate entity. We're happy about this transition, to say the least.
>
> On April 1, 2024, we'll officially start our BAM by BIG brand which will
> have the same look, the same entire team, and all the same aspects of BAM.
> I want to emphasize: Nothing is changing with your team, how we operate, or
> what we stand for. In fact, this makes us even more enthralled to
> represent our partners like you and to continue our mission of moving
> stories forward. In addition, this is absolutely not an April fools stunt.
>
> This change to the new BAM by BIG brand requires a couple of things to
> note:
>
>
> -
>
> A new Google suite, domain and email address for the team: The team
> will be setting up a new Google Drive, new email alias, shared drive and
> will be communicating everything by April 1, 2024.
> -
>
> A new invoice and bank account: Please disregard invoices sent by LLYC
> if you happen to receive any. A new invoice(s) will be coming from BAM's
> finance team via finance@bambybig.agency shortly.
>
>
> Thank you in advance for navigating this change with us and being the

> partners we are proud to represent.
>
> We're here to answer anything, of course. Please feel free to call or text
> me at ███████ I'll be in touch with further messaging about our
> transition as needed.
>
> Beck Bamberger
>
> Pronouns: She, Her
>
> CEO and founder - San Diego, CA (Pacific Time Zone)
>
> Direct: ███████
>
> www.bamtheagency.com
>
> Stories Move The World. We Move Stories Forward.
>
>
> BAM is a flexible agency, with teams working across multiple time zones
> Monday–Thursday. I may be slow to respond on Fridays.
>


--

Brenda Manea

Managing Director - Denver, CO (Mountain Time Zone)

Direct: ███████

www.bamtheagency.com


BAM is a flexible agency, with teams working across multiple time zones
Mon-Thurs.

I may be slow to respond on Fridays.

| From: | Brenda Manea on behalf of Brenda Manea <brenda@bamtheagency.com> |
|---|---|
| To: | ███████████████████ |
| Cc: | ████████████ ; ████████ |
| Subject: | Re: Update to BAM website, email, and billing |
| Date: | Monday, March 18, 2024 6:33:37 PM |

Thank you, Beck!

██ and ██ -- As Beck mentioned, nothing is changing with your team, how we operate, or what we stand for. We're excited to transition into a fresh Google Drive and email. We're getting that set up in the coming days and will be in touch with you with new links, calendar invites, etc. :)

We're happy to answer any q's during our call tomorrow, and if you'd like to speak sooner, give us a ring. Thank you!

-Brenda


On Mon, Mar 18, 2024 at 4:28 PM Rebecca Bamberger <rebecca@bamtheagency.com> wrote:

> Hi ██ and ██ -Reaching out with a few updates for you:
>
> In short, we're formally ending our partnership with our acquirer, LLYC,
> and are in transition to buy back BAM. As you likely know, buy backs are
> not unheard of. For us, it became overwhelmingly clear in the last several
> months that our values and operations were much better aligned as a
> separate entity. We're happy about this transition, to say the least.
>
> On April 1, 2024, we'll officially start our BAM by BIG brand which will
> have the same look, the same entire team, and all the same aspects of BAM.
> I want to emphasize: Nothing is changing with your team, how we operate, or
> what we stand for. In fact, this makes us even more enthralled to
> represent our partners like you and to continue our mission of moving
> stories forward. In addition, this is absolutely not an April Fools stunt.
>
> This change to the new BAM by BIG brand requires a couple of things to
> note:
>
>
>   -
>
>    A new Google suite, domain and email address for the team: The team
>    will be setting up a new Google Drive, new email alias, shared drive and
>    will be communicating everything by April 1, 2024.
>   -
>
>    A new invoice and bank account: Please disregard invoices sent by LLYC
>    if you happen to receive any. A new invoice(s) will be coming from BAM's
>    finance team via finance@bambybig.agency shortly.
>
>
> Thank you in advance for navigating this change with us and being the
> partners we are proud to represent.

>
> We're here to answer anything, of course. Please feel free to call or text
> me at  I'll be in touch with further messaging about our
> transition as needed.
>
>
>
> Beck Bamberger
>
> Pronouns: She, Her
>
> CEO and founder - San Diego, CA (Pacific Time Zone)
>
> Direct: ███████████
>
> www.bamtheagency.com
>
> Stories Move The World. We Move Stories Forward.
>
>
> BAM is a flexible agency, with teams working across multiple time zones
> Monday–Thursday. I may be slow to respond on Fridays.
>

--

Brenda Manea

Managing Director - Denver, CO (Mountain Time Zone)

Direct: ███████████

www.bamtheagency.com


BAM is a flexible agency, with teams working across multiple time zones
Mon-Thurs.

I may be slow to respond on Fridays.

| | |
|---|---|
| **From:** | "Jasmine Jones" via thirtymadison on behalf of "Jasmine Jones" via thirtymadison <thirtymadison@bamtheagency.com> |
| **To:** | ████████ ; ████████ |
| **Cc:** | |
| **Subject:** | Re: Update to BAM website, email, and billing |
| **Date:** | Monday, April 1, 2024 5:04:52 PM |

Sorry for the delay - appreciate the update here, Bam team!

