1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA BAMBERGER WORKS, LLC d/b/a BAM COMMUNICATIONS, a Delaware limited liability company; LLORENTE & CUENCA USA, INC., a Delaware corporation; and LLORENTE & CUENCA MADRID S.L., a foreign corporation, | Case No.:  24-CV-706 JLS (DDL) **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | (ECF No. 5) |
| v. | |
| REBECCA BAMBERGER, an individual; RBW HOLDCO, INC., a California corporation; BAM BY BIG LLC, a California limited liability company; and DOES 1 through 20, | |
| Defendants. | |

Presently before the Court is an *Ex Parte* Application for Issuance of Temporary Restraining Order ("Appl.," ECF No. 5) filed by Plaintiffs Rebecca Bamberger Works, LLC ("BAM"); Llorente & Cuenca USA, Inc. ("LLYC USA"); and Llorente & Cuenca Madrid S.L. ("LLYC Madrid") (collectively, "Plaintiffs").  On April 30, 2024, the Court

1

issued an Order ("Order," ECF No. 7) construing the Application—only to the extent it sought a temporary restraining order—as a motion for preliminary injunction and ordering Defendants to respond.  Defendants Rebecca Bamberger ("Bamberger"), RBW Holdco, Inc. ("RBW"), and BAM by BIG LLC ("BIG") then filed a Response ("Resp.," ECF No. 16), to which Plaintiffs replied ("Reply," ECF No. 23).  The Court held oral argument on May 16, 2024.  Having carefully considered the Parties' submissions and the law, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Application.

## BACKGROUND

## I.    Factual Background

### A.    LLYC Purchases a Stake in BAM

LLYC USA is a subsidiary of LLYC Madrid.  First Garcia Decl. ¶ 1.[1]  Both companies are part of LLYC Group ("LLYC"), "a global corporate affairs and marketing group of companies" headquartered in Madrid, Spain.  *Id.* ¶ 4.  LLYC Madrid owns "trademark Registration No. 6,066,337 with the United States Patent and Trademark Office" for the mark "LLYC."  See *id.* ¶¶ 4, 5–8.  LLYC has spent millions of dollars promoting the services associated with its mark.  *Id.* ¶ 12.

BAM is a U.S.-based public relations and digital marketing agency that works with venture capital brands, technology companies, and venture-backed start-ups.  *Id.* ¶ 17; Decl. Rebecca Bamberger Supp. Defs.' Resp. ("Bamberger Decl.") ¶ 2, ECF No. 16-1. Since 2006, BAM has used the mark "BAM" in connection with its services.  First Garcia Decl. ¶ 18

In March of 2023, LLYC acquired 80% of BAM's equity from BAM Chief Executive Officer ("CEO") Bamberger via a Membership Interest Purchase Agreement

---

[1] Plaintiffs supported their Application with declarations by Luisa Garcia ("First Garcia Decl."), Todd Renner ("Renner Decl."), and Gregory Nylen ("First Nylen Decl.").  These declarations collectively make up ECF Nos. 6-1 through 6-15.  Though the Application and its associated Declarations are currently filed under seal, Plaintiffs submitted proposed redactions to said materials on May 16, 2024.  Out of an abundance of caution, the Court has taken pains to avoid revealing in this Order specific information from those portions of the Application that Plaintiffs seek to redact.

("PA," First Garcia Decl. Ex. 3). *Id.* ¶¶ 16, 19, 21. Bamberger's corporation RBW retained a 20% stake in BAM. *See id.* ¶ 22. As part of the purchase, RBW and Bamberger agreed to comply with a Restrictive Covenants Agreement ("RCA," First Garcia Decl. Ex 4). *Id.* ¶ 23. Bamberger also agreed to remain BAM's CEO subject to an Employment Agreement ("EA," First Garcia Decl. Ex. 5). *Id.* ¶ 24. Finally, BAM, LLYC, RBW, and Bamberger executed an Operating Agreement ("OA," First Garcia Decl. Ex. 6) stating that BAM would be operated by a three-member board. *Id.* ¶¶ 29–30. The board would include Bamberger and two LLYC representatives. *Id.*

After the purchase, LLYC incorporated their LLYC mark into the BAM branding to create a new mark: "BAM by LLYC." *Id.* ¶ 25. BAM used this mark in "all aspects of BAM's [s]ervices." *Id.* ¶ 28.

### B.    *Corporate Conflict Arises*

In late 2023, relations between Bamberger and LLYC began to sour. The tension started when LLYC sought to transition BAM's bank account from Chase Bank to HSBC. *Id.* ¶ 40–45. Rather than transition the funds as ordered by the board, Bamberger withdrew hundreds of thousands of dollars from BAM's account. *Id.* ¶¶ 46–51, 66–74. At least some of these funds were transferred to Bamberger's personal account. *Id.*

Around the same time, Bamberger created two California companies—VC Comms Con LLC and Big Magical Events LLC. *Id.* ¶¶ 52–59. BAM performed at least $252,000 worth of services for these companies. *Id.* Bamberger then dissolved both companies in February of 2024, and neither company has paid BAM. *Id.*

BAM's board members pressured Bamberger to explain these actions across multiple meetings held between February 14 and April 1, 2024. *Id.* ¶¶ 60–65, 68–74. Bamberger assured the board she would resolve the issues, but nevertheless continued to transfer funds from BAM's account to her personal account until at least March 14. *See id.* ¶¶ 65–66. Per Bamberger, these transfers represented reimbursements for valid business expenses. Bamberger Decl. ¶ 21.

/ / /

### C.     *Bamberger Seeks to Take BAM Back*

While the above dispute persisted, Bamberger began working on a plan to take back BAM from LLYC.  Bamberger first informed LLYC that she wanted to "end [her and BAM's] relationship with LLYC" in early December of 2023.  Bamberger Decl. ¶ 13.  LLYC responded that "there was no basis for unilateral termination," particularly without "a finalized buyout of LLYC's interest."  Suppl. Decl. Luisa Garcia Supp. Pls.' Appl. ("Suppl. Garcia Decl.") ¶ 11, ECF No. 23-1.  Bamberger and LLYC then had "ongoing discussions" over the next few weeks.  Bamberger Decl. ¶ 14.

Attempting to "accelerate the winding down of the business relationship," Bamberger sent a letter to LLYC on March 5, 2024, stating that she intended to resign pursuant to the terms of the PA and accusing LLYC of breach.  *Id.* ¶¶ 16–17.  LLYC rejected Bamberger's resignation and disputed the alleged breaches in a responsive letter dated March 15, 2024.  Suppl. Garcia Decl. ¶¶ 12–13.

Alongside her letter, Bamberger renewed her efforts to unwind BAM's acquisition.  Bamberger Decl. ¶ 17.  Per Bamberger, LLYC representative Federico Isuani told her on March 15 that he had spoken with LLYC CEO Alejandro Romero, who had "agreed [that a buyback] is a better path forward."  *Id.* ¶ 18 (alteration in original).  On March 18, Bamberger emailed Isuani and the two LLYC representatives on BAM's board, stating, in relevant part:

> I'm happy we're aligned with a buy back option where I will buy back BAM.  I wanted to convey that every member at BAM is aware of this coming transition, and we have started a detailed change management plan internally.

Suppl. Garcia Decl. Ex. 4.  BAM's board responded on March 19, stating:

> [We] believe it is too premature to implement any strategic changes to the operation of BAM or inform BAM employees of any changes in ownership.  As you know, LLYC has not received any formal or detailed proposal regarding your potential repurchase.  Thus, there is no basis to make any changes to BAM's operations, which should be business as usual.  Please hold off from further conversations with employees on this

subject or implementing any changes to BAM until determined by the Board.

*Id.* That same day, LLYC's counsel emailed a similar message to Bamberger's counsel, who responded ten days later in relevant part as follows:

> Ms. Bamberger will not engage in future communications with BAM personnel regarding a potential buy-out or other transaction with LLYC in a manner that will distract or cause confusion. BAM has a culture of transparency and Ms. Bamberger has a commitment to her senior team-members to share relevant information with them. To the extent any such conversations may be premature, Ms. Bamberger will refrain from communications with BAM personnel at this time regarding a potential transaction.

*Id.* Ex. 5.

### D.   *Bamberger Puts the Cart Before the Horse*

Despite this tepidly reassuring message, LLYC's efforts to stall Bamberger's "change management" had come too late. By March 13, 2024, at the latest, Bamberger had created—and shared among BAM employees—an internal document mapping out a transition away from LLYC. *See* First Garcia Decl. ¶¶ 84–86. As part of this plan, Bamberger formed Defendant BAM by BIG LLC ("BIG") on March 16. *Id.* ¶¶ 78–80. That same day, she also registered a new domain name and created a webpage that "includes an exact duplicate of all the web pages used by the BAM domain." *Id.* ¶ 80.