Thanks,
Jasmine

On Mon, Mar 18, 2024 at 6:58 PM Katie Marggraf <katie@bamtheagency.com> wrote:

> Thank you, Beck!
>
> ██████ -- As Beck mentioned, nothing is changing with your team, how we
> operate, or what we stand for. We're excited to transition into a fresh
> Google Drive and email. We're getting that set up in the coming days and
> will be in touch with new links, calendar invites, etc.
>
> In the meantime, happy to answer any questions during our meeting this
> week and/or jump on a call before.
>
> Thanks!
> Katie, Laura, Briana, Rachel and Julian
>
> Katie Marggraf (she/her)
>
> Managing Director of Health Tech Practice – Mountain Time Zone
>
> Direct: ████████
>
> www.bamtheagency.com
>
> Stories Move The World. We Move Stories Forward.
>
>
> BAM is a flexible agency, with teams working across multiple time zones
> Monday–Thursday. I may be slow to respond on Fridays.
>
> ·
>
> On Mon, Mar 18, 2024 at 4:37 PM Rebecca Bamberger <
> rebecca@bamtheagency.com> wrote:
>
>> Hi ██████ -Reaching out with a few updates for you:
>>
>> In short, we're formally ending our partnership with our acquirer, LLYC,
>> and are in transition to buy back BAM. As you likely know, buy backs are
>> not unheard of. For us, it became overwhelmingly clear in the last several
>> months that our values and operations were much better aligned as a
>> separate entity. We're happy about this transition, to say the least.
>>
>> On April 1, 2024, we'll officially start our BAM by BIG brand which will

>> have the same look, the same entire team, and all the same aspects of BAM.
>> I want to emphasize: Nothing is changing with your team, how we operate, or
>> what we stand for. In fact, this makes us even more enthralled to
>> represent our partners like you and to continue our mission of moving
>> stories forward. In addition, this is absolutely not an April Fools stunt.
>>
>> This change to the new BAM by BIG brand requires a couple of things to
>> note:
>>
>>
>>   -
>>
>>   A new Google suite, domain and email address for the team: The team
>>   will be setting up a new Google Drive, new email alias, shared drive and
>>   will be communicating everything by April 1, 2024.
>>   -
>>
>>   A new invoice and bank account: Please disregard invoices sent by
>>   LLYC if you happen to receive any. A new invoice(s) will be coming from
>>   BAM's finance team via finance@bambybig.agency shortly.
>>
>>
>> Thank you in advance for navigating this change with us and being the
>> partners we are proud to represent.
>>
>> We're here to answer anything, of course. Please feel free to call or
>> text me at ███████████. I'll be in touch with further messaging about our
>> transition as needed.
>>
>>
>> Beck Bamberger
>>
>> Pronouns: She, Her
>>
>> CEO and founder - San Diego, CA (Pacific Time Zone)
>>
>> Direct: ███████████
>>
>> www.bamtheagency.com
>>
>> Stories Move The World. We Move Stories Forward.
>>
>>
>> BAM is a flexible agency, with teams working across multiple time zones
>> Monday–Thursday. I may be slow to respond on Fridays.
>>
>

--

[image: photo]

* Jasmine Jones (she/her/hers) *
Director, Communications, Thirty Madison
███████████

thirtymadison.com

# EXHIBIT 16

**PageVault**

| | |
|---|---|
| Document title: | BAM \| Contact |
| Capture URL: | https://www.bambybig.agency/contact |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:43:07 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:43:08 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 3 |
| Capture ID: | bcMJZRb4DguhHvVrBUm958 |
| User: | automation@page-vaul |

PDF REFERENCE #:     gcgYMzi7ew23Guj5cj4cNA



BAM | ABOUT | CLIENTS | SERVICES | EVENTS | BLOG | TEAM | CAREERS | CONTACT

# Contact

We're in 14+ states in the U.S. and 13+ countries via our partner, LLYC. If you're looking for PR, marketing, or human comms in the U.S. and are a venture-backed startup or venture capitalist, drop us a line here.

Want to work at BAM? Head to our Careers page.

**CONTACT US**

## CHAT WITH BAM

### BAM
About
Clients
Services
Community
Careers

### BAM STORIES
Blog
Webinars
BAM Team

### CONTACT BAM
Contact Us

  

# Contact

We're in 14+ states in the U.S. and 13+ countries via our partner, LLYC. If you're looking for PR, marketing, or human comms in the U.S. and are a venture-backed startup or venture capitalist, drop us a line here.

Want to work at BAM? Head to our Careers page.

**CONTACT US**

## CHAT WITH BAM

### BAM
About
Clients
Services
Community
Careers

### BAM STORIES
Blog
Webinars
BAM Team

### CONTACT BAM
Contact Us

  

**PageVault**

| | |
|---|---|
| Document title: | BAM | Services |
| Capture URL: | https://www.bambybig.agency/services |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:43:09 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:43:11 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 3 |
| Capture ID: | vxjT71zQV6ehNdmbJwT9YQ |
| User: | automation@page-vaul |

PDF REFERENCE #:    1q9vZCe8FnU9geqPbx4izS



BAM   ABOUT   CLIENTS   SERVICES   EVENTS   BLOG   TEAM   CAREERS   CONTACT

# Services

MEDIA RELATIONS    DIGITAL MARKETING    EVENTS    VC RELATIONS

# Media Relations

We are passionate storytellers that work with you to bring your story to the right audience through our media relationships. Our strategy goes beyond just KPIs. We partner with you to understand what your objectives are, and we target publications and earned coverage that supports your business goals. And, we don't stop working to secure you coverage once a specific number is met. If we can earn more, we do.



# Move your story in the right direction

**GET STARTED**



## CHAT WITH BAM

**BAM**

About
Clients
Services
Community
Careers

**BAM STORIES**

Blog
Webinars
BAM Team

**CONTACT BAM**

Contact Us

PageVault

Document title:             BAM Blog | Stories

Capture URL:                https://www.bambybig.agency/blog

Page loaded at (UTC):       Mon, 08 Apr 2024 11:43:11 GMT

Capture timestamp (UTC):    Mon, 08 Apr 2024 11:43:13 GMT

Capture tool:               2.58.0

Collection server IP:       54.174.78.137

Browser engine:             Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36

Operating system:           linux x64 (Node v20.5.1)

PDF length:                 7

Capture ID:                 rrmYfbAJ3oMCbb8oSjgEa9

User:                       automation@page-vaul

PDF REFERENCE #:    oiW6Tsz5tH1aAeibJNf6hR

BAM by LLYC

BAM    ABOUT    CLIENTS    SERVICES    EVENTS    **BLOG**    TEAM    CAREERS    CONTACT

# Stories



**PR & MEDIA RELATIONS** • 04-Apr-2024

## Tailoring Your Media Relations Strategy for the Climate Tech Industry

In 2023, U.S. startup investments fell by 30%. Though climate tech was not completely immune to the turbulent funding environment, the industry still emerged as a winner with a 38% increase in inves...