Then, in mid-March of 2024, Bamberger executed the transition. Working with BAM employees, she (1) redirected all traffic from BAM's website to BIG's website, (2) transferred BAM's internal documents and client files to BIG's new Google Drive, (3) emailed clients to inform them that BAM was ending its relationship with LLYC, and (4) sent new invoices with BIG's bank information to clients and directed them to ignore old invoices from BAM. *Id.* ¶¶ 90–117. BIG's website retains the "BAM by LLYC" mark. *See id.* ¶ 113.

Bamberger suggests she took these actions (1) in reliance on "[LLYC's] verbal representation" regarding a buyback and (2) "in good faith to ensure a smooth and mutually

beneficial transition."   Bamberger Decl. ¶ 18.   She also declares that she transitioned BAM's Google Drive only because "LLYC['s] Google suite was nonfunctional." *Id.* ¶ 19. She does not explain, however, why said limitations required her to create a new website, new email accounts, a new corporation, a new bank account, and new invoices. *See id.* ¶ 19.   Nor does she explain why it was reasonable for her to announce a buyback to clients with an effective date of April 1, *see* Decl. Michael Houston Supp. Plaintiffs' Appl. ("Houston Decl.") Ex. 5, ECF No. 23-2, based solely on a verbal statement indicating a buyout *might* be a path forward, Bamberger Decl. ¶ 18.

### E.   Fall out

Plaintiffs began investigating Bamberger's actions on April 4, 2024, after one of BAM's clients contacted LLYC USA to inquire about a duplicate invoice it received from BIG.  First Garcia Decl. ¶ 75.[2]  During this investigation, Bamberger continued to pursue a buyback.  Bamberger represented on April 10, 2024, that her counsel would present LLYC with buyback terms.  Suppl. Garcia Decl. ¶ 21.  LLYC clarified in response that it was "not in the middle of negotiating any transaction with [Bamberger], and even if [it were, Bamberger] would still be required to comply with [her] contractual obligations." *Id.* Ex. 6.   No "formal and viable" buyback terms were provided. *Id.* ¶ 23

On April 24, 2024—five days after filing this lawsuit—BAM fired Bamberger and appointed Michael Houston as interim CEO.  Houston Decl. ¶¶ 1,4.  That day, BAM's clients began to contact Houston seeking to end their contracts. *Id.* ¶ 15.  Making matters worse, since Houston's appointment, all of BAM's employees save one have "failed to respond to all emails, LinkedIn messages, meeting invites, and requests for return of BAM's computer equipment and files." *Id.* ¶¶ 7–8.  The sole responder—Brenda Manea— resigned. *Id.* ¶ 9.  On April 30, having yet to receive any communications from its employees, BAM determined said employees to have effectively resigned. *Id.* ¶ 12.  BAM then discovered that all former employees set up email forwarding directing emails sent to

---

[2] Since then, multiple clients have reported confusion regarding duplicate invoices. *Id.* ¶¶ 118–129.

24-CV-706 JLS (DDL)

their BAM accounts to new BIG accounts.  *Id.* ¶ 13.  Moreover, Plaintiffs learned that BIG, through Bamberger, extended job offers to all of BAM's employees on April 26, 2024.  *See id.* ¶ 11.

The trickle of client departures became a flood.  Starting May 1, additional BAM clients sought to cancel their contracts, citing the resignations of BAM's employees even though BAM had not yet informed its clients of said resignations.  *Id.* ¶¶ 17–18. Approximately 50% of BAM's clients have sought termination.  *Id.* ¶ 21.

## II.     Relevant Procedural Background

Plaintiffs filed this action on April 19, 2024, asserting, among other causes of action, misappropriation of trade secrets, trademark infringement, breach of contract, and violation of California's Computer Data Access and Fraud Act ("CDAFA").  *See generally* Compl., ECF No. 1.  One week later, Plaintiffs filed the Application, which the Court largely denied due to Plaintiffs' failure to provide notice to Defendants.  Order at 4–7.[3]  The Court, however, construed Plaintiffs' Application as a motion for a preliminary injunction and set an expedited briefing schedule.  *Id.* at 13.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction, the moving party must show: (1) likely success on the merits; (2) likely irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest.  *Id.* at 20.  Although the movant must make a showing on each element, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th

---

[3] The Court also denied Plaintiffs' request for a seizure order, denied without prejudice Plaintiffs' request for expedited discovery, granted Plaintiffs' request for an evidence preservation order, and granted in part Plaintiffs' request to seal the Application and supporting materials.  *See generally* Order.

Cir. 2011).  Under this approach, a court may issue a preliminary injunction where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135 (internal quotation marks omitted).

Most preliminary injunctions are prohibitory; they "prohibit[] a party from taking action and 'preserve[] the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)).  Where, by contrast, a requested injunction would require the nonmovant to take affirmative action (*i.e.*, a mandatory injunction), the movant must "establish that the law and facts *clearly favor* her position."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  Indeed, "[m]andatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases.'"  *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979)).  This is true because "[a] mandatory injunction 'goes well beyond simply maintaining the status quo *[p]endente lite* [and] is particularly disfavored.'"  *Id.* (first alteration added) (quoting *Anderson*, 612 F.2d at 1114).

## DISCUSSION

### I.  Evidentiary Objections

Though Defendants have filed no objections to Plaintiffs' evidence, Defendants complained at oral argument that Plaintiffs submitted evidence alongside their Reply.

When litigating a preliminary injunction, a plaintiff may submit evidence in reply that is "responsive to an argument made in the opposing party's opposition."  *QBAS Co. v. C Walters Intercoastal Corp.*, No. SACV 10-406 AG MLGX, 2010 WL 7785955, at *3 (C.D. Cal. Dec. 16, 2010); *see also Rosen Ent. Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908, 913 (C.D. Cal. 2004) (considering evidence submitted in reply that "directly rebuts evidence presented in . . . opposition").  Relatedly, a district court does not err by

considering arguments raised only in reply so long as it affords the nonmovant an opportunity to respond at oral argument. *See El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040–41 (9th Cir. 2003).

Here, the evidence provided by Plaintiffs in reply is directly responsive to evidence associated with and arguments made in the Response.[4]  Defendants make two primary factual arguments: (1) Bamberger reasonably anticipated a buyback and (2) BIG and BAM are not separate, competing entities. *See, e.g.*, Resp. at 16–17, 19–20.  Plaintiffs' Reply evidence serves to refute these two contentions.  *See generally* Reply.  Moreover, Defendants addressed the evidence and arguments raised by the Reply at oral argument, and the Court has considered Defendants' contentions in this regard when issuing its ruling. Lastly, Defendants did not request leave to file a sur-reply.  The Court will therefore consider evidence submitted alongside Plaintiffs' Reply.

## II.   Likelihood of Success

Though Plaintiffs bring numerous causes of action, they "base [their] motion for injunctive relief" on statutory law and contractual language limiting Defendants' use of Plaintiffs' "confidential information and trademarks."  Appl. at 19–20.  To that end, Plaintiffs argue only that they are likely to succeed with respect to their claims for (1) violation of CDAFA, (2) misappropriation of trade secrets, (3) trademark infringement, and (4) breach of contract.[5]  The Court addresses each in turn.

### A.   CDAFA

CDAFA provides a civil cause of action for damages and injunctive relief to the owner of a computer system against any person who "[k]nowingly accesses and without

---

[4] Much of Plaintiffs' Reply evidence is not only responsive, but also reflects events that have taken place since Plaintiffs submitted the Application.  *See, e.g.*, Houston Decl.  The Reply thus also represented Plaintiffs' first opportunity to submit this evidence.

[5] Plaintiffs also suggest they are likely to succeed on their claims for violation of "the Anticounterfeiting Act of 1984," the "Anticybersquatting Consumer Protection Act," and "California's Unfair Competition Law."  Appl. at 20.  Plaintiffs do not, however, brief these causes of action, and the Court therefore will not address them here.

permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2).  CDAFA does not apply solely to "hackers"; instead, the Ninth Circuit has interpreted § 502 to also bar "logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015).

Defendants do not dispute that Bamberger copied information from BAM's drive. *See* Resp. at 22–23; *see also* First Garcia Decl. Ex. 13 (containing transition plan, created by Bamberger, which indicates that the "transfer of BAM Drive to BAMbyBIG new Drive" began on March 18, 2024).  Instead, Defendants contend that Bamberger, as BAM's CEO, was impliedly authorized to transfer information from BAM's drive to another drive to "protect BAM's business."  Resp. at 23.  Specifically, Defendants contend Bamberger copied BAM's drive because "LLYC's Google drive system did not function properly." *Id.*  Per Bamberger, she and her employees referred to the new drive as "BIG" solely to differentiate it from the nonfunctional system; the new drive still belongs to BAM. Bamberger Decl. ¶ 20.

The Court does not find Bamberger's explanation credible for three reasons.  First, Bamberger complains that LLYC's drive was nonfunctional because "numerous mission critical client documents [were] lost or inaccessible to team members." *Id.* ¶ 6.  If that were true, however, it is unclear how transferring documents from the allegedly nonfunctional drive to a new drive would repair this issue.  If documents were missing or inaccessible on BAM's drive, they could not be transferred to BIG's drive.