SEARCH 🔍

CATEGORY ▾

## EDITOR'S PICKS

**WEBINARS** • 11-Dec-2023

1 AMA Webinar Recap: Artificial Intelligence

**WEBINARS** • 10-Oct-2023

2 AMA Webinar Recap: Contributed Content




Document title: BAM Blog | Stories
Capture URL: https://www.bambybig.agency/blog
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:13 GMT





PR & MEDIA RELATIONS • 04-Apr-2024

## Tailoring Your Media Relations Strategy for the Climate Tech Industry

BAM • 28-Mar-2024

## Conference Attendance 101: How Founders Can Maximize Their Time and Impact





PR & MEDIA RELATIONS • 14-Mar-2024

## Building a Strong Relationship with Your Media Relations Agency

CAREERS • 07-Mar-2024

## The Candidate Journey: What to Expect When You Apply at BAM

### 2 AMA Webinar Recap: Contributed Content



INCLUSION • 26-Sep-2023

### 3 101 Latin American/Hispanic Leaders in Tech and Venture 2023

BAM • 08-Aug-2023

### 4 Rejecting Hustle Culture: BAM's Annual Summer Shutdown

WEBINARS • 27-Jul-2023

### 5 AMA Webinar Recap: Consumer Tech



## NEWSLETTER SIGN UP

FIRST NAME*

LAST NAME*

EMAIL ADDRESS*

# Relations Agency - Apply at BAM

LAST NAME

EMAIL ADDRESS*

SUBSCRIBE





**PR & MEDIA RELATIONS** • 29- Feb-2024

**PR & MEDIA RELATIONS** • 15- Feb-2024

## 10 Black Tech Titans 2024

## 4 Conversations We Had in NYC: BAM Event Week Recap

‹  **1**  2  3  4  5  ›

# PR BEST PRACTICES







**PR & MEDIA RELATIONS** • 04- Apr-2024

**PR & MEDIA RELATIONS** • 14- Mar-2024

**PR & MEDIA RELATIONS** • 29- Feb-2024

## Tailoring Your Media Relations

## Building a Strong Relationship

## 10 Black Tech Titans 2024





**PR & MEDIA RELATIONS** • 04- Apr-2024

# Tailoring Your Media Relations Strategy for the Climate Tech Industry

**PR & MEDIA RELATIONS** • 14- Mar-2024

# Building a Strong Relationship with Your Media Relations Agency

**PR & MEDIA RELATIONS** • 29- Feb-2024

# 10 Black Tech Titans 2024



# Webinars



**WEBINARS** • ASK MEDIA ANYTHING

## AMA Webinar: Artificial Intelligence

Aaron Mok, writer for *Business Insider*, shares his tips for pitching AI stories.

WATCH NOW

● ○ ○



## BAM NEWS







**PR & MEDIA RELATIONS** • 04-Apr-2024

**BAM** • 28-Mar-2024

**PR & MEDIA RELATIONS** • 14-Mar-2024

### Tailoring Your Media Relations Strategy for the Climate Tech Industry

### Conference Attendance 101: How Founders Can Maximize Their Time and Impact

### Building a Strong Relationship with Your Media Relations Agency

# The best stories in your inbox.

# The best stories in your inbox.

| FIRST NAME* | LAST NAME* | EMAIL ADDRESS* |

**SUBSCRIBE**

## CHAT WITH BAM

### BAM

About

Clients

Services

Community

Careers

### BAM STORIES

Blog

Webinars

BAM Team

### CONTACT BAM

Contact Us

  

**Page Vault**

| | |
|---|---|
| Document title: | BAM | Team |
| Capture URL: | https://www.bambybig.agency/team |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:43:18 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:43:20 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 8 |
| Capture ID: | 2gS9v1s36UVN7zKQqx5oRF |
| User: | automation@page-vaul |

PDF REFERENCE #:    62b9fU199qkGEdij1BzFjX



BAM    ABOUT    CLIENTS    SERVICES    EVENTS    BLOG    TEAM    CAREERS    CONTACT

# Our Stories

We are nerds, rappers, first-generation college graduates, podcasters, helicopte pilots, hip-hop dancers, mountaineers, immigrants, moms, and more. Together, we bring 300+ years of collective PR, marketing, and Human Comms experience to the table, from venture-backed startups to Fortune 500 brands.



# Change makers.



Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT










ROSINA FERRANTE
SR. ACCOUNT EXECUTIVE

RAMEL WALLACE
SR. COMMUNITY MANAGER

COURTNEY CROCKETT
PARTNERSHIPS MANAGER

SHAYNA ZEIGEN
ACCOUNT MANAGER

LAUREN'S STORY >

Our Executive Vice President, Lauren Grassetti, is a PR guru. She came from LEWIS Global Communications and has 16 years of experience working with over 80+ brands. Besides leading BAM's PR and media relations account servicing team, she's one of our #BAMmamas and is based out of Virginia.



Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT





Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT

priority. Having worked for years as a mentor, soccer coach, and running her own fitness-based program with incarcerated youth, Jill takes pride in having a multi-disciplinary and humanistic approach to individuals and teams.

Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT



## MIKE'S STORY >

Mike Melvin is our growth captain. He ensures we're leveling up in everything we do — from the caliber of clients we work with to the cash money we're bringing in. Outside of work, he's passionate about photography and spending time with his family.



Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT

MIKE'S STORY >

Mike Melvin is our growth captain. He ensures we're leveling up in everything we do — from the caliber of clients we work with to the cash money we're bringing in. Outside of work, he's passionate about photography and spending time with his family.