Second, the evidence weighs against Bamberger's contention that she was impliedly authorized to copy and repurpose information from BAM's drive without consulting BAM's board.  The OA gives BAM's board "the exclusive right" to manage BAM.  OA at 26–27.  Moreover, LLYC, through its majority on BAM's board, created BAM's drive to "increase BAM's security."  *See* Suppl. Garcia Decl. ¶ 6; First Garcia Decl. ¶ 39.

Because Bamberger's copied drive flouted the business purpose behind the creation of BAM's allegedly nonfunctional drive, *see id.* ¶¶ 99–104 (stating that BIG's drive was at one point "publicly accessible"), it seems likely that Bamberger copied information from BAM's drive "without permission." *See* Cal. Penal Code § 502(c).

Finally, the evidence uniformly suggests the copied drive does not belong to BAM, but instead to BIG—BAM's *competitor*. Defendants contended at oral argument that BIG is a mere shell corporation without clients or employees. But a "shell" corporation does not send invoices to the clients of another corporation. *See* First Garcia Decl. Ex. 11 (containing copies of invoices sent by BIG to BAM clients). Nor does a shell corporation send offers of employment to all employees at a competing company. *See* Houston Decl. ¶ 11 & Ex. 2 (containing DocuSign emails evidencing offers of employment from BIG, through Bamberger, to BAM employees).

Defendants offer no rejoinder to the above evidence. Nor did Defendants contest at oral argument the updated version of Bamberger's transition document submitted by Plaintiffs in Reply, which indicates that BIG's "focus [as of April 24, 2024, after Bamberger's firing] [was] . . . [t]ransitioning [BAM's] clients to BAM by BIG (as was in the works)." Houston Decl. Ex. 1. Indeed, this document indicates Bamberger and former BAM employees are presently working to "secure termination letters of clients from BAM by LLYC and new letters for BAM by BIG as was already in motion." *Id.* These are the actions of a competitor, not a shell.

Even if Bamberger were impliedly authorized to copy information from BAM's drive for use by BAM employees, she certainly was not authorized to copy information to benefit a competitor. *See PerkinElmer Health Scis., Inc. v. Mahnaz Salem*, No. CV 21-1619-DMG (KSX), 2021 WL 2548684, at *3 (C.D. Cal. Apr. 9, 2021). Plaintiffs are thus likely to succeed on their CDAFA claim.

### B.    *Trade Secret Misappropriation*

Plaintiffs bring claims under the federal Defense of Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"). Appl. at 20. When plaintiffs

elect this approach, "[c]ourts . . . analyze[] the[] claims together because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed under either statute, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58.

### 1.   Possession of Trade Secrets

A trade secret is "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret" through reasonable measures. *Id.* at 657, 660.

### a.   Specific Information

Defendants contend Plaintiffs have not identified their trade secrets with sufficient particularity. Resp. at 13–16. As Defendants point out, a plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (alterations in original) (quoting *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990)). That said, "the reasonable particularity standard is a flexible one that does not require explication of the trade secrets 'down to the finest detail.'" *Alphonso Inc. v. Tremor Video, Inc.*, No. 22-CV-03629-NC, 2022 WL 17968081, at *2 (N.D. Cal. Oct. 31, 2022) (quoting *STEMCELL Techs. Canada Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC (LB), 2022 WL 585668, at *4 (N.D. Cal. Feb. 24, 2022)).

Plaintiffs identify the following compilations of information they claim constitute trade secrets:

> a.   Financial information, including pro forma financial statements;
> b.   Business development strategies, plans, proposals, and policies and procedures, including [BAM's] business

models;

        c.     New business development information, including business credentials, proposals presented and feedback received, budgeting policies and examples for new businesses, portfolio of services (provided by BAM or other LLYC companies), sales policies and procedure, case studies, and customer relationship management ("CRM") information: leads, past proposals, contact information;

        d.     Contact database, which is a discrete dataset that includes the names, contact information and other important business information with respect to BAM's partners, customers, targets, and employees, amongst other individuals;

        e.     Client list and database containing research and experience regarding client relationships;

        f.     Client information, including proposals approved by clients, contracts or terms of agreement with clients, confidential information of clients' activity before it is made public, templates and formats for communications plans, status reports and results presentations, methodologies and materials to implement communications activities (checklists, documents and presentations for media trainings, events, press releases, and news pitches), client strategies and action plans, and databases of people in current and past clients and their contact information;

        g.     Third-party outreach, including a media and journalist database, key opinion leaders and influencers database, third-party biographies and profiles, and contracts and agreements with strategic partners;

        h.     Financial information, business plans, business intelligence reports, pricing, contracts, client budgeting and payment and conditions of suppliers;

        i.     Human resources, recruitment documents, competence dictionary, compensation policies, and training materials;

First Garcia Decl. ¶ 33.

Per Defendants, these "broad categories" of information "represent a summary of every type of document that any PR firm might keep," "undoubtedly sweep publicly available documents within their scope," and preclude Defendants from determining whether any specific information was either disclosed or has independent economic value.

Resp. at 14–15 (citing *Action Learning Sys., Inc. v. Crowe*, No. CV 14-5112-GW(SHX), 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014)).

In Reply, Plaintiffs note that because Defendants "have stolen *all* of BAM's documents," particularity of description is of lesser concern in this case. Reply at 8. Plaintiffs also focus on one specific category—customer relationship management information—pointing out that the Ninth Circuit has recognized such information can constitute a trade secret. Appl. at 8 (citing *Gallagher Benefit Servs., Inc. v. De La Torre*, 283 F. App'x 543, 545–46 (9th Cir. 2008)).

The Court sides with Plaintiffs. Where a plaintiff provides evidence showing a defendant copied a large volume of information from its servers, courts have found a high likelihood of success so long as "at least some of the [stolen material] consists of sufficiently identified compilations of [valuable] information." *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020). Put differently, if a plaintiff identifies with specificity at least one likely trade secret, the fact that a plaintiff also references other categories of information does not preclude a finding of likely success.

Plaintiffs have identified with sufficient particularity at least one potential trade secret—their compiled customer information. In *Cutera*, the court found the plaintiff had identified a trade secret with sufficient particularity by referencing its "confidential customer contract information, including current and prospective customer names and contact information . . . , sales lead and call information and records, confidential information related to undisclosed pricing, historical quote history, . . . analyses of customer demands, preferences, feedback, and needs," and "previous discussions with customers." *Id.* at 105–06. Similarly, in *Action Learning Systems*, the court found the following description adequate:

> [N]ames and telephone numbers and email addresses of
> personnel at schools that are important for ALS and competitors
> to know and are not readily available on the internet or in the
> phone book. . . . ALS['s] contact list was developed over years
> and consists of those who are the people [in school districts] that

buy the services, the information includes knowing the customers [sic] preferences, and what they need, want, and have previously purchased.  It also includes the price point for the school and/or district to get approved, and what they are or may be interested in now, based on what ALS has provided them in the past, the price point for getting approved, as well as product pricing parameters.

2014 WL 12564011, at *6 (alterations in original).  Where Plaintiffs' client information is concerned, Plaintiffs' description is comparable to those found sufficient in *Cutera* and *Action Learning Systems*.  *See* First Garcia Decl. ¶ 33.

### b.    Valuable Because It Is Unknown to Others

Whether Plaintiffs' compiled client information is entitled to protection is a separate matter.  *See Action Learning Sys.*, 2014 WL 12564011, at *5–7 (finding the plaintiff had identified its alleged trade secret with sufficient specificity but nevertheless holding plaintiff had not shown said information was valuable).  Here, precedent weighs in Plaintiffs' favor.  Customer databases, *i.e.*, "valuable collection[s] of data assembled over many years that allow [companies] to tailor [their] service contracts and pricing to the unique needs of [their] customers" are sufficiently valuable to constitute trade secrets.  *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).  Indeed, numerous district courts have entered preliminary injunctions to prevent competitors' misappropriation of client relationship databases.  *See, e.g.*, *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012); *Henry Schein, Inc. v. Cook*, No. 16-CV-03166-JST, 2016 WL 3418537, at *4–5 (N.D. Cal. June 22, 2016).

Plaintiffs declare BAM has spent approximately eighteen years compiling customer information, including sales leads, past proposals, relationship information, and action plans associated with specific customers.  *See* First Garcia Decl. ¶ 32.  This wealth of information, in the hands of a competitor, would likely help that competitor vulture BAM's clients.  Therefore, Plaintiffs' compiled customer information is likely valuable because it is unknown to others.

/ / /

c.      Reasonable Measures to Keep Secret

Plaintiffs took the following steps to protect their compilation of client information: (1) implementing employee confidentiality agreements and policies; (2) securing servers with unique logins, passwords, and two-factor authentication; and (3) limiting access "to only those individuals or entities that have a legitimate business need."  First Garcia Decl. ¶¶ 34–39.  Plaintiffs provide an exemplar employee confidentiality agreement and their employee handbook's confidentiality policy.  First Garcia Decl. Ex. 7.  In addition, Plaintiffs submit the signed RCA, in which Bamberger agreed not to disclose BAM's confidential information, including information about BAM's clients.  RCA §§ 1.3, 3.  At the preliminary injunction stage, courts have repeatedly held such steps likely constitute reasonable protections sufficient to confer trade secret status.  *See, e.g.*, *MAI Sys.*, 991 F.2d at 521; *Edwards Lifesciences Corp. v. Launey*, No. 823CV00304WLHADSX, 2023 WL 4680774, at *3 (C.D. Cal. June 12, 2023); *Cutera*, 444 F. Supp. 3d at 1207.  The Court finds the same here.