## CHAT WITH BAM

| BAM | BAM STORIES | CONTACT BAM |
|---|---|---|
| About | Blog | Contact Us |
| Clients | Webinars | |
| Services | BAM Team | |
| Community | | |
| Careers | | |

  

Document title: BAM | Team
Capture URL: https://www.bambybig.agency/team
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:20 GMT

| | |
|---|---|
| Document title: | BAM \| Clients |
| Capture URL: | https://www.bambybig.agency/clients |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:43:19 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:43:21 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 6 |
| Capture ID: | txahH4LrEy9FgVHf2DmGCV |
| User: | automation@page-vaul |

PDF REFERENCE #:    un11JSDhzfMve6QiQsmtfG



BAM    ABOUT    CLIENTS    SERVICES    EVENTS    BLOG    TEAM    CAREERS    CONTACT

# Clients



## We move stories forward for technology companies and venture capital funds

We do more than just email pitches on your behalf. Our unbeatable CARE strategy means more money raised and more exits realized. Check out a few of our client IPOs, unicorns, and practice areas below.

Document title: BAM | Clients
Capture URL: https://www.bambybig.agency/clients
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:21 GMT

practice areas below.

We're your outsourced marketing and PR team while you're still building your internal one. Working with founders directly who work in tandem with us is one of our favorite partnerships.

**GET STARTED**



**Howdy**

Reintroducing a brand to their target audience

**The ISH Food Company**

Creating a media footprint for a new

**Carputty**

Building awareness with a Series A announcement

Document title: BAM | Clients
Capture URL: https://www.bambybig.agency/clients
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:21 GMT



### BAM CLIENTS RAISE MORE

We work exclusively with venture-backed startups and venture capital firms that move the world forward from seed to IPO. On average, our clients raise 94% more funding than others on Crunchbase.



# Move your story in the right direction

GET STARTED

Document title: BAM | Clients
Capture URL: https://www.bambybig.agency/clients
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:21 GMT

# Move your story in the right direction

GET STARTED



**CHAT WITH BAM**

**BAM**

About

Clients

Services

Community

Careers

**BAM STORIES**

Blog

Webinars

BAM Team

**CONTACT BAM**

Contact Us

PageVault

| | |
|---|---|
| Document title: | BAM \| Home |
| Capture URL: | https://www.bambybig.agency/home |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:43:21 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:43:22 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 54.175.14.236 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 6 |
| Capture ID: | uexs3r58eVSB59DGzEQ9PC |
| User: | automation@page-vaul |

PDF REFERENCE #:    3i39sWzo25agD6a8rsdWpv



BAM    ABOUT    CLIENTS    SERVICES    EVENTS    BLOG    TEAM    CAREERS    CONTACT



———

# Stories move the world. We move stories forward.

BAM is a communications agency that believes stories move the world. We move stories forward for venture-backed startups and venture funds that challenge, change, and create entire industries. It's working: our venture-backed startup and venture fund clients raise 94% more capital on average. In 2023, BAM was acquired by LLYC, a global agency in 13 countries and counting.

**GET STARTED**




Document title: BAM | Home
Capture URL: https://www.bambybig.agency/home
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:22 GMT

Document title: BAM | Home
Capture URL: https://www.bambybig.agency/home
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:22 GMT

companies by providing support in four critical areas.

## CONNECT

We are passionate storytellers that work with you to bring your story to the right audience through our media relationships.

## AMPLIFY

We integrate marketing into your media relations strategy to amplify your earned media coverage and make sure every internal employee, VC, LP, or sales prospect knows your story.

## REACH

We curate 40+ events a year to bring together leaders in venture, media, and tech to give our clients the advantage of developing strategic and beneficial relationships.

## ENGAGE

We are in constant communication with our network of 400+ notable venture funds to help you get in front of the right audience at the right time.



OUR SERVICES

C      pelling

# Compelling



Stories sell but results compe[...]
measured, qualitative impact [...]
our venture backed clients ac[...]
stage (seed + Series A), health
logistics/supply chain, consu[...]
fintech, sustainability, enterpr[...]
growth (Series D+ to IPO).

OUR CLIENTS

We call ourselves BAMfs. If you know,
you know. Our 300+ combined years of
tech and storytelling experience drive u[...]
every day.



# Unmatched





# Unmatched

OUR STORY

CHAT WITH BAM

**BAM**

About
Clients
Services
Community
Careers

**BAM STORIES**

Blog
Webinars
BAM Team

**CONTACT BAM**

Contact Us

Document title: BAM | Home
Capture URL: https://www.bambybig.agency/home
Capture timestamp (UTC): Mon, 08 Apr 2024 11:43:22 GMT

**PageVault**

| | |
|---|---|
| Document title: | BAM \| Events |
| Capture URL: | https://www.bambybig.agency/events |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:45:33 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:45:35 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 6 |
| Capture ID: | fY3wTkmw3ma8kkCAXiNdQK |
| User: | automation@page-vaul |



BAM    ABOUT    CLIENTS    SERVICES    EVENTS    BLOG    TEAM    CAREERS    CONTACT

JILL VEGLAHN
HEAD OF BAM

Events



Relationships are made in-person. We curate 40+ events a year to bring together leaders in venture, media, and tech to give our clients the advantage of developing strategic and beneficial relationships. Most notable? Our Media Matchmaking Day brings venture-backed startups together with 60+ top-tier media every quarter in San Francisco and New York City. Check out more of our upcoming events below.

with 60+ top-tier media every quarter in San Francisco and New York City. Check out more of our upcoming events below.

# March 2024 Events – San Francisco



### Media Dinner: Deep Tech

**Date: Tuesday, March 12, 5:30 - 8:30 pm PT**

We curate intimate dinners with media, industry experts, and founders to establish rapport and create opportunity for advantageous relationships. Our upcoming March dinner will be focused entirely on those that work within the deep tech industry.