### 2.      *Misappropriation*

Misappropriation involves "the acquisition of a trade secret by 'improper means,' which includes 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy.'"  *Id.* at 1205 (quoting Cal. Civ. Code §§ 3426.1(a), (b)(1)).  Misappropriation also occurs when "information from a customer database is used to solicit customers."  *MAI Sys.*, 991 F.2d at 521.

Plaintiffs have shown Defendants likely misappropriated their compiled client information.  Plaintiffs provide evidence that Defendants copied without authorization BAM's entire Google Drive—which contained all of BAM's client information—into a new Google Drive controlled by BIG.  *See* First Garcia Decl. ¶¶ 100–04.  In addition, Plaintiffs have identified (1) specific documents on BIG's drive evidencing BIG's use of BAM's client-related information, Renner Decl. ¶ 20 & Exs. 3–4; and (2) evidence that Defendants have solicited BAM's clients using this information, *see* First Garcia Decl. Exs. 11, 13.  Finally, Plaintiffs have shown Bamberger had a contractual duty not to disclose

information to entities, such as BIG, that are distinct from BAM.  *See* RCA §§ 1.3, 3.

Defendants respond only that "a company cannot improperly 'misappropriate' a trade secret from itself."  Resp. at 17.  This argument, however, assumes that BAM and BIG are the same entity, an assumption belied by (1) BIG's status as a separate corporate entity and (2) the litany of evidence showing that BIG is currently operating as BAM's competitor.  *See supra* Section II.A; First Garcia Decl. ¶¶ 78–79, 104.  Misappropriation likely occurred.

### 3.   *Damage to Plaintiff*

Defendants finally suggest Plaintiffs "fail to even address damages."  Resp. at 17. Plaintiffs, however, submit evidence showing (1) clients have likely paid BIG for services provided by BAM and (2) BAM has lost 50% of its clients.  *See* First Garcia Decl. Ex. 11; Houston Decl. ¶¶ 15–21; *id.* Exs. 1, 3, 4.  And, though Defendants contended at oral argument that BAM lost its clients not because of misappropriation, but instead due to its decision to fire Bamberger, the evidence paints a different picture.  Specifically, documents taken from BIG's Google Drive show that BIG used BAM's client information to target specific clients to transition to BIG (and to identify other clients to avoid).  *See* First Garcia Decl. ¶ 114; *id.* Ex. 17.  This evidence, alongside the suspiciously identical language used in cancellation requests submitted by BAM clients, Houston Decl. ¶¶ 17–21; *id.* Ex. 4, suggests Defendants affirmatively used BAM's client information to take BAM's clients. Plaintiffs have thus likely suffered damage due to Defendants' misappropriation of Plaintiffs' trade secrets.  Plaintiffs are likely to succeed on their trade secrets claim.

### C.   *Trademark Infringement*

To establish a likelihood of success on the merits on a trademark infringement claim, a plaintiff "must show that it is '(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark.'"  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (per curiam)).

/ / /

### 1.    Valid Ownership Interest

Generally speaking, a plaintiff does not "own" a mark unless they use the mark in commerce prior to the alleged infringer.  *See Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).  This "use in commerce" requirement has two elements: a plaintiff must (1) render services in commerce and (2) use or display their mark publicly in the sale or advertising of those services.  *Rearden*, 683 F.3d at 1204.  "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion."  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999)

Plaintiffs offer uncontested evidence that they have both advertised all three marks at issue—"BAM," "LLYC," and "BAM by LLYC"—and rendered services in commerce under said marks.  LLYC was founded in 1995, and BAM was launched sometime in 2006.  First Garcia Decl. ¶¶ 13, 18.  Both have provided—and continue to provide—public relations and marketing services.  *Id.* ¶¶ 8, 17.  BAM has used its "BAM" logo in connection with those services since its founding, *id.* ¶ 18, and has advertised said mark on its website, *see id.* ¶¶ 18, 20.  LLYC Group registered its "LLYC" mark in 2020 and has spent millions advertising its brand.  *Id.* ¶¶ 6, 12.  Finally, after LLYC acquired BAM in March of 2023, Plaintiffs created the new "BAM by LLYC" mark, which they used in BAM's "published documents, customer communications, and to advertise [BAM's] services."  *Id.* ¶ 28.  All these actions occurred before BIG was founded on February 16, 2024.  *See id.* ¶ 78.  The "use in commerce" requirement is thus satisfied.

### 2.    Confusingly Similar Mark

As Defendants do not contest ownership or their use of Plaintiffs' mark, the case "turns on whether [Defendants'] use of [Plaintiffs'] marks is likely to cause consumer confusion."  *Network Automation*, 638 F.3d at 1145.  To resolve this issue, courts consider eight factors: "(1) the strength of the mark; (2) proximity or relatedness of the goods; (3)

24-CV-706 JLS (DDL)

similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003)).  The Court addresses each in turn.[6]

### a.    *Sleekcraft* Factor 1: Strength of Marks

*Sleekcraft* factor 1 implicates two forms of a mark's strength: conceptional strength and commercial strength.  *JL Beverage Co.*, 828 F.3d at 1106.

Conceptual strength assesses "the obviousness of [a mark's] connection to the good or service to which it refers."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010).  Courts determine conceptual strength by "classify[ing] a mark along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic."  *JL Beverage Co.*, 828 F.3d at 1107.  Generic marks are never entitled to trademark protection; descriptive marks are protectable upon a showing of "acquired distinctiveness" (secondary meaning); and suggestive, arbitrary, and fanciful marks are inherently distinctive and thus automatically entitled to trademark protection.  *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).

Commercial strength, by contrast, assesses "actual marketplace recognition."  *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield Commc'ns*, 174 F.3d at 1058).  Because commercial strength is an "evidence-intensive inquiry," consideration of commercial strength "is unnecessary at the preliminary injunction stage."  *Id.* at 1150.

/ / /

---

[6] As Defendants do not dispute that they have no right to use "LLYC," but instead argue only that they are free to use "BAM," and "BAM by," the Court's analysis focuses only on those latter two marks.

The Parties primarily dispute whether the "BAM" mark is inherently distinctive (*i.e.*, arbitrary, fanciful, or suggestive) or descriptive and therefore protectable only upon a showing of secondary meaning.[7]  "A suggestive mark is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance . . . [;] the mark does not *describe* the [service's] features, but *suggests* them.'" *Zobmondo Ent.*, 602 F.3d at 1114 (first alteration in original) (quoting *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir.1998)).  A merely descriptive mark, by contrast, "define[s] qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood."  *Id.* (alteration in original) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002)).  "[P]ersonal names—both surnames and first names—are generally regarded as descriptive terms."  *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 760 (9th Cir. 2006) (alteration in original) (quoting *815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir.1988)).

Defendants contend that "BAM" is descriptive because it is "essentially a surname[;] it is a shorter version of 'Bamberger.'"  Resp. at 18.  For a mark to be categorized as a surname, however, prospective purchasers must view the mark as "primarily *only* a name."  *See Quicksilver, Inc.*, 466 F.3d at 761.  When determining whether a mark is "primarily only a name," courts consider whether the mark has a dictionary definition.  *Id.*  And, unfortunately for Defendants, "BAM" has a dictionary definition: "a sudden loud noise—often used interjectionally to indicate a sudden impact or occurrence."  *Bam*, Merriam-Webster, https://www.merriam-webster.com/dictionary/bam (last visited May 15, 2024).  It is unlikely, therefore, that BAM qualifies as a surname.

Instead, applying the Ninth Circuit's primary test for distinguishing suggestive and descriptive marks reveals that "BAM" is likely at least a suggestive mark.  The most-used

---

[7] Though Plaintiffs suggest that the "BAM" mark is arbitrary, the Court, for reasons that will become apparent below, need only determine that "BAM" is (likely) inherently distinctive; *i.e.*, suggestive.

24-CV-706 JLS (DDL)

test for evaluating distinctiveness is the "imagination test," which "asks whether 'imagination or a mental leap is required in order to reach a conclusion as to the nature of the [service] being referenced.'" *Zobmondo Ent.*, 602 F.3d at 1115 (quoting *Rudolph Int'l, Inc. v. Realys, Inc.,* 482 F.3d 1195, 1198 (9th Cir. 2007)).   For instance, the mark "MovieBuff" was held suggestive as to a searchable database containing entertainment-industry-related information because a consumer must make a mental leap from the definition of movie buff (one who loves movies) to the nature of the product in question. *Brookfield Commc'ns*, 174 F.3d at 1041, 1058.   Where "BAM" is concerned, a consumer must make a mental leap from the actual definition of "BAM" (a sudden, loud sound) to desirable characteristics associated with marketing services (*e.g.*, fast-moving, attention-grabbing).   So, it is likely that "BAM" is inherently distinctive and therefore entitled to protection without a showing of acquired distinctiveness.