Who: Founders, Media, Investors in the deep tech industry
Where: Dalida, 101 Montgomery Street, Suite 100 (The Presidio), San Francisco CA

**FILL OUT THE NOMINATION FORM**



### Media Dinner: Climate Tech

**Date: Wednesday, March 13, 5:30 - 8:30 pm PT**

We curate intimate dinners with media, industry experts, and founders to establish rapport and create opportunity for advantageous relationships. Our upcoming March dinner will be focused entirely on those that work within the climate tech industry.

Who: Founders, Media, Investors in the climate tech industry
Where: Dalida, 101 Montgomery Street, Suite 100 (The Presidio), San Francisco CA



those that work within the climate tech industry.

Who: Founders, Media, Investors in the climate tech industry

Where: Dalida, 101 Montgomery Street, Suite 100 (The Presidio), San Francisco CA

**FILL OUT THE NOMINATION FORM**

# April Events – New York City



## Media Dinner: Workplace Tech

**Date: Wednesday, April 10 at 5:30 - 8:30 pm ET**

We curate intimate dinners with media, industry experts, and founders to establish rapport and create opportunity for advantageous relationships. Our upcoming April dinner will be focused entirely on those that work within the workplace tech industry.

Who: Founders, Media, Investors in the workplace tech industry
Where: Dirty French, 180 Ludlow St, New York, NY

**FILL OUT THE NOMINATION FORM**



## Media Dinner: Climate Tech

**Date: Thursday, April 11 at 5:30 - 8:30 pm ET**

We curate intimate dinners with media, industry experts, and founders to establish rapport and create opportunity for advantageous relationships. Our upcoming April dinner will be focused entirely on those that work within the climate tech industry.

Who: Founders, Media, Investors in the climate tech industry
Where: Dirty French, 180 Ludlow St, New York, NY

**FILL OUT THE NOMINATION FORM**

Where: Dirty French, 180 Ludlow St, New York, NY

FILL OUT THE NOMINATION FORM

# Webinar Recordings












**AMA WEBINAR: AI**

Aaron Mok from *Business Insider* explores the proliferation of AI in 2023 and 8 tips for pitching AI reporters and what types of stories *Insider* publishes.

WATCH

**PR BOOTCAMP RECAP: HOW TO CREAT CONTENT TO SUPPORT YOUR MEDIA RELATIONS PROGRAM**

BAM's PR experts Sarah and Brenda shared the key steps for creating a content strategy, choosing the best platform for your content, the ins and outs of sponsored content, and useful tips for writing top-notch bylines.

WATCH

**AMA WEBINAR RECAP: FUTURE OF WORK**

Lauren Weber of *The Wall Street Journal*, Cloey Callahan of *Digiday*, and Gabriela Riccardi of *Quartz* explored trends in corporate work, tech journalism, and outlined three key elements of a compelling pitch. Register below to watch the recording.

WATCH













## PR BOOTCAMP RECAP: HOW TO PITCH FUNDING

This webinar gives you the roadmap for announcing your big funding moment, from drafting the press release to pitching an exclusive.

WATCH

## AMA RECAP: SUSTAINABILITY AND CLIMATE TECH

Megan Hernbroth of *Axios*, Jason Abbruzzese of *NBC News Digital*, and Catherine Boudreau of *Insider* shared what they look for in pitches, what stories always catch their attention, and their feelings on embargoes vs. exclusives.

WATCH

## PR BOOTCAMP RECAP: HOW READY IS YOUR STARTUP FOR PR?

How Ready is Your Startup for PR? In this webinar, we share the assessment that explores your company messaging, third-party validators, current assets, existing relationships, PR expectations, and viable news pipeline.

WATCH

# CHAT WITH BAM

**BAM**

About
Clients
Services
Community
Careers

**BAM STORIES**

Blog
Webinars
BAM Team

**CONTACT BAM**

Contact Us





**PageVault**

| | |
|---|---|
| Document title: | BAM \| Careers |
| Capture URL: | https://www.bambybig.agency/careers |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:45:46 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:45:48 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 52.5.8.50 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 5 |
| Capture ID: | dGVney1vUChAyHaUHvttXs |
| User: | automation@page-vaul |

PDF REFERENCE #:    sKcARKyinZRw5zh86vpCz4



BAM    ABOUT    CLIENTS    SERVICES    EVENTS    BLOG    TEAM    CAREERS    CONTACT

# Careers





# People are our biggest asset.

Incredible people working together to get big sh*t done: Welcome to BAM. Check out our film from our 2023 retreat in Napa below to see if we're your

Document title: BAM | Careers
Capture URL: https://www.bambybig.agency/careers
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

asset.

Incredible people working together to get big sh*t done: Welcome to BAM. Check out our film from our 2023 retreat in Napa below to see if we're your kind of people.

Are you sounding like our next culture add at BAM? We can't wait to meet you. Drop us a line.



# Benefits

**Becoming the best person possible while at BAM and beyond is one of our top focuses. Here's a list of a few perks we offer in 2023 that go beyond the basic ones we already cover:**

- Coaching: Pick your executive coach and join our

Document title: BAM | Careers
Capture URL: https://www.bambybig.agency/careers
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT



**VIEW OPEN ROLES**

**Becoming the best person possible while at BAM and beyond is one of our top focuses. Here's a list of a few perks we offer in 2023 that go beyond the basic ones we already cover:**

- Coaching: Pick your executive coach and join our "peer pod" group coaching with our in-house certified coaches

- 4 Day Work Week: Work Monday through Thursday

- Client bonuses: Our contracts have client bonuses that let you get rewarded for knocking it out of the park

- Money club: One-on-one time with our Money Coach so you can count and keep your dollars

- College tuition reimbursement: You pay down your debt, we'll help, too

- Therapy reimbursement: Pick your therapist, and we'll pay for it

- Paid sabbaticals: Long-time BAMfs get 6 weeks to refresh. We've have a number of BAMfs who have been here for 5-10+ years.