Defendants disagree, arguing that because there are 339 active marks in the United States Patent and Trademark Office database that incorporate "BAM," the "BAM" mark exists in a "crowded field" and therefore possesses reduced strength.   Resp. at 18 (citing *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988)). Plaintiffs contest this issue, *see* Reply at 5, but the Court need not resolve the argument. Assuming the "BAM" mark's strength is weakened by a crowded field of similar marks, "even a 'weak' mark [may suffer] likely confusion when another edges very close in both appearance and use."   1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:76 (5th ed. Mar. 2024 Update); *see also Brookfield Commc'ns*, 174 F.3d at 1058–59.   As the remainder of the Court's analysis reveals, such is the case here.[8]

---

[8] The Court also notes that both Parties rely entirely on third-party trademark registrations as evidence of a "crowded field" or lack thereof.   Third-party trademark registrations, however, are not competent proof of a crowded field.   *Olde Tyme Foods, Inc. v. Roundy's, Inc.*, 961 F.2d 200, 204 (Fed. Cir. 1992) ("As to strength of a mark, however, registration evidence may not be given *any* weight."); 1 McCarthy, *supra*, § 11:89 ("The citation of third party registrations is not proof of third party uses for the purpose of showing a crowded field and relative weakness of a mark.").   Thus, the Court would not weigh a crowded field—or lack thereof—in either party's favor regardless.

21

b.   *Sleekcraft* Factor 2: Proximity or Relatedness of the Services

"Related [services] are those [services] which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Entrepreneur Media, Inc.*, 279 F.3d at 1147 (internal quotation marks omitted) (quoting *Sleekcraft*, 599 F.2d at 348 n.10).  When determining whether services are related, courts consider whether the services serve a similar purpose and whether the audiences for the services overlap. *See Brookfield Commc'ns*, 174 F.3d at 1056.

BAM and BIG offer identical services (digital marketing services), are based in the same city (San Diego), and serve the same clients (technology start-ups and venture capital firms).  *See* First Garcia Decl. ¶¶ 17–18; 78–82, 113–114.  Indeed, Bamberger informed BAM's clients that BIG *is* BAM and has redirected all internet traffic from BAM's domain to BIG's.  *Id.* ¶¶ 93, 105–06; *see also* Bamberger Decl. ¶¶ 18–19.  *Sleekcraft* factor 2 thus likely weighs strongly in favor of consumer confusion.[9]

c.   *Sleekcraft* Factor 3: Similarity of the Marks

Where *Sleekcraft* factor 3 is concerned, "the more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion."  *Brookfield Commc'ns*, 174 F.3d at 1054.  Here, as BIG uses an "exact duplicate" of BAM's website, BIG's "BAM" marks contained therein are exact duplicates of BAM's "BAM" marks.  *See* First Garcia Decl. ¶ 80.  Indeed, it is undisputed that BIG is using both "BAM" and "BAM by" with the same font and coloration as does BAM.  *See* First Garcia Decl. ¶¶ 18, 76, 96–98, 108; Bamberger Decl. ¶ 23.  And, though BIG's domain name (<bambybig.agency>) differs slightly from BAM's domain name (<bamtheagency.com>), said differences are insubstantial, especially when considering the identical nature of the websites' content.

---

[9] For related reasons, *Sleekcraft* factor 5 (marketing channels used) would appear to weigh in favor of confusion; because BAM and BIG occupy identical market niches, it stands to reason they use the same marketing channels.  That said, Plaintiffs' evidence demonstrates only that BAM and BIG both advertise using the internet.  *See* First Garcia Decl. ¶ 80.  And shared use of the internet, standing alone, is insufficient to weigh *Sleekcraft* factor 5 in a plaintiff's favor.  *Network Automation*, 638 F.3d at 1151. The Court thus assigns no weight to this factor.

*See* First Garcia Decl. ¶¶ 20, 80.  *Sleekcraft* factor 3 thus strongly suggests consumer confusion is likely.

> d.    Remaining Factors

Where two companies (1) directly compete in the same market and (2) their marks/offerings are virtually identical when encountered in that market, consumer confusion is likely to ensue even if all other *Sleekcraft* factors weigh against the plaintiff.  *See Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 257 (9th Cir. 1986) (holding district court's conclusion to the contrary clearly erroneous).  The Court will nevertheless briefly address the most relevant remaining factors.[10]

First, evidence of actual confusion (factor 4).  Though Defendants summarily assert that "there is no evidence that any client has been confused," Plaintiffs provide email communications from at least two clients who were unsure whether they should pay BAM or BIG for services rendered by BAM.  First Garcia Decl. ¶¶ 127–129.  As Defendants offer no reason to discount this evidence, the Court concludes that factor 4 weighs in favor of consumer confusion.

Next, Defendants' intent (factor 7).  This factor is somewhat misnamed—it focuses "not [on the defendant's] intent, but rather [on] whether it adopted [its mark] with the knowledge that the mark already belonged to [the plaintiff]."  *JL Beverage Co.*, 828 F.3d at 1112.  As Bamberger was BAM's founder prior to launching BIG, it follows she was aware that the "BAM" mark belonged to BAM when she adopted it for use by BIG.  *See* Bamberger Decl. ¶¶ 1, 19.  Thus, factor 7 favors Plaintiffs.

Last comes the degree of care likely to be exercised by the purchaser.  This factor considers how discerning a reasonably prudent consumer would be when purchasing the services at issue.  *Brookfield Commc'ns*, 174 F.3d at 1060.  Here, though neither Party has submitted evidence as to the cost of BAM's services, the Court suspects they are expensive

---

[10] The Court need not address expansion in product lines where, as here, the "two companies compete to a significant extent."  *Brookfield Commc'ns*, 174 F.3d at 1060.

enough that a reasonably prudent consumer would exercise care.  This is particularly true given that BAM focuses its marketing on venture capital professionals and technology entrepreneurs—a likely sophisticated clientele.  This factor thus weighs against consumer confusion.  Even so, it is "not sufficient to overcome the likelihood of confusion strongly established by the other factors."  *See Brookfield Commc'ns*, 174 F.3d at 1060.

As Plaintiffs possess protectable marks, and the Court's analysis of the *Sleekcraft* factors suggest consumer confusion is highly likely to arise from Defendants' competing marks, Plaintiffs are likely to succeed on their trademark infringement claim.

### D.  Breach of Contract

#### 1.  Relevant Contractual Language

Plaintiffs argue that four contracts—the PA, the RCA, the EA, and the OA[11]—together require Defendants to "keep BAM's confidential information and trade secrets protected from unauthorized disclosure."  Appl. at 25–26; Reply at 2–4; First Garcia Decl. ¶¶ 35–39 (identifying the following relevant provisions: sections 1.1(k), 1.1(j), and 4.1 of the EA; section 4.7 of the OA, and section 6.04 of the PA).  Plaintiffs also suggest Defendants have "violat[ed] . . . the noncompete provisions" of these contracts.  Appl. at 17; Reply at 3–4.  As the protections offered by these four contracts heavily overlap, the Court addresses only the RCA.

The RCA contains three relevant prohibitions.  Section 1.1 (the "Nonsolicitation Provision") requires Bamberger and RBW, for a period of five years beginning on the date of the RCA, to refrain from soliciting or otherwise encouraging employees, consultants, and service providers of Plaintiffs to end their employment/engagement with Plaintiffs.  Relatedly, Section 1.2 (the "Noncompete Provision") requires Bamberger and RCW, for the same five-year period, to refrain (1) from "in any manner engag[ing] in . . . a Competitive Business"; and (2) from "tak[ing] any action that is designed or intended to

---

[11] For ease of reading, the Court repeats the titles of these documents here: Membership Interest Purchase Agreement ("PA"); Restrictive Covenants Agreement ("RCA"); Employment Agreement ("EA"); and Operating Agreement ("OA").

have the effect of discouraging any lessor, licensor, customer, supplier, or other business or other business relation of [Plaintiffs]" from maintaining their business relationship with Plaintiffs.[12]   *Id.* at 2–3.   Finally, Section 1.3 (the "Confidentiality Provision") states in relevant part:

> The Restricted Parties agree that the Restricted Parties shall keep the Confidential information strictly confidential and shall not, and shall cause its and its Affiliates' employees, officers, directors, managers, and agents not to, disclose . . . any portion of the Confidential Information to any Person . . . .[13]

### 2.   Governing Law

Both Parties assumed in their briefing that California law applies to Plaintiffs' breach of contract claim despite express provisions in the PA and RCA stating that Delaware law governs.   *See* Appl. at 25–26; Resp. at 20; PA § 11.10; RCA § 8.   When the Court raised the issue at oral argument, both Parties consented to the application of California law for purposes of this likelihood of success analysis.   The Court therefore proceeds under California law.[14]   *See Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 781–82 (4th Cir. 2023) ("Choice of law is not jurisdictional. . . . 'Where  neither party argues that the forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.'" (quoting *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995)); *Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011) ("In determining which state's law applies, a diversity court is free to

---

[12] A "Competitive Business" includes, with select exceptions, "any business enterprise or service or product offering . . . that competes with, or that is intended to compete with or displace in the market, the Business or any of the services or products provided or sold in the Business."  RCA § 3.  The "Business" involves "providing marketing and public relations services."  PA at 1.