- 6-month paid parent leave: Any gender for any parent, doesn't matter

- All the usual stuff: Full health, dental, vision insurance, and 401K matching

- Monthly joy stipend: Spend it on massages, poetry classes, whatever gives you joy

- Supportive Santa: Like secret Santa but a year-round way to support and delight your fellow BAMfs

- Two paid company-wide vacation weeks: BAM is closed Christmas Eve to the day after New Year's

Document title: BAM | Careers
Capture URL: https://www.bambybig.agency/careers
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

been here for 5-10+ years.

- 6-month paid parent leave: Any gender for any parent, doesn't matter

- All the usual stuff: Full health, dental, vision insurance, and 401K matching

- Monthly joy stipend: Spend it on massages, poetry classes, whatever gives you joy

- Supportive Santa: Like secret Santa but a year-round way to support and delight your fellow BAMfs

- Two paid company-wide vacation weeks: BAM is closed Christmas Eve to the day after New Year's Day, and the week of July 4th, so our BAMfs can rest



CHAT WITH BAM

**BAM**
About
Clients
Services
Community
Careers

**BAM STORIES**
Blog
Webinars
BAM Team

**CONTACT BAM**
Contact Us

Document title: BAM | Careers
Capture URL: https://www.bambybig.agency/careers
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

**PageVault**

| | |
|---|---|
| Document title: | BAM \| About |
| Capture URL: | https://www.bambybig.agency/about |
| Page loaded at (UTC): | Mon, 08 Apr 2024 11:45:46 GMT |
| Capture timestamp (UTC): | Mon, 08 Apr 2024 11:45:48 GMT |
| Capture tool: | 2.58.0 |
| Collection server IP: | 54.175.14.236 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.6167.85 Safari/537.36 |
| Operating system: | linux x64 (Node v20.5.1) |
| PDF length: | 5 |
| Capture ID: | hCanSpmLrpWVDuZzURVivL |
| User: | automation@page-vaul |

PDF REFERENCE #:    dXohQoSJLTWBoZ6XXB4u7v



# About Us

We started in 2008 back when the economy wasn't great and tech wasn't everything. Our founder was a journalist, knew media mattered, and bet technology would change the world as well as our everyday lives. Today, we're a team of 30+ BAMfs who love storytelling. In 2023, BAM was acquired by LLYC, a global communications, digital marketing, and consulting firm.

team of 30+ BAMfs who love storytelling. In 2023, BAM was acquired by LLYC, a global communications, digital marketing, and consulting firm.

# Our Values



## Our values are pretty important. Here's what they are.

### POSITIVE

Positive actions lead to positive results.

### PARTNERSHIP ORIENTED

We partner with our clients to achieve bigger results.

### POWERFUL

Media has power, each of us has power, and we are a powerful team

MEET THE TEAM

Document title: BAM | About
Capture URL: https://www.bambybig.agency/about
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

## PURPOSEFUL

We have a clear purpose as individuals, a company, and as partners of innovative brands.

## PRACTICE

We uphold a learner's mindset and have the humility to constantly learn and grow.



MEET THE TEAM

# DEI at BAM



READ OUR DEI COMMITMENTS >

From our DEI client requirement to our 50%+ BIPOC representation at BAM, we're changing what the agency and venture capital communities look like.

CHAT WITH BAM

BAM        BAM STORIES        CONTACT BAM

Document title: BAM | About
Capture URL: https://www.bambybig.agency/about
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

# DEI at BAM



READ OUR DEI COMMITMENTS >

From our DEI client requirement to our 50%+ BIPOC representation at BAM, we're changing what the agency and venture capital communities look like.

## CHAT WITH BAM

**BAM**

About

Clients

Services

Community

Careers

**BAM STORIES**

Blog

Webinars

BAM Team

**CONTACT BAM**

Contact Us

  

BAM by LLYC

Document title: BAM | About
Capture URL: https://www.bambybig.agency/about
Capture timestamp (UTC): Mon, 08 Apr 2024 11:45:48 GMT

Page 4 of 4

# EXHIBIT 17



# EXHIBIT 18

**To:**    Mike Melvin[mike@bambybig.agency]
**Cc:**    finance@bambybig.agency[finance@bambybig.agency][ ████████████████ ],
rebecca@bamtheagency.com[rebecca@bamtheagency.com]
**From:**    ████████████████
**Sent:**    Tue 3/26/2024 2:55:07 AM (UTC-07:00)
**Subject:**    Re: BAM Change of Bank Account

Hi Mike,
Thank you for confirming.

Just to avoid any email discrepancies, would you please be able to send me the banking information over on company headed paper? It would be greatly appreciated.

Many thanks,



On Mon, 25 Mar 2024 at 16:26, Mike Melvin <mike@bambybig.agency> wrote:

Hi Jacob,

Thank for your email and for following up. I am Mike, the head of finance at BAM and I'll be your main point of contact for any questions you may have for billing.

We are no longer using the HSBC account, so please submit future payments to the following:

**ACH/Direct Deposit payment – BAM banking information:**
Account number: ████████
Routing number: ████████
New York (downstate) routing: ████████
New York (upstate) routing: ████████
Bank: Chase Bank
Address: 270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant:
International SWIFT/BIC code for Chase: CHASUS33 (USD payments) and (Foreign Currency payments)

Best,
Mike

On Mon, Mar 25, 2024 at 6:54 AM 'Jacob Overton' via Finance <finance@bambybig.agency> wrote:

Good afternoon,
Is there any update on the above?

Many thanks,

On Tue, 19 Mar 2024 at 15:56, ███████████████████████████████ wrote:

Hi finance team,
We have received an email from rebecca@bamtheagency.com to inform us that you are ending your partnership with LLYC and consequently your bank account details will be changing.

We have got one invoice currently outstanding (reference #0053200050 due 21/03/2024) which we were going to schedule for payment tomorrow.