[13] "Person[s]" include entities such as corporations and limited liability companies.   PA at 15. "Confidential Information" is defined in footnote 22, *infra*.

[14] Even if the Parties had not so agreed, it is likely that California law would apply at least to the Noncompete and Nonsolicitation Provisions of the RCA.  *See, e.g.*, *Stryker Sales Corp. v. Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606, 621 (E.D. Cal. 2017); *Arthur J. Gallagher & Co. v. Lang*, No. C 14-0909 CW, 2014 WL 2195062, at *3 (N.D. Cal. May 23, 2014).

honor the parties' reasonable agreement."); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 31 (1st Cir. 1984) (applying Rhode Island law despite a contractual choice-of-law clause stating Michigan law governs because the relevant party had briefed Rhode Island law).

### 3.   Analysis

To prevail on a breach of contract claim in California, a plaintiff must show "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). Here, the existence of the contracts is undisputed. *See* Resp. at 20–22. So are Plaintiffs' damages. *See id.*; *see also* Houston Decl. ¶ 21. The Parties' arguments thus focus on Plaintiffs' performance and Defendants' breach. The Court will address each. Before reaching breach, however, the Court will discuss the relevant provisions' enforceability.

### a.   Plaintiffs' Performance

Defendants primarily contend that because Plaintiffs improperly included information technology ("IT") transition costs in their calculation of deferred payments due Defendants under the PA, Plaintiffs failed to perform and therefore may not bring a claim for breach. Resp. at 21–22. Plaintiffs dispute that they breached, Reply at 2–3, but neither Party offers evidence supporting or confirming their calculation of the deferred payments. The Court need not dive into the minutiae of payment calculations, however. Even if Plaintiffs miscalculated the deferred payment, such a breach likely would not constitute a material breach sufficient to excuse Defendants' continued performance.

"When a party's failure to perform a contractual obligation constitutes a *material* breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown v. Grimes*, 120 Cal. Rptr. 3d 893, 902 (Ct. App. 2011) (emphasis added). California courts consider the following factors when determining materiality:

> (1) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;
> (2) the extent to which the injured party may be adequately

26

> compensated in damages for lack of complete performance;
> (3) the extent to which the party failing to perform has already partly performed or made preparations for performance;
> (4) the greater or less hardship on the party failing to perform in terminating the contract;
> (5) the wilful [sic], negligent, or innocent behavior of the party failing to perform; and
> (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

*Sackett v. Spindler*, 56 Cal. Rptr. 435, 441 (Ct. App. 1967) (formatting altered for clarity); *see also* 14A Cal. Jur. 3d Contracts § 382 (Apr. 2024 Update). These factors focus on whether the breach "in any real or substantial measure . . . frustrate[s] the purpose of the contract." *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 241 Cal. Rptr. 487, 495 (Ct. App. 1987) (quoting *Jacob & Youngs v. Kent*, 129 N.E. 889, 891 (N.Y. 1921)).

Plaintiffs' alleged breach is likely not material under this test. Where factor one is concerned, Defendants' counsel conceded at oral argument that Defendants have already received a substantial portion of the consideration due under the PA. *See also* Suppl. Garcia Decl. Ex. 2 at 8 (letter from separate counsel for Defendants stating Plaintiffs "ha[ve] paid 67% of the 80% of BAM purchased thus far."). Turning to factor two, to the extent that Defendants have received miscalculated deferred payments, Defendants offer no reason why such harm could not be compensated in damages. Regarding factors three and four, given that Plaintiffs have already paid substantial consideration to Defendants, allowing Defendants to cease performance now would cause an unjust forfeiture. Respecting factor five, as Defendants offer no evidence of Plaintiffs' bad faith, Plaintiffs' alleged miscalculation would seem at worst negligent. Finally, a miscalculated deferred payment does not suggest that Plaintiffs will fail to perform the remainder of the contract.

Moreover, the design of the PA suggests that a miscalculated deferred payment does not frustrate the purpose of the contract. The PA expressly contemplates disputes over the amount paid through deferred payments; it (1) creates a procedure for Defendants to review and object to each payment; and (2) provides that Defendants and LLYC, to the extent they

cannot resolve their dispute through negotiation, must submit their dispute to a neutral "Accounting Referee." PA at 25–26. These provisions indicate the Parties intended their contractual relationship to survive despite disagreements over deferred payments.

Lastly, to the extent Defendants purport to rely on other alleged breaches—*e.g.*, the solicitation of select BAM employees by LLYC, the implementation of allegedly deficient IT infrastructure, or LLYC's interference with Bamberger's "control of the company," Bamberger Decl. ¶¶ 4, 8, 9—Defendants fail to tie said breaches to specific contractual language. To the contrary, the PA contemplates that "[LLYC] shall have sole discretion with regard to all matters relating to the operation of the company," PA at 21; that LLYC may "integrate [BAM] into [its] corporate organization and enterprise level programs," *id.* at 22; and that LLYC "has no obligation to operate [BAM] in order to achieve the Deferred Payments or maximize the amount of the Deferred Payments," *id.* Moreover, the OA creates a three-member board with "the exclusive right to manage the business of [BAM];" allows Bamberger to designate one member of the board and LLYC to designate two; and gives each member one vote, with a majority vote carrying the day. OA at 26–27. If Bamberger had truly found continued control of BAM "non-negotiable," she likely would not have agreed to such a management structure.

Defendants have thus failed to show Plaintiffs are unlikely to succeed by arguing that Plaintiffs have materially failed to uphold their end of the bargain.

### b.    Enforceability of Agreements

Notwithstanding the likely absence of a material breach on Plaintiffs' part, they cannot enforce void contractual language. California maintains a "settled legislative policy in favor of open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 (Cal. 2008). Under this policy, noncompetes and nonsolicitation clauses, regardless of how narrowly drawn, are void unless they fall within a statutory exception. *Edwards*, 189 P.3d at 293.

One such exception applies to restrictive covenants associated with the sale of the goodwill of a business. *See* Cal. Bus. & Prof. Code § 16601 ("Any person who sells the

goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold . . . has been carried on, so long as the buyer . . . carries on a like business therein."). This exception "prevent[s] the seller from depriving the buyer of the full value of its acquisition." *Alliant Ins. Servs., Inc. v. Gaddy*, 72 Cal. Rptr. 3d 259, 267 (Ct. App. 2008). Here, neither Party disputes that when LLYC acquired BAM, it acquired BAM's goodwill. *See also NewLife Scis., LLC v. Weinstock*, 128 Cal. Rptr. 3d 538, 548 (Ct. App. 2011) ("Where a covenant not to compete is executed as an adjunct of a sale of a business there is an inference that the business had a 'goodwill' and that it was transferred." (quoting *Monogram Indus., Inc. v. Sar Indus., Inc.*, 134 Cal. Rptr. 714, 720 (Ct. App. 1976)); RCA at 3 (recognizing the Parties entered into the RCA to "protect . . . the goodwill inherent" in BAM).

Even under the goodwill exception, however, the RCA's Nonsolicitation and Noncompete Provisions are likely unenforceable as written. When evaluating whether a restrictive covenant relating to the sale of a business' goodwill is valid, courts apply a "rule of reasonableness." *See Edwards*, 189 P.3d at 290, 292. California courts applying this rule have found that though "courts may enforce nonsolicitation covenants barring the seller from soliciting *the sold business's* employees and customers[,] . . . nonsolicitation covenants barring the seller from soliciting all employees and customers of the buyer" are void. *Strategix, Ltd. v. Infocrossing W., Inc.*, 48 Cal. Rptr. 3d 614, 617 (Ct. App. 2006). So too are covenants barring the seller from *hiring*, as opposed to soliciting, employees of the sold company. *See Loral Corp. v. Moyes*, 219 Cal. Rptr. 836, 844 (Ct. App. 1985). Because Sections 1.1. and 1.2 of the RCA bar Defendants from hiring LLYC's employees, soliciting LLYC's customers, or competing with LLYC in addition to BAM, they likely fall on the wrong side of these lines. *See* RCA at 2–4.