I am just reaching out to double check what bank account this should be paid into? Are we okay to use the HSBC account ending 6620 stated on the invoice or is there a new bank account that we should use?

Many thanks,



This email is sent on behalf of Genomics plc, a public limited company registered in England and Wales with registered number 8839972, VAT registered number 189 2635 65 and registered office at King Charles House, Park End Street, Oxford, OX1 1JD, United Kingdom.

The contents of this e-mail and any attachments are confidential to the intended recipient. If you are not the intended recipient please do not use or publish its contents, contact Genomics plc immediately at info@genomicsplc.com then delete. You may not copy, forward, use or disclose the contents of this email to anybody else if you are not the intended recipient. Emails are not secure and may contain viruses.

This email is sent on behalf of Genomics plc, a public limited company registered in England and Wales with registered number 8839972, VAT registered number 189 2635 65 and registered office at King Charles House, Park End Street, Oxford, OX1 1JD, United Kingdom.

The contents of this e-mail and any attachments are confidential to the intended recipient. If you are not the intended recipient please do not use or publish its contents, contact Genomics plc immediately at info@genomicsplc.com then delete. You may not copy, forward, use or disclose the contents of this email to anybody else if you are not the intended recipient. Emails are not secure and may contain viruses.

# EXHIBIT 19

[REDACTED]

# EXHIBIT 20

| | |
|---|---|
| **From:** | [REDACTED] |
| **To:** | Emmanuel Ramírez |
| **Cc:** | [REDACTED] MIA Cuentas LLYC; Mike Melvin; [REDACTED] |
| **Subject:** | Re: BAM INVOICE MARCH 2024 |
| **Date:** | Thursday, April 4, 2024 12:42:02 PM |
| **Attachments:** | Billing Document - 53200082 Everest Labs March 2024.pdf |
| | Bill_0053200082_Invoice_0053200082.pdf |

Hi Emmanuel,

We are receiving separate mails from BAM by BIG for PR services for the same amount but with different bank details. Can you please confirm if the invoice from LLYC and BAM by Big are the same or different?
Attaching the invoices below for your reference.


Thank you,
Accounting team


On Wed, Mar 6, 2024 at 8:03 PM Emmanuel Ramírez <emmanuel.ramirez@llyc.global> wrote:

> Dear all, I hope this email finds you well.
>
> Please find attached invoice 53200082 for services rendered in March 2024.
>
> My best regards,
>
> --
>
>
> * Emmanuel Ramírez *
>
> [image: LLYC]
>
> T.: +1 786 590 1000
> 600 Brickell Avenue, Suite 2125
> Miami, FL 33131
>
> llyc.global
>
> The contents of this e-mail are confidential. They are intended for the
> named recipient only. If you have received this e-mail by mistake, please
> delete it immediately along with any attachments. / Este mensaje es
> confidencial y va dirigido únicamente a la persona propietaria de la
> dirección de correo. Si por cualquier error recibe este mensaje, por favor
> elimínelo inmediatamente junto con los documentos adjuntos. / Esta mensagem
> é confidencial e está dirigida apenas à pessoa proprietária do endereço de
> correio eletrônico. Se por qualquer erro receber esta mensagem, elimine-a
> de imediato, por favor, junto com os documentos em anexo.
>
>


--
*Thanks,*

*Accounting Team*



**BAM By BIG**

2855 5th Ave
San Diego, CA  92103 USA
+12673535725
mike@bambybig.agency

# INVOICE

| | |
|---|---|
| BILL TO | |
| ███████ | |
| EverestLabs | |

| | |
|---|---|
| INVOICE | 0053200082 |
| DATE | 03/06/2024 |
| TERMS | Net 30 |
| DUE DATE | 04/05/2024 |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | PR Services for | March 2024 | 1 | | 15,750.00 |

BALANCE DUE  **$15,750.00**

# LLYC

**Rebecca Bamberger Works, LLC**
**600 Brickell Avenue, Suite 2125**
**CP: 33131    Miami**
**EIN: 83-0468288**
**PH: + 1 786590 1000**
**www.llorenteycuenca.com**

**NUMBER:**            0053200082
**INVOICE DATE:**    Mar 6, 2024
**DUE DATE:**          Apr 5, 2024
**PURCHASE ORDER NUMBER:**

**EverestLabs**
  **94538**
**ID Number: 364809011**

| DESCRIPTION | AMOUNT |
|---|---|
| PR Services March 2024 | 15.750,00 |
| **Total USD** | **15,750.00** |

Please write all checks payable to Rebeca Bamberger Works LLC
**For your convenience, wire transfer funds to:**
Bank: HSBC
Bank Address: 2929 Walden Ave, Depew, NY 14043
ABA Number: (WIRE) ███████
Routing Numberr: (ACH) ███████
Account: ███████
SWIFT: ███████
* If paying more than one invoice, please reference all invoice numbers in wiring instructions *
**Payment terms:**          Net Due in 30 days

53200082

# EXHIBIT 21

---------- Forwarded message ---------
De: **Mauricio Payán** <mpayan@llyc.global>
Date: mié, 17 abr 2024 a las 17:40
Subject: Fwd: BAM Invoice April 2024
To: Marta Guisasola <mguisasola@llyc.global>, Luis Cadena <luis.cadena@llyc.global>

FYI

---------- Forwarded message ---------
█ ████████ ████████████████████████
Date: mar, 16 abr 2024 a la(s) 11:57 p.m.
Subject: Re: BAM Invoice April 2024
To: Emmanuel Ramírez <emmanuel.ramirez@llyc.global>
Cc: Mauricio Payán <mpayan@llyc.global>, MIA Cuentas LLYC <ar-mia@llorenteycuenca.com>, Mike Melvin <mike@bamtheagency.com>

Hi Emmanuel,

Thank you for sending the invoice! I also received an invoice (No. 124) from BAM by BIG for PR Service in April plus media retainer. Please let me know which invoice we should pay. Going forward could you please invoice us from one source (either BAM by BIG via Intuit QuickBooks, or you email me LLYC invoice)? Please let me know which one you'll use going forward.