Plaintiffs' likelihood of success on their claims for breach of the Nonsolicitation and Noncompete Provisions depends, therefore, on whether the Court may reform (*i.e.*, "blue pencil") these covenants. California courts frequently refuse to reform such provisions, reasoning that doing so would provide employers with no incentive to draft contracts that

comply with the law.[15]  *See, e.g.*, *Kolani v. Gluska*, 75 Cal. Rptr. 2d 257, 260 (Ct. App. 1998).  Nevertheless, California courts have discretion to reform agreements executed in connection with the sale of the goodwill of a business.  *See id.*; *Swenson v. File*, 475 P.2d 852, 856 (Cal. 1970); Hon. Ming W. Chin et al., *California Practice Guide: Employment Litigation* § 14.380 (March 2024 update).  As here, the RCA was executed alongside the sale of BAM's goodwill—and the actions Plaintiffs seek to enjoin are clear threats to the value of LLYC's acquisition—the Court may (and likely would) reform rather than void entirely the two provisions.[16]

The Court turns to California decisions upholding noncompete and nonsolicitation provisions as a guide.  In two California Court of Appeal decisions—*Monogram* and *Alliant*—courts concluded preliminary injunctions preventing the defendant from operating a similar business were lawful so long as they were limited to areas where the evidence showed the parties "conducted all phases of their business including production, promotional[,] and marketing activities as well as sales." *Alliant*, 72 Cal. Rptr. 3d at 268 (quoting *Monogram*, 134 Cal. Rptr. at 721).  In *Monogram*, the underlying provision spanned the United States and Canada and lasted for five years.  134 Cal. Rptr. at 717.

The relevant question, therefore, is the geographic extent of BAM's business. Section 1.2 of the RCA applies (in part) "anywhere in the United States."  RCA at 2.

---

[15] Plaintiffs may now be regretting their choice to assent to the application of California law.  The Court offers this (not entirely reassuring) comfort: Delaware courts have refused to either enforce or "blue pencil" nearly identical restrictive covenants when applying Delaware law.  *See, e.g.*, *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 759 (Del. Ch. 2023); *Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *12–13 (Del. Ch. Oct. 6, 2022).

[16] The court in *Strategix* refused to reform a noncompete, executed in connection with the sale of a business, that enjoined solicitation of both the buyer and sold companies' employees. 48 Cal. Rptr. 3d at 617–18.  The court distinguished *Swenson*, a Supreme Court of California case holding said contracts could be reformed, on the grounds that *Swenson* involved only an overbroad geographic restriction.  *Id.*  Because the Court does not see a meaningful difference between a noncompete that is overbroad geographically and a noncompete that is overbroad in some other manner, the Court declines to follow *Strategix*.  *Cf. Stephens v. Bean*, 224 P. 1022, 1023–24 (Cal. Ct. App. 1924) (reforming a noncompete clause that incorporated no limitations as to "time, territory, *or the nature of the business which defendant agrees not to carry on*." (emphasis added)).

Neither party, however, has provided evidence showing that BAM conducted its business throughout the entirety of the United States.  Absent such evidence, issuing an injunction spanning the United States in its entirety would be improper.  Instead, for purposes of this likelihood of success analysis, the Court would likely reform Sections 1.1 and 1.2 to be limited to the geographic scope of BAM's business.  *Cf. Roadrunner Intermodal Servs., LLC v. T.G.S. Transp., Inc.*, No. 117CV01056DADBAM, 2019 WL 1400093, at *11 (E.D. Cal. Mar. 28, 2019) (reforming, on summary judgment, a noncompetition clause executed in connection with the sale of a business).

### c.    Defendants' Breach

Plaintiffs offer substantial evidence suggesting Bamberger has breached even a reformed, not-overbroad version of the Nonsolicitation and Noncompetition Provisions of the RCA.  First, Plaintiffs provide copies of invoices sent by BIG to BAM clients.  First Garcia Decl. Ex. 11.  Second, Plaintiffs provide emails sent by Bamberger to BAM clients informing them that BAM was "formally ending [its] partnership with . . . LLYC," stating that BAM was starting its "BAM by BIG brand," and directing said clients to "disregard invoices sent by LLYC." *Id.* Ex. 14.  Finally, Plaintiffs offer copies of emails suggesting that Bamberger "extended job offers on behalf of BIG to all of BAM's employees." Houston Decl. ¶ 11 & Ex. 2.

Moreover, for the reasons stated above in the Court's discussion of CDAFA and trade secret misappropriation, Plaintiffs have offered substantial evidence suggesting Defendants breached the confidentiality provisions of the RCA (by creating a copy of BAM's drive for use by BIG).  *See* RCA § 3 (defining "Confidential Information" in part as information relating to BAM's business, products, finances, and operations, including client information); *id.* § 1.3 (barring disclosure of confidential information to any "Person"); PA at 15 (defining "Person" to include a "corporation," a "limited liability company," or "other entity").  Indeed, courts finding plaintiffs likely to succeed on CUTSA claims have also found a likelihood of success on breach of confidentiality agreement claims with little analysis. *See, e.g., Henry Schein*, 2016 WL 3418537, at *6; *Launey*, 2023

WL 4680774, at *4.

Accordingly, the Court concludes Defendants are likely to succeed in their claims for breach of the Nonsolicitation, Noncompete, and Confidentiality Provisions.

## III. Irreparable Harm

Plaintiffs' irreparable harm argument flows as follows. BIG's misappropriation of BAM's trade secrets has eliminated the competitive advantage that BAM should hold over BIG—a nascent competitor. Appl. at 26–28. And in the absence of this advantage, BIG has rapidly stolen BAM's clients and employees, leaving BAM "an empty shell." *See* Reply at 8.

Defendants respond that because the only harm LLYC faces in the value of its investment in BAM, LLYC can be made whole through monetary damages. *Id.* at 23. Defendants fail to recognize, however, that "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (alteration in original) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

BAM has lost 50% of its clients and all its employees in just a few short weeks. *See* Houston Decl. ¶¶ 12, 24. The Court thus finds it likely that (1) BAM has lost its ability to serve prospective customers and (2) will go out of business absent injunctive relief. These severe harms weigh in favor of issuing a preliminary injunction.

## IV. Balance of the Equities

When assessing this factor, the Court "must 'balance the interests of all parties and weigh the damage to each.'" *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)). Plaintiffs contend the balance of the equities favors them because "Defendants have no legitimate interest in the first place." Appl. at 29. Put differently, because

Defendants lack the authority to use misappropriated trade secrets, wield Plaintiffs' trademarks, or ignore their contractual obligations, hardship stemming from ceasing these actions cannot be weighed in Defendants' favor.

Defendants respond that "[d]enying [the Application] w[ould] allow Defendants to continue operating the business as they have for more than 15 years," whereas "permitting Plaintiffs' requested injunction will reduce BAM to rubble and strip both parties of their interest in the asset."[17]  Resp. at 24.  In reply, Plaintiffs note that Defendants' counsel is not representing BAM, but BIG.  Reply at 10.  And BAM, which has lost 50% of its clients, is already being reduced to rubble *by BIG*.  *Id.*  Preventing continued operation by BIG, Plaintiffs contend, will allow BAM to recapture its lost clients and prevent further loss.  *Id.*

The Court agrees with Plaintiffs.  Any hardship Defendants suffer from being required to comply with their statutory and contractual duties cannot weigh in their favor. *Henry Schein*, 2016 WL 3418537, at *9.  To hold otherwise would be to reward Defendants for their likely unlawful actions.  *See Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1074–75 (S.D. Cal. 2019) (rejecting the defendant's "audacious" claim that an injunction would harm them because it would interfere with a project they had launched using wrongfully acquired software); *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1199 (E.D. Wash. 2003) (similar).  Even assuming this injunction forces BIG to ceases its operations, Bamberger and RBW will be placed in the position they contemplated when they signed the RCA.  The balance of the equities thus favors Plaintiff.

## V.   Public Interest

Finally, the Court must consider whether "the public interests that might be injured by a preliminary injunction . . . outweigh the public interests that will be served."  *See All. for the Wild Rockies*, 632 F.3d at 1138. This factor "primarily addresses impact on non-

---

[17] Defendants apparently fail to recognize that this argument is inconsistent with their representation, at oral argument, that BIG is not operating.

parties rather than parties." *CTIA - The Wireless Ass'n*, 928 F.3d at 852 (quoting *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931–32 (9th Cir. 2003)).

Here, the public interest favors the issuance of an injunction. "Courts often find that the public has a strong interest in protecting intellectual property rights." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019); *see also* 11A Charles A. Wright et al., *Federal Practice and Procedure* § 2948.4 (3d ed. April 2023 Update) ("A federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction.").[18] Moreover, "[d]iscouraging disgruntled contractors and employees from engaging in vigilante justice is in the public interest." *Hidden Empire Holdings, LLC v. Angelone*, No. CV226515MWFAGRX, 2022 WL 17080131, at \*15 (C.D. Cal. Sept. 30, 2022).

Defendants suggest the Court should consider the potential impact of an injunction on BIG's clients, who may lose their marketing services if an injunction is entered. *See* Resp. at 24. As Plaintiffs pointed out at oral argument, however, those clients are free to return to LLYC should they need services. The risk of harm to said clients, therefore, is slim.

In sum, Plaintiffs have shown a high likelihood of success on the merits, that they will likely suffer irreparable harm if an injunction is not entered, that the balance of the equities tips significantly in their favor, and that the public interest favors the issuance of injunctive relief. The Court thus proceeds to address two remaining issues: (1) the proper scope of an injunction and (2) the amount of bond, if any, that Plaintiffs should be required to post.