Could you please send future invoices to touringcapalllc@bill.com and cc me?

Thank you!



Linkedin | touringcapital.com

On Wed, Apr 10, 2024 at 8:02 AM, Emmanuel Ramírez <emmanuel.ramirez@llyc.global> wrote:

Dear all, I hope this email finds you well.

Please find attached invoice 53200115 for services rendered in April 2024.

My best regards

--

## Emmanuel Ramírez

LLYC

T.: +1 786 590 1000
600 Brickell Avenue, Suite 2125
Miami, FL 33131

llyc.global

The contents of this e-mail are confidential. They are intended for the named recipient only. If you have received this e-mail by mistake, please delete it immediately along with any attachments. / Este mensaje es confidencial y va dirigido únicamente a la persona propietaria de la dirección de correo. Si por cualquier error recibe este mensaje, por favor elimínelo inmediatamente junto con los documentos adjuntos. / Esta mensagem é confidencial e está dirigida apenas à pessoa proprietária do endereço de correio eletrônico. Se por qualquer erro receber esta mensagem, elimine-a de imediato, por favor, junto com os documentos em anexo.

# BAM

**BAM By BIG**

2855 5th Ave
San Diego, CA  92103 USA
+12673535725
mike@bambybig.agency

## INVOICE

BILL TO

███████████
██████████████████
████████████

| | | |
|---|---|---|
| INVOICE | 124 |
| DATE | 04/01/2024 |
| TERMS | Net 30 |
| DUE DATE | 05/01/2024 |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | PR Services for | April 2024 | 1 | 12,000.00 | 12,000.00 |
| | PR Services for | Half of Social Media Retainer | 0.50 | 5,000.00 | 2,500.00 |

**BALANCE DUE**                     **$14,500.00**

Contact finance@bambybig agency with any questions
BAM accepts payments via Bill.com (www.Bill.com) using
BAM's Payment Network ID ███████████████

ACH/Direct Deposit payment    BAM banking information
Account number: ████████
Routing number ███████
New York (downstate) routing: █████████
New York (upstate) routing ████████
Bank: Chase Bank
Address  270 Park Avenue, New York, NY 10017, USA
Bank Phone#: 212.270.6000
CHIP Participant
International SWIFT/BIC code for Chase: ████████ (USD payments) and
(Foreign Currency payments)

# EXHIBIT 22



LLYC

Contact Us

‹ Return

# INTELLECTUAL PROPERTY FACES THE CHALLENGE OF THE DIGITAL WORLD

Inventions, artworks, symbols, trademarks, logos... These are all creations usually associated with the field of intellectual property and, consequently, are legally protected by patents, copyrights, and trademarks.

However, **new technologies and digitalization have brought new challenges to the field of intellectual property.** Now, it must not only protect new types of non-traditional trademarks, such as holograms, but also purely digital creations, such as mobile applications and other software. There are also questions regarding how to enforce these rights in online environments and digital marketplaces.

**Protecting intangible assets** can represent enormous value for a company, and it **becomes even more necessary and complex in an increasingly digital and globalized world**. Beyond the ongoing development of legal regulations in this area, intellectual property disputes of any kind can pose **significant reputational risks for companies**.

Intellectual property disputes and risks have become much broader in the age of hyperconnectivity. A good example of this concerns Amazon's popular marketplace, which allows third-party sellers to offers their products on its website.

One seller was offering products from the well-known brand Davidoff on this platform. Coty (a company licensed to Davidoff products) argued in court that both the vendor and Amazon were king use of this trademark, therefore making them both directly liable for the violation of rketing its products without the owner's authorization.

Case 3:24-cv-00706-JLS-DDL    Document 27-2    Filed 05/16/24    PageID.2217    Page 521 of 524



**LLYC**

Contact Us

Another major dispute between tech giants in recent years has been over intellectual property, specifically software patents. Oracle, the owner of the Java programming language, accused Google of having used lines of Java SE code in Android, thereby violating copyright laws. It claimed $9 billion in compensation from Google. The U.S. Supreme Court recently ended this 10-year-long dispute, ruling that Google can legally make use of Java code snippets. This established a significant precedent in the technology sector in terms of how copyright is deemed to affect software.

**One of the risks most frequently facing businesses is another entity copying or misusing a distinctive element of its brand.** This can happen both within and beyond its sector of activity and takes advantage of the business' good name, potentially leading to consumer confusion.

In the digital environment, where **we cannot physically check the qualities of the products we purchase,** it becomes a risk brands must be especially aware of in order to be able to identify possible trademark disputes.

DOWNLOAD

**AUTHORS**
Luis González
Alba García

VIEW MORE

LLYC

Contact Us



Jul 31 2023

## PRECISION MEDICINE FOR CANCER TREATMENT: SO CLOSE, YET SO FAR

Healthcare



Jul 20 2023

## FROM STANDBY TO INFINITY: M&A MARKET TRENDS

Financials / Investors

Case 3:24-cv-00706-JLS-DDL    Document 27-2    Filed 05/16/24    PageID.2219    Page 523 of 524



Contact Us



Oct 19 2023

## EVALUATING MARKETING & COMMUNICATIONS ROI

E-commerce

Economy

## SUBSCRIBE

Stay up to date with our latest news.

First Name*

Last Name*

Email*

SEND

I give my consent to the Privacy Policy.

* This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

LLYC in Miami



Contact Us ☰

LLYC Ideas

LLYC Foundation

LLYC Venturing

in  𝕏  ⃝  ▶  f  @

LLYC © 2024 All rights reserved

ES **EN** PT BR
600 Brickell Avenue, Suite 2125 Miami, Florida 33131
+1 786 5901000

Ethical channel
Privacy Policy
Cookie Policy
Data Privacy For Social Listening