---

[18] Defendants rejoin that the public "has a compelling interest in preventing the monopolization of common words that can be used to describe a wide range of products and services." Resp. at 24. Per Defendants, granting an injunction as to Plaintiffs' trademark claims would "effectively remove [the mark 'BAM'] from the market." *Id.* at 25. Defendants misunderstand the law governing trademark infringement; an injunction would not remove the "BAM" mark from the market, but instead would only preclude *Defendants* from using said mark in *this specific context*.

1

**VI.   Scope of Injunction**

2

    *A.   BAM's Money and Bank Accounts*

3

       In Plaintiffs' proposed order, they request that the Court mandate Defendants to

4

"[r]eturn all monies belonging to Plaintiffs, including any monies belonging to BAM

5

directed or diverted to BIG or Bamberger's bank accounts," and "[t]ransfer control of any

6

BAM bank accounts to BAM."   These forms of relief pertain to Plaintiffs' claims for

7

conversion, unjust enrichment, receipt of stolen funds, monies had and received, and fraud.

8

*See* Compl. at 42–48.   Plaintiffs raised none of these claims in their Application and

9

therefore have failed to show either a likelihood of success or a likelihood of irreparable

10

harm with respect to those claims.   *See Garcia*, 786 F.3d at 739 (declining to consider the

11

plaintiffs' tort claims—and claimed harm resulting from those torts—because the plaintiff

12

moved for preliminary injunctive relief only with respect to her copyright claim).   The

13

Court thus **DENIES** Plaintiffs application to the extent it seeks the above relief.

14

    *B.   BIG Bank Account Freeze*

15

       Plaintiffs also request that the Court freeze BIG's bank accounts.   In a trademark

16

infringement case, district courts have the inherent power to freeze an alleged infringer's

17

assets to preserve their ability to grant an accounting of the defendant's profits later in the

18

litigation.   *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir.

19

1992).   District courts should carefully exercise their discretion in so doing, however, and

20

may deny an asset freeze where a plaintiff has not shown that the defendant is likely to hide

21

their allegedly ill-gotten funds.   *See id.* at 563; *see also id.* at 563–64 (Fernandez, J.,

22

concurring).   Here, Plaintiffs have made no showing regarding Defendants' propensity to

23

hide assets or otherwise evade justice.   The Court thus **DENIES** Plaintiffs' Application to

24

the extent it seeks to freeze BIG's bank accounts.

25

    *C.   Additional Mandatory Relief*

26

       Plaintiffs request two additional forms of mandatory relief.   First, Plaintiffs would

27

require Defendants to "return all property and information belonging to Plaintiffs,

28

including but not limited to control [of] all electronic information storage platform[s] or

services (including any Google Drive storing BAM's information), and all equipment belonging to BAM."  Second, Plaintiffs would mandate Defendants to "[r]eturn control of BAM's Domain <bamtheagency.com> to BAM."

Courts often issue orders requiring defendants in trade-secret lawsuits to return specific drives or hardware containing plaintiffs' trade secrets.  *See, e.g.*, *Apex.AI, Inc. v. Langmead*, No. 23-CV-02230-BLF, 2023 WL 3391962, at *5 (N.D. Cal. May 10, 2023). Courts are reluctant, however, to issue mandatory relief requiring defendants to return vague and undefined categories of property.  *See, e.g.*, *Sitrus Tech. Corp. v. Le*, 600 F. Supp. 3d 1106, 1112 (C.D. Cal. 2022); *Insider Software, Inc. v. ID Designs, Inc.*, No. 20-CV-05990-BLF, 2020 WL 5094842, at *4 (N.D. Cal. Aug. 28, 2020).

For the reasons stated in this Court's discussion of Plaintiffs' CDAFA and trade secret misappropriation claims, Plaintiffs have shown that the law and facts clearly favor mandatory relief with respect to the Google Drive likely copied by Defendants.  That said, because mandatory relief is disfavored—and as Plaintiffs do not identify in their Application other trade-secret-containing property/equipment that Defendants may possess—the Court declines to issue an injunction mandating the return of "all" property and information belonging to Plaintiffs.  *See, e.g.*, *Sitrus Tech.*, 600 F. Supp. 3d at 1112 ("Plaintiff's preliminary injunction would require Defendant to turn[]over trade secret information that he may or may not have, on devices that may or may not exist, which may or may not be in Defendant's possession.  This is hardly the type of situation the mandatory injunction was designed, or is able, to properly remedy.").

Lastly, given the audacious nature of BIG's likely trademark infringement, Plaintiffs have shown that the law and facts clearly favor mandatory relief with respect to BAM's domain name.  Defendants should not be allowed to wholly preclude Plaintiffs from using Plaintiffs' domain name and website to advertise their services.

## VII.   Bond

Federal Rule of Civil Procedure 65(c) states that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the

costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Despite this mandatory phrasing, Rule 65 "invests the district court 'with discretion as to the amount of security required, *if any*'" and allows a court to "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999)).

Plaintiffs argue that because "the specific relief that [they] seek is merely to prevent clear unauthorized and unlawful acts by Defendants," "there is no risk of pecuniary harm to Defendants in issuing [an injunction]."  Appl. at 30.  Defendants nowhere in their briefing address the issue of bond.  When pressed by the Court at argument, Defendants suggested a bond of $50,000.

The Court will impose a $50,000 bond.  This case involves the enforcement of noncompete and nonsolicitation provisions.  Because enforcement of these provisions will affect Bamberger's ability to pursue her chosen career, the Court cannot find that no realistic likelihood of harm exists.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Application (ECF No. 5).  In addition to the evidence preservation order set forth in the April 30, 2024 Order (ECF No. 7)—and pending the conclusion of the litigation in this matter—the Court **ORDERS** as follows.

1.     Except to the extent required to comply with this Order or participate in this litigation, Defendants, their officers, agents, servants, employees, attorneys, and anyone in active concert or participation with any of the above **SHALL NOT**:

a.     Engage in the direct or indirect transaction or solicitation of substantial business activities in competition with BAM in the geographic areas where BAM has engaged in any substantial phase of its business: *i.e.*, the provision of public relations and marketing representation to technology startups and venture capital brands.  The solicitation of substantial business activities includes, but is not limited

to, the direct or indirect solicitation of BAM's present and former clients and employees.

b.     Use, disclose, transfer, or access physical or electronic documents, files, or any other information-storage mechanisms containing information taken from BAM without the express permission of BAM's board, including but not limited to information contained on BIG's copy of BAM's drive.

c.     Disclose in any manner BAM's confidential information.[19]

d.     Redirect the domain <bamtheagency.com> to any other domain.

e.     Use the BAM, LLYC, or BAM by LLYC marks/names or any reproduction, counterfeit, copy, or colorable imitation of those marks/names.

f.     Communicate or imply to others that their services are associated with BAM or LLYC, including through sending invoices implying a connection.

g.     Deliver, hold for sale, share, distribute, transfer, or otherwise move, store, or dispose of in any manner any documents, communications, or other items bearing the BAM by LLYC, LLYC, or BAM marks or any reproduction, counterfeit,

---

[19] Confidential information "means all information (regardless of whether specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by [Defendants and their employees/agents], that relates to the [b]usiness, products, operations, financial condition, services, research, or development of [BAM] or any of [its] respective customers, vendors, suppliers, independent contractors, or other business relations, including: (a) internal business information (including information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, [BAM, its] respective clients and suppliers and confidential information; (c) industry research compiled by, or on behalf of, [BAM], including identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, the Company; (d) compilations of data and analyses, processes, methods, track and performance records, data and databases relating thereto; (e) personally identifiable information of [BAM's] customers; and (f) information related to the [BAM's] intellectual property and updates of any of the foregoing; provided, however, that 'Confidential Information' shall not include any information that (A) is or becomes generally known in the trade or industry or available to the public other than as a result of a breach by [Defendants]; (B) becomes available to [Defendants] on a non-confidential basis from a source other than [BAM], provided that such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, [BAM] with respect to such information; or (C) is developed by Defendants without use of or reference to the Confidential Information." RCA § 3.

copy, or colorable imitation of those marks.

2.      Within seven days of Plaintiffs' satisfaction of the conditions set forth below in item three, Defendants, their officers, agents, servants, employees, attorneys, and anyone in active concert or participation with any of the above persons **SHALL**:

       a.      Cease the operation of BIG's website at <bambybig.agency>.

       b.      Return control of the domain <bamtheagency.com> to BAM as it functioned before Defendants' redirection.

       c.      Return the contents of—and all copies of—BAM's drive into the sole control of Defendants.

3.      This preliminary injunction shall not take effect until Plaintiffs (1) file with the Clerk of the Court an undertaking in the form of a bond, certified or cashier's check, or cash in the amount of $50,000 as security for any damages that may result if Defendants are found to have been wrongfully restrained and (2) file proof of such action on this case's docket.

**IT IS SO ORDERED.**

Dated:  May 31, 2024

Hon. Janis L. Sammartino
United States District Judge

24-CV-706 JLS (DDL